C.A. No. 25-228

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UBER TECHNOLOGIES, INC., AND PORTIER, LLC,

*Plaintiffs-Appellants*,

MAPLEBEAR INC., d/b/a INSTACART,

*Intervenor-Plaintiff*,

v.

CITY OF SEATTLE,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Western District of Washington (Seattle)
D. Ct. No. 2:24-cv-02103-MJP
The Honorable Marsha J. Pechman, District Judge

**BRIEF OF THE CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA AS *AMICUS CURIAE*
IN SUPPORT OF PLAINTIFFS-APPELLANTS**

Jonathan D. Urick
Audrey Beck
U.S. CHAMBER LITIGATION
  CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

Adam G. Unikowsky
*Counsel of Record*
Jonathan J. Marshall
JENNER & BLOCK LLP
1099 New York Avenue, NW,
  Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

## DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1(a) and 29(a)(4)(A), undersigned counsel states that *amicus curiae* The Chamber of Commerce of the United States of America (Chamber) is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation and no publicly held company has 10% or greater ownership in the Chamber.

Date: February 18, 2025

*/s/ Adam G. Unikowsky*

Adam G. Unikowsky

*Counsel of Record for Amicus Curiae The Chamber of Commerce of the United States of America*

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ..................................................... i

TABLE OF AUTHORITIES .................................................... iii

IDENTITY AND INTEREST OF *AMICUS CURIAE* ............................ 1

SUMMARY OF THE ARGUMENT ........................................... 3

ARGUMENT ...................................................................... 5

I.   The Free Speech Clause Protects A Business's Right, No Less Than An Individual's, To Be Free From Government-Compelled Speech .............................................................. 5

II.  The District Court's Analysis Improperly Disregarded The Free-Speech Implications Of The Seattle Ordinance ..................... 9

    A.   Laws Regulating The Way In Which Businesses Speak About Their Services Are Subject To First Amendment Scrutiny ................................................................. 10

    B.   The District Court's Analysis Wrongly Departed From These Basic First Amendment Principles ........................... 12

CONCLUSION ................................................................. 17

CERTIFICATE OF COMPLIANCE ......................................... 18

CERTIFICATE OF SERVICE ............................................... 19

# TABLE OF AUTHORITIES

CASES

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) .................................. 5

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) .................. 9

*Coyote Publishing, Inc. v. Miller*, 598 F.3d 592
(9th Cir. 2010).................................................................................... 9

*Expressions Hair Design v. Schneiderman*, 581 U.S. 37
(2017) ...................................................................................... 10–11

*First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) ........... 5

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949)................ 11

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of
Boston*, 515 U.S. 557 (1995) ........................................................... 6

*McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995)............. 5

*National Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263
(9th Cir. 2023)................................................................................... 6

*National Institute of Family & Life Advocates v. Becerra*,
585 U.S. 755 (2018) ................................................................... 8, 14

*NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024) ....... 9, 13, 16

*Pacific Gas & Electric Co. v. Public Utilities Commission of
California*, 475 U.S. 1 (1986) ..................................................... 5, 7

*Riley v. National Federation of the Blind of North Carolina,
Inc.*, 487 U.S. 781 (1988) ................................................................ 6

*Rumsfeld v. Forum for Academic & Institutional
Rights, Inc.*, 547 U.S. 47 (2006) ......................................... 11, 15–16

iii

*San Francisco Apartment Ass'n v. City & County of San Francisco*, 881 F.3d 1169 (9th Cir. 2018) ................................ 11–12

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ................................... 8

*Wooley v. Maynard*, 430 U.S. 705 (1977) ............................................ 7

*X Corp. v. Bonta*, 116 F.4th 888 (9th Cir. 2024) ................................. 8

**STATUTES**

Seattle, Wash., Mun. Code § 8.40.050(A)(1) ...................................... 12

Seattle, Wash., Mun. Code § 8.40.070 ............................................... 13

**RULES**

Fed. R. App. P. 29(a)(4)(E) ...................................................................... 1

**OTHER AUTHORITIES**

Brief of *Amici Curiae* The Chamber of Commerce of the United States of America et al. in Support of Appellee & Affirmance, *Healy v. Milliman, Inc.*, No. 24-3327 (9th Cir.), ECF No. 39.1 (Dec. 20, 2024) .................................... 1

Brief of The Chamber of Commerce of the United States of America as *Amicus Curiae* in Support of Defendants-Appellants, *Pandolfi v. AviaGames, Inc.*, No. 24-5817 (9th Cir.), ECF No. 22.1 (Jan. 22, 2025) ........................................... 1

Brief of The Chamber of Commerce of the United States of America as *Amicus Curiae* Supporting Plaintiff-Appellee, *Pharmaceutical Research & Manufacturers of America v. Stolfi*, No. 24-1570 (9th Cir.), ECF No. 36.1 (Sept. 11, 2024) .................................................................. 2

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* The Chamber of Commerce of the United States of America (Chamber) is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files briefs as *amicus curiae* in cases, like this one, that raise issues of concern to the Nation's business community—including many in this Court. *See, e.g.*, Brief of The ~~Chamber of Commerce of the United States of America~~ as *Amicus Curiae* in Support of Defendants-Appellants, *Pandolfi v. AviaGames, Inc.*, No. 24-5817 (9th Cir.), ECF No. 22.1 (Jan. 22, 2025); Brief of *Amici Curiae* The Chamber of Commerce of the United States of

---

[1] All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* states that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and that no person or entity other than *amicus*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

America et al. in Support of Appellee & Affirmance, *Healy v. Milliman, Inc.*, No. 24-3327 (9th Cir.), ECF No. 39.1 (Dec. 20, 2024); Brief of The Chamber of Commerce of the United States of America as *Amicus Curiae* Supporting Plaintiff-Appellee, *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, No. 24-1570 (9th Cir.), ECF No. 36.1 (Sept. 11, 2024).

The Chamber has a strong interest in this case, which implicates businesses' rights under the First Amendment to be free from government intrusion on their speech. The Chamber is concerned about the implications of the ruling below, in which the district court held that the Free Speech Clause plays no role in analyzing the validity of a law that compels businesses to speak in the way that the government dictates rather than permit them to craft their own messages. If the district court's analysis were to be adopted by this Court, States and local jurisdictions throughout this Circuit will be empowered to intrude on businesses' free-speech rights in the guise of purportedly regulating *conduct*. But well-established First Amendment principles leave no doubt: that a business operates in a commercial sphere does not mean it forfeits its constitutional rights, even when it comes to speech regarding commercial activity. And a speech-compelling law's regulation of conduct does not

2

necessarily render its speech implications immune from the Free Speech Clause.

The Chamber therefore urges this Court to adhere to the precedent of the Supreme Court and this Court that applies First Amendment scrutiny to laws compelling speech by commercial entities. Under this precedent, the district court's analysis cannot stand.

## SUMMARY OF THE ARGUMENT

I. It has long been established that businesses, like individuals, are protected by the Free Speech Clause. That means businesses, like individuals, are protected against laws that seek to compel speech—*i.e.*, to put the government's preferred message in private speakers' mouths.

It may be tempting for legislatures to impinge businesses' free-speech rights in the guise of regulating commercial conduct. Courts therefore must be vigilant in policing the First Amendment rights of businesses. Businesses play a special role in the marketplace of ideas that the Free Speech Clause protects. The doctrine of the Supreme Court and this Court recognizes that role by consistently applying First Amendment scrutiny to laws that restrict or compel businesses' speech.

II.   In particular, laws that *compel* businesses to speak are consistently subjected to First Amendment scrutiny.  And critically here, it has not mattered whether the compelled speech is about a controversial topic or more mundane issues relating to commercial activity.  The throughline of free-speech doctrine in this country is that the First Amendment—and some form of means-end scrutiny—applies *whenever* a law facially compels speech.

The district court's analysis below was not sensitive to these core First Amendment principles.  In the district court's view, Seattle's Ordinance—which compels businesses like Uber and Instacart to announce policies and make disclosures of the City's choosing—is nothing more than a regulation of *conduct* with a mere incidental burden on speech.  That is wrong.  The Ordinance regulates conduct, to be sure, but it also facially compels businesses to speak.  First Amendment scrutiny is therefore warranted.  The City cannot avoid the constitutional implications of its compelled-speech regime by simply packaging rules offensive to the First Amendment with rules governing conduct.

This Court should reverse the judgment below.

# ARGUMENT

## I. The Free Speech Clause Protects A Business's Right, No Less Than An Individual's, To Be Free From Government-Compelled Speech.

It is black-letter law that the First Amendment protects the right of businesses to speak freely just as it protects the right of individuals to do so. *See First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 777 (1978). That is because "[c]orporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (*PG&E*) (plurality opinion) (quoting *Bellotti*, 435 U.S. at 783). And the "inherent worth" of speech—what the Free Speech Clause is designed to defend—"does not depend upon the identity of its source, whether corporation, association, union, or individual." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 353 (1995) (quoting *Bellotti*, 435 U.S. at 777); *see 303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023).

Indeed, businesses' speech contributes to the marketplace of ideas in a variety of ways, and businesses have a distinct viewpoint to offer on a wide array of topics. For instance, businesses can offer valuable factual

5

information and opinions on new products, technologies, and services. They can provide unique insight into the advantages and disadvantages of current or proposed economic regulations and policy. And they are particularly well situated and motivated to advocate for how new laws, changes in policy, and competing political candidates will affect U.S. economic growth.

An integral aspect of businesses' free-speech protection under the First Amendment is their right to be free from government compulsion to speak a particular message. After all, "in the context of protected speech, the First Amendment's guarantee … makes no distinction of 'constitutional significance' 'between compelled speech and compelled silence.'" *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1275 (9th Cir. 2023) (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988)). And that guarantee "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley v. Ir.-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). Like individuals, businesses presumptively enjoy the right to control the content of their speech—and to avoid being the mouthpiece for the government's preferred messages—

6

even when it comes to speech about commercial activities. *See PG&E*, 475 U.S. at 16 (plurality opinion) ("For corporations as for individuals, the choice to speak includes within it the choice of what not to say.").

It may be easy for courts and legislative bodies to discount these well-established principles given that the government subjects businesses to a wealth of regulations. Rules that intrude on businesses' freedom of speech—whether by restricting speech or compelling businesses to speak in a particular way—can often be smuggled in alongside regulations of businesses' conduct.

In fact, because businesses play such an important role in our Nation's marketplace of ideas, those in power may have strong incentives to stifle businesses' speech or coopt their voice. Legislative bodies may find it particularly tempting to use their (sometimes legitimate) power to regulate certain conduct by businesses to (illegitimately) turn businesses into mouthpieces for the government's preferred messages. Such efforts are problematic for two reasons. First, regardless of the speaker affected, compelled speech is always a serious impingement on "the right of freedom of thought protected by the First Amendment." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). And additionally, using public-facing

businesses as a megaphone for projecting the government's preferred messages allows the government to ensure a message's wide distribution without accepting political accountability. Governments and government officials are perfectly capable of promoting their views through their own pulpits. It serves no purpose—to the contrary, it offends First Amendment values—for governments and their officials to avoid accountability by dragooning businesses into purveying public officials' views as if they were the businesses' own. Accordingly, courts must vigilantly police the line between legitimate regulation of businesses and their conduct, on the one hand, and illegitimate efforts to impede the full exercise of First Amendment rights, on the other.

In light of the special importance and unique dangers relating to speech by businesses, the Supreme Court and this Court have consistently applied First Amendment scrutiny when the government compels disclosures by businesses, regardless whether those disclosures are of uncontroversial commercial fact or of political messages wont to engender controversy. *See, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766–67 (2018) (*NIFLA*); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563–66 (2011); *X Corp. v. Bonta*, 116 F.4th 888, 899–901 (9th Cir.

8

2024); *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1119–20 (9th Cir. 2024); *Coyote Publ'g, Inc. v. Miller*, 598 F.3d 592, 599–600 (9th Cir. 2010). Just as clear is that the power to regulate (or prohibit) certain commercial activity does not imply a power to regulate the way a business speaks about that activity. *See, e.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 512 (1996) (plurality opinion); *NetChoice*, 113 F.4th at 1117.

These consistent throughlines of First Amendment case law must be the starting point of the analysis here.

## II. The District Court's Analysis Improperly Disregarded The Free-Speech Implications Of The Seattle Ordinance.

In case after case, the Supreme Court and this Court have recognized that the Free Speech Clause offers protection against compelled disclosures, even in the context of commercial activities. The district court, however, concluded that the effects of Seattle's Ordinance on Uber's and Instacart's speech could be disregarded as merely incidental burdens of a rule governing conduct. The court therefore applied *no* First Amendment scrutiny whatsoever. That conclusion cannot be squared with well-established principles of free-speech doctrine.

9

### A. Laws Regulating The Way In Which Businesses Speak About Their Services Are Subject To First Amendment Scrutiny.

It is beyond dispute that laws compelling businesses to speak about their operations are subject to First Amendment scrutiny, just as is the case with laws regulating the political speech of private individuals. Both the Supreme Court and this Court routinely apply the Free Speech Clause to rules compelling businesses to speak, even when the compelled statements relate to the businesses' economic activity.

Consider *Expressions Hair Design v. Schneiderman*, 581 U.S. 37 (2017). The New York law at issue prohibited retailers from imposing a "surcharge" for customers who use credit cards, though it permitted retailers to offer a "discount" for those paying with cash. *Id.* at 39–40. At first glance, this law might appear to be nothing more than a price regulation—*i.e.*, a regulation of conduct rather than speech. So the Second Circuit held. *Id.* at 43.

The Supreme Court, however, disagreed. The Court observed that a law requiring a particular price for a particular item ("for example, a law requiring all New York delis to charge $10 for their sandwiches") would be a regulation of conduct beyond the concern of the First

Amendment; even though it would require retailers to list the government's specified price, that would be merely "incidental to [the law's] primary effect on conduct." *Expressions Hair Design*, 581 U.S. at 47; *see Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006) (*FAIR*) ("[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949))). But the New York law differed because it "regulate[d] … *how* sellers may communicate their prices." *Expressions Hair Design*, 581 U.S. at 47 (emphasis added). In other words, the law—though it certainly regulated conduct—*also* regulated speech, and thus implicated the First Amendment, because it regulated not just prices but the "communication of prices." *Id*. at 48.

Consider as well this Court's decision in *San Francisco Apartment Ass'n v. City & County of San Francisco*, 881 F.3d 1169 (9th Cir. 2018). That case concerned a San Francisco ordinance regulating landlords' negotiation of lease-buyout agreements with their tenants. *Id*. at 1173. The landlords argued that the regulation compelled speech by requiring

11

certain disclosures to tenants before commencing buyout negotiations, such as the fact that under the ordinance, tenants had certain rights in the negotiations. *Id.* at 1174, 1176. No one argued that San Francisco lacked power to grant tenants those rights, just as no one argues in these appeals that Seattle lacks power to give couriers certain rights against deactivation. But by requiring regulated parties to *make disclosures about those rights*, the ordinance implicated the First Amendment, and this Court proceeded to analyze it accordingly. *See id.* at 1176–78.

In short, regulations of businesses' conduct are often constitutionally permissible. But when those regulations also compel the business to speak in a particular way, the First Amendment comes into play.

## B. The District Court's Analysis Wrongly Departed From These Basic First Amendment Principles.

Under these principles, it is straightforward that First Amendment scrutiny is warranted in this case. The Ordinance goes well beyond simply regulating deactivations—it affirmatively compels speech in several ways. The Ordinance requires businesses like Uber and Instacart to develop and disclose written policies relating to deactivation. Seattle, Wash., Mun. Code § 8.40.050(A)(1). It also requires those businesses, before deactivating a courier, to provide detailed information and records

regarding the reasons for deactivation and any incidents leading to the deactivation decision. *See id.* § 8.40.070. By not simply regulating deactivation but compelling *disclosures* relating to deactivation, the Ordinance implicates the First Amendment's free-speech guarantee. *See NetChoice*, 113 F.4th at 1117 ("It is … well-established that the forced disclosure of information, even purely commercial information, triggers First Amendment scrutiny.").

The district court's contrary conclusion—that the Ordinance is merely a regulation of conduct and thus the First Amendment does not apply at all—is untenable. The court's analysis betrays a serious misunderstanding of First Amendment principles.

The district court began its analysis by stating that "the Ordinance's requirements do little more than regulate conduct without any significant impact on speech or expression." Order 7.[2] The court appeared to rely on the premise that First Amendment scrutiny applies to a law regulating conduct only if that conduct is expressive or if the law was enacted for the specific purpose of targeting expression. Order 6–7.

---

[2] The district court's order denying preliminary relief appears at pages 3 to 18 of the Excerpts of Record in No. 25-228, ECF No. 12.2, and at pages 2 to 17 of the Excerpts of Record in No. 25-231, ECF No. 7.2.

That premise is erroneous. Here, the Ordinance facially compels Uber and Instacart to speak, so it is simply irrelevant whether its enactment was principally motivated by a desire to protect workers or by a desire to "regulate speech or expressive conduct." Order 7. Laws compelling speech *always* trigger First Amendment scrutiny, and the district court was wrong to overlook this basic principle of constitutional law.

The district court next rejected Uber's analogy to the regulation at issue in *NIFLA*, which applied strict scrutiny to a California law requiring certain clinics engaged in pregnancy-related advocacy to make disclosures about state-sponsored reproductive care. 585 U.S. at 761–63, 766–67. The court believed that this case is not like *NIFLA* because, under the Ordinance here, "Uber is not required to make any affirmative statement with which it may disagree." Order 9. Again, this is irrelevant under well-established First Amendment principles. The Free Speech Clause does not only protect against being forced to utter controversial statements with which the speaker disagrees. As explained above, the First Amendment plays a role whenever speech is compelled, whether the compelled speaker is a business speaking about economic information

14

or an activist speaking about political issues. The district court was wrong to so quickly jettison the First Amendment's protections.

Finally, the district court analogized the Ordinance to the law at issue in *FAIR*, 547 U.S. 47. *FAIR* involved a federal law requiring law schools (and other institutions of higher education) to provide military recruiters with access equal to that granted other recruiters, on pain of forfeiting federal funding. *Id.* at 51–52. The Supreme Court rejected a free-speech challenge to the law, holding that the law governed conduct with only an incidental burden on the law schools' speech. *See id.* at 60–65.

Invoking *FAIR*, the district court observed that the fact "[t]hat a law prohibits employers from engaging in particular conduct, such as racial discrimination, 'hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct.'" Op. 10 (quoting *FAIR*, 547 U.S. at 62). In the district court's view, the Ordinance here "regulates conduct—the grounds on which an 'app worker' may be terminated—and any speech-related impacts are minimal and similarly incidental to those at issue in [*FAIR*]." *Id.*

15

This analogy is flawed. First Amendment scrutiny was unwarranted in *FAIR* because the challenged law "d[id] not dictate the content of the [schools'] speech at all." 547 U.S. at 62. The law required only that schools provide access to military recruiters; any associated speech derivative of that requirement was plainly incidental to the law's requirements. By contrast, the Ordinance here *facially requires regulated businesses to speak a specific message.* This case is thus a far cry from *FAIR*, and it instead fits squarely within the Supreme Court's and this Court's cases applying First Amendment scrutiny to laws compelling businesses to disclose information they would prefer to keep close to the vest. This Court may not "ignore that the [Ordinance] compels speech simply because other parts of [it] may primarily or exclusively regulate non-expressive conduct." *NetChoice*, 113 F.4th at 1117. Put otherwise, Seattle "cannot insulate a specific provision of law from a … challenge under the First Amendment by bundling it with other, separate provisions that do not implicate the First Amendment." *Id.*

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

Date: February 18, 2025

*/s/ Adam G. Unikowsky*

Adam G. Unikowsky
  *Counsel of Record*
Jonathan J. Marshall
JENNER & BLOCK LLP
1099 New York Avenue, NW,
  Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

Jonathan D. Urick
Audrey Beck
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

*Counsel for Amicus Curiae*
  *The Chamber of Commerce of the*
  *United States of America*

17

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)**  25-228

    I am the attorney or self-represented party.

    **This brief contains 3,159 words,** excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

    I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[**X**] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[  ] it is a joint brief submitted by separately represented parties.

[  ] a party or parties are filing a single brief in response to multiple briefs.

[  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Adam G. Unikowsky*    **Date** February 18, 2025

18

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the ACMS system.

I further certify that all participants in the case are registered ACMS users and that service will be effected through the ACMS system.

Date: February 18, 2025         */s/ Adam G. Unikowsky*
                                Adam G. Unikowsky

                                *Counsel of Record for Amicus
                                Curiae The Chamber of Commerce
                                of the United States of America*