No. 25-228

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UBER TECHNOLOGIES, INC. AND PORTIER, LLC,

*Plaintiffs-Appellants*,

and

MAPLEBEAR INC. D/B/A INSTACART,

*Intervenor-Plaintiff,*

v.

CITY OF SEATTLE,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Western District of Washington
No. 2:24-cv-02103-MJP
Hon. Marsha J. Pechman

**OPENING BRIEF OF PLAINTIFFS-APPELLANTS
UBER TECHNOLOGIES, INC. AND PORTIER, LLC**

Neema Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067
(424) 332-4800

Robert J. Maguire
Theo A. Lesczynski
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
(206) 757-8094

Stacey K. Grigsby
David M. Zionts
Neha Jaganathan
Alexander J. Cave
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Attorneys for Plaintiffs-Appellants Uber Technologies, Inc. and Portier, LLC*

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants Uber Technologies, Inc. and Portier, LLC (together, "Uber"), by their undersigned counsel, state that Uber Technologies, Inc. is a publicly held corporation with no parent company. Based solely on SEC filings regarding beneficial ownership of Uber Technologies, Inc.'s stock, Uber Technologies Inc. is unaware of any shareholder who beneficially owns ten percent or more of Uber Technologies, Inc.'s outstanding stock. Portier, LLC is a wholly-owned subsidiary of Uber Technologies, Inc.

Date: February 11, 2025

/s/ David M. Zionts
David M. Zionts
*Attorney for Plaintiffs-Appellants*
*Uber Technologies, Inc. and*
*Portier, LLC*

i

## TABLE OF CONTENTS

DISCLOSURE STATEMENT ........................................................... i

TABLE OF CONTENTS ............................................................. ii

TABLE OF AUTHORITIES.......................................................... iv

INTRODUCTION .................................................................. 1

JURISDICTIONAL STATEMENT ..................................................... 4

RELEVANT CONSTITUTIONAL AND STATUTORY PROVISIONS................ 4

ISSUES PRESENTED............................................................... 4

STATEMENT OF THE CASE........................................................ 5

    A.   The Ordinance ....................................................... 5

    B.   Uber's Beliefs About Deactivations .................................. 9

    C.   The Ordinance's Effect on Uber's Deactivation Policy ..................... 12

    D.   Proceedings Below .................................................. 14

SUMMARY OF THE ARGUMENT ..................................................... 15

STANDARD OF REVIEW ........................................................... 18

ARGUMENT ..................................................................... 19

I.   Uber Is Likely to Succeed on the Merits of its Claim that the Ordinance Violates the First Amendment..................................... 19

    A.   The Ordinance Is Subject to First Amendment Scrutiny................... 19

        1.   The Ordinance regulates speech by compelling Uber to announce a written deactivation policy, limiting what Uber may say in its written policy, and ordering Uber to make written statements about individual deactivations. ........ 19

        2.   The district court erred in concluding that the Ordinance regulates only conduct. .......................................... 23

|   |   | a) | Key provisions of the Ordinance regulate Uber's speech directly. ............................................... 23 |

|   |   | b) | First Amendment scrutiny is not limited to laws compelling express endorsement of government views. .............................................................. 29 |

|   |   | c) | The district court's reasoning would allow governments free rein to target speech under the guise of regulating conduct alone. ................................ 32 |

B. The Ordinance Does Not Survive First Amendment Scrutiny. .......... 36

    1. The Ordinance dictates the content of Uber's speech and is thus subject to strict scrutiny. ................................ 36

    2. Lesser scrutiny applicable to regulation of "commercial speech" does not apply. .......................................... 43

    3. Because the City could have achieved its ends without burdening nearly as much speech, the Ordinance cannot survive any form of heightened scrutiny. ................................. 47

II. Uber Is Likely to Succeed on the Merits of its Claim that the Ordinance Is Unconstitutionally Vague. ...................................... 50

III. Uber Is Likely to Show that the Entire Ordinance Is Invalid. ...................... 55

IV. A Preliminary Injunction Is Warranted. ........................................ 58

    A. Irreparable Harm ................................................................ 58

    B. Balance of Equities and Public Interest ............................. 60

CONCLUSION ................................................................................ 62

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
  570 U.S. 205 (2013) ...................................................................20, 21

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles,*
  559 F.3d 1046 (9th Cir. 2009) ..............................................60

*Anderson v. City of Hermosa Beach,*
  621 F.3d 1051 (9th Cir. 2010) ..............................................28

*Ariix, LLC v. NutriSearch Corp.,*
  985 F.3d 1107 (9th Cir. 2021) ..............................................45

*Baird v. Bonta,*
  81 F.4th 1036 (9th Cir. 2023) ........................................58, 60

*Bartnicki v. Vopper,*
  532 U.S. 514 (2001)...............................................................20

*Belle Maer Harbor v. Charter Twp. of Harrison,*
  170 F.3d 553 (6th Cir. 1999) ................................................52

*Bolger v. Youngs Drug Prods. Corp.,*
  463 U.S. 60 (1983)..................................................................44

*Butcher v. Knudsen,*
  38 F.4th 1163 (9th Cir. 2022) ........................................50, 51

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
  447 U.S. 557 (1980)................................................................44

*City of Lakewood v. Plain Dealer Publ'g Co.,*
  486 U.S. 750 (1988)................................................................55

*CTIA - The Wireless Ass'n v. City of Berkeley,*
  928 F.3d 832 (9th Cir. 2019) ................................................45

*Doe v. Harris,*
  772 F.3d 563 (9th Cir. 2014) ................................................18

iv

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) ....................................................18, 60

*Elrod v. Burns*,
  427 U.S. 347 (1976) ...........................................................................59

*Expressions Hair Design v. Schneiderman*,
  581 U.S. 37 (2017) ....................................................................*passim*

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012) .....................................................................50, 51

*First Resort, Inc. v. Herrera*,
  860 F.3d 1263 (9th Cir. 2017) ...........................................................52

*Giboney v. Empire Storage & Ice Co.*,
  336 U.S. 490 (1949) ...........................................................................26

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) .....................................................................50, 55

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013) ...........................................................59

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ...............................................................................48

*HomeAway.com, Inc. v. City of Santa Monica*,
  918 F.3d 676 (9th Cir. 2019) .............................................................25

*IMDb.com Inc. v. Becerra*,
  962 F.3d 1111 (9th Cir. 2020) ...........................................................44

*Johnson v. United States*,
  576 U.S. 591 (2015) .....................................................................53, 55

*Junior Sports Mags. Inc. v. Bonta*,
  80 F.4th 1109 (9th Cir. 2023) ............................................................47

*League of Women Voters of Washington v. State*,
  184 Wash.2d 393 (Wash. 2015), *as amended on denial of
  reconsideration* (Nov. 19, 2015) .......................................................56

v

*Leonard v. City of Spokane*,
127 Wash.2d 194 (Wash. 1995) ...................................................56, 58

*Masonry Bldg. Owners of Oregon v. Wheeler*,
394 F.Supp.3d 1279 (D. Or. 2019) ...................................................45

*McCullen v. Coakley*,
573 U.S. 464 (2014)...................................................47, 50

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)...................................................33

*Nat'l Ass'n of Wheat Growers v. Bonta*,
85 F.4th 1263 (9th Cir. 2023) ...................................................45, 46, 47

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018)...................................................41, 47

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) ...................................................*passim*

*New York v. United States*,
505 U.S. 144 (1992)...................................................33

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*,
475 U.S. 1 (1986)...................................................31

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)...................................................37, 43, 47

*Reno v. ACLU*,
521 U.S. 844 (1997)...................................................51

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006)...................................................24, 26, 27

*San Francisco Apartment Ass'n v. City & Cnty. of San Francisco*,
881 F.3d 1169 (9th Cir. 2018) ...................................................45

*Sorrell v. IMS Health, Inc.*,
564 U.S. 552 (2011)...................................................20, 26

vi

*Texas v. Johnson*,
   491 U.S. 397 (1989)................................................................27, 28

*Trustees of Indiana Univ. v. Curry*,
   918 F.3d 537 (7th Cir. 2019) ...............................................52

*Twitter, Inc. v. Garland*,
   61 F.4th 686 (9th Cir. 2023) ................................................22

*Vidal v. Elster*,
   602 U.S. 286 (2024)...............................................................38

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
   455 U.S. 489 (1982)...............................................................51

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989).........................................................48, 50

*Williams-Yulee v. Fla. Bar*,
   575 U.S. 433 (2015)...............................................................47

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)...................................................................18

*X Corp. v. Bonta*,
   116 F.4th 888 (9th Cir. 2024) ......................................*passim*

*Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*,
   471 U.S. 626 (1985)....................................................21, 30, 45

## Statutes

28 U.S.C. §1292(a)(1)..................................................................4

28 U.S.C. §1331 ...........................................................................4

42 U.S.C. §2000e–2(a)(1) ..........................................................48

App-Based Worker Deactivation Rights Ordinance,
   Seattle, Wash., Ordinance 126878 (Aug. 14, 2023) (codified in part
   at Seattle Mun. Code, ch. 8.40 and §3.02.125)..........................*passim*

**Other Authorities**

*Seattle City Council Passes First-In-The-Nation Law Protecting App-Based Workers from Unreasonable Deactivations*, Seattle City Council Blog (Aug. 8, 2023), https://council.seattle.gov/2023/08/08/seattle-city-council-passes-first-in-the-nation-law-protecting-app-based-workers-from-unreasonable-deactivations/ ................................................................5

# INTRODUCTION

This Court, just last year, could not have been clearer about the reach of the First Amendment: "the forced disclosure of information … triggers First Amendment scrutiny." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1117 (9th Cir. 2024). The City of Seattle has steered directly into these perilous constitutional waters. It enacted a law that requires Uber (and companies like it) to write and communicate policies on a particular, sensitive subject. But even though the law acknowledges the policy is Uber's own, it does not allow Uber to write whatever it believes. Uber must instead write a policy the City finds "reasonable," and in it, Uber may not say several purportedly unreasonable things. The City will penalize Uber if its written policy is not up to snuff—totally separate from any conduct. This is speech regulation, clear as it comes.

The context for this speech regulation is a set of hotly debated issues of public concern. Uber operates platforms—including, as relevant here, Uber Eats, a platform facilitating on-demand deliveries of food and goods—that connect people seeking services to those who want to provide them. On rare occasions, companies operating these platforms need to deactivate a courier's account, restricting the courier's access to the platform. Uber does so only as a last resort, based on robust policies tailored to its platform and consistent with its experience and beliefs. Uber has every incentive to keep access to its platform available to as many couriers as

1

possible, and it recognizes that platform access is often an essential source of income for couriers.  But Uber is also committed to ensuring safety, quality, reliability, and privacy for all users, including the consumers who use the platform to arrange delivery services.  How to balance these considerations is a matter of public debate, and Uber works hard to strike the right balance.

The City has charged into this debate with what it acknowledges is a first-of-its-kind law.  *See* App-Based Worker Deactivation Rights Ordinance, Seattle, Wash., Ordinance 126878 (Aug. 14, 2023) (codified in part at Seattle Mun. Code (SMC), ch. 8.40 and §3.02.125).  But it opted not to directly regulate deactivations of couriers' accounts.  Instead, the City has separately and directly targeted each "network company's written deactivation policy"—that is, its speech.

The City is entitled to its views.  It is entitled to think that couriers who regularly disappoint consumers should have continued access to the platform.  It is entitled to think that couriers who get in collision after collision should stay on the roads making deliveries.  And it is entitled to think that when someone complains of abuse or assault by a courier, the courier should be given specific records about the complainant, even though this approach endangers victims and chills reporting.

The City might even be able to legislate on these views.  It might, for instance, have tried to impose standards directly governing Uber's deactivation decisions.  Of course, doing so would have been fraught—these are hard decisions, and if the City's

balance caused longer delivery times and more frequent safety incidents, Seattleites would know exactly who to blame.  What the City cannot do, however, is offload responsibility to Uber and order it to serve as a mouthpiece for the City's views.

The district court refused to enjoin this unprecedented law for one central reason: it thought the City regulated no speech at all, only the conduct of deactivations.  That was seriously mistaken.  It disregards the text of the Ordinance, which squarely compels Uber to adopt a written policy and dictates what that policy may say, wholly independent from the conduct of any deactivation.  It flouts First Amendment precedent, including two cases this Court decided just last year.  And it has deeply troubling implications, empowering governments to intervene in public debates not by directly regulating conduct, but by ordering private parties to spout the party line.

Once the district court's foundational legal error is corrected, the rest of the analysis is straightforward.  The City's content-based regulation of Uber's speech triggers strict scrutiny.  It cannot survive *any* form of meaningful First Amendment scrutiny.  And as the district court correctly recognized, the other injunction factors rise and fall with Uber's likelihood of success on the merits.  This Court should reverse with instructions to enter a preliminary injunction.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §1331 because Plaintiffs-Appellants claim that a Seattle ordinance violates the U.S. Constitution.  On December 31, 2024, the district court entered an order denying both a temporary restraining order and a preliminary injunction.  ER-3-18. Plaintiffs-Appellants timely appealed on January 13, 2025.  ER-158-59.  This Court therefore has jurisdiction under 28 U.S.C. §1292(a)(1).

## RELEVANT CONSTITUTIONAL AND STATUTORY PROVISIONS

Relevant provisions are reproduced in the Addendum to this brief.

## ISSUES PRESENTED

1.      Whether the Ordinance's requirements that Uber adopt its own written policy concerning a sensitive matter, conform its written policy to the City's specifications, and make specific statements and disclose specific records, likely violate the First Amendment.

2.      Whether the Ordinance's requirement that Uber's written policy be "reasonable" likely violates the Fourteenth Amendment as unconstitutionally vague, given that the only guidance the Ordinance provides on what constitutes a "reasonable" policy is a list including counterintuitive examples.

3.      Whether the remainder of the Ordinance is likely non-severable from its unconstitutional provisions.

4.      Whether the Ordinance should be preliminarily enjoined.

4

## STATEMENT OF THE CASE

### A.    The Ordinance

Every day, app-based platforms like Uber connect consumers seeking delivery and other services with individuals providing those services. Occasionally, platforms must take the serious step of "deactivating" the account of a courier or other service provider. That may be necessary, for example, when there is good reason to believe that a courier presents a safety threat, has consistently fallen well below consumers' expectations, or has engaged in fraud.

The City of Seattle boasts that it is the first government in the Nation to enact regulation concerning deactivations of courier accounts on app-based platforms.[1] In 2023, Seattle adopted the App-Based Worker Deactivation Rights Ordinance. Seattle, Wash., Ordinance 126878 (Aug. 14, 2023) (codified in part at Seattle Mun. Code (SMC), ch. 8.40 and §3.02.125). The Ordinance applies to Uber and other "network companies" that "facilitate work by 250 or more app-based workers worldwide." SMC §8.40.040(A).[2] But it does not directly regulate deactivation decisions. Instead, its overriding focus is on companies' *policies* concerning such deactivations. Through a series of provisions, the Ordinance compels network

---

[1] *See Seattle City Council Passes First-In-The-Nation Law Protecting App-Based Workers from Unreasonable Deactivations*, Seattle City Council Blog (Aug. 8, 2023), https://council.seattle.gov/2023/08/08/seattle-city-council-passes-first-in-the-nation-law-protecting-app-based-workers-from-unreasonable-deactivations/.

[2] Drivers providing ride-sharing services are not covered. SMC §8.40.020.

5

companies to adopt such policies; limits what those policies may say; prohibits companies from deactivating accounts except as consistent with the policies the Ordinance requires them to adopt; and forces them to explain and substantiate how individual deactivations are consistent with those policies.

***Deactivation policy requirement***, SMC §8.40.050.  A keystone provision of the Ordinance is its deactivation policy requirement.  It compels a covered network company, before it may deactivate a courier's account, to inform the courier "in writing of the network company's deactivation policy, defining what constitutes a violation that may result in deactivation." *Id.* §8.40.050(A)(1).  Thus, if a company expects to ever need to deactivate a courier's account, it must create and announce a policy, in its own name, describing grounds for deactivation.  But while that policy is unmistakably "the network company's deactivation policy," *id.*, it must meet a series of City-prescribed requirements.  The policy "must be specific enough for an app-based worker to understand what constitutes a violation and how to avoid violating the policy." *Id.*  And it must be a "[r]easonable policy," in that it must be "reasonably related to the network company's safe and efficient operations." *Id.* §8.40.050(A)(2).

The Ordinance does not define what "reasonable" or "reasonably related" mean.  Instead, it lists "[e]xamples of policies" that are "not reasonably related" to "safe and efficient operations," while stressing that unreasonable policies "are not

6

limited to" these "[e]xamples." *Id.* The examples include "any policy that would result in deactivation based solely on a quantitative metric derived from aggregate customer ratings of an app-based worker's performance," and "any policy that would deactivate a worker based on the results of a background check, consumer report, driver record, or record of traffic infractions, except in cases of egregious misconduct or where required by other applicable law." *Id.* §§8.40.050(A)(2)(e), (h).

*Prohibition on deactivations inconsistent with required deactivation policies*, **SMC §8.40.060.** A separate provision prohibits covered network companies from "subject[ing] an app-based worker to unwarranted deactivation." *Id.* §8.40.060(A). An "unwarranted deactivation" is "a deactivation that does not comply with Section 8.40.050"—that is, the deactivation policy requirement. *Id.* §8.40.020. In other words, the Ordinance defines an "unwarranted deactivation" as one not grounded in a deactivation policy that the City finds "reasonable."

*Explanation and substantiation requirements*, **SMC §§8.40.070, 8.40.080.** The Ordinance also mandates that companies provide written explanations and disclose certain information in the context of individual deactivation decisions. Companies must provide a "notice of deactivation" that includes a "written statement" disclosing a wide range of information, such as "[t]he reasons for deactivation"; the "policy that was violated"; and "the specific incident or pattern of

7

incidents that violated the deactivation policy." *Id.* §§ 8.40.070(A), (A)(1). The written statement must identify "[a]ny and all records relied upon to substantiate deactivation," *id.* §8.40.070(A)(3), and those records must be disclosed, too, *id.* §8.40.080(A). Except in defined cases of "egregious misconduct," deactivation may not take effect until 14 days after the required written explanation is provided. *Id.* §§8.40.070(A), (C).

The Ordinance took effect on January 1, 2025. Ordinance §5. The City's Office of Labor Services ("OLS") is charged with enforcing it, including by imposing significant penalties. SMC §§8.40.125-8.40.170. Currently, OLS may enforce some of the Ordinance's requirements, including if a company fails to communicate a reasonable deactivation policy as required. *See id.* §§ 8.40.130(A)-(B) (delayed enforcement authority over specified provisions, not including §8.40.050(A)(1) (deactivation policy requirement) or §8.40.050(A)(2) (reasonableness requirement)). Beginning on June 1, 2027, OLS may enforce the remaining provisions, including Section 8.40.060's prohibition on "unwarranted" deactivations. *See id.* As of January 1, 2025, all provisions are enforceable by private right of action. *Id.* §8.40.230.

OLS is responsible for making rules to implement the Ordinance, *see, e.g.*, *id.* §8.40.125, but its rulemaking process has been beset by delay, *see generally* ER-56-98. Despite repeated requests for clarity and guidance on the Ordinance's standards

and requirements, OLS declined to finalize any rules before the Ordinance took effect. ER-59.

### B. Uber's Beliefs About Deactivations

Uber is a technology company that operates a platform connecting people seeking ride and delivery services to third-party drivers and couriers who seek to provide them. ER-100. For delivery services, the platform also connects couriers with merchants, who are seeking delivery services for their goods. *Id.* Uber's widely-used platform allows millions of people around the globe to hail rides within minutes and, relevant here, to use Uber Eats to order food, beverages, and other goods for delivery on demand. *Id.* And it provides millions of drivers and couriers with the opportunity to earn income by providing those services, and a wide range of merchants with an additional market opportunity. *Id.*

Because person-to-person connections are the lifeblood of this business—and because making those connections requires drivers and couriers to transport people and goods, often to or from their homes and workplaces—Uber is committed to "'stand[ing] for safety' by making 'Uber safer for everyone using [its] platform.'" ER-115 (citation omitted). Uber furthers that commitment through numerous measures, such as publishing industry-leading safety reports, hosting an annual event focused on its latest safety innovations, seeking feedback from an external Safety Advisory Board of leading experts and stakeholders, and requiring routine

9

background checks of drivers and couriers. ER-116-18. Likewise, "Uber is committed to earning and keeping the trust of couriers and consumers who use its platform by protecting their privacy," including by minimizing the disclosure of information that may identify users. ER-119. In particular, Uber is careful to protect consumer information, and thereby safeguard against retaliation, when it receives a consumer's report alleging courier misconduct. *See, e.g.*, ER-108.

Uber is also committed to ensuring that efficient and reliable deliveries are available to all. ER-105. It thus has every incentive to maintain couriers' access to the platform to keep delivery times low for consumers. ER-100. And it recognizes that doing so preserves what may be an important source of income for couriers. ER-101. Uber accordingly takes the decision to deactivate accounts seriously, and it views deactivation only as a last resort. ER-100-01. But while deactivation is rare, it nonetheless is a key component of Uber's commitments to safety and quality. Through years of experience, and informed by its commitments and values, Uber has formed beliefs on the set of behaviors and indicators that should result in account deactivation. ER-101. For example, Uber believes that the following may warrant account deactivation, and it has historically deactivated courier accounts for these reasons:

- Aggregate consumer ratings that remain below a minimum threshold even after Uber has reached out to help the courier improve, because Uber's

10

experience is that such ratings often reflect serious quality or safety issues. ER-103-05.

- A background or driving record check that reveals, for instance, felony offenses, serious pending criminal charges, or an unsafe driving record. ER-102-03.

- Discrimination, including systematically refusing or cancelling orders on the basis of consumers' locations due to the characteristics of people and businesses in those locations.  ER-105-06, 110.

- Fraud.  ER-106.

Uber's website has provided extensive information and guidance regarding these practices, including details on potential paths to losing platform access, and advice and resources to help couriers avoid that outcome.  *See* ER-100 & n.2.  Uber also maintains Community Guidelines applicable to *everyone* who uses its platform, *see* ER-115-16, and it tells consumers and couriers alike that violating those Guidelines, including safety-related guidelines, may lead to a loss of access, *id.*; ER-105-06.

Uber takes measures to ensure that courier accounts are deactivated only when warranted.  ER-100-01, 106-08.  Most notably, Uber has maintained a thorough investigation process for courier-related consumer reports.  ER-106-08.  Depending on the circumstances and the seriousness of the potential issue, investigations have

11

occurred either before or after loss of access.  ER-107-08.  And when Uber has determined that deactivation is necessary, it has made every reasonable effort to communicate, clearly and candidly, the reason why.  ER-108.  But consistent with its beliefs about and commitments to safety and privacy, Uber has not provided information to couriers that risks jeopardizing the safety of others.  *Id.*  As an example, when deactivating couriers' accounts based on consumer reports of sexual assault, violence, or harassment, Uber has not provided the couriers with information that could identify reporting consumers or reveal their home or workplace locations.  *Id.*  Nor, in cases of deactivation for fraudulent activity, has it provided information that may reveal its fraud-detection mechanisms in a way that may assist future fraudsters in evading detection or violating its policies.  *Id.*

### C.    The Ordinance's Effect on Uber's Deactivation Policy

Under the Ordinance, Uber is not free to craft a deactivation policy in line with its actual beliefs.  Instead, the Ordinance requires Uber to issue a policy, as its own, that is inconsistent with some of those beliefs.  For example:

***Consumer ratings.***  Uber believes that consistently low aggregate consumer ratings often reflect serious performance or safety issues, and that when such issues persist even after outreach from Uber, they warrant account deactivation.  ER-104-05.  Under the Ordinance, however, a deactivation policy that would "result in a

deactivation based solely on a quantitative metric derived from aggregate customer ratings" is a prohibited unreasonable policy.  SMC §8.40.050(A)(2)(e).

*Safety and background checks.*  Uber has deactivated courier accounts based on the results of background checks, including when they reveal that a courier has had several recent traffic collisions, regardless of fault attribution.  ER-102-03, 109. Uber has done so because it believes that every traffic accident is a potential indicator of unsafe driving, ER-103, 109, and at any rate, accident fault information is typically unavailable, ER-111.  Under the Ordinance, however, "any policy that would deactivate" a courier's account "based on the results of a background check, consumer report, driver record, or record of traffic infractions" is a prohibited unreasonable policy.  SMC §8.40.050(A)(2)(h).  The Ordinance's exception for "egregious misconduct" does not allow Uber's policy to consider collisions to be reasonably related to safety unless they are specifically deemed "at-fault."  *Id.* §§8.40.020, 8.40.050(A)(2)(h).

*Discrimination and refusing service.*  Uber believes that couriers should not have access to its platform if they systematically refuse or cancel requests from certain locations based on the characteristics of people and businesses there.  ER-110.  Under the Ordinance, however, Uber appears to be barred from announcing a deactivation policy consistent with this belief, because any deactivation policy that "would result in a deactivation based on … acceptance or rejection of any individual

13

offer, any types of offers, or any number or proportion of offers" is a prohibited unreasonable policy.  SMC §8.40.050(A)(2)(b).

### D.    Proceedings Below

On December 18, 2024, Uber sued the City and sought both a temporary restraining order (TRO) and a preliminary injunction against the Ordinance.  As relevant to this appeal, Uber alleges that key provisions of the Ordinance violate its free speech rights under the First Amendment and are unconstitutionally vague under the Fourteenth Amendment's Due Process Clause.  ER-149-53.[3]

The district court denied preliminary relief.  ER-3-18.  It held that Uber is unlikely to succeed on the merits of its First Amendment claim because the Ordinance "merely limits the grounds on which Uber may justify" deactivating courier accounts and does not compel Uber to "make any affirmative statement with which it may disagree," nor to "stake out any position on what is or is not related to safety and efficiency."  ER-9-11.  On that understanding, the district court concluded that the Ordinance "regulates conduct," with at most "incidental" effects on speech, and thus that "the First Amendment's protections are not triggered."  ER-12-13.  The court similarly concluded that Uber's vagueness challenge was unlikely to succeed,

---

[3] Uber further alleges that the Ordinance violates its First Amendment right to expressive association; its rights under the Contracts Clause, Art. I, §10; and its Fourth Amendment right to be free from unreasonable searches.  ER-151-52, 153-55.  Those claims are not at issue in this appeal.

14

focusing its analysis on whether the word "[r]easonable" is vague as a general matter. *See* ER-14-17.

The district court identified no reason to deny an injunction other than its likelihood-of-success determination. Rather, the court concluded that Uber had not shown irreparable harm, or that the balance of equities favored relief, "[g]iven the Court's analysis as to the merits." ER-17; *see also* ER-18. The court thus concluded "that the TRO and preliminary injunction should not issue," and it denied Uber's motion "as to both requests." ER-18.

Uber timely noticed this appeal of the district court's order to the extent it denied a preliminary injunction. ER-158-59.

## SUMMARY OF THE ARGUMENT

**I.** Uber is likely to succeed on the merits of its claim that the Ordinance violates the First Amendment.

**A.** The Ordinance regulates Uber's speech. The deactivation policy requirement compels speech by forcing Uber to communicate its own written deactivation policy describing when it will deactivate courier accounts. And it regulates that speech's content by requiring that Uber's policy be "reasonably related" to Uber's "safe and efficient operations." The explanation and substantiation requirements likewise compel speech by forcing written communications explaining and substantiating individual deactivations.

15

The district court erred in concluding that these provisions regulate only conduct. The deactivation policy requirement does not stop Uber from deactivating courier accounts on any ground, and the fact that a *separate* provision addresses account deactivations does not mean no First Amendment scrutiny applies. The same is true of the explanation and substantiation requirements. Troublingly, the district court's rule would allow governments to evade accountability for policy choices and distort public debate by regulating speech under the guise of regulating conduct.

**B.** The Ordinance does not survive First Amendment scrutiny. Both the deactivation policy requirement and the explanation and substantiation requirements are subject to strict scrutiny. Each regulates speech based on content: the deactivation policy requirement compels speech about deactivations and censors particular views, and the explanation and substantiation requirements compel explanations of individual deactivations. These requirements also compel Uber to express opinions, at least implicitly, because the required policy and explanations will necessarily convey views about what considerations warrant deactivation and are reasonably related to safety and efficiency. Contrary to the City's assertions below, the Ordinance is not a commercial speech regulation subject to lesser scrutiny.

16

In any event, the Ordinance cannot survive even intermediate scrutiny, let alone strict scrutiny. The City cannot carry its burden to show adequate tailoring under either standard. It has not shown why it needed to regulate speech in order to achieve its objectives, rather than simply proscribing deactivations on disfavored grounds. Whatever other flaws such an ordinance would have had, it would have regulated Uber's conduct, not its speech.

**II.** Uber is also likely to succeed in showing that the deactivation policy requirement is unconstitutionally vague. That requirement is subject to the more stringent vagueness inquiry applicable to speech regulations, and it fails. Its "reasonably related" standard is facially indeterminate, and no judicial guidance, tradition, custom, or statutory context clarifies it. In fact, the statutory context only confuses, because rather than explain what policies *do* meet the standard, the Ordinance offers only a counterintuitive list of eight that supposedly do not.

**III.** Uber is likely to show that the entire Ordinance is invalid. Without the unconstitutional deactivation policy requirement, the Ordinance cannot function, because its provisions consistently assume the existence of that requirement and deactivation policies issued under it.

**IV.** The remaining factors favor a preliminary injunction. Because Uber is likely to succeed on its constitutional claims, it is suffering *per se* irreparable harm,

17

as well as harm to its reputation and business.  The public interest also sharply favors enjoining this likely-unconstitutional law.

## STANDARD OF REVIEW

A preliminary injunction is warranted when the movant shows that it will likely succeed on the merits, that it will suffer irreparable harm absent relief, that the balance of the equities favors relief, and that relief is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  When the defendant is a government actor, the last two factors merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

The government "bears the burden of justifying [a] speech-restrictive law." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014) (cleaned up).  A party seeking a preliminary injunction based on a free speech claim thus bears only the initial "burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Id.*

Although this Court reviews for abuse of discretion the denial of a preliminary injunction, it "review[s] de novo the underlying issues of law." *X Corp. v. Bonta*, 116 F.4th 888, 897 (9th Cir. 2024).

18

## ARGUMENT

I.   **Uber Is Likely to Succeed on the Merits of its Claim that the Ordinance Violates the First Amendment.**

A.   **The Ordinance Is Subject to First Amendment Scrutiny.**

1.   *The Ordinance regulates speech by compelling Uber to announce a written deactivation policy, limiting what Uber may say in its written policy, and ordering Uber to make written statements about individual deactivations.*

A linchpin of the Ordinance is its deactivation policy requirement.  That requirement forces Uber to communicate a "written deactivation policy, defining what constitutes a violation that may result in deactivation," and to inform couriers "in writing" of that policy.  SMC §8.40.050(A)(1).

The Ordinance is crystal clear about whose policy this is: it is "the network company's written deactivation policy."  *Id.*  But even though Uber must write the policy and issue it under its own name, the Ordinance limits what Uber can say in its own policy.  Specifically, it requires the policy to be "reasonably related" to Uber's "safe and efficient operations."  *Id.* §8.40.050(A)(2).  And it identifies eight policies that are deemed not to meet that standard, and which Uber may therefore not adopt.  *See id.* §8.40.050(A)(2)(a)-(h).

These requirements plainly regulate Uber's speech: they require Uber to speak, and then dictate what Uber may not say when it does.

Begin with compelled speech.  "It is well-established that the First Amendment protects 'the right to refrain from speaking at all.'"  *NetChoice*, 113

19

F.4th at 1117 (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)).  "It is also well-established that the forced disclosure of information, even purely commercial information, triggers First Amendment scrutiny." *Id.*  That is because "the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 570 (2011).

The Ordinance does not allow Uber to "refrain from speaking" about the policies it believes should govern account deactivation decisions.  *NetChoice*, 113 F.4th at 1117 (cleaned up).  Instead, it forces Uber to "creat[e] and disseminat[e] information" on that topic, *Sorrell*, 564 U.S. at 570, by requiring Uber to formulate its own deactivation policy and inform couriers of that policy in writing.

That forced written communication is speech.  Indeed, "if the acts of disclosing and publishing information do not constitute speech, it is hard to imagine what *does* fall within that category." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (emphasis added) (cleaned up).  If anything, it is *especially* clear that disclosure of the information at issue here—the content of an organization's policy on a subject susceptible to a range of competing views—constitutes speech.  As the Supreme Court has explained, for example, a "direct regulation" demanding that a private speaker "have a policy" on a controversial matter "plainly violate[s] the First Amendment." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 210, 213 (2013) (*AOSI*) (cleaned up).  And as this Court observed last year, even a

20

law requiring a social media platform to disclose its "existing [terms of service]" would regulate speech and trigger First Amendment scrutiny, albeit perhaps only the scrutiny applicable to commercial speech regulation. *X Corp.*, 116 F.4th at 901. Even forcing a disclosure of "purely factual and uncontroversial information"—such as by requiring "attorneys who advertise their willingness to represent clients on a contingent-fee basis to state that the client may have to bear certain expenses even if he loses"—triggers *some* form of First Amendment scrutiny. *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 650-51 (1985). Given all that, a "network company's deactivation policy," SMC §8.40.050(A)(1)— reflecting judgment calls on sensitive issues of safety and more—is surely speech, and compelling the communication of such a policy is surely compelled speech.

But beyond merely compelling speech, the deactivation policy requirement goes further, regulating the *content* of Uber's speech. In particular, the policy that Uber must communicate as its own may not include any policy the City deems not "reasonably related" to "safe and efficient operations." *Id.* §8.40.050(A)(2). And the Ordinance identifies eight specific policies that are categorically off-limits for Uber's policy. *Id.* § 8.40.050(A)(2)(a)-(h); *supra* pp. 6-7.

These restrictions can be viewed as specifying the content of the compelled speech—in other words, as "telling [Uber] what [it] must say." *AOSI*, 570 U.S. at 213 (internal quotation marks omitted) (quoting *Rumsfeld v. F. for Acad. &*

*Institutional Rts., Inc.*, 547 U.S. 47, 61 (2006) (*FAIR*)).  Or they can be viewed as "forbidding certain communications," based on their content, "in advance of the time that such communications are to occur"—in other words, a "prior restraint."  *Twitter, Inc. v. Garland*, 61 F.4th 686, 702 (9th Cir. 2023) (cleaned up).  Either way, the upshot is the same: the "reasonable policy" requirement directly regulates the content of Uber's speech.

Still other provisions of the Ordinance likewise regulate speech as speech. When Uber decides to deactivate a courier's account, the Ordinance's explanation and substantiation requirements force it to provide the courier with a "written statement" including (among other information) "[t]he reasons for deactivation," the "policy that was violated," "the specific incident or pattern of incidents that violated the deactivation policy," and a list of "[a]ny and all records relied upon to substantiate deactivation," as well as the records themselves.  SMC §§8.40.070(A), (A)(1), (A)(3), 8.40.080(A).  Those requirements, like the deactivation policy requirement, do not allow Uber to remain silent.  They compel Uber to issue a written communication explaining and substantiating how a courier has violated its account deactivation policy.  They thus entail the "forced disclosure of information," *NetChoice*, 113 F.4th at 1117—including, in some cases, sensitive information that Uber would otherwise keep confidential, like the details of a

22

consumer's report of an alleged sexual assault or the methods Uber uses to detect fraud on its platform. They therefore "trigger[] First Amendment scrutiny." *Id.*

### 2. The district court erred in concluding that the Ordinance regulates only conduct.

At the City's urging, *see* ER-38-40, the district court nonetheless held that "the First Amendment's protections are not triggered," ER-13. It thought the deactivation policy requirement "merely limits the grounds on which Uber may justify" deactivating a courier's account. ER-9. And it thus concluded that—like "anti-discrimination or workplace safety laws"—"the Ordinance regulates conduct" with at most "incidental" effects on speech, placing it outside the reach of the First Amendment. ER-10, 12.[4]

That conclusion is badly mistaken. It misunderstands the Ordinance, deviates from this Court's clear First Amendment jurisprudence, and if affirmed would have dangerous implications.

### a) Key provisions of the Ordinance regulate Uber's speech directly.

One might imagine a *different* ordinance like the one the district court described. Such a law might, for instance, have provided that "any deactivation not

---

[4] The district court focused almost entirely on the deactivation policy requirement. With respect to the explanation and substantiation requirements, it simply asserted that the required disclosures are "merely incidental to the worker-protections embedded in the law." ER-11.

23

reasonably related to the network company's safe and efficient operations is unlawful." And it might have listed eight specific deactivation grounds and prohibited them as unlawful. To be clear, such an ordinance would be deeply misguided public policy and might suffer from other constitutional problems.[5] But it at least would have regulated only *conduct*, by "limit[ing] the grounds on which Uber may justify" a deactivation. ER-9. In that sense, it would be akin to "anti-discrimination or workplace safety laws," ER-10, which generally do not trigger First Amendment scrutiny because any effect they may have on speech is "plainly incidental" to a direct "regulation of conduct," *FAIR*, 547 U.S. at 62. So, for example, a law prohibiting race-based hiring does not trigger First Amendment scrutiny even though it "will require an employer to take down a sign reading 'White Applicants Only.'" *Id.*

Here, though, the City chose a different path. It imposed a direct, standalone regulation of Uber's deactivation *policies*—that is, a direct regulation of Uber's speech.

As explained above, the deactivation policy requirement (1) compels Uber to communicate its own deactivation policy, and (2) identifies specific types of policies

---

[5] For instance, a hypothetical ordinance making it unlawful to deactivate a courier's account "unreasonably," coupled with a non-exhaustive, counterintuitive list of examples of supposedly unreasonable deactivations like the one the Ordinance includes, would be unconstitutionally vague. *Cf. infra* pp. 50-55.

24

Uber may not adopt and communicate. *See supra* pp. 6-7, 19-21. It thus compels Uber to speak and dictates the content of that speech—both plain as day. In fact, the "*only* inevitable effect" of this provision is on speech, rather than conduct. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019) (emphasis added). It does nothing to stop Uber from deactivating courier accounts on any ground, even grounds inconsistent with whatever policy it adopts.

This speech regulation does not escape First Amendment scrutiny just because the City *separately* prohibited "unwarranted deactivation[s]." SMC §8.40.060(A). As this Court held last year, the government "cannot insulate a specific provision of law" from First Amendment scrutiny "by bundling it with other, separate provisions that do not implicate the First Amendment." *NetChoice*, 113 F.4th at 1117.

Here, moreover, the Ordinance makes abundantly clear that the "unwarranted deactivation" provision (SMC §8.40.060(A)) is separate from the requirements of communicating a policy (*id.* §8.40.050(A)(1)) and ensuring that the policy is reasonable (*id.* §8.40.050(A)(2)). They are in different sections of the Ordinance, and they are subject to different enforcement regimes. Through mid-2027, OLS can enforce only the deactivation policy requirement, but not the prohibition on unwarranted deactivations. SMC §§8.40.130(A)-(B). In other words, right now, OLS is authorized *only* to police Uber's speech about deactivations, *not* its deactivation decisions themselves (*i.e.*, its conduct). Even thereafter, the City can

penalize Uber based on the content of its policy without more—even if Uber never actually deactivates courier accounts for reasons the City disapproves. All of that confirms that the Ordinance's regulation of speech is independent of its regulation of conduct.[6]

The Ordinance thus "imposes more than an incidental burden on protected expression." *Sorrell*, 564 U.S. at 567. The "incidental" label, and the lack of First Amendment protection it implies, applies when a law "make[s] a course of conduct illegal" and that conduct may happen to be "in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *FAIR*, 547 U.S. at 62 (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). For example, an antitrust law may incidentally burden speech because most anticompetitive agreements are "brought about through speaking or writing." *Giboney*, 336 U.S. at 502; *see also Sorrell*, 564 U.S. at 567. Or a price control law requiring delis to charge $10 for sandwiches may incidentally burden speech, because "a store would likely have to put '$10' on its menus or have its employees

---

[6] If anything, it is the Ordinance's speech regulation that takes primacy over any conduct regulation. As Uber explains below, to the extent the Ordinance regulates conduct, it prohibits only deactivations inconsistent with a compliant deactivation *policy*. It thus depends entirely on the speech regulation for substantive content. *See infra* p. 56; *see also supra* p. 7.

26

tell customers that price." *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017).

The Ordinance's deactivation policy requirement is different—it is "a law directed at speech itself." *Texas v. Johnson*, 491 U.S. 397, 406 (1989) (cleaned up). It does not regulate conduct at all, much less conduct that might happen to be "carried out by means of language." *FAIR*, 547 U.S. at 62 (cleaned up). On its face, it requires companies to communicate "in writing the network company's deactivation policy," SMC §8.40.050(A)(1), and restricts what that written policy may say, *see id*. §8.40.050(A)(2). Those commands unquestionably, directly, and in all cases compel and dictate the content of a written communication—and that is all they do.

The deactivation policy requirement is thus just like the law the Supreme Court encountered in *Expressions Hair Design*, a case the district court never mentioned. That law forced merchants charging differential prices to cash and credit customers to call the difference a cash discount rather than a credit surcharge. 581 U.S. at 39, 47. The Second Circuit held that the law was "simply a conduct regulation" because it operated as a "price control[]." *Id.* at 46-47. But the Supreme Court—focusing carefully on the law's mechanics, rather than merely its subject matter—disagreed. It explained that unlike a "mine-run price regulation"—such as "a law requiring all New York delis to charge $10 for their sandwiches"—the law

27

did not "simply regulate the amount that a store could collect" and thus regulate "conduct." *Id.* at 47-48. Instead, it regulated "how sellers may communicate their prices," by forcing a merchant wishing to post a single sticker price to list the higher credit price and offer a cash discount, rather than list the lower cash price and impose a credit surcharge. *Id.* at 47. Because the law "regulat[ed] the communication of prices rather than prices themselves," the Court held, it "regulate[d] speech," and thus triggered First Amendment scrutiny. *Id.* at 48.

The deactivation policy requirement is comparable. Like the law at issue in *Expressions Hair Design*, it regulates nothing about what conduct companies may or may not engage in; as explained, only a *separate* provision of the Ordinance addresses actual deactivations of courier accounts. Also like that law, it instead regulates only communications about its subject matter; again, it forces network companies to issue their own deactivation policies and restricts what they may say. Because the deactivation policy requirement "regulat[es] the communication of [grounds for deactivation] rather than [grounds for deactivation] themselves," it too "regulate[s] speech." *Id.*

In short, the deactivation policy requirement, standing alone, facially regulates "pure speech," which is "entitled to First Amendment protection." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1058 (9th Cir. 2010); *see also Johnson*, 491 U.S. at 406. And the same is true of the Ordinance's explanation and

28

substantiation requirements, SMC §§8.40.070(A), 8.40.080(A), notwithstanding the district court's bare assertion to the contrary, ER-11. Like the deactivation policy requirement, *all* those requirements do is force Uber to make written communications; they have no direct effect on the conduct of deactivations. *See supra* pp. 7-8, 22-23. They, too, therefore trigger First Amendment scrutiny.

> b)     First Amendment scrutiny is not limited to laws
>         compelling express endorsement of government views.

In concluding that the Ordinance regulates only conduct, the district court repeatedly observed that the Ordinance does not require Uber to "make any affirmative statement with which it may disagree" or to "stake out any position on what is or is not related to safety and efficiency." ER-10-11; *see also* ER-9 (Ordinance "does not compel Uber to make an affirmative statement on what it may or may not believe is safe or efficient"); ER-11 (Ordinance "does not require Uber to adopt an express statement that endorses the City's view on what constitutes safety or efficiency"); ER-12 (Ordinance "does not require Uber to publicly stake out an affirmative position on sensitive social issues"). As Uber explains below, the Ordinance does require Uber to express views at odds with its own, at least implicitly. *See infra* pp. 38-42. But the district court's observations are also entirely irrelevant to the question of whether the Ordinance regulates speech.

A law need not force a private speaker to follow a specific government script, or to stake out any particular affirmative position, to compel speech and thus trigger

29

First Amendment scrutiny. Nor must it even force a statement at odds with the speaker's own beliefs. The governing rule, as this Court recently reaffirmed, is broad, straightforward, and "well-established": "the forced disclosure of information, even purely commercial information, triggers First Amendment scrutiny." *NetChoice*, 113 F.4th at 1117. The First Amendment, after all, "protects 'the right to refrain from speaking at all.'" *Id.* (quoting *Wooley*, 430 U.S. at 714). So *whenever* the government forces a private speaker to speak—no matter the nature of the required speech—First Amendment scrutiny applies. The only remaining question is what *level* of scrutiny applies.

For instance, laws requiring speech *about* a given topic trigger First Amendment scrutiny, even if they do not limit the views the speaker may express on that topic. *See, e.g.*, *id.* at 1117 (law requiring internet businesses to "opine on potential harm to children" who may access their services or products); *X Corp.*, 116 F.4th at 901-02 (law requiring social media platforms to "convey [their] policy views on intensely debated and politically fraught topics" and "convey how [they] ha[ve] applied [their] policies"). Even requirements compelling disclosure of "purely factual and uncontroversial" commercial information trigger First Amendment review. *Zauderer*, 471 U.S. at 651 (requirement that attorney advertising disclose information regarding client liability for costs).

30

To be sure, different types of forced disclosures trigger different *levels* of First Amendment scrutiny—strict, intermediate, or something less—depending on the nature of the information at issue. *See NetChoice*, 113 F.4th at 1119-20. But *all* forced communication of information triggers *some* First Amendment scrutiny. *Id.* at 1117. Because the Ordinance requires such communication, *see supra* pp. 19-29, it is subject to First Amendment scrutiny. The district court seriously erred in concluding that the Ordinance instead needed to force express adoption of the City's views to trigger such scrutiny.

Perhaps worse yet, the district court—again at the City's urging, *see* ER-38, 40—at times suggested that it would make no difference if the Ordinance *did* force Uber to convey the City's views (as it in fact does, *see infra* pp. 38-42), because the Ordinance leaves Uber free to "voice its opposition" to the Ordinance's requirements "even if it must comply with them," ER-10; *see also* ER-11. The district court's apparent suggestion—that the government may enlist private speakers as its mouthpieces provided it does not also bar them from expressing their own views—is wholly foreign to the First Amendment. As the Supreme Court has warned, free speech "protection would be empty" if the government could freely "require speakers"—including companies—"to affirm in one breath that which they deny in the next." *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 16 (1986) (plurality opinion).

31

c) The district court's reasoning would allow governments free rein to target speech under the guise of regulating conduct alone.

The district court's assessment that the Ordinance is not subject to First Amendment scrutiny has deeply troubling implications. Its reasoning would free (or even embolden) governments to skirt public accountability and distort public debate by compelling speech instead of directly regulating conduct.

When governments regulate only conduct, the chain of accountability is generally clear. Here, for example, had the City directly prohibited companies from deactivating accounts on specified grounds—rather than regulate Uber's speech about deactivations, and only separately, and at most indirectly, regulate deactivations themselves—Seattle residents and visitors would know just who to blame if the result was slow delivery times, increased fraud, deterioration in public safety, or other harms: the City Council and Mayor.

But the lines of accountability are not so clear when the government conscripts private parties to speak its message. Here, for example, if delivery times balloon or safety incidents increase, Seattle residents and visitors may well look to companies like Uber as the authors of those harms. After all, observers could look up a "network company's written deactivation policy," SMC §8.40.050(A)(1), issued in the company's own name, and find that policy wanting in how it treats low-performing and unsafe couriers. In other contexts, the Constitution is keenly attuned

32

to keeping the lines of accountability between the people and their government clear. *Cf. New York v. United States*, 505 U.S. 144, 169 (1992) ("[W]here the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision."). The First Amendment similarly aims to protect against restrictions that "negatively affect[] the processes through which political discourse or public opinion is formed or expressed." *Expressions Hair Design*, 581 U.S. at 49 (Breyer, J., concurring in the judgment).

Moreover, regulation by compelled speech distorts public debate by suggesting support for certain ideas that, in reality, is not there. Here, for instance, Seattleites may be left with the impression that network companies across the board think persistently low consumer ratings, or (in most cases) failed background or driving record checks, do not warrant account deactivation. Again, one could look up "the network company's written deactivation policy" and find it reflects that view. But that is not actually the case; Uber, for one, does not agree. *See supra* pp. 10-13. "However imperfect the private marketplace of ideas," worse is the government distorting it by "coercing speakers to provide more of some views or less of others." *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024).

33

The district court's conflation of speech and conduct regulation is thus a recipe for abuse. If affirmed, it would empower governments of all stripes to evade accountability for their choices and force widespread adoption of their views by targeting speech, all while avoiding *any* First Amendment scrutiny. For instance, a government opposed (or sympathetic) to the use of diversity, equity, and inclusion principles in making employment decisions might go beyond prohibiting (or requiring) consideration of those principles in hiring. They might force employers to issue *their own policies* rejecting (or endorsing) those ideas. Indeed, governments could follow that same playbook on any number of controversial issues. Consider:

| Instead of these conduct regulations … | governments could adopt these speech regulations, pair them with a separate conduct regulation, and avoid *any* First Amendment scrutiny. |
|---|---|
| **Conduct:** No employer shall pay any employee a wage less than $25 per hour. | **Speech:** Employers must adopt and publish a written policy declaring a fair wage for their industry.  A wage is not fair if it is less than $25.<br><br>**Conduct:** It is unlawful for an employer to pay any employee less than the fair wage specified in the employer's policy. |
| **Conduct:** It is unlawful for an employer to consider diversity, equity, and inclusion in making employment decisions. | **Speech:** Employers must publish a written employment policy.  The employer's written policy must state that the employer's policy is not to consider diversity, equity, and inclusion in making employment decisions.<br><br>**Conduct:** It is unlawful for an employer to take an employment action inconsistent with its published policy. |
| **Conduct:** It is unlawful for any business to discriminate against customers on the basis of transgender status or gender identity, including by not allowing customers to use the bathrooms that match their gender identities. | **Speech:** Businesses must adopt and publish a written, reasonable anti-discrimination policy.  A reasonable policy must state that the business's policy is (a) not to discriminate against customers on the basis of transgender status and (b) in particular, to allow customers to use the bathrooms that match their gender identities.<br><br>**Conduct:** It is unlawful for a company to violate its published anti-discrimination policy. |

There is a reason the laws on the right-hand side of the chart sound odd. If Congress, a state legislature, or a city council passed a law like those, no one would doubt the First Amendment has something to say about it. Regulating the use of DEI principles in hiring decisions might be a mine-run employment regulation, but regulating the *communication* of a company's own DEI policies regulates speech. *See Expressions Hair Design*, 581 U.S. at 48 ("[R]egulating the communication of prices rather than prices themselves … regulates speech."). So too here. Regulating the grounds for deactivating courier accounts might be a routine conduct regulation. But regulating the *communication* of deactivation grounds—by directly regulating each "network company's written deactivation policy," SMC §8.40.050(A)(1)— regulates speech.

## B.    The Ordinance Does Not Survive First Amendment Scrutiny.

Because it regulates Uber's speech, the Ordinance is subject to First Amendment scrutiny. Because it regulates that speech based on its content, it is subject to *strict* scrutiny. And because it cannot survive *any* form of heightened scrutiny, it is unconstitutional.

### 1.    The Ordinance dictates the content of Uber's speech and is thus subject to strict scrutiny.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state

36

interests"—that is, only if the government shows that they survive strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A law is content based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* And—as this Court twice confirmed last year—the same is true of a law that requires a private speaker to "express a view" about a topic, even "implicitly." *X Corp.*, 116 F.4th at 901; *see also NetChoice*, 113 F.4th at 1119-20. The Ordinance's deactivation policy requirement and its explanation and substantiation requirements are content based for each of those reasons.

On its face, the Ordinance plainly "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. Begin with the deactivation policy requirement. That requirement forces Uber to adopt and announce a written policy—that is, to speak—on a specific topic: when courier account deactivations are warranted. And by barring Uber from communicating policies that are not "reasonable" (and identifying eight potential policies as unreasonable), *see* SMC §8.40.050(A)(2), it singles out particular messages on that topic for censorship. As just one example among many, *see supra* pp. 12-14, that prohibition prevents Uber from saying in its written policy the following, even though it accurately states Uber's views: "In Uber's experience, below-minimum aggregate ratings are often correlated with safety, fraud, misconduct, and other quality issues," and therefore "Uber deactivates accounts of couriers whose

37

aggregate ratings are consistently below the minimum aggregate rating requirement in their delivery location," ER-105. The deactivation policy requirement is thus a "particularly egregious" content-based regulation—one that "targets not merely a subject matter, but particular views taken by speakers on a subject." *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (cleaned up).

Though the explanation and substantiation requirements may not similarly censor speech based on viewpoint, they still compel Uber to disclose information regarding a specific topic, namely the basis for particular account deactivations. SMC §§8.40.070(A), 8.40.080(A); *see supra* pp. 7-8, 22-23. They, too, are therefore subject to strict scrutiny, even if meant to be a "transparency" measure. *See X Corp.*, 116 F.4th at 901-02 (compelled expression of company's "opinions about" its policies subject to strict scrutiny).

Both provisions also require Uber to "express a view," *id.* at 901, including views at odds with Uber's own. Consider first the deactivation policy requirement. It is impossible for Uber to comply with the command to communicate a deactivation policy "reasonably related" to "safe and efficient operations," SMC §8.40.050(A)(2), without "opin[ing] on" what considerations warrant deactivation and whether they are reasonably related to safety and efficiency, *NetChoice*, 113 F.4th at 1119. By including a particular deactivation trigger in its policy, Uber necessarily conveys the view that the trigger both warrants terminating a courier's

38

access to the platform and is reasonably related to safety and efficiency.  And likewise, by excluding a particular trigger, Uber necessarily conveys the view that it is *not* reasonably related to safety and efficiency, or is otherwise not a sound basis for deactivating courier accounts; otherwise, Uber could and would have included it.

To be sure, the Ordinance does not require Uber to state those views *explicitly*. For instance, Uber need not write in its policy, in so many words, that any particular trigger is or is not reasonably related to safety or efficiency.  But this Court has squarely rejected the notion that laws require speakers to "express a view," and thus trigger strict scrutiny, only when they require explicitly stating an opinion.  *X Corp.*, 116 F.4th at 901.  It is enough that a law requires a speaker to at least "implicitly" convey opinions.  *Id.*  And, as this Court recognized just last year in *X Corp.*, the content of a company's policy on a sensitive matter does so.  In that case, the Court held that a law requiring social media companies to file reports "detail[ing] [their] policies and actions concerning certain state-specified categories of content" effectively "compel[led] every covered social media company to reveal its policy opinion about contentious issues, such as what constitutes hate speech or misinformation and whether to moderate such expression," and therefore triggered strict scrutiny.  *Id.* at 899; *see id.* at 901-03.

39

The same is true here.  What Uber chooses to include in the deactivation policy it must issue—a policy that is unmistakably Uber's own, *see* SMC §8.40.050(A)(1) (requiring communication of "the network company's deactivation policy")—will necessarily "reveal [a] policy opinion," *X Corp.*, 116 F.4th at 899, that the triggers included warrant deactivation and are reasonably related to safety and efficiency, and that those excluded do not.  More, the policy as a whole will necessarily "express a view," *id.* at 901, regarding the appropriate balance between safety and efficiency on the one hand, and maintaining platform access for couriers on the other—weighty questions that are subject to public debate and good-faith disagreement.  Even the district court recognized this reality, allowing that the content of Uber's deactivation policy "may suggest to some that Uber has a particular view on safety."  ER-11.

Yet under the Ordinance, the "policy opinion[s]" Uber must convey—in its own policy—will not always be Uber's own.  *X Corp.*, 116 F.4th at 899.  For when the City does not share Uber's opinions—as is the case, for example, with respect to low aggregate consumer ratings, repeated traffic accidents that cannot be shown to be at-fault, or discriminatory refusals of orders based on delivery locations (all of which Uber, based on its long experience, believes may warrant deactivation, but the City does not), *see supra* pp. 10-14—the Ordinance requires Uber to set its views aside and adopt a policy embracing *the City*'s instead.

40

Contrary to the district court's mistaken understanding, *see supra* p. 29, the deactivation policy requirement thus forces Uber to express—at least "implicitly," *X Corp.*, 116 F.4th at 901—the City's views as if they were its own, even when Uber would articulate a different view if left to speak freely.  Not only that, even where Uber might generally agree with the City's views, it locks Uber into articulating those views indefinitely—even though Uber is continuously reviewing and improving its deactivation policies for accuracy, fairness, and in response to couriers' feedback, while also upholding its safety and privacy standards.  ER-101.  In short, the deactivation policy requirement "plainly alters the content of [Uber's] speech" on a variety of sensitive subjects and compels it "to speak a particular message": the City's message.  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (*NIFLA*) (cleaned up).

The same holds true of the Ordinance's explanation and substantiation requirements.  As noted, those provisions require Uber to provide couriers whose accounts have been deactivated with a detailed written explanation of how they have violated the deactivation policy, plus all "records relied upon … to substantiate deactivation."  SMC §8.40.080(A); *see id.* §§ 8.40.070(A)(1), (3).  Like any exercise in explaining or substantiating how a governing policy applies to a given set of facts, preparing such a written statement necessarily involves the exercise of judgment and, ultimately, the expression of "opinions about" the "polic[y]."  *X Corp.*, 116

41

F.4th at 901. The reasons in that statement will also of course reflect (at minimum) the views embodied in Uber's deactivation policy—views that, as just described, Uber may not actually hold.

In some cases, moreover, disclosing this information will require Uber to set aside still more of its own beliefs. For example, should Uber deactivate a courier's account after a consumer credibly reports that a courier sexually assaulted her at her home, it will be forced—notwithstanding its safety and privacy commitments—to turn over to the courier all records substantiating the deactivation, SMC §§8.40.070(A)(3), 8.40.080(A), including the consumer's report and the "date, time, and location" of the alleged assault, *id.* §8.40.080(A). Uber believes information like that should be kept confidential because it leads the alleged perpetrator straight to his accuser, infringing her privacy and potentially endangering her safety. *See* ER-108; ER-120. Yet disclosing that information as the Ordinance requires would convey a contrary view. Or suppose Uber deactivates a courier's account for engaging in fraudulent activity. The records Uber is forced to turn over may well reveal Uber's closely guarded techniques for detecting and preventing fraud, providing future fraudsters with a roadmap to avoid getting caught and wrongly suggesting that Uber cares little about preventing fraud. ER-112.

The deactivation policy requirement and explanation and substantiation requirements thus each "target speech based on its communicative content" in

42

multiple ways.  *Reed*, 576 U.S. at 163.  Each is therefore "presumptively unconstitutional" and subject to strict scrutiny.  *Id.*

> ### 2.    Lesser scrutiny applicable to regulation of "commercial speech" does not apply.

The City argued below that the Ordinance at most regulates only "commercial speech" that is "factual and uncontroversial."  ER-40-43.  That is doubly wrong: the Ordinance does not regulate "commercial speech" at all, much less "factual and uncontroversial" commercial speech.

"Speech is commercial"—and thus subject to intermediate rather than strict scrutiny—"when it does no more than propose a commercial transaction." *NetChoice*, 113 F.4th at 1119 (cleaned up).  The speech the Ordinance regulates does not fit that description.  That speech instead explains the circumstances under which Uber may deactivate the accounts of couriers who have *already* contracted with Uber, or, in the case of the disclosures compelled by the explanation and substantiation requirements, the reasons for deactivation decisions that Uber has already made.  But even if such speech could somehow be understood to "propose a commercial transaction," it necessarily does much more: it conveys "subjective opinions" regarding sensitive matters of public concern.  *Id.* at 1120.  The Ordinance's deactivation policy requirement compels Uber to "recast" its existing deactivation guidance consistent with requirements prescribed by the City, at least "implicitly opining" on the appropriate balance between important and potentially

43

competing values like public safety, efficiency, and platform openness. *X Corp.*, 116 F.4th at 901. And the disclosures mandated by the explanation and substantiation requirements will inevitably reflect those views and others, such as views on protecting the privacy and safety of sexual assault victims. *See supra* pp. 41-42. Those opinions are "best classified as non-commercial speech," *NetChoice*, 113 F.4th at 1120, as they are not "related solely to the economic interests of the speaker and its audience," *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980).

This Court therefore "need not reach the *Bolger* factors" that courts use to classify speech as commercial (or not) in close cases. *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1122 (9th Cir. 2020); *see Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 64-67 (1983). In all events, though, none of those factors suggests that the Ordinance regulates mere commercial speech.

The first factor, whether the speech at issue is an "advertisement," is not satisfied, as the City conceded below. *IMDb.com*, 962 F.3d at 1122; *see* ER-42. Nor is the second factor—whether the speech "refer[s] to a particular product." *IMDB.com*, 962 F.3d at 1122. Again, the Ordinance requires speech reflecting opinions on sensitive matters of public concern, not merely Uber's relationship with couriers using its platform. Likewise, as to the third factor, Uber lacks an "economic motivation" to speak as the Ordinance requires. The "crux" of the economic

44

motivation inquiry is whether "economic benefit [is] the primary purpose" for the particular speech at issue. *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1117 (9th Cir. 2021). Here, it most certainly is not. Again, Uber would speak differently than the Ordinance requires if free to do so. *See supra* pp. 12-14, 38-42. There is no economic purpose—let alone a *primary* economic purpose—behind speech a company is compelled by law to offer, but which it "wish[es] to avoid." *Masonry Bldg. Owners of Oregon v. Wheeler*, 394 F.Supp.3d 1279, 1298 (D. Or. 2019).

Despite all that, the City insisted below that the Ordinance is subject not even to intermediate scrutiny, but to the "lesser form of scrutiny"—"akin to a rational basis test"—that applies to "compelled commercial speech that is 'purely factual and uncontroversial.'" *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1266 (9th Cir. 2023); *see Zauderer*, 471 U.S. at 651. That lenient scrutiny has been held to apply, for instance, to laws requiring disclosures that merely recite the existence of certain rights under law, *see San Francisco Apartment Ass'n v. City & Cnty. of San Francisco*, 881 F.3d 1169, 1177-78 (9th Cir. 2018), and laws requiring "safety warning[s]" of known risks associated with particular products, *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 846-47 (9th Cir. 2019).

The compelled speech Uber challenges here is nothing like such unremarkable disclosures. Uber's thoughts on which indicators warrant deactivating courier accounts, expressed in a policy the Ordinance requires it to create from scratch, are

opinions—not unyielding, "purely factual" information like the existence of a particular legal right or the reality that cell phones emit radio-frequency radiation. The same is true of Uber's views, expressed in the written explanations the Ordinance forces it to prepare, on how a courier has violated its deactivation policy. *Cf. NetChoice*, 113 F.4th at 1120 ("[A] business's opinion about how its services might expose children to harmful content online is not 'purely factual and uncontroversial'" (quoting *Zauderer*, 471 U.S. at 651)). The City knows well how to craft an anodyne "notice of rights" law that merely requires disclosure of certain "rights established by [a law]"—it did exactly that in a *separate* provision of the Ordinance. SMC §8.40.100 (requiring network companies to "affirmatively provide each app-based worker with a written notice of rights established by this Chapter 8.40"). The separate requirement to communicate "the network company's written deactivation policy," and to conform that policy to the City's view of what is "reasonable," is not remotely similar. *Id.* §§ 8.40.050(A)(1)-(2).

Nor is the subject matter of the required speech "uncontroversial." It involves not undeniable truths, but sensitive questions of judgment, like the appropriate balance between public safety, efficiency, and platform openness, that are subject to reasonable and robust debate. The speech is thus "objective[ly]" controversial. *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1277. And it is "subjectively

46

controversial" too, because the Ordinance requires Uber in some cases to convey views on these subjects with which it disagrees. *Id.*; *see supra* pp. 38-42.

The Ordinance is thus subject to neither intermediate scrutiny nor something less. Because it regulates speech based on its content, it must survive strict scrutiny.

> 3.   *Because the City could have achieved its ends without burdening nearly as much speech, the Ordinance cannot survive any form of heightened scrutiny.*

"[I]t is the rare case" in which a government can show that a speech regulation survives strict scrutiny. *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015) (internal quotation marks omitted) (quoting *Burson v. Freeman*, 504 U.S. 191, 211 (1992) (plurality opinion)). This is not such a case. Indeed, even if only *intermediate* scrutiny applied, the Ordinance would still not pass muster.

Strict scrutiny is a "stringent standard." *NIFLA*, 585 U.S. at 766. To survive it, a law must be "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. In other words, it "must be the least restrictive means" of achieving such an interest. *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Intermediate scrutiny is somewhat more forgiving, but still requires the government to "show that the statute directly and materially advances a substantial governmental interest and that 'it is not more extensive than is necessary to further that interest.'" *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1116 (9th Cir. 2023) (quoting *Cent. Hudson*, 447 U.S. at 566). Because the City could have furthered any interests it has without

47

regulating anywhere near as much speech, it cannot carry its burden under either standard.

The Ordinance states that it seeks to protect app-based workers in order to "protect[] and promote[] public health, safety, and welfare." Ordinance §1(C). Protecting health, safety, and welfare is surely a legitimate goal, but not one the Supreme Court has ever held is so compelling, and "of the highest order," that it potentially justifies directly regulating speech. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010). In all events, the City is not free to pursue that interest the way it has here.

In particular, the City—which bears the burden to show adequate tailoring under either strict or intermediate scrutiny—lacks any explanation for why its interests "would be achieved less effectively" had it not regulated Uber's speech. *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). That is because there is none. The City could have proscribed deactivations on whatever grounds it disfavors, without forcing Uber to pretend it disfavors those grounds, too. Indeed, to the extent the City views itself as "establishing protections" for "workers," Ordinance §1(C), that is how such protections usually work, *see, e.g.*, 42 U.S.C. §2000e–2(a)(1). The City has never explained why it instead chose to regulate deactivation *policies*. And there is no reason to think that a normal conduct

48

regulation would have been less effective here than the City's unusual approach of directly regulating speech.[7]

Again, such a law would have been inadvisable and might suffer different constitutional problems. *See supra* p. 24 & n.5. And it is understandable that City Councilors and the Mayor did not want to substantively micromanage platforms' deactivation decisions, and thus take direct responsibility for the harms that will result. But the First Amendment still prohibits the City from forcing private speakers to bear that burden themselves when direct regulation of conduct would achieve the same objectives. Whatever other flaws an ordinance directly proscribing certain grounds for deactivation would have, it would at least regulate "[deactivation grounds] themselves" rather than "the communication of [deactivation grounds]," and so would not raise the same First Amendment concerns. *Expressions Hair Design*, 581 U.S. at 48.

The Ordinance thus "burden[s] substantially more speech than is necessary" to further the City's aim, and it is not sufficiently tailored to satisfy intermediate

---

[7] Other options were available, too. For instance, the City could have "incentiviz[ed]," rather than mandated, companies to adopt the deactivation policies it prefers. *NetChoice*, 113 F.4th at 1121.

49

scrutiny, *Ward*, 491 U.S. at 799—let alone strict scrutiny's "least restrictive means" test, *McCullen*, 573 U.S. at 478.  It therefore violates the First Amendment.[8]

## II.    Uber Is Likely to Succeed on the Merits of its Claim that the Ordinance Is Unconstitutionally Vague.

The Fourteenth Amendment's basic guarantee of due process requires "laws which regulate persons or entities" to "give fair notice of conduct that is forbidden or required."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  This "fundamental principle in our legal system"—"the first essential of due process of law"—"requires the invalidation of laws that are impermissibly vague."  *Id.* (cleaned up).

A law ordinarily violates this principle if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *Id.* (cleaned up).  But "[f]or laws implicating First Amendment freedoms, the void-for-vagueness doctrine has special purchase."  *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022).  Because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone … than if the boundaries of the forbidden areas were clearly marked," *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (cleaned up),

---

[8] Uber's First Amendment challenge is as-applied rather than facial.  But given the nature and structure of the Ordinance, it is hard to imagine any constitutional application of the deactivation policy requirement.

50

especially "rigorous adherence" to the fair notice requirement "is necessary to ensure that ambiguity does not chill protected speech," *Fox Television Stations*, 567 U.S. at 253-54; *see also Reno v. ACLU*, 521 U.S. 844, 871-72 (1997) ("vagueness" of a "content-based regulation of speech" in particular "raises special First Amendment concerns because of its obvious chilling effect"). Courts thus apply an even "more stringent vagueness test" to laws that "interfere[] with the right of free speech or of association." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982); *see, e.g.*, *Butcher*, 38 F.4th at 1169.

The Ordinance's deactivation policy requirement—which unquestionably regulates speech, *see supra* pp. 19-36—does not pass that test. That requirement, once more, compels Uber to craft and promulgate, on pain of significant penalties, a "[r]easonable policy" regarding deactivations, including only grounds for deactivation "reasonably related" to Uber's "safe and efficient operations." SMC §8.40.050(A)(2); *see id.* §8.40.170(A). The district court thought that was clear enough, and emphasized that use of the word "reasonable" is not *always* unconstitutionally vague. *See* ER-16-17. But that is not the question—it is whether the reasonableness requirement deployed *in this Ordinance* supplies adequate guidance to the targets of its regulation. It does not.

The standard that the deactivation policy requirement employs is at the very least facially indeterminate, as the term "reasonable" has no "commonly accepted

51

meaning." *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 558 (6th Cir. 1999). To be sure, a reasonableness standard may supply sufficient guidance to regulated parties in contexts where judicial guidance, tradition, industry custom, or statutory or regulatory context shed light. *See Trustees of Indiana Univ. v. Curry*, 918 F.3d 537, 542 (7th Cir. 2019) ("[W]hen considering whether statutory terms are too vague a federal court must take into account how they have been interpreted and applied."); *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1274 (9th Cir. 2017) ("[O]therwise imprecise terms may avoid vagueness problems when used in combination with terms that provide sufficient clarity" (cleaned up)). Here, though, there is no guidance, tradition, or custom on which regulated entities may rely. The City, after all, has boasted that the Ordinance is the first law of its kind in the Nation. *See supra* p. 5 & n.1. As it blazes the trail, it cannot simultaneously assume that Uber can divine what deactivation policies the City will deem "reasonable."

As for context, here it confuses rather than clarifies. The Ordinance does not explain what sorts of policies *are* "reasonably related" to "safe and efficient operations"; it offers up only a non-exhaustive list of eight that supposedly are *not*. And although some entries in that list are unremarkable—for instance, policies allowing for account deactivation based on "an app-based worker contacting the network company" or "asserting their legal rights," SMC §§8.40.050(A)(2)(d), (g)—the inclusion of others is confounding. It is surprising,

52

to say the least, to learn that a policy allowing account deactivation based on "a quantitative metric derived from aggregate customer ratings of an app-based worker's performance," or on "the results of a background check, consumer report, driver record, or record of traffic infractions" (with only limited exceptions), can *never* be even "reasonably related" to a platform's "safe and efficient operations." *Id.* §§8.40.050(A)(2)(e), (h).

*That*—rather than the Ordinance's mere inclusion of a "reasonableness" standard—is why the deactivation policy requirement is unconstitutionally vague. Nothing clarifies the naturally indeterminate standard it employs, there is no accepted industry custom, practice, or tradition of regulation to give it meaning, *and* what the Ordinance does say makes the standard that much more confusing.

The Supreme Court's decision in *Johnson v. United States*, 576 U.S. 591 (2015), illustrates the problem. That case, like this one, involved a statute with an already ambiguous catch-all clause followed by a "confusing list of examples." *Id.* at 603. "[C]ombining indeterminacy" in that way, the Court held, "produce[d] more unpredictability and arbitrariness than the Due Process Clause tolerates." *Id.* at 598. The Court's colorful hypothetical showed why: "The phrase 'shades of red,' standing alone, does not generate confusion or unpredictability; but the phrase 'fire-engine red, light pink, maroon, *navy blue*, or colors that otherwise involve shades of red' assuredly does so." *Id.* at 603 (emphasis in original) (cleaned up).

53

That lesson applies with full force here.  Like the statute at issue in *Johnson*, the Ordinance employs an undeniably flexible phrase—"reasonably related" to "safe and efficient operations"—and further obfuscates its meaning by tying it to examples that most would think *are*, or at least can be, reasonably related to safe and efficient operations.  The point is not, as the district court thought, that there is a "fundamental disagreement" between Uber and the City with respect to those puzzling examples— though that is certainly true.  ER-17.  It is that the City's non-exhaustive list of forbidden policies includes examples so counterintuitive that it is impossible for Uber to guess what *else* the City may deem not reasonably related to safety or efficiency.  Consumer ratings and background checks, one might say, are "navy blue" in the Ordinance's list of "shades of red."  Uber can only guess whether purple, green, and yellow will end up making that list, too.

Indeed, apparently the City itself can only guess.  Having reviewed Uber's existing deactivation guidance and declarations concerning that guidance, the City's own declarant below—an attorney from the Civil Enforcement section of the City Attorney's office—was unable to say definitively whether much of Uber's guidance complied with the Ordinance, offering only that there "could be" or "may not" be a conflict.  ER-19, 21-23.

In short, the Ordinance gives Uber next to no guidance about what specifics a "reasonable policy" may and may not lawfully contain.  Because crafting such a

54

policy with so little guidance "at best could be only guesswork," the Ordinance "denies fair notice" to Uber. *Johnson*, 576 U.S. at 597, 602 (cleaned up). The result will be chilled expression and deactivation policies that are both underinclusive and unresponsive to changes in on-the-ground conditions. In the face of such a vague statutory directive, the safest course is to "steer far wide[] of the unlawful zone," *Grayned*, 408 U.S. at 109 (cleaned up), and leave a potential deactivation trigger out of the policy—even if it concerns a safety, quality, anti-discrimination, or other issue on which Uber would otherwise take a strong stand. And should Uber guess right and land on a deactivation policy the City *does* approve, it would be unwise to adapt in response to new circumstances, since any policy change is a new roll of the dice. The Due Process Clause prohibits the City from placing Uber in that untenable position.

## III. Uber Is Likely to Show that the Entire Ordinance Is Invalid.

As Uber has explained, the Ordinance's deactivation policy requirement violates both the First Amendment and the Due Process Clause. Because that provision is not severable from the remainder of the Ordinance, the entire Ordinance is invalid.

"Severability of a local ordinance is a question of state law." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 772 (1988). Under Washington law, an unlawful provision is not severable if it is "intertwined with the remainder of the

[law]" and "fundamental to [its] efficacy"—even if the law contains a severability clause. *League of Women Voters of Wash. v. State*, 184 Wash.2d 393, 411-12 (Wash. 2015), *as amended on denial of reconsideration* (Nov. 19, 2015).  A law is "virtually worthless" if its "heart and soul" is an invalid provision, and it is therefore difficult to "believe[] that the legislature would have passed" the law without that provision. *Leonard v. City of Spokane*, 127 Wash.2d 194, 201-02 (Wash. 1995) (cleaned up).

The deactivation policy requirement is just such a provision: it is the foundation upon which the rest of the Ordinance is built, and without it the Ordinance simply cannot function.  Most notably, the Ordinance's prohibition on "unwarranted deactivation[s]" has substantive content only in light of the deactivation policy requirement.  SMC §8.40.060(A).  That is because the Ordinance defines an "[u]nwarranted deactivation" as one "that does not comply with Section 8.40.050"—the deactivation policy requirement.  *Id.* §8.40.020.  If Section 8.40.050 is unconstitutional—and it is—there is nothing in that section to "comply with," and the Ordinance's definition of "unwarranted deactivation" becomes a null set.

That is far from all.  The whole Ordinance is shot through with the assumption that the deactivation policy requirement will be operative, and that covered companies will issue deactivation policies consistent with its commands.  Take away that assumption—because the deactivation policy requirement is unconstitutional— and the Ordinance quickly unravels.  The procedures it provides for challenging

individual deactivations as "unwarranted," *see id.* §8.40.060, become useless; without the deactivation policy requirement giving content to the very notion of an "unwarranted" deactivation, there is no standard governing whether a challenge should succeed or fail. The Ordinance's explanation and substantiation requirements are independently unconstitutional, but they also fall apart without the deactivation policy requirement. They demand that companies explain and substantiate how their deactivation policies were violated, but without the deactivation policy requirement, companies need not issue such a policy in the first place. *See* SMC §§8.40.070(A), 8.40.080(A). So too does the records production requirement, which authorizes OLS to require companies to turn over their deactivation policies and data on the reasons for deactivations under those policies—material that need not exist without the deactivation policy requirement. *See id.* §§8.40.090(A)(1)(b), (e). The list goes on and on.[9]

The Ordinance as a whole thus cannot function if the requirement to adopt a deactivation policy in the first place is invalidated, and it is inconceivable that the

---

[9] The Ordinance's notice of rights requirement forces companies to provide notice of "[t]he right to challenge an unwarranted deactivation"—a concept that, again, depends on the deactivation policy requirement for all its substantive content. SMC §8.40.100(B)(1). And its recordkeeping requirements mandate that companies keep a "compliance file" for each deactivation, including the deactivation notice provided—a notice that, as just explained, must contain content that need not exist without the deactivation policy requirement. *Id.* §8.40.110(A)(1).

57

City Council "would have passed" the Ordinance without that requirement. *Leonard*, 127 Wash.2d at 201 (cleaned up).  The Ordinance is therefore invalid in its entirety.[10]

## IV.  A Preliminary Injunction Is Warranted.

Although the district court was wrong to conclude that Uber is unlikely to succeed on the merits, it was right to recognize that the remaining preliminary injunction factors largely rise or fall with the merits.  *See* ER-17-18.  Because Uber's claims *are* likely to succeed—and additional considerations likewise favor granting relief—a preliminary injunction is warranted.

### A.    Irreparable Harm

Uber is likely to suffer irreparable constitutional injury, as well as irreparable harm to its business and reputation, as long as the Ordinance remains in effect.  This factor thus favors a preliminary injunction.

*First*, because the Ordinance violates Uber's constitutional rights, it necessarily inflicts irreparable harm.  When a plaintiff alleges a "constitutional violation and injury" and "shows [it] is likely to prevail on the merits" of its constitutional claims, "that showing usually demonstrates [it] is suffering irreparable harm no matter how brief the violation."  *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th

---

[10] At a minimum, the deactivation policy requirement is not severable from the specific provisions noted in this discussion, and so enforcement of those provisions should be enjoined.

58

Cir. 2023).  In particular, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).  Uber is suffering such injury each day the Ordinance remains in effect.

*Second*, Uber is irreparably harmed by the City dictating the content of Uber's speech, which risks misleading the public about Uber's actual beliefs.  As Uber has explained, the Ordinance forces it to announce a deactivation policy, as its own, that conforms to the City's views on when courier accounts should be deactivated, and to disclose information the City thinks couriers should have, but which Uber believes should be kept confidential.  Because the City has interposed Uber and other network companies between the public and the City's policy choices, compliance with the Ordinance may lead the public to believe that *Uber* has reneged on its public commitments and lowered its safety, quality, and privacy standards—for example, by failing to commit to deactivating the accounts of couriers who have consistently failed to meet consumer expectations.  *See supra* pp. 32, 38-42; ER-109-11, 120-21. That is likely to harm Uber's reputation, *see* ER-111, 120-21, and such "loss of control over business reputation and damage to goodwill" amounts to irreparable harm, *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

59

*Third*, in some cases, the Ordinance's explanation and substantiation requirements will put Uber to an impossible choice *between* irreparable harms. ER-112. When Uber determines that a courier has committed fraud, for example, it will need to choose between deactivating the courier's account—and thus being forced to turn over information revealing its proprietary techniques for detecting fraud—or allowing the courier to continue using the platform, thus ignoring what the Ordinance itself recognizes to be "egregious misconduct," SMC §8.40.020. To do the former would help future fraudsters evade detection, but to do the latter would allow the potential fraud to continue and embolden the courier who committed it. ER-112. Being forced into that sort of "Hobson's choice" itself constitutes irreparable harm. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009).

### B.    Balance of Equities and Public Interest

The balance of equities and public interest—which merge here because the City is a government actor, *see Drakes Bay Oyster Co.*, 747 F.3d at 1092—likewise favor a preliminary injunction.

*First,* "it is *always* in the public interest to prevent the violation of a party's constitutional rights." *Baird*, 81 F.4th at 1040 (emphasis added, internal quotation marks omitted) (quoting *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707 (9th

Cir. 2022)).  Uber's likelihood of success "tips the public interest sharply" in favor of relief.  *Id.*[11]

*Second*, the public will not be harmed by a modest delay in enforcement of the Ordinance pending resolution of Uber's serious constitutional claims.  Delay, in fact, is built into the Ordinance itself: the City enacted it in August 2023, but scheduled it to take effect only in January 2025.  And OLS is barred from enforcing certain provisions—including the ban on "unwarranted" deactivations—for nearly two-and-a-half years more.  SMC §8.40.130(B).  Those built-in delays hardly suggest an urgent need for the Ordinance to remain in effect.  Nor does the City's dilatoriness in issuing rules to implement the Ordinance.  Despite consistent engagement from Uber and other stakeholders, the City did not even begin the rulemaking process until thirteen months after the Ordinance's enactment, and it *still* has not issued final rules.  *See* ER-58-59.  All of this reinforces the conclusion that there is no urgent need for this likely-unconstitutional Ordinance to remain in effect while Uber's serious constitutional claims are litigated.

---

[11] The district court was thus wrong to assert—without citing any authority, or offering any explanation—that "[e]ven if there was a likelihood of success, the public interest and balance of equities are divided, as the Ordinance does attempt to serve the public interest."  ER-18.  *Attempting* to serve the public interest in an unconstitutional way is not in the public interest.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court and remand with instructions to enter a preliminary injunction against enforcement of the Ordinance.

Date: February 11, 2025

|  | */s/ David M. Zionts* |
|---|---|
| Robert J. Maguire | Stacey K. Grigsby |
| Theo A. Lesczynski | David M. Zionts |
| DAVIS WRIGHT TREMAINE LLP | Neha Jaganathan |
| 920 Fifth Avenue, Suite 3300 | Alexander J. Cave |
| Seattle, WA 98104-1610 | COVINGTON & BURLING LLP |
| (206) 757-8094 | One CityCenter |
| robmaguire@dwt.com | 850 Tenth Street, NW |
| theolesczynski@dwt.com | Washington, DC 20001 |
|  | (202) 662-6000 |
|  | sgrigsby@cov.com |
|  | dzionts@cov.com |
|  | njaganathan@cov.com |
|  | acave@cov.com |
|  |  |
|  | Neema Sahni |
|  | Covington & Burling LLP |
|  | 1999 Avenue of the Stars, Suite 3500 |
|  | Los Angeles, CA 90067 |
|  | (424) 332-4800 |
|  | nsahni@cov.com |

*Attorneys for Plaintiffs-Appellants Uber Technologies, Inc. and Portier, LLC*

62

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** 25-228

The undersigned attorney or self-represented party states the following:

[ ]    I am unaware of any related cases currently pending in this court.

[ ]    I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ X ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

Case no. 25-231, *Maplebear Inc., et al. v. City of Seattle*, arises out of the same case in the U.S. District Court for the Western District of Washington and raises substantially the same issues. *See Uber Technologies, Inc. v. City of Seattle*, No. 2:24-cv-02103-MJP (W.D. Wash.). Uber Technologies, Inc. and Portier, LLC are the original plaintiffs in the underlying case. Maplebear Inc. d/b/a Instacart intervened as plaintiff and joined Uber's preliminary injunction motion. Maplebear Inc., like Uber, has appealed the district court's order denying a preliminary injunction.

**Signature** */s/ David M. Zionts*                          **Date** February 11, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-228

I am the attorney or self-represented party.

**This brief contains 13,779 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ]   complies with the word limit of Cir. R. 32-1.

[ ]   is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ]   is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ]   is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ]   complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ David M. Zionts*_____   **Date** February 11, 2025_____

**ADDENDUM**

## TABLE OF CONTENTS

App-Based Worker Deactivation Rights Ordinance, Seattle, Wash.,
    Ordinance 126878 (Aug. 14, 2023) (codified in part at Seattle Mun.
    Code, ch. 8.40 and §3.02.125)....................................................................... A-1

U.S. Const. Amendment I ...................................................................... A-40

U.S. Const. Amendment XIV, §1 ................................................... A-41

**App-Based Worker Deactivation Rights Ordinance, Seattle, Wash., Ordinance 126878 (Aug. 14, 2023) (codified in part at Seattle Mun. Code, ch. 8.40 and §3.02.125)**

## CITY OF SEATTLE

## ORDINANCE 126878

## COUNCIL BILL 120580

AN ORDINANCE relating to app-based worker labor standards; establishing labor standards on deactivation protections for app-based workers working in Seattle; amending Section 3.02.125 of the Seattle Municipal Code; and adding a new Chapter 8.40 to the Seattle Municipal Code.

WHEREAS, the Washington Constitution provides in Article XI, Section 11 that "[a]ny county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws"; NOW, THEREFORE,

**BE IT ORDAINED BY THE CITY OF SEATTLE AS FOLLOWS:**

**Section 1. The City Council ("Council") finds and declares that:**

A. App-based work is a growing source of income for workers in Seattle and across the country.

B. In the exercise of The City of Seattle's police powers, the City is granted authority to pass regulations designed to protect and promote public health, safety, and welfare.

C. This ordinance protects and promotes public health, safety, and welfare by establishing protections against unwarranted deactivations for app-based workers.

D. Many Seattle workers, including app-based workers, cannot fully participate in the community's dynamic civic life or pursue its myriad educational, cultural, and recreational opportunities because they struggle to meet their households' most basic needs, suffering job insecurity and economic instability.

E. Minimum labor standards benefit employers and hiring entities by improving worker performance, reducing worker turnover, and thereby improving productivity and the quality of the services provided by workers, including app-based workers.

A-1

F. Network companies typically manage large pools of app-based workers by relying on algorithmic management systems, which allow app-based workers to be "assigned, optimized, and evaluated through algorithms and tracked data."

G. While algorithmic management may bring certain benefits to network companies, these innovations also generate significant challenges for app-based workers, including information asymmetries and extreme power imbalances between workers and network companies.

H. App-based workers often do not have the information they need to know about how they will be evaluated. Algorithms that dictate core aspects of app-based workers' relationship with a network company can change unexpectedly, leading to arbitrary evaluations and unwarranted deactivations.

I. App-based workers are subject to network company policies that unilaterally deactivate workers for a variety of reasons without consistent access to a fair process for such deactivations, nor do the workers have access to responsive network company personnel with the power to correct unwarranted deactivations by in-person meetings or telephone.

J. App-based workers face potential deactivation for reasons including but not limited to: rejecting too many orders; being unavailable on certain days or times; cancelling offers with cause; being delayed in fulfilling orders; receiving low ratings from consumers; or algorithmic errors.

K. Network companies do not consistently apply clear performance expectations or policies for deactivations, and often deactivate app-based workers without explanation or warning.

L. App-based workers report being deactivated for low customer ratings, despite the fact that extensive social science research finds that consumer-sourced rating systems are highly likely to be influenced by bias on the basis of factors such as race or ethnicity. App-based workers also report deactivation based on customer harassment and false reports from customers.

M. Many network companies do not have processes to substantively reconsider a deactivation based on a case-by-case human review, and have little incentive to put those processes in place.

N. A review of network company hiring policies shows that most network companies perform recurring background checks on app-based workers as a condition of continued service. Network companies do not provide clear guidance

on background check criteria, methods for evaluating the relationship of criminal history record information to the performance of app-based service, procedures for correcting background check information, or procedures for appealing deactivations based on background check information.

O. Unclear and/or inconsistently applied background check policies exacerbate the difficulties app-based workers with criminal history records face when trying to secure or maintain work opportunities.

P. The high prevalence of background checks with errors, mismatched identities, and incomplete information, due to scant oversight of background check information provided to the private market, compounds these difficulties.

Q. Studies estimate that 50 to 80 percent of FBI criminal records are inaccurate. A common problem is that law enforcement agencies fail to update arrest or charge records with information about the outcome of a case. About a third of felony arrests never lead to a conviction, another third lead to conviction of a different (usually lesser) offense, and other convictions are overturned on appeal, expunged, or sealed.

R. The flexibility to determine hours of availability and which offers to accept, reject, or cancel with cause allows workers to make informed decisions on how and when to earn their income without fear of deactivation.

S. App-based workers who perform services in Seattle are not typically limited to work in the geographic boundaries of Seattle, and often accept offers to perform services in other jurisdictions.

T. Access to the records substantiating a network company's decision to deactivate an app-based worker, and access to records of the services performed in Seattle by that app-based worker, are critical for an app-based worker to meaningfully challenge their deactivation and attempt to get reinstated as soon as possible.

U. Establishing a reasonable standard for the deactivations of app-based workers as well as the ability to challenge unwarranted deactivations will help ensure that thousands of app-based workers who provide vital services in Seattle will be able to enjoy a measure of job security.

V. App-based workers who have protection against unwarranted deactivation will be more likely to remain in their positions over time. Such experienced app-

based workers will improve the safety and reliability of the app-based services provided to Seattle customers.

W. Minimum labor and compensation standards, including the right to challenge unwarranted deactivations, promote the general welfare, health, and prosperity of Seattle by ensuring that app-based workers have stable incomes and can better support and care for their families and fully participate in Seattle's civic, cultural, and economic life.

X. The regulation of app-based workers better ensures that such workers can perform their services in a safe and reliable manner and thereby promotes the welfare of the people and is thus a fundamental governmental function.

**Section 2. A new Chapter 8.40 is added to the Seattle Municipal Code as follows:**

**Chapter 8.40 APP-BASED WORKER DEACTIVATION RIGHTS**

**8.40.010 Short title**

This Chapter 8.40 shall constitute the "App-Based Worker Deactivation Rights Ordinance" and may be cited as such.

**8.40.020 Definitions**

For purposes of this Chapter 8.40:

"Accept" means an initial communication from an app-based worker to a network company that the app-based worker intends to perform services in furtherance of an offer, including but not limited to indicating acceptance through the worker platform.

"Adverse action" means reducing compensation; garnishing tips or gratuities; temporarily or permanently denying or limiting access to work, incentives, or bonuses; offering less desirable work; terminating; deactivating; threatening; penalizing; retaliating; engaging in unfair immigration-related practices; filing a false report with a government agency; or discriminating against any person for any reason prohibited by Section 8.40.120. "Adverse action" for an app-based worker may involve any aspect of the app-based worker's work, including compensation, work hours, volume, and frequency of offers made available, desirability and compensation rates of offers made available, responsibilities, or other material change in the terms and conditions of work or in the ability of an app-based worker

A-4

to perform work. "Adverse action" also includes any action by the network company or a person acting on the network company's behalf that would dissuade a reasonable person from exercising any right afforded by this Chapter 8.40.

"Agency" means the Office of Labor Standards and any division therein.

"Aggrieved party" means an app-based worker or other person who suffers tangible or intangible harm due to a network company's or other person's violation of this Chapter 8.40.

"App-based service" means any service in an offer facilitated or presented to an app-based worker by a network company or participation by an app-based worker in any training program required by a network company.

"App-based worker" means a person who has entered into an agreement with a network company governing the terms and conditions of use of the network company's worker platform or a person affiliated with and accepting offers to perform services for compensation via a network company's worker platform. For purposes of this Chapter 8.40, at any time, but not limited to, when an app-based worker is logged into the network company's worker platform, the worker is considered an app-based worker.

"Application dispatch" means technology that allows customers to directly request dispatch of app-based workers for provision of services and/or allows app-based workers or network companies to accept offers to perform services for compensation and payments for services via the internet using interfaces, including but not limited to website, smartphone, and tablet applications.

"Background check" means a request or attempt to obtain, directly or through an agent, a person's conviction record or criminal history record information from the Washington State Patrol or any other source that compiles and maintains such records or information.

"Cancellation with cause" has the same meaning as defined in Section 8.37.020.

"City" means The City of Seattle.

"Compensation" means the total amount of payment owed to an app-based worker by reason of performing work facilitated or presented by the network company, including but not limited to network company payments, bonuses, incentives, and tips earned from customers.

"Consumer report" has the same meaning as defined in RCW 19.182.010 as amended.

"Conviction record" and "criminal history record information" are meant to be consistent with chapter 10.97 RCW as amended, and mean information regarding a final criminal adjudication or other criminal disposition adverse to the subject, including a verdict of guilty, a finding of guilty, or a plea of guilty or nolo contendere. A criminal conviction record does not include any prior conviction that has been the subject of an expungement, vacation of conviction, sealing of the court file, pardon, annulment, certificate of rehabilitation, or other equivalent procedure based on a finding of the rehabilitation of the person convicted, or a prior conviction that has been the subject of a pardon, annulment, or other equivalent procedure based on a finding of innocence. It does include convictions for offenses for which the defendant received a deferred or suspended sentence, unless the adverse disposition has been vacated or expunged.

"Criminal history record information" is meant to be consistent with chapter 10.97 RCW as amended.

"Customer" means a paying customer and/or recipient of an online order.

"Deactivation" means the blocking of an app-based worker's access to the worker platform, changing an app-based worker's status from eligible to accept offers to perform services to ineligible, or other material restriction in access to the worker platform that is effected by a network company. Deactivation" does not include temporary suspensions lasting less than 48 hours when the worker platform is unavailable to an app-based worker due to reasons unrelated to the action or behavior of the app-based worker and that are clearly communicated to the app-based worker at the time of the temporary suspension. Such reasons include but are not limited to: technology, software, or network outages; account access or security issues; routine maintenance; and inclement weather endangering the safety of app-based workers in performing services in Seattle.

"Director" means the Director of the Office of Labor Standards or the Director's designee.

"Discrimination," "discriminate," and/or "discriminatory act" have the same meaning as defined in Section 14.04.030.

"Driver record" means an abstract of a person's driving record as described in RCW 46.52.130 as amended.

A-6

"Egregious misconduct" means an action or behavior by an individual app-based worker that: (1) endangers the physical safety of the customer, or a third person, the network company, or an animal; or (2) intentionally causes economic harm to the customer, a third person, or the network company; or (3) is threatening, harassing, or abusive to the customer, a third party, or the network company. "Egregious misconduct" includes but is not limited to conduct that occurs outside of an app-based worker's provision of app-based services or use of the network company's worker platform if the network company can prove by a preponderance of the evidence that the conduct directly relates to the app-based worker's fitness to provide app-based services or to use the network company's worker platform.

1. "Egregious misconduct" includes but is not limited to the following conduct in connection with an app-based worker's provision of app-based services or use of the network company's worker platform: assault, sexual assault, sexual harassment, communicating with a minor for immoral purposes, sexual conduct as defined in RCW 7.105.010 as amended, unlawful harassment as defined in RCW 7.105.010 as amended, hate crimes, racial slurs, unlawful imprisonment as defined in RCW 9A.40.040 as amended, kidnapping, unlawful possession of a firearm, solicitation of any sexual act, registration as a sex offender, stalking, theft, fraud, robbery, burglary, money laundering, animal cruelty, cybercrimes as defined in chapter 9A.90 RCW as amended, prostitution, driving-related crimes pursuant to RCW 46.61.500 through 46.61.540 as amended, failing to maintain a valid state driver's license, and other conduct that would constitute a Class A felony offense under Title 9 or 9A RCW as amended.

2. Egregious misconduct shall not include conduct related to non-criminal moving violations as defined by WAC 308-104-160, as amended, or traffic collisions unless the app-based worker has accumulated more than three non-criminal moving violations or at-fault collisions in the previous three years.

3. The Director may issue rules further defining what constitutes economic harm or egregious misconduct.

"Extraordinary circumstances" means circumstances beyond the network company's control that will materially influence the determination of whether a deactivation was warranted. Extraordinary circumstances may include, but are not limited to, a pending criminal investigation.

"Franchise" has the same meaning as defined in RCW 19.100.010 as amended.

"Front pay" means the compensation an app-based worker would earn or would have earned if reinstated to their former position.

"Hearing Examiner" means the official appointed by the City Council and designated as the Hearing Examiner under Chapter 3.02 or that person's designee (e.g., Deputy Hearing Examiner or Hearing Examiner Pro Tem).

"Incentive" means a sum of money paid to an app-based worker in addition to the guaranteed minimum network company payment for an offer, upon completion of specific tasks presented by the network companies, including but not limited to completing performance of a certain number of offers, completing performance of a certain number of consecutive offers, completing performance of an offer subject to a price multiplier or variable pricing policy, making oneself available to accept offers in a particular geographic location during a specified period of time, or recruiting new app-based workers.

"Network company" means an organization, whether a corporation, partnership, sole proprietor, or other form, operating in Seattle, that uses an online-enabled application or platform, such as an application dispatch system, to connect customers with app-based workers, present offers to app-based workers through a worker platform, and/or facilitate the provision of services for compensation by app-based workers.

1. The term "network company" includes any such entity or person acting directly or indirectly in the interest of a network company in relation to the app-based worker.

2. The term "network company" excludes:

a. An entity offering services that enable individuals to schedule appointments with and/or process payments to users, when the entity neither engages in additional intermediation of the relationships between parties to such transactions nor engages in any oversight of service provision;

b. An entity operating digital advertising and/or messaging platforms, when the entity neither engages in intermediation of the payments or relationships between parties to resulting transactions nor engages in any oversight of service provision;

c. An entity that meets the definition of "transportation network company" as defined by RCW 46.04.652 as amended; or

A-8

          d. An entity that meets the definition of "for-hire vehicle company" or "taxicab association" as defined in Section 6.310.110.

        A company that meets the definition of network company in this Section 8.40.020 and does not fall within any of the exclusions contained in this Section 8.40.020 is subject to this Chapter 8.40. Network companies include marketplace network companies, as defined by Section 8.37.020.

        "Offer" means one or more online orders presented to an app-based worker as one opportunity to perform services for compensation that the app-based worker may accept or reject.

        1. An opportunity to perform services for compensation includes but is not limited to an opportunity described via a worker platform as a shift, a period of time to be spent engaged in service provision, a continuous period of time in which the app-based worker must make themself available to perform services, or any other continuous period of time when the worker is not completely relieved of the duty to perform the service(s), and such a period of time shall be considered as one offer.

        2. The term "offer" includes pre-scheduled offers and on-demand offers, as defined in Section 8.37.020.

        "Online order" means an order for services that is placed through an online-enabled application or platform, such as an application dispatch system, and that is facilitated by a network company or presented by a network company for its own benefit. The Director may issue rules further defining the definition of "online order" and the types of transactions excluded from this definition. The term "online order" does not include the following transactions:

        1. Sale or rental of products or real estate;

        2. Payment in exchange for a service subject to professional licensure that has been listed by the Director pursuant to Section 8.37.020;

        3. Payment in exchange for services wholly provided digitally;

        4. Payment in exchange for creative services or works;

        5. Transportation network company (TNC) dispatched trips. For purposes of this Section 8.40.020, "TNC dispatched trips" means the provision of transportation by a driver for a passenger through the use of a transportation network company's application dispatch system; and

6. Transportation provided by taxicabs or for-hire vehicles, as defined in Chapter 6.310.

"Operating in Seattle" means, with respect to a network company, facilitating or presenting offers to provide services for compensation using an online-enabled application or platform, such as an application dispatch system, to any app-based worker, where such services are performed in Seattle.

"Paying customer" means a person or entity placing an online order via a network company's online-enabled application or platform.

"Perform services in Seattle" means activities, conducted by an app-based worker in furtherance of an offer, that occur in whole or in part within Seattle.

1. The term "perform services in Seattle" includes any time spent on a commercial stop in Seattle that is related to the provision of delivery or other services associated with an offer.

2. The term "perform services in Seattle" does not include stopping for refueling, stopping for a personal meal or errands, or time spent in Seattle solely for the purpose of travelling through Seattle from a point of origin outside Seattle to a destination outside Seattle with no commercial stops in Seattle.

"Rate of inflation" means 100 percent of the annual average growth rate of the bi-monthly Seattle-Tacoma-Bellevue Area Consumer Price Index for Urban Wage Earners and Clerical Workers, termed CPI-W, for the 12-month period ending in August; provided that the percentage increase shall not be less than zero.

"Respondent" means the network company or any person who is alleged or found to have committed a violation of this Chapter 8.40.

"Successor" means any person to whom a network company quitting, selling out, exchanging, or disposing of a business sells or otherwise conveys in bulk and not in the ordinary course of the network company's business, a major part of the property, whether real or personal, tangible or intangible, of the network company's business. For purposes of this definition, "person" means an individual, receiver, administrator, executor, assignee, trustee in bankruptcy, trust, estate, firm, corporation, business trust, partnership, limited liability partnership, company, joint stock company, limited liability company, association, joint venture, or any other legal or commercial entity.

"Tips" means a verifiable sum to be presented by a customer as a gift or gratuity in recognition of some service performed for the customer by the app-based worker receiving the tip.

"Traffic infraction" means a violation of state law or administrative regulation, or local law, ordinance, regulation, or resolution, relating to traffic including parking, standing, stopping, and pedestrian offenses, which is not classified as a criminal offense, consistent with RCW 46.63.020 as amended. A "traffic infraction" includes any offense committed in another jurisdiction that includes the elements of any offense designated as a traffic infraction consistent with RCW 46.63.020 as amended.

"Unwarranted deactivation" means a deactivation that does not comply with Section 8.40.050.

"Worker platform" means the worker-facing application dispatch system software or any online-enabled application service, website, or system, used by an app-based worker, that enables the arrangement of services for compensation.

"Written" or "in writing" means a printed or printable communication in physical or electronic format including a communication that is transmitted through email, text message, or a computer system, or is otherwise sent or maintained electronically, including via the worker platform.

## 8.40.030 App-based worker coverage

A. For the purpose of this Chapter 8.40, except for Section 8.40.100, covered app-based workers are limited to those for whom:

    1. During the previous 180 days, at least 25 percent of their completed offers, or offers cancelled with cause, involved performing services in Seattle for a covered network company; or

    2. The app-based worker's deactivation is related to an incident or incidents that occurred while performing services in Seattle for a covered network company.

B. For the purpose of Section 8.40.100, an app-based worker is covered by Section 8.40.100 if the app-based worker performs services in Seattle facilitated or presented by a network company covered by this Chapter 8.40.

C. An app-based worker who is a covered employee under Chapter 14.20 for a covered network company, or a covered employee under Chapter 14.20 for a customer of an online order, is not a covered app-based worker under this Chapter 8.40.

**8.40.040 Network company coverage**

A. For the purposes of this Chapter 8.40, covered network companies are limited to those that facilitate work performed by 250 or more app-based workers worldwide regardless of where those workers perform work, including but not limited to chains, integrated enterprises, or franchises associated with a franchise or network of franchises that facilitate work performed by 250 or more app-based workers worldwide in aggregate.

B. To determine the number of app-based workers performing work for the current calendar year:

1. The calculation is based upon the average number per calendar week of app-based workers who worked for compensation during the preceding calendar year for any and all weeks during which at least one app-based worker worked for compensation.

2. For network companies that did not have any app-based workers during the preceding calendar year, the number of app-based workers counted for the current calendar year is calculated based upon the average number per calendar week of app-based workers who worked for compensation during the first 90 calendar days of the current year in which the network company engaged in business.

3. If a network company quits, sells out, exchanges, or disposes the network company's business, or the network company's business is otherwise acquired by a successor, the number of app-based workers hired for the current calendar year for the successor network company is calculated based upon the average number per calendar week of app-based workers who worked for compensation during the first 90 calendar days of the current year in which the successor network company engaged in business.

4. All app-based workers who worked for compensation shall be counted, including but not limited to:

a. App-based workers who are not covered by this Chapter 8.40;

b. App-based workers who worked in Seattle; and

          c. App-based workers who worked outside Seattle.

C. Separate entities that form an integrated enterprise shall be considered a single network company under this Chapter 8.40. Separate entities will be considered an integrated enterprise and a single network company under this Chapter 8.40 where a separate entity controls the operation of another entity. The factors to consider in making this assessment include but are not limited to:

          1. Degree of interrelation between the operations of multiple entities;

          2. Degree to which the entities share common management;

          3. Centralized control of labor relations;

          4. Degree of common ownership or financial control over the entities; and

          5. Use of a common brand, trade, business, or operating name.

## 8.40.050 Deactivation requirements

A. A network company shall adopt the following measures prior to deactivating an app-based worker, except as provided in subsections 8.40.050.C and 8.40.050.D:

          1. Fair notice of deactivation policy. A network company must inform the app-based worker in writing of the network company's deactivation policy, defining what constitutes a violation that may result in deactivation. The network company's written deactivation policy must be specific enough for an app-based worker to understand what constitutes a violation and how to avoid violating the policy. The deactivation policy must be available to the app-based worker in English and any language that the network company knows or has reason to know is the primary language of the app-based worker. The deactivation policy must be accessible to the app-based worker at least three years after deactivation. The Director may issue rules governing the form and description of the deactivation policy, the manner of its distribution, and required languages for its translation.

          2. Reasonable policy. The policy that may lead to a deactivation must be reasonably related to the network company's safe and efficient operations. Examples of policies that are not reasonably related to the network company's safe and efficient operations include, but are not limited to:

a. Any rule or policy that would result in a deactivation based on an app-based worker's availability to work or number of hours worked, consistent with subsection 8.37.080.A.1;

b. Any policy that would result in a deactivation based on an app-based worker's acceptance or rejection of any individual offer, any types of offers, or any number or proportion of offers, consistent with subsection 8.37.080.A.2;

c. Any policy that would result in a deactivation based on an app-based worker's cancellation of an offer with cause, consistent with subsection 8.37.080.C;

d. Any policy that would result in a deactivation based on an app-based worker contacting the network company;

e. Any policy that would result in a deactivation based solely on a quantitative metric derived from aggregate customer ratings of an app-based worker's performance;

f. Any policy that would result in a deactivation based on statements by an app-based worker regarding compensation and/or working conditions made to customers, other app-based workers, network companies, the media, public officials, and/or the public;

g. Any policy that would result in a deactivation based on an app-based worker asserting their legal rights, whether in court or via procedures provided by any local, state, or federal agency; and

h. Any policy that would deactivate a worker based on the results of a background check, consumer report, driver record, or record of traffic infractions, except in cases of egregious misconduct or where required by other applicable law.

3. Investigation. A network company must conduct a fair and objective investigation prior to deactivating an app-based worker. The investigation must be sufficiently thorough to justify the deactivation and demonstrate an unbiased and neutral view of facts collected. If the app-based worker does not participate in the investigation or provide relevant information, the network company may complete the investigation based on available sources of information.

4. Confirmation of violation. The network company must demonstrate by a preponderance of the evidence that the alleged violation of the network company's policy or rule occurred.

5. Consistent application. The network company must apply the rule or policy, and penalty for violations, in a consistent manner.

6. Proportionate penalty. The penalty of deactivation must be reasonably related to the offense, and account for mitigating circumstances, such as the app-based worker's past work history with the network company.

B. Deactivation of an app-based worker will be considered unwarranted if the action is intended to or results in discrimination or a discriminatory act.

C. Subject to the provisions of this Section 8.40.050 and rules issued by the Director, a network company may immediately deactivate an app-based worker if such action is required to comply with any applicable court order or local, state, or federal laws or regulations, or where an app-based worker has engaged in egregious misconduct.

D. In the case of allegations of egregious misconduct, the network company may deactivate the app-based worker before completing an investigation. Except in extraordinary circumstances, the investigation shall not take longer than 14 days. If the investigation is delayed due to extraordinary circumstances, the network company must provide the app-based worker with written notice that the investigation is delayed, the reason(s) for the delay, and the date on which the completion of the investigation is anticipated.

## 8.40.060 Right to challenge deactivation

A. A network company shall not subject an app-based worker to unwarranted deactivation.

B. An app-based worker shall have a right to challenge the worker's deactivation through an internal deactivation challenge procedure established by the network company.

1. A network company shall create an internal deactivation challenge procedure that shall be available to the app-based worker immediately upon notice of their deactivation and up to 90 days after the app-based worker's receipt of notice.

A-15

2. The internal deactivation challenge procedure must be available to the app-based worker in writing, in a format that is readily accessible to the app-based worker, and in English and any language that the network company knows or has reason to know is the primary language of the app-based worker. The written policy describing the deactivation challenge procedure shall be available to the app-based worker at least three years after deactivation. The Director may issue rules governing the form and content of the policy describing the deactivation challenge procedure, the manner of its distribution, and required languages for its translation.

3. A network company shall review and respond to an app-based worker's challenge to deactivation within 14 days of receiving a challenge.

4. A network company's response to a worker's challenge to deactivation must include a written statement certified by an individual at the network company with authority to reinstate the app-based worker. The written statement must include one of the following:

a. Evidentiary substantiation of the deactivation pursuant to Section 8.40.080, and substantive responses to questions or claims made by the app-based worker in challenging the deactivation;

b. Any extraordinary circumstances necessitating a delayed timeline for response, and an anticipated date for a response either substantiating the deactivation or reinstating the app-based worker; or

c. A determination that the worker did not violate the network company's deactivation policy and therefore must be reinstated on the platform.

C. In addition to pursuing an internal challenge to deactivation pursuant to subsection 8.40.060.B, an app-based worker shall have a right to file a complaint with the Agency or bring a civil action for violations of the requirements of this Chapter 8.40 upon receiving the network company's initial response to the internal challenge, or 14 days after initiating a challenge, whichever comes earlier. An app-based worker may pursue all avenues of relief available thereafter within three years of the alleged violation, or as tolled pursuant to subsection 8.40.150.C.

D. An app-based worker shall have a right to challenge their deactivation and pursue all avenues of relief available to them regardless of the geographic location of the incidents leading to the network company's decision to deactivate the app-based worker.

**8.40.070 Notice of deactivation**

A. Except as provided under subsection 8.40.070.C, a network company shall provide an app-based worker with notice of deactivation 14 days in advance of the deactivation, as well as upon the effective date of deactivation. The notice of deactivation shall include a written statement of the following:

1. The reasons for deactivation; including the network company's policy that was violated, pursuant to Section 8.40.050, and the specific incident or pattern of incidents that violated the deactivation policy;

2. The effective date of deactivation;

3. Any and all records relied upon to substantiate deactivation, pursuant to Section 8.40.080;

4. The length of the deactivation;

5. A description of the steps an app-based worker can take to remedy the deactivation;

6. The app-based worker's right to challenge such deactivation under this Chapter 8.40;

7. The network company's process for challenging a deactivation, pursuant to subsection 8.40.060.B, including the available methods of contact for an app-based worker to initiate a challenge; and

8. Any other items pursuant to Director's Rules.

B. The network company shall provide notice of deactivation in a form and manner designated by the Agency. The Agency may create and distribute a model notice of deactivation in English and other languages as provided by rules issued by the Director. However, network companies are responsible for providing app-based workers with the notice of deactivation required by this subsection 8.40.070, regardless of whether the Agency has created and distributed a model notice of deactivation.

C. For deactivations involving egregious misconduct, pursuant to subsection 8.40.050.C, the network company shall provide an app-based worker with the notice of deactivation no later than the effective date of deactivation.

**8.40.080 Access to records substantiating deactivation**

A. Pursuant to subsection 8.40.080.C, upon notice of deactivation, a network company shall provide an app-based worker with the records relied upon by the network company to substantiate deactivation, unless contrary to local, state, or federal law. These records shall include but not be limited to the date, time, and location of all incidents supporting the deactivation decision, a copy of the evidence the network company considered in the deactivation decision, and a certified statement from an individual at the network company with authority to reinstate the app-based worker, attesting that these are true and accurate records to the individual's knowledge.

B. If further records substantiating a deactivation come into the network company's possession after the app-based worker is deactivated, such records shall be provided to the app-based worker as soon as practicable and no later than 14 days from the date of the network company's receipt.

C. If an app-based worker challenges a deactivation pursuant to subsection 8.40.060.B, all records of that challenge and any responses must be provided to the worker within 14 days of each submittal or response.

D. If the records substantiating deactivation involve information related to a customer or a third party and the network company reasonably believes that information could compromise the customer or third party's safety, the network company may take measures to anonymize information related to that customer or third party. If a complaint from a customer or third party is the sole basis for a deactivation, the network company may provide a summary description of the records substantiating the deactivation. The Director may issue rules regarding the measures taken to summarize the records substantiating the deactivation or anonymize information related to a customer or third party.

E. Network companies covered by Chapter 8.37 shall establish an accessible system for app-based workers to access their receipts for each offer performed or cancelled, pursuant to subsection 8.37.070.B. Network companies shall make this system available to the app-based worker via smartphone application or online web portal. This accessible system shall be available to an app-based worker at least three years after deactivation.

F. Network companies shall retain the records required by this Section 8.40.080 for a period of three years.

G. If a network company fails to disclose adequate records to the app-based worker as required under this Section 8.40.080, there shall be a presumption, rebuttable by clear and convincing evidence, that the network company violated this Chapter 8.40 for the relevant periods and for each app-based worker for whom records were not disclosed in a timely manner. This presumption is substantive and necessary to effectuate the other rights provided in this Chapter 8.40.

## 8.40.090 Affirmative production of records

A. A network company shall affirmatively transmit to the Agency such records as required by rules issued by the Director, on at least a quarterly basis until July 1, 2026, and at least every six months thereafter. The Director shall have the authority to require such aggregated or disaggregated records deemed necessary, appropriate, or convenient to administer, evaluate, and enforce the provisions of this Chapter 8.40. The Director may issue rules requiring that aggregated records be produced as a distribution at defined percentiles. The Director may issue data production rules of general applicability as well as rules specific to on-demand network companies, as defined in Section 8.37.020.

1. Records for production may include:

a. Records regarding the number of deactivations initiated by a network company;

b. Records regarding the reasons for deactivation most commonly referred to, such as the rule or policy violated by the app-based worker;

c. The number of app-based workers challenging their deactivation and the forum in which they are pursuing a challenge;

d. The number of app-based workers reinstated after deactivation, length of deactivation prior to reinstatement, and length of service prior to deactivation;

e. The network company's deactivation policy;

f. The network company's internal deactivation challenge procedure, pursuant to Section 8.40.060, including the available methods of contact for an app-based worker to initiate a challenge; and

g. Any other records that the Director determines are material and necessary to effectuate the purposes of this Chapter 8.40.

2. The Director shall issue rules governing the submission format, security, and privacy protocols relating to the submission of network company records, to the extent permitted by law.

## 8.40.100 Notice of rights

A. Network companies shall affirmatively provide each app-based worker with a written notice of rights established by this Chapter 8.40. The Agency may create and distribute a model notice of rights in English and other languages. If the Agency creates a model notice of rights, network companies shall affirmatively provide such notice according to the schedule outlined in subsection 8.40.100.A.1. However, network companies are responsible for providing app-based workers with the notice of rights required by this Section 8.40.100, in a form and manner sufficient to inform app-based workers of their rights under this Chapter 8.40, regardless of whether the Agency has created and distributed a model notice of rights.

1. Network companies shall affirmatively provide each app-based worker with the written notice of rights within one month of the effective date of this Chapter 8.40. For each app-based worker hired by the network company after this date, network companies shall provide the notice of rights within 24 hours of the first completed offer that involved performing services in Seattle, facilitated or presented by the network company.

2. For each app-based worker, network companies shall provide the notice of rights no less than annually.

B. The notice of rights shall provide information on:

1. The right to challenge an unwarranted deactivation through a network company's internal deactivation challenge procedure and/or through other avenues pursuant to Section 8.40.060, subject to coverage eligibility under subsection 8.40.030.A;

2. The policy describing the deactivation challenge procedure pursuant to subsection 8.40.060.B;

3. The right to 14 days' notice of an impending deactivation, except in the case of egregious misconduct;

4. The right to access any and all records relied upon by the network company to substantiate deactivation, pursuant to Section 8.40.080;

5. The right to be protected from retaliation for exercising in good faith the rights protected by this Chapter 8.40; and

6. The right to file a complaint with the Agency consistent with Section 8.40.130 or bring a civil action for violation of the requirements of this Chapter 8.40.

C. Network companies shall provide the notice of rights required by subsection 8.40.100.B in an electronic format that is readily accessible to the app-based worker. The notice of rights shall be made available to the app-based worker via smartphone application, email, or online web portal, in English and any language that the network company knows or has reason to know is the primary language of the app-based worker. The Director may issue rules governing the form and content of the notice of rights, the manner of its distribution, and required languages for its translation.

D. Network companies other than marketplace network companies shall establish an accessible system for app-based workers to understand their eligibility to challenge a deactivation, pursuant to subsection 8.40.030.A. This system shall be available to the app-based worker via smartphone application or online web portal. This system shall be available to an app-based worker, at least three years after deactivation. The Director may issue rules defining reasonable criteria or requirements for this system to ensure that app-based workers have sufficient information to understand when they are covered by the entirety of this Chapter 8.40, including but not limited to notice of coverage by this Chapter 8.40, the number of offers completed or cancellations in the previous 180 days, the number of completed offers or cancellations that involved performing services in Seattle in the previous 180 days, the overall percentage of completed offers that involved performing services in Seattle in the previous 180 days, and the app-based worker's receipts and/or payment disclosures for each offer performed or cancelled in the previous 180 days, pursuant to subsection 8.37.070.B and Section 14.34.060.

E. Marketplace network companies shall provide sufficient information for app-based workers to understand their eligibility to challenge a deactivation upon request by the app-based worker. Marketplace network companies shall make this information available upon request to the app-based worker via email. Marketplace network companies shall make this information available to an app-based worker, at least three years after deactivation. The Director may issue rules defining reasonable criteria or requirements to ensure that app-based workers have sufficient information to understand when they are covered by the entirety of this Chapter 8.40, including but not limited to notice of coverage by this Chapter 8.40, the number of offers completed or cancellations in the previous 180 days, the number of completed offers

A-21

or cancellations that involved performing services in Seattle in the previous 180 days, and the overall percentage of completed offers that involved performing services in Seattle in the previous 180 days.

**8.40.110 Network company records**

A. Network companies shall retain records that document compliance with this Chapter 8.40 for each app-based worker, including, at a minimum, a compliance file for each deactivation. The Director may issue rules governing the format of the records needed to constitute compliance of this Section 8.40.110. The Director may also issue rules governing the form, format, and content of the compliance file for each deactivation. This compliance file may include:

1. The deactivation notice provided to the app-based worker, pursuant to Section 8.40.070;

2. Date of completion of investigation;

3. Whether the deactivation involved egregious misconduct and, if so, the egregious misconduct at issue;

4. Whether the deactivation investigation includes extraordinary circumstances, pursuant to subsection 8.40.050.B and, if so, the extraordinary circumstances at issue;

5. Number of offers completed in the 180 days prior to deactivation notice;

6. Number of completed offers that involved performing services in Seattle in the 180 days prior to deactivation notice;

7. Date of deactivation challenge according to the network company's internal deactivation challenge procedure;

8. All responses to an app-based worker regarding a deactivation challenge, pursuant to subsections 8.40.060.B and 8.40.080.C; and

9. Any other records pursuant to Director's Rules.

B. Network companies shall retain the records required by subsection 8.40.110.A for a period of three years.

C. If a network company fails to retain adequate records required under subsection 8.40.110.A, there shall be a presumption, rebuttable by clear and convincing evidence, that the network company violated this Chapter 8.40 for the relevant periods and for each app-based worker for whom records were not retained. This presumption is substantive and necessary to effectuate the rights provided in this Chapter 8.40.

## 8.40.120 Retaliation prohibited

A. No network company or any other person acting on behalf of the network company shall interfere with, restrain, deny, or attempt to deny the exercise of any right protected under this Chapter 8.40.

B. No network company or any other person shall take any adverse action against any person because the person has exercised in good faith the rights protected under this Chapter 8.40. Such rights include, but are not limited to, the right to make inquiries about the rights protected under this Chapter 8.40; the right to inform others about their rights under this Chapter 8.40; the right to inform the person's network company, the person's legal counsel, a union or similar organization, or any other person about an alleged violation of this Chapter 8.40; the right to file an oral or written complaint with the Agency or bring a civil action for an alleged violation of this Chapter 8.40; the right to cooperate with the Agency in its investigations of this Chapter 8.40; the right to testify in a proceeding under or related to this Chapter 8.40; the right to refuse to participate in an activity that would result in a violation of city, state, or federal law; and the right to oppose any policy, practice, or act that is unlawful under this Chapter 8.40.

C. No network company or any other person shall communicate to a person exercising rights protected in this Section 8.40.120, directly or indirectly, the willingness to inform a government worker that the person is not lawfully in the United States, or to report, or to make an implied or express assertion of a willingness to report, suspected citizenship or immigration status of an app-based worker or family member of an app-based worker to a federal, state, or local agency because the app-based worker has exercised a right under this Chapter 8.40.

D. It shall be a rebuttable presumption of retaliation if a network company or any other person takes an adverse action against a person within 90 days of the person's exercise of rights protected in this Section 8.40.120. The network company may rebut the presumption with clear and convincing evidence that the adverse action was taken for a permissible purpose.

E. Proof of retaliation under this Section 8.40.120 shall be sufficient upon a showing that a network company or any other person has taken an adverse action against a person and the person's exercise of rights protected in this Section 8.40.120 was a motivating factor in the adverse action, unless the network company can prove that the action would have been taken in the absence of such protected activity.

F. The protections afforded under this Section 8.40.120 shall apply to any person who mistakenly but in good faith alleges violations of this Chapter 8.40.

G. A complaint or other communication by any person triggers the protections of this Section 8.40.120 regardless of whether the complaint or communication is in writing or makes explicit reference to this Chapter 8.40.

## 8.40.125 Rulemaking authority

The Director is authorized to promulgate, revise, or rescind rules and regulations deemed necessary, appropriate, or convenient to administer, evaluate, and enforce the provisions of this Chapter 8.40 pursuant to Chapter 3.02, providing affected entities with due process of law and in conformity with the intent and purpose of this Chapter 8.40. Any rules promulgated by the Director shall have the force and effect of law and may be relied on by network companies, app-based workers, and other parties to determine their rights and responsibilities under this Chapter 8.40.

## 8.40.130 Enforcement power and duties

A. Except as provided in subsection 8.40.130.B, on or after January 1, 2025, the Agency shall have the power to administer and enforce this Chapter 8.40 and shall have such powers and duties in the performance of these functions as are defined in this Chapter 8.40 and otherwise necessary and proper in the performance of the same and provided for by law.

B. The Agency shall not have the power to enforce subsections 8.40.050.A.3, 8.40.050.A.4, 8.40.050.A.5, 8.40.050.A.6, 8.40.050.B, 8.40.050.C, and 8.40.060.A until June 1, 2027. Starting June 1, 2027, the Agency may enforce subsections 8.40.050.A.3, 8.40.050.A.4, 8.40.050.A.5, 8.40.050.A.6, 8.40.050.B, 8.40.050.C, and 8.40.060.A. This subsection 8.40.130.B does not limit the ability of an app-based worker to seek other avenues of relief for violations of those subsections.

## 8.40.140 Violation

The failure of any respondent to comply with any requirement imposed on the respondent under this Chapter 8.40 is a violation.

**8.40.150 Investigation**

A. Except as provided in subsection 8.40.130.B, the Agency shall have the power to investigate any violations of this Chapter 8.40 by any respondent. The Agency may prioritize investigations of workforces that are vulnerable to violations of this Chapter 8.40. The Agency may initiate an investigation pursuant to Director's Rules, including but not limited to situations when the Director has reason to believe that a violation has occurred or will occur, or when circumstances show that violations are likely to occur within a class of network companies or businesses because either the workforce contains significant numbers of app-based workers who are vulnerable to violations of this Chapter 8.40, or the workforce is unlikely to volunteer information regarding such violations. An investigation may also be initiated through the receipt by the Agency of a report or complaint filed by an app-based worker, or any other person.

B. An app-based worker or other person may report to the Agency any suspected violation of this Chapter 8.40. The Agency shall encourage reporting pursuant to this Section 8.40.150 by taking the following measures:

1. The Agency shall keep confidential, to the maximum extent permitted by applicable laws, the name and other identifying information of the app-based worker or person reporting the violation. However, with the authorization of such person, the Agency may disclose the name of the app-based worker or other person and identifying information as necessary to enforce this Chapter 8.40 or for other appropriate purposes.

2. The Agency may require the network company to post or otherwise notify other app-based workers working for the network company that the Agency is conducting an investigation. The network company shall provide the notice of investigation in a form, place, and manner designated by the Agency. The Agency shall create the notice of investigation in English and other languages.

3. The Agency may certify the eligibility of eligible persons for "U" Visas under the provisions of 8 U.S.C. § 1184(p) and 8 U.S.C. § 1101(a)(15)(U). This certification is subject to applicable federal law and regulations, and Director's Rules.

C. The Agency's investigation shall commence within three years of the alleged violation. To the extent permitted by law, the applicable statute of limitations for civil actions is tolled during any investigation under this Chapter 8.40 and any

administrative enforcement proceeding under this Chapter 8.40 based upon the same facts. For purposes of this Chapter 8.40:

       1. The Agency's investigation begins on the earlier date of when the Agency receives a complaint from a person under this Chapter 8.40, or when the Agency provides notice to the respondent that an investigation has commenced under this Chapter 8.40.

       2. The Agency's investigation ends when the Agency issues a final order concluding the matter and any appeals have been exhausted; the time to file any appeal has expired; or the Agency notifies the respondent in writing that the investigation has been otherwise resolved.

D. The Agency's investigation shall be conducted in an objective and impartial manner.

E. The Director may apply by affidavit or declaration in the form allowed under RCW 5.50.050 as amended to the Hearing Examiner for the issuance of subpoenas requiring a network company to produce the records required by Section 8.40.080 or 8.40.110, or for the attendance and testimony of witnesses, or for the production of documents required to be retained under Section 8.40.080 or 8.40.110, or any other document relevant to the issue of whether any app-based worker or group of app-based workers received the information or other benefits required by this Chapter 8.40, and/or to whether a network company has violated any provision of this Chapter 8.40. The Hearing Examiner shall conduct the review without hearing as soon as practicable and shall issue subpoenas upon a showing that there is reason to believe that: a violation has occurred; a complaint has been filed with the Agency; or circumstances show that violations are likely to occur within a class of businesses because the workforce contains significant numbers of app-based workers who are vulnerable to violations of this Chapter 8.40, the workforce is unlikely to volunteer information regarding such violations, or the Agency has gathered preliminary information indicating that a violation may have occurred.

F. A network company that fails to comply with the terms of any subpoena issued under subsection 8.40.150.E in an investigation by the Agency under this Chapter 8.40 before the issuance of a Director's Order issued pursuant to subsection 8.40.160.C may not use such records in any appeal to challenge the correctness of any determination by the Agency of liability, damages owed, or penalties assessed.

G. In addition to other remedies, the Director may refer any subpoena issued under subsection 8.40.150.E to the City Attorney to seek a court order to enforce any subpoena.

H. Where the Director has reason to believe that a violation has occurred, the Director may order any appropriate temporary or interim relief to mitigate the violation or maintain the status quo pending completion of a full investigation or hearing, including but not limited to a deposit of funds or bond sufficient to satisfy a good faith estimate of compensation, interest, damages, and penalties due. A respondent may appeal any such order in accordance with Section 8.40.180.

## 8.40.160 Findings of fact and determination

A. Except when there is an agreed-upon settlement, the Director shall issue a written determination with findings of fact resulting from the investigation and statement of whether a violation of this Chapter 8.40 has or has not occurred based on a preponderance of the evidence before the Director.

B. If the Director determines that there is no violation of this Chapter 8.40, the Director shall issue a "Determination of No Violation" with notice of an app-based worker's or other person's right to appeal the decision, pursuant to Director's Rules.

C. If the Director determines that a violation of this Chapter 8.40 has occurred, the Director shall issue a "Director's Order" that shall include a notice of violation identifying the violation or violations.

1. The Director's Order shall state with specificity the amounts due under this Chapter 8.40 for each violation, including payment of unpaid compensation, liquidated damages, civil penalties, penalties payable to aggrieved parties, fines, and interest pursuant to Section 8.40.170.

2. The Director's Order may specify that civil penalties and fines due to the Agency can be mitigated for respondent's timely payment of remedy due to an aggrieved party pursuant to subsection 8.40.170.A.4.

3. The Director's Order may specify that civil penalties and fines are due to the aggrieved party rather than due to the Agency.

4. The Director's Order may direct the respondent to take such corrective action as is necessary to comply with the requirements of this Chapter 8.40, including but not limited to monitored compliance for a reasonable time period.

5. The Director's Order shall include notice of the respondent's right to appeal the decision pursuant to Section 8.40.180.

### 8.40.167 Navigation program

A. The Agency may establish a navigation program that provides intake, information, outreach, and/or education relating to the provisions and procedures of this Chapter 8.40. The range of information provided by the navigation program may include, but is not limited to:

1. General court information, such as:

a. Information on court procedures for filing civil actions in a court of competent jurisdiction; and

b. Information on obtaining translation and interpretation services;

2. General arbitration information, such as:

a. Information on arbitration procedures for filing arbitration claims; and

b. Information on obtaining translation and interpretation services;

3. A list of organizations that can be used to identify attorneys;

4. Organizations providing outreach and education, and/or legal assistance, to app-based workers;

5. Information about classifying workers as employees or independent contractors; and

6. As determined by the Director, additional information related to the provisions of this Chapter 8.40, other workplace protections, or other resources for resolving workplace issues.

B. The navigation program shall not include legal advice from the Agency. However, if the Agency provides information to an app-based worker about a community organization through the navigation program, the community organization is not precluded from providing legal advice.

## 8.40.170 Remedies

A. The payment of unpaid compensation, liquidated damages of up to twice the amount of unpaid compensation, civil penalties, penalties payable to aggrieved parties, fines, and interest provided under this Chapter 8.40 is cumulative and is not intended to be exclusive of any other available remedies, penalties, fines, and procedures.

1. The amounts of all civil penalties, penalties payable to aggrieved parties, and fines contained in this Section 8.40.170 shall be increased annually to reflect the rate of inflation and calculated to the nearest cent on January 1 of each year thereafter. The Agency shall determine the amounts and file a schedule of such amounts with the City Clerk.

2. If a violation is ongoing when the Agency receives a complaint or opens an investigation, the Director may order payment of unpaid compensation plus interest that accrues after receipt of the complaint or after the investigation opens and before the date of the Director's Order.

3. Interest shall accrue from the date the unpaid compensation was first due at 12 percent annum, or the maximum rate permitted under RCW 19.52.020 as amended.

4. If there is a remedy due to an aggrieved party, the Director may waive part or all civil penalties and fines due to the Agency based on timely payment of the full remedy due to the aggrieved party.

a. The Director may waive the total amount of civil penalties and fines due to the Agency if the Director determines that the respondent paid the full remedy due to the aggrieved party within ten days of service of the Director's Order.

b. The Director may waive half the amount of civil penalties and fines due to the Agency if the Director determines that the respondent paid the full remedy due to the aggrieved party within 15 days of service of the Director's Order.

c. The Director shall not waive any amount of civil penalties and fines due to the Agency if the Director determines that the respondent has not paid the full remedy due to the aggrieved party after 15 days of service of the Director's Order.

5. When determining the amount of liquidated damages, civil penalties, penalties payable to aggrieved parties, and fines due under this Section 8.40.170 for

a settlement agreement or Director's Order, including but not limited to the mitigation of civil penalties and fines due to the Agency for timely payment of remedy due to an aggrieved party under subsection 8.40.170.A.4, the Director may consider:

        a. The total amount of unpaid compensation, liquidated damages, penalties, fines, and interest due;

        b. The nature and persistence of the violations;

        c. The extent of the respondent's culpability;

        d. The substantive or technical nature of the violations;

        e. The size, revenue, and human resources capacity of the respondent;

        f. The circumstances of each situation;

        g. The amount of penalties in similar situations; and

        h. Pursuant to rules that the Director may issue, other factors that are material and necessary to effectuate the terms of this Chapter 8.40.

B. A respondent found to be in violation of this Chapter 8.40 shall be liable for full payment of unpaid compensation due plus interest in favor of the aggrieved party for the period of deactivation under the terms of this Chapter 8.40, and other equitable relief.

    1. If the precise amount of unpaid compensation cannot be determined due to a respondent's failure to produce records or if a respondent produces records in a manner or form which makes timely determination of the amount of unpaid compensation impracticable, the Director may:

        a. Determine unpaid compensation as a matter of just and reasonable inference, including the use of representative evidence such as testimony or other evidence from representative employees or other aggrieved parties establishing violations for a class of employees or aggrieved parties; or

        b. Assess a daily amount for unpaid compensation plus interest in favor of the aggrieved party in a minimum amount of at least the equivalent of payment for eight hours of work at the "hourly minimum wage" rate for Schedule 1 employers under Chapter 14.19.

2. For a first violation of this Chapter 8.40, the Director may assess liquidated damages in an additional amount of up to twice the unpaid compensation.

3. For subsequent violations of this Chapter 8.40, the Director shall assess an amount of liquidated damages in an additional amount of twice the unpaid compensation.

4. For purposes of establishing a first and subsequent violation for this Section 8.40.170, the violation must have occurred within ten years of the settlement agreement or Director's Order.

C. A respondent found to be in violation of this Chapter 8.40 for retaliation under Section 8.40.120 shall be subject to any appropriate relief at law or equity including, but not limited to, reinstatement of the aggrieved party, front pay in lieu of reinstatement with full payment of unpaid compensation plus interest in favor of the aggrieved party under the terms of this Chapter 8.40, and liquidated damages in an additional amount of up to twice the unpaid compensation. The Director also shall order the imposition of a penalty payable to the aggrieved party of up to $6,230.88.

D. The Director is authorized to assess civil penalties for a violation of this Chapter 8.40 and may specify that civil penalties are due to the aggrieved party rather than due to the Agency.

1. For a first violation of this Chapter 8.40, the Director may assess a civil penalty of up to $622.85 per aggrieved party.

2. For a second violation of this Chapter 8.40, the Director shall assess a civil penalty of up to $1,245.71 per aggrieved party, or an amount equal to ten percent of the total amount of unpaid compensation, whichever is greater.

3. For a third or any subsequent violation of this Chapter 8.40, the Director shall assess a civil penalty of up to $6,230.88 per aggrieved party, or an amount equal to ten percent of the total amount of unpaid compensation, whichever is greater.

4. For purposes of this subsection 8.40.170.D, a violation is a second, third, or subsequent violation if the respondent has been a party to one, two, or more than two settlement agreements, respectively, stipulating that a violation has occurred; and/or one, two, or more than two Director's Orders, respectively, have issued against the respondent in the ten years preceding the date of the violation; otherwise, it is a first violation.

A-31

E. The Director is authorized to assess fines for a violation of this Chapter 8.40 and may specify that fines are due to the aggrieved party rather than due to the Agency. The Director is authorized to assess fines as follows:

| Violation | Fine |
|---|---|
| Failure to comply with deactivation requirements under Section 8.40.050 | $622.85 per aggrieved party |
| Failure to provide app-based worker with an internal deactivation challenge procedure under Section 8.40.060 | $622.85 per aggrieved party |
| Failure to provide app-based worker with a notice of deactivation under Section 8.40.070 | $622.85 per aggrieved party |
| Failure to provide app-based worker with records relied upon by the network company to substantiate the deactivation under Section 8.40.080 | $622.85 per aggrieved party |
| Failure to provide certified statement attesting to records provided to substantiate deactivation under Section 8.40.080 | $622.85 per aggrieved party |
| Failure to provide written notice of rights under Section 8.40.100 | $622.85 per aggrieved party |
| Failure to retain network company records for three years under subsections 8.40.110.B | $622.85 per missing record |
| Failure to provide notice of investigation to app-based workers under subsection 8.40.150.B.2 | $622.85 per aggrieved party |
| Failure to post or distribute public notice of failure to comply with final order under subsection 8.40.210.A.1 | $622.85 per aggrieved party |

The maximum amount that may be imposed in fines in a one-year period for each type of violation listed above is $6,230.88 per aggrieved party.

F. A respondent that willfully hinders, prevents, impedes, or interferes with the Director or Hearing Examiner in the performance of their duties under this Chapter 8.40 shall be subject to a civil penalty of not less than $1,245.71 and not more than $6,230.88.

G. In addition to the unpaid compensation, penalties, fines, liquidated damages, and interest, the Agency may assess against the respondent in favor of the City the reasonable costs incurred in enforcing this Chapter 8.40, including but not limited to reasonable investigation costs and attorneys' fees. The Director may issue rules on the amounts and contributing factors for assessing reasonable investigation costs and is strongly encouraged to assess such costs in favor of the City to support the Agency's implementation of this Chapter 8.40.

H. A respondent that is the subject of a settlement agreement stipulating that a violation shall count for debarment, or a final order for which all appeal rights have been exhausted, shall not be permitted to bid, or have a bid considered, on any City contract until such amounts due under the final order have been paid in full to the Director. If the respondent is the subject of a final order two times or more within a five-year period, the network company shall not be allowed to bid on any City contract for two years. This subsection 8.40.170.H shall be construed to provide grounds for debarment separate from, and in addition to, those contained in Chapter 20.70 and shall not be governed by that chapter; provided, that nothing in this subsection 8.40.170.H shall be construed to limit the application of Chapter 20.70. The Director shall notify the Director of Finance and Administrative Services of all respondents subject to debarment under this subsection 8.40.170.H.

## 8.40.180 Appeal period and failure to respond

A. An app-based worker or other person who claims an injury as a result of an alleged violation of this Chapter 8.40 may appeal the Determination of No Violation, pursuant to Director's Rules.

B. A respondent may appeal the Director's Order, including all remedies issued pursuant to Section 8.40.170, by requesting a contested hearing before the Hearing Examiner in writing within 15 days of service of the Director's Order. If a respondent fails to appeal the Director's Order within 15 days of service, the Director's Order shall be final. If the last day of the appeal period so computed is a Saturday, Sunday, or federal or City holiday, the appeal period shall run until 5 p.m. on the next business day.

## 8.40.190 Appeal procedure and failure to appear

A. Contested hearings shall be conducted pursuant to the procedures for hearing contested cases contained in Section 3.02.090 and the rules adopted by the Hearing Examiner for hearing contested cases. The hearing shall be conducted de novo and the Director shall have the burden of proving by a preponderance of the

evidence that the violation or violations occurred. Upon establishing such proof, the remedies and penalties imposed by the Director shall be upheld unless it is shown that the Director abused discretion. Failure to appear for a contested hearing shall result in an order being entered finding that the respondent committed the violation stated in the Director's Order. For good cause shown and upon terms the Hearing Examiner deems just, the Hearing Examiner may set aside an order entered upon a failure to appear.

B. In all contested cases, the Hearing Examiner shall enter an order affirming, modifying, or reversing the Director's Order.

## 8.40.200 Appeal from Hearing Examiner order

A. The respondent may obtain judicial review of the decision of the Hearing Examiner by applying for a Writ of Review in the King County Superior Court within 30 days from the date of the decision in accordance with the procedure set forth in chapter 7.16 RCW as amended, other applicable law, and court rules.

B. The decision of the Hearing Examiner shall be final and conclusive unless review is sought in compliance with this Section 8.40.200.

## 8.40.210 Failure to comply with final order

A. If a respondent fails to comply within 30 days of service of any settlement agreement with the Agency, or with any final order issued by the Director or the Hearing Examiner for which all appeal rights have been exhausted, the Agency may pursue, but is not limited to, the following measures to secure compliance:

1. The Director may require the respondent to post or distribute public notice of the respondent's failure to comply in a form and manner determined by the Agency.

2. The Director may refer the matter to a collection agency. The cost to the City for the collection services will be assessed as costs, at the rate agreed to between the City and the collection agency, and added to the amounts due.

3. The Director may refer the matter to the City Attorney for the filing of a civil action in a court of competent jurisdiction to enforce such order or to collect amounts due. In the alternative, the Director may seek to enforce a settlement agreement, Director's Order, or a final order of the Hearing Examiner under Section 8.40.190.

4. The Director may request that the City's Department of Finance and Administrative Services deny, suspend, refuse to renew, or revoke any business license held or requested by the network company or person until such time as the network company complies with the remedy as defined in the settlement agreement or final order. The City's Department of Finance and Administrative Services shall have the authority to deny, refuse to renew, or revoke any business license in accordance with this subsection 8.40.210.A.4.

B. No respondent that is the subject of a final order issued under this Chapter 8.40 shall quit business, sell out, exchange, convey, or otherwise dispose of the respondent's business or stock of goods without first notifying the Agency and without first notifying the respondent's successor of the amounts owed under the final order at least three business days before such transaction. At the time the respondent quits business, or sells out, exchanges, or otherwise disposes of the respondent's business or stock of goods, the full amount of the remedy, as defined in a final order issued by the Director or the Hearing Examiner, shall become immediately due and payable. If the amount due under the final order is not paid by respondent within ten days from the date of such sale, exchange, conveyance, or disposal, the successor shall become liable for the payment of the amount due; provided, that the successor has actual knowledge of the order and the amounts due or has prompt, reasonable, and effective means of accessing and verifying the fact and amount of the order and the amounts due. The successor shall withhold from the purchase price a sum sufficient to pay the amount of the full remedy. When the successor makes such payment, that payment shall be deemed a payment upon the purchase price in the amount paid, and if such payment is greater in amount than the purchase price the amount of the difference shall become a debt due such successor from the network company.

## 8.40.220 Debt owed The City of Seattle

A. All monetary amounts due under the Director's Order shall be a debt owed to the City and may be collected in the same manner as any other debt in like amount, which remedy shall be in addition to all other existing remedies; provided, that amounts collected by the City for unpaid compensation, liquidated damages, penalties payable to aggrieved parties, or front pay shall be held in trust by the City for the aggrieved party and, once collected by the City, shall be paid by the City to the aggrieved party.

B. If a respondent fails to appeal a Director's Order to the Hearing Examiner within the time period set forth in subsection 8.40.180.B, the Director's Order shall be final, and the Director may petition the Seattle Municipal Court, or any court of

competent jurisdiction, to enforce the Director's Order by entering judgment in favor of the City finding that the respondent has failed to exhaust its administrative remedies and that all amounts and relief contained in the order are due. The Director's Order shall constitute prima facie evidence that a violation occurred and shall be admissible without further evidentiary foundation. Any certifications or declarations authorized under RCW 5.50.050 as amended containing evidence that the respondent has failed to comply with the order or any parts thereof, and is therefore in default, or that the respondent has failed to appeal the Director's Order to the Hearing Examiner within the time period set forth in subsection 8.40.180.B, and therefore has failed to exhaust the respondent's administrative remedies, shall also be admissible without further evidentiary foundation.

C. If a respondent fails to obtain judicial review of an order of the Hearing Examiner within the time period set forth in subsection 8.40.200.A, the order of the Hearing Examiner shall be final, and the Director may petition the Seattle Municipal Court to enforce the Director's Order by entering judgment in favor of the City for all amounts and relief due under the order of the Hearing Examiner. The order of the Hearing Examiner shall constitute conclusive evidence that the violations contained therein occurred and shall be admissible without further evidentiary foundation. Any certifications or declarations authorized under RCW 5.50.050 as amended containing evidence that the respondent has failed to comply with the order or any parts thereof, and is therefore in default, or that the respondent has failed to avail itself of judicial review in accordance with subsection 8.40.200.A, shall also be admissible without further evidentiary foundation.

D. In considering matters brought under subsections 8.40.220.B and 8.40.220.C, the Seattle Municipal Court may include within its judgment all terms, conditions, and remedies contained in the Director's Order or the order of the Hearing Examiner, whichever is applicable, that are consistent with the provisions of this Chapter 8.40.

## 8.40.230 Private right of action

A. Any person or class of persons that suffers an injury as a result of a violation of this Chapter 8.40, or is the subject of prohibited retaliation under Section 8.40.120, may bring a civil action in a court of competent jurisdiction against the network company or other person violating this Chapter 8.40 and, upon prevailing, may be awarded reasonable attorney fees and costs and such legal or equitable relief as may be appropriate to remedy the violation including, without limitation: the payment of any unpaid compensation plus interest due to the person; liquidated damages in an additional amount of up to twice the unpaid compensation; a penalty

payable to the aggrieved party of up to $6,230.88 if the aggrieved party was subject to prohibited retaliation; and other civil penalties and fines payable to any aggrieved party, consistent with Section 8.40.170. Interest shall accrue from the date the unpaid compensation was first due at 12 percent per annum, or the maximum rate permitted under RCW 19.52.020 as amended.

B. For purposes of this Section 8.40.230, "person" includes any entity a member of which has suffered an injury or retaliation, or any other individual or entity acting on behalf of an aggrieved party that has suffered an injury or retaliation.

C. For purposes of determining membership within a class of persons entitled to bring an action under this Section 8.40.230, two or more app-based workers are similarly situated if they:

    1. Performed services in Seattle for the same network company or network companies, whether concurrently or otherwise, at some point during the applicable statute of limitations period;

    2. Allege one or more violations that raise similar questions as to liability; and

    3. Seek similar forms of relief.

D. For purposes of subsection 8.40.230.C, app-based workers shall not be considered dissimilar solely because:

    1. The app-based workers' claims seek damages that differ in amount; or

    2. The job titles of or other means of classifying the app-based workers differ in ways that are unrelated to their claims.

E. An order issued by a court may include a requirement for a network company to submit a compliance report to the court and/or to the Agency.

**8.40.233 Waiver**

Any waiver by an individual of any provisions of this Chapter 8.40 shall be deemed contrary to public policy and shall be void and unenforceable.

## 8.40.235 Encouragement of more generous policies

A. Nothing in this Chapter 8.40 shall be construed to discourage or prohibit a network company from the adoption or retention of minimum standards for deactivation policies for app-based workers that are more generous than the minimum standards required by this Chapter 8.40.

B. Nothing in this Chapter 8.40 shall be construed as diminishing the obligation of the network company to comply with any contract or other agreement providing more generous minimum standards for deactivation policies for app-based workers than required by this Chapter 8.40.

## 8.40.240 Other legal requirements-Effect on other laws

A. The provisions of this Chapter 8.40:

1. Supplement and do not diminish or replace any other basis of liability or requirement established by statute or common law;

2. Shall not be construed to preempt, limit, or otherwise affect the applicability of any other law, regulation, requirement, policy, or standard for minimum deactivation requirements, or other protections to app-based workers; and

3. Shall not be interpreted or applied so as to create any power or duty in conflict with federal or state law.

B. This Chapter 8.40 shall not be construed to preclude any person aggrieved from seeking judicial review of any final administrative decision or order made under this Chapter 8.40 affecting such person. Nothing in this Section 8.40.240 shall be construed as restricting the right of an app-based worker or other person to pursue any other remedies at law or equity for violation of the app-based worker's rights.

C. A network company's failure to comply with the provisions of this Chapter 8.40 shall not render any contract between the network company and an app-based worker void or voidable.

D. No provision of this Chapter 8.40 shall be construed as providing a determination about the legal classification of any individual as an employee or independent contractor.

**8.40.250 Severability**

The provisions of this Chapter 8.40 are declared to be separate and severable. If any clause, sentence, paragraph, subdivision, section, subsection, or portion of this Chapter 8.40, or the application thereof to any network company, app-based worker, person, or circumstance, is held to be invalid, it shall not affect the validity of the remainder of this Chapter 8.40, or the validity of its application to other persons or circumstances.

**Section 3. Section 3.02.125 of the Seattle Municipal Code, last amended by Ordinance 126788, is amended as follows:**

**3.02.125 Hearing Examiner filing fees**

A. The filing fee for a case before the City Hearing Examiner is $85, with the following exceptions:

| Basis for Case | Fee in dollars |
|---|---|
| * * * | |
| All-Gender Restroom Notice of Violation (Section 14.07.040) | No fee |
| App-Based Worker Deactivation Rights Ordinance (Chapter 8.40) | No fee |
| App-Based Worker Minimum Payment Ordinance (Chapter 8.37) | No fee |
| * * * | |

* * *

**Section 4. The City Council requests that the Office of Labor Standards provide a report back to Council on the implementation of this ordinance by no later than September 1, 2026.**

**Section 5. Section 2 of this ordinance shall take effect on January 1, 2025.**

**Section 6. This ordinance shall take effect and be in force 30 days after its approval by the Mayor, but if not approved and returned by the Mayor within ten days after presentation, it shall take effect as provided by Seattle Municipal Code Section 1.04.020.**

## U.S. Const. Amendment I

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

## U.S. Const. Amendment XIV, §1

**Section 1.**

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

No. 25-228

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UBER TECHNOLOGIES, INC. AND PORTIER, LLC,

*Plaintiffs-Appellants*,

and

MAPLEBEAR INC. D/B/A INSTACART,

*Intervenor-Plaintiff*,

v.

CITY OF SEATTLE,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Western District of Washington
No. 2:24-cv-02103-MJP
Hon. Marsha J. Pechman

EXCERPTS OF RECORD OF PLAINTIFF-APPELLANTS UBER
TECHNOLOGIES, INC. AND PORTIER, LLC (Volume 1 of 1)

Neema Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067
(424) 332-4800

Robert J. Maguire
Theo A. Lesczynski
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
(206) 757-8094

Stacey K. Grigsby
David M. Zionts
Neha Jaganathan
Alexander J. Cave
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Attorneys for Plaintiffs-Appellants Uber Technologies, Inc. and Portier, LLC*

**INDEX**

| Document | Document Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| Order Denying Motion for Temporary Restraining Order and Preliminary Injunction | 12/31/2024 | 34 | ER-3 |
| Declaration of Sara O'Connor-Kriss | 12/23/2025 | 24 | ER-19 |
| Defendant's Opposition to Motion for Temporary Restraining Order | 12/23/2025 | 20 | ER-24 |
| Declaration of Allison Ford | 12/18/2024 | 13 | ER-56 |
| Declaration of Daniel Crawford | 12/18/2024 | 10 | ER-99 |
| Declaration of Hannah Nilles | 12/18/2024 | 9 | ER-114 |
| Plaintiffs' Complaint for Declaratory and Injunctive Relief | 12/18/2024 | 1 | ER-123 |
| Notice of Appeal | 1/13/2025 | 38 | ER-158 |
| District Court Docket Sheet | N/A | N/A | ER-164 |

1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF WASHINGTON
9                               AT SEATTLE

10    UBER TECHNOLOGIES, INC. and              CASE NO. 2:24-cv-2103-MJP
      PORTIER, LLC,
11                                             ORDER DENYING MOTION FOR
                           Plaintiffs,         TEMPORARY RESTRAINING
12                                             ORDER AND PRELIMINARY
      MAPLEBEAR INC. d/b/a INSTACART,          INJUNCTION
13
                           Plaintiff-Intervenor
14
            v.
15
      CITY OF SEATTLE,
16
                           Defendant.
17

18

19          This matter comes before the Court on Plaintiffs' Motion for Temporary Restraining

20    Order and Preliminary Injunction. (Dkt. No. 8.) Having reviewed the Motion, the Response (Dkt.

21    No. 20), the Memorandum in Support Intervention (Dkt. No. 27), and all supporting materials,

22    and having held oral argument on December 31, 2024, the Court DENIES the Motion.

23

24

ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION - 1

## BACKGROUND

Plaintiffs Uber Technologies, Inc. and Portier, LLC ("Uber") operate a food delivery platform, Uber Eats, which allows customers to order food, groceries, and other items through the Uber Eats phone app. (Declaration of Daniel Crawford ¶¶ 5–6 (Dkt. No. 10).) The app sends the order to the business for fulfillment, and then offers the platform's delivery drivers, or "app workers," the opportunity to pick up the orders and deliver them to the customers for a fee. App workers do not have the same legal protections as employees, and are vulnerable to being "deactivated," or losing access to the delivery app and an "essential source of income." (Crawford Decl. ¶ 9.)

In August 2023, the City of Seattle passed the App-Based Worker Deactivation Rights Ordinance (the "Ordinance"). The Ordinance is attached to this Order. Set to go into effect on January 1, 2025, the Ordinance "establish[es] labor standards on deactivation protections for app-based workers working in Seattle." Ordinance at 1. The Ordinance adds a new chapter to the Seattle Municipal Code, SMC 8.40, which takes aim at unwarranted deactivations by requiring "network companies," such as Uber, to "inform" app workers "in writing" of the company's deactivation policy, "defining what constitutes a violation that may result in deactivation." SMC 8.40.050(A)(1). The policy must be "specific enough for an app-based worker to understand what constitutes a violation and how to avoid violating the policy," and it must be "reasonably related to the network company's safe and efficient operations." SMC 8.40.050(A)(1)–(2). The Ordinance includes a non-exhaustive list of example policies which are "not reasonably related to . . . safe and efficient operations." SMC 8.40.050(2)(a)–(h).

Beyond the deactivation policy requirement primarily at issue in this dispute, the Ordinance includes: (1) the right for an app worker to challenge their deactivation, SMC

1  8.40.060; (2) a requirement that network companies to retain "records relied upon by the network

2  company to substantiate deactivation," SMC 8.40.080(A); (3) an authorization for the Seattle

3  Office of Labor Standards ("OLS") director to "promulgate, revise, or rescind rules," SMC

4  8.40.125, and (4) permission for OLS to investigate potential violations of the Ordinance, SMC

5  8.40.150. And while the Ordinance prohibits OLS from penalizing or investigating "unwarranted

6  deactivations" until June 1, 2027, see SMC 8.40.130(B), there is a private right of action that

7  allows civil suits to be brought against network companies for violations, see SMC 8.40.230.

8     After the Ordinance was passed, Uber and other stakeholders engaged with the City

9  throughout the legislative process to refine the contours of the prohibitions and enforcement

10  mechanisms outlined by the Ordinance. (Declaration of Jasmine Marwaha ¶¶ 6, 9 (Dkt. No. 22).)

11  During that time, Uber "submitted multiple rounds of comments, offered testimony, and met

12  with industry stakeholders and OLS representatives," but were "concerned about their ability to

13  timely assess and comply with the Ordinance and OLS rules." (Declaration of Allison Ford ¶¶

14  18, 20 (Dkt. No. 11).) Although Uber was invited to stakeholder meetings starting in 2021, (see

15  Marwaha Decl. ¶¶ 6, 9), and provided feedback early in the process, (see id. at Ex. 1), Uber

16  claims that the process "dragged on" and was subject to "substantial delays," (see Ford Decl. ¶¶

17  18–19).

18     Considering the City's perceived foot-dragging, Uber filed its lawsuit and the Motion 13

19  days before the Ordinance took effect. Uber seeks to enjoin enforcement of SMC 8.40 against it,

20  arguing that they would be irreparably harmed should the law be allowed to take effect on

21  January 1, 2025. Though the Motion is not specific, the proposed order seeks a temporary

22  restraining order ("TRO") and injunction preventing enforcement of the Ordinance against only

23

24

ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION - 3

1  Uber and not others. (See Dkt. No. 8-1 at 1.) At oral argument, however, Uber clarified that it is

2  pursuing only an as-applied challenge to the Ordinance.

3  **ANAYLSIS**

4  **A.    Legal Standard**

5          A TRO or preliminary injunction is "an extraordinary remedy that may only be awarded

6  upon a clear showing that the plaintiff is entitled to such relief." Winter v. Nat. Res. Def.

7  Council, 555 U.S. 7, 22 (2008). The purpose of a TRO or preliminary injunction is to preserve

8  the status quo and the rights of the parties until a final judgment on the merits can be rendered.

9  U.S. Philips Corp. v. KBC Bank N.V., 590 F.3d 1091, 1094 (9th Cir. 2010).

10         TROs are governed by the same standard applicable to preliminary injunctions. Stuhlbarg

11  Int'l Sales Co. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (2001) (noting that

12  preliminary injunction and temporary restraining order standards are "substantially identical").

13  To obtain a TRO or preliminary injunction, Uber must show it is (1) likely to succeed on the

14  merits, (2) likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of

15  equities tips in its favor, and (4) an injunction is in the public interest. Stormans, Inc. v. Selecky,

16  586 F.3d 1109, 1127 (9th Cir. 2009). A TRO or preliminary injunction is "never awarded as of

17  right." Winter, 555 U.S. at 22. In each case, the Court "must balance the competing claims of

18  injury and must consider the effect on each party of the granting or withholding of the requested

19  relief." Id.

20         The Ninth Circuit applies a "sliding scale" approach in considering the factors outlined in

21  Winter. A stronger showing of one element may offset a weaker showing of another. All. for the

22  Wild Rockies v. Cottrell, 632 F.3d 1127, 1131–32 (9th Cir. 2011). So "when the balance of

23  hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious

24

ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION - 4

1    questions going to the merits.'" hiQ Labs, Inc. v. LinkedIn Corp., 938 F.3d 985, 992 (9th Cir.

2    2019) (quoting All. for the Wild Rockies, 632 F.3d at 1135).

3         In considering the likelihood of success on the merits, the Court is not strictly bound by

4    the rules of evidence, as the temporary restraining order or preliminary injunction "is customarily

5    granted on the basis of procedures that are less formal and evidence that is less complete than in

6    a trial on the merits." Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981). Because of the

7    extraordinary nature of injunctive relief, including the potential for irreparable injury if not

8    granted, a court may consider evidence outside the normal rules of evidence, including: hearsay,

9    exhibits, declarations, and pleadings. Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009).

10   "[I]n the First Amendment context, the moving party bears the initial burden of making a

11   colorable claim that its First Amendment rights have been infringed . . . at which point the

12   burden shifts to the government to justify the restriction." Thalheimer v. City of San Diego, 645

13   F.3d 1109, 1115–16 (9th Cir. 2011).

14   **B.     Likelihood of Success on the Claims**

15        Uber identifies three claims that it believes justify a TRO and preliminary injunction: (1)

16   the Ordinance compels speech in violation of the First Amendment; (2) the Ordinance restricts

17   Uber's expressive association rights in violation of the First Amendment; and (3) the Ordinance

18   is unconstitutionally vague in violation of the Due Process Clause. The Court examines all three

19   claims and the reasons why Uber is unlikely to succeed on them.

20        **1.     First Amendment Claim**

21        Uber argues that the Ordinance violates the First Amendment by compelling speech and

22   failing to satisfy strict scrutiny. Uber is incorrect.

23

24

1

**a.**  **Legal Standard for First Amendment Claim**

2

Given that Uber pursues an as-applied challenge, and not a facial challenge, it must show

3

only that the Ordinance unconstitutionally regulates its own speech. See <u>Italian Colors Rest. v.</u>

4

<u>Becerra</u>, 878 F.3d 1165, 1174–75 (9th Cir. 2018).

5

**b.**  **The Ordinance Does Not Trigger First Amendment Protection
Because It Does Not Regulate Speech**

6

The starting point of the Court's analysis is whether the Ordinance presents a restriction

7

on speech. The Court finds that the Ordinance does not, and that the First Amendment claim is

8

unlikely to succeed on the merits.

9

"The First Amendment requires heightened scrutiny whenever the government creates 'a

10

regulation of speech because of disagreement with the message it conveys.'" <u>Sorrell v. IMS</u>

11

<u>Health Inc.</u>, 564 U.S. 552, 566 (2011) (quoting <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791

12

(1989)). But "restrictions on protected expression are distinct from restrictions on economic

13

activity or, more generally, on nonexpressive conduct." <u>Id.</u> at 567. And "the First Amendment

14

does not prevent restrictions directed at commerce or conduct from imposing incidental burdens

15

on speech." <u>Id.</u> For example, the Supreme Court has held that the First Amendment did not apply

16

to an antidiscrimination law requiring employers to remove "White Applicants Only" signs, to an

17

ordinance barring outdoor fires that also forbid burning a flag, and antitrust laws preventing

18

restraints on trade. See <u>id.</u>

19

"To determine whether the First Amendment applies, we must first ask the 'threshold

20

question [of] whether conduct with a 'significant expressive element' drew the legal remedy or

21

the ordinance has the inevitable effect of singling out those engaged in expressive activity."

22

<u>HomeAway.com, Inc. v. City of Santa Monica</u>, 918 F.3d 676, 685 (9th Cir. 2019) (quoting <u>Int'l</u>

23

<u>Franchise Ass'n v. City of Seattle</u>, 803 F.3d 389, 408 (9th Cir. 2015) (citation and quotation

24

ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION - 6

1  omitted)). "A court may consider the 'inevitable effect of a statute on its face,' as well as a

2  statute's 'stated purpose.'" Id. (quoting Sorrell, 564 U.S. at 565). "However, absent narrow

3  circumstances, a court may not conduct an inquiry into legislative purpose or motive beyond

4  what is stated within the statute itself." Id.

5       With these guideposts in mind, the Court finds that the Ordinance's requirements do little

6  more than regulate conduct without any significant impact on speech or expression. This can be

7  seen in both the Ordinance's stated goal and its requirements. The Ordinance seeks to "protect[]

8  and promote[] public health, safety, and welfare by establishing protections against unwarranted

9  deactivations for app-based workers." Ordinance, Section 1(C). It furthers that goal by requiring

10  network companies like Uber to maintain and disclose a deactivation policy and to ensure that

11  the policy "reasonably relate[s] to the network company's safe and efficient operations." SMC

12  8.40.050(A)(1)-(2). In other words, the Ordinance wants to make sure network workers know the

13  basis for being terminated and to make sure the grounds for termination have some reasonable

14  relation to safety and efficiency. The Ordinance aims to ensure fairness to workers and safety to

15  the public. It does not seek to regulate speech or expressive conduct.

16       To the extent the Ordinance implicates speech, it is incidental to its worker-related

17  conduct goals. Uber argues that the Ordinance compels it to publicly embrace the City's view on

18  what is "safe and efficient," not what it believes is reasonable. But the Ordinance merely limits

19  the grounds on which Uber may justify a termination. That these grounds must be related to

20  safety and efficiency does not compel Uber to make an affirmative statement on what it may or

21  may not believe is safe or efficient. Nothing in Uber's briefing or oral argument changes this

22  fact. For example, Uber argues that it will be forced to proclaim that "it does not believe

23  consumer ratings have anything to do with its platform's safe or efficient operations" even

24

ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION - 7

1    though it strongly disagrees. (Mot. at 12.) This argument does not track the actual language of

2    the Ordinance. The Ordinance does not compel Uber to say that consumer ratings are

3    irrelevant—it only requires Uber's policy not to solely rely on consumer ratings to support

4    deactivation. And, perhaps most importantly, the Ordinance does not require Uber to stake out

5    any position on what is or is not related to safety and efficiency. It can voice its opposition to the

6    City's minimum standards even if it must comply with them. To the extent Uber has to conform

7    its policy to minimum standards, it is no different from ensuring regulatory compliance with

8    anti-discrimination or workplace safety laws. The focus remains on conduct, and any expressive

9    impact is incidental.

10        Uber's additional claims that the Ordinance forces it to publicly endorse the City's view

11    on safety also ring hollow. Uber identifies three examples of how it believes the Ordinance

12    compels speech. First, Uber argues that it will not be allowed to deactivate a worker who has

13    fewer than three non-criminal moving violations or at-fault collisions, even though it cannot

14    obtain "at fault" data to make this determination. Even if this is true, it does not implicate

15    expressive speech or conduct—it merely limits a factual basis on which Uber may deactivate a

16    worker, and any burden on speech is incidental. Second, Uber argues that the Ordinance would

17    require it to adopt a policy that conflicts with its ability to terminate drivers for refusing or

18    canceling requests originating from a particular neighborhood. But as the City points out, this

19    does not compel speech; it merely requires Uber to maintain a non-discrimination policy in

20    conformity with the City's Ordinance. That this may be related to safety and efficiency does not

21    transform the requirement into a matter of free expression. Lastly, Uber argues that it will be

22    compelled to speak because it must disclose information about incidents leading to a deactivation

23    that might, in fact, harm third parties. But these disclosures do not implicate expressive speech

24

1    and they are merely incidental to the worker-protections embedded in the law. And, as with other

2    aspects of Uber's Motion, it distorts the disclosure requirements. To the extent it must provide a

3    worker with the materials justifying a termination, any information about, for example, an

4    assault, can be anonymized to avoid any harm to third parties. See SMC 8.40.080. Even if this

5    anonymization process were somehow flawed, it does not trigger First Amendment concerns.

6         The two Supreme Court cases on which Uber principally relies do not support Uber's

7    argument that the Ordinance regulates speech. First, Uber cites to a Supreme Court case that

8    determined a federal law requiring non-governmental organizations to adopt an express policy

9    opposing prostitution to obtain federal funding compelled speech. Agency for Int'l Dev. v. All.

10   For Open Soc'y Int'l, Inc., 570 U.S. 205, 210 (2013). But here, the Ordinance does not require

11   Uber to adopt an express statement that endorses the City's view on what constitutes safety or

12   efficiency. Rather, it must refrain from having a policy that leads to terminations for certain

13   kinds of conduct, all of which relate to commercial activity of app workers. That this may

14   suggest to some that Uber has a particular view on safety does not render the Ordinance's impact

15   on speech anything more than incidental to its focus on protecting app workers and setting

16   minimum standards for deactivation. Second, Uber cites to another Supreme Court case where

17   the Court found a law requiring licensed and unlicensed pregnancy clinics to inform patients

18   about their rights and ability to obtain abortions compelled speech in violation of the First

19   Amendment. Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 585 U.S. 755, 760–61, 769, 773

20   (2018). But here, Uber is not required to make any affirmative statement with which it may

21   disagree. Rather, it must just disclose its policies and make sure they meet minimum standards.

22   To the extent Uber disagrees with the standards as being unrelated to safety or efficiency, it is

23   free to say so and no penalties would attach for so stating. The facts before the Court here are far

24

ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION - 9

1  closer to those at issue in <u>Rumsfeld v. F. for Acad. & Institutional Rts., Inc.</u>, where the Supreme

2  Court found a law requiring military recruiters on law school campuses regulated conduct and

3  that any impact on speech was merely incidental. 547 U.S. 47, 62 (2006). That a law prohibits

4  employers from engaging in particular conduct, such as racial discrimination, "hardly means that

5  the law should be analyzed as one regulating the employer's speech rather than conduct." <u>Id.</u>

6  Here, the Ordinance regulates conduct—the grounds on which an "app worker" may be

7  terminated—and any speech-related impacts are minimal and similarly incidental to those at

8  issue in <u>Rumsfeld</u>.

9       The Ordinance is also far afield of the two main Ninth Circuit cases on which Uber relies,

10 which involved California laws found to implicate the First Amendment. First, in <u>X Corp. v.</u>

11 <u>Bonta</u>, the Ninth Circuit found a California law requiring social media companies to disclose

12 content-moderation policies and to stake out public positions on divisive issues such as hate

13 speech, racism, extremism, harassment, and other issues both targeted and compelled speech.

14 116 F.4th 888, 897–98 (9th Cir. 2024). The disclosures in <u>X Corp.</u> implicated controversial free

15 speech issues in the context of businesses engaged in providing public fora for speech activity.

16 Here, the Ordinance regulates delivery workers and the focus is on non-speech related conduct in

17 a purely commercial context, far from the speech-specific businesses at issue in <u>X Corp</u>. The

18 Ordinance does not require definitions or disclosures of Uber's general views on safety or

19 efficiency. Second, the Ordinance is also different from the challenged law in <u>NetChoice, LLC v.</u>

20 <u>Bonta</u>, which required social media platforms to essentially create and file reports that identified

21 each online service, product, or feature that children might access and any risk that they posed to

22 children. 113 F.4th 1101, 1109 (9th Cir. 2024). Here, the Ordinance does not require Uber to

23 publicly stake out an affirmative position on sensitive social issues that implicate overall speech

24

1 activity. Nor is Uber in the business of providing services that implicate speech activity, as was

2 the case in <u>NetChoice</u>. Here, Uber must simply conform its deactivation policy to the City's

3 minimum requirements that concern delivery worker safety and fairness—conduct, not speech.

4 The Ordinance does not require Uber to opine on or express any opinion as to whether its

5 services or products harm anyone, as was the case in <u>NetChoice</u>.

6      The Court here finds that Uber's First Amendment claim likely fails because the

7 Ordinance does not compel speech and the First Amendment's protections are not triggered.

8      **2.    The Ordinance Does Not Restrict Uber's Expressive Associative Rights**

9      Uber claims that the Ordinance violates its right to engage in expressive association. This

10 claim fails for the simple reason that the Ordinance does not implicate expressive conduct.

11      The Supreme Court has "recognized a First Amendment right to associate for the purpose

12 of speaking, which [it has] termed a 'right of expressive association.'" <u>Rumsfeld</u>, 547 U.S. at 68

13 (quoting <u>Boy Scouts of America v. Dale</u>, 530 U.S. 640, 644 (2000)). The right to associate does

14 not mean "that in every setting in which individuals exercise some discrimination in choosing

15 associates, their selective process of inclusion and exclusion is protected by the Constitution."

16 <u>N.Y. State Club Ass'n, Inc. v. City of New York</u>, 487 U.S. 1, 13 (1988). "To determine whether

17 a group is protected by the First Amendment's expressive associational right, we must determine

18 whether the group engages in 'expressive association'" which is "some form of expression,

19 whether it be public or private." <u>Dale</u>, 530 U.S. at 648. If the plaintiff identifies an expressive

20 association, then "[t]he forced inclusion of an unwanted person in a group infringes the group's

21 freedom of expressive association if the presence of that person affects in a significant way the

22 group's ability to advocate public or private viewpoints." <u>Id.</u> The right to associate also includes

23 the right not to associate with others. <u>See id.</u>

24

ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION - 11

1    Uber has failed to identify any expressive association that it engages in, and the record

2  here suggests that Uber's association with its "app workers" is purely commercial. The

3  arrangement that Uber has with its "app workers" mirrors that of employer and employee. The

4  "app worker" drivers "associate" with Uber for the purposes of employment and deriving

5  income. And Uber's desire to "associate" with the "app workers" is ultimately to derive revenue,

6  build good will, and compete with other "network" operators like Instacart. There is nothing

7  expressive in this arrangement and the Court finds a lack of expressive association implicated.

8  Uber's activities share no similarity with those of the Boy Scouts, whose rights were at issue in

9  Dale. Unlike Uber, the Boy Scouts is a non-profit organization association of individuals who

10  wish to share and learn common values and skills, not to generate revenue for commercial gain.

11  Uber associates with "app workers" for purely commercial reasons, and not to share values or

12  exchange ideas. Uber has not identified any basis on which the Court might find that the

13  Ordinance impacts any expressive right to associate. The Court therefore finds little likelihood of

14  success on the merits of this claim.

15    **3.    The Ordinance Is Not Unconstitutionally Vague**

16    Uber next argues that the Ordinance violates the Due Process Clause of the Fourteenth

17  Amendment by failing to meaningfully explain what the City views as a policy that is

18  "reasonably related" to "safe and efficient operations," and is thus void for vagueness. (Mot. at

19  19–21.) The Court finds Uber to be unlikely to succeed on the merits of its Due Process claim.

20    A law is void for vagueness if it "fails to provide a person of ordinary intelligence fair

21  notice of what is prohibited," or if it is "so standardless that it authorizes or encourages seriously

22  discriminatory enforcement." United States v. Williams, 553 U.S. 285, 304 (2008) (citing Hill v.

23  Colorado, 530 U.S. 703, 732 (2000); Grayned v. City of Rockford, 408 U.S. 104, 108–109

24

1    (1972)). "The operative question under the fair notice theory is whether a reasonable person

2    would know what is prohibited by the law." Tingley v. Ferguson, 47 F.4th 1055, 1089 (9th Cir.

3    2022), cert. denied, 144 S. Ct. 33 (2023). However, "perfect clarity and precise guidance have

4    never been required even of regulations that restrict expressive activity." Ward, 491 U.S. at 794;

5    see also United States v. Flores, 63 F.3d 1342, 1373 (5th Cir. 1995) (rejecting argument "that the

6    term 'substantial' is vague" and concluding that a "'substantiality' requirement is frequently

7    encountered and readily understood").

8        "The degree of vagueness that the Constitution tolerates . . . depends in part on the nature

9    of the enactment." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489,

10    498 (1982). Rules that impose "criminal rather than civil penalties" or "threaten[] to inhibit the

11    exercise of constitutionally protected rights" are subject to "a more stringent vagueness test." Id.

12    at 498–99. In contrast, rules enacting "economic regulation[s]," are "subject to a less strict

13    vagueness test because its subject matter is often more narrow, and because businesses . . . can

14    be expected to consult relevant [rules] in advance of action," and because "the consequences of

15    imprecision are qualitatively less severe." Id. at 498–99. "Accordingly, [economic] regulations

16    will be found to satisfy due process so long as they are sufficiently specific that a reasonably

17    prudent person, familiar with the conditions the regulations are meant to address and the

18    objectives the regulations are meant to achieve, would have fair warning of what the regulations

19    require." Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Review Comm'n, 108

20    F.3d 358, 362 (D.C. Cir. 1997) (collecting cases).

21        Having found neither a threat to Uber's exercise of its First Amendment rights, nor the

22    possibility of criminal sanctions, the Court analyzes the merits of Uber's due process challenge

23    under a less strict vagueness test. However, for the avoidance of doubt, the Court notes that

24

ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION - 13

1  Uber's due process argument would be unlikely to succeed on the merits even if subject to a

2  more stringent level of scrutiny.

3      Uber first takes issue with the Ordinance's use of the term "reasonable," arguing that "no

4  "commonly accepted meaning exists for the term reasonable[.]" (Mot. at 19.) As a general

5  matter, the Court does "not doubt the constitutionality of laws that call for the application of a

6  qualitative standard" such as reasonability. Johnson v. United States, 576 U.S. 591, 603–04

7  (2015). "[T]he law is full of instances where a man's fate depends on his estimating rightly . . .

8  some matter of degree." Id. at 604 (quoting Nash v. United States, 229 U.S. 373, 377 (1913)

9  (alteration in original)). Indeed, the term "reasonable" is ubiquitous in our statutory scheme and

10  common law. For example, the very inquiry Uber must satisfy regarding fair notice is "whether a

11  reasonable person would know what is prohibited by the [Ordinance]." Tingley, 47 F.4th at 1089

12  (emphasis added). The Court therefore rejects Uber's argument regarding the vagueness of the

13  term "reasonable," and, in doing so, joins a host of federal courts who have rejected the same

14  essential premise. See, e.g., Nat'l Ass'n for Fixed Annuities v. Perez, 217 F. Supp. 3d 1, 41

15  (D.D.C. 2016) (collecting cases "replete with decisions rejecting vagueness challenges . . . to the

16  words 'reasonable,' 'reasonably,' and 'unreasonably'".)

17      The Court further finds as unavailing Uber's reliance on the out-of-circuit, Belle Maer

18  Harbor v. Charter Twp. of Harrison, 170 F.3d 553 (6th Cir. 1999). There, the court's motivating

19  due process concern sounded in discriminatory enforcement, noting that it "constitutes the more

20  important aspect of the vagueness doctrine." Id. at 556–57 (citing Smith v. Goguen, 415 U.S.

21  566 (1974)). The Sixth Circuit found that the regulation's use of the reasonableness standard

22  "entrusts the enforcement decision regarding the . . . restriction to the moment-to-moment

23  judgment of the policeman on his beat," which, when combined with the imposition of criminal

24

ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION - 14

1    sanctions, violated due process by providing "[t]ownship inspectors with a convenient tool for

2    harsh and discriminatory enforcement against particular groups deemed to merit their

3    displeasure." Id. at 559 (quotations omitted.) In contrast, Uber does not appear to claim that the

4    Ordinance will be discriminatorily enforced, nor does the Ordinance impose criminal sanctions.

5         Uber next accuses the Ordinance of muddying its already-murky waters by including

6    eight examples of impermissible policies, claiming that the examples are "confusing" because

7    they include policies which "most people would think are at least related to safe and efficient

8    operations." (Mot. at 20 (emphasis in original).) According to Uber, some example policies, such

9    as those prohibiting drivers from contacting the network company or asserting their legal rights,

10   "have little to do with safe and efficient operations," while others, such as policies triggering

11   deactivation based on customer ratings or the result of a background check, are so clearly related

12   to safety and efficiency that their "confounding" inclusion in the list undermines the whole

13   enterprise. (Id.) This is not a vagueness problem rather than a fundamental disagreement between

14   Uber and the City as to what policies are reasonably related to the safe and efficient operation of

15   delivery services.

16        Uber fails to show how the "reasonably related" language in the Ordinance somehow

17   prevents it from understanding what types of deactivation policies would be prohibited. The

18   Court therefore finds little likelihood of success on the merits of this claim.

19   **C.    Irreparable Harm**

20        Given the Court's analysis as to the merits of Uber's claim, the Court finds no basis to

21   find an irreparably harm. Accordingly, this factor weighs against issuance of a TRO or

22   preliminary injunction.

23

24

ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION - 15

1  **D.    Balance of Equities and Public Interest**

2      The balance of equities and public interest also do not favor Uber, given the lack of likely

3  success on the merits. Even if there was a likelihood of success, the public interest and balance

4  of equities are divided, as the Ordinance does attempt to serve the public interest.

5                          *        *        *

6      Having considered the four <u>Winter</u> factors, the Court finds that the TRO and preliminary

7  injunction should not issue. The Court therefore DENIES the Motion.

8                          **CONCLUSION**

9      The Court appreciates the depth of briefing and argument provided by both Parties in this

10  matter. Having considered the issues, the Court finds that the TRO and preliminary injunction

11  should not issue, primarily because Uber has not identified any likelihood of success on the

12  merits of the three claims it has identified. Therefore, the Court DENIES the Motion as to both

13  requests.

14      The clerk is ordered to provide copies of this order to all counsel.

15      Dated December 31, 2024.

16

17                          Marsha J. Pechman
                            United States Senior District Judge
18

19

20

21

22

23

24

ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION - 16

THE HONORABLE MARSHA J. PECHMAN

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UBER TECHNOLOGIES, INC. and PORTIER, LLC,<br><br>                    Plaintiffs,<br><br>          v.<br><br>CITY OF SEATTLE,<br><br>                    Defendant. | CASE NO. 2:24-cv-02103 MJP<br><br>DECLARATION OF SARA O'CONNOR-KRISS IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER |

I, Sara O'Connor-Kriss, hereby declare:

1.      I am an Assistant City Attorney in the Civil Division – Civil Enforcement section of the Seattle City Attorney's Office. I make this declaration based on personal knowledge.

2.      I advised City departments including the legislative department and the Seattle Office of Labor Standards during the drafting and implementation of the app-based worker protection ordinances, including SMC Chapter 8.40, the App-Based Worker Deactivation Rights Ordinance.

3.      I have reviewed Uber's new deactivation policy at: https://www.uber.com/us/en/drive/driver-app/deactivation-review/ (last visited Dec. 20. 2024).

4.      Most of Uber's policy complies or does not conflict with the City of Seattle's App-Based Worker Deactivation Rights Ordinance (the "Ordinance").

DECLARATION OF SARA O'CONNOR-KRISS IN
OPPOSITION TO MOTION FOR TEMPORARY
RESTRAINING ORDER - 1
CASE NO. 2:24-cv-02103 MJP

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

Docusign Envelope ID: 9F28C29A-5E70-4230-9D37-A9A789618B66

5.    Uber's Policy "01" is generally consistent with SMC 8.40.050, which requires a deactivation policy that permits workers to "understand what constitutes a violation."

6.    Uber's Policy "02" is consistent with SMC 8.40.050.A.6, which requires network companies to consider "mitigating circumstances, such as the app-based worker's past work history with the network company."

7.    Uber's Policy "05" is consistent with SMC 8.40.050.A, which requires consistent application of the deactivation policy.

8.    Uber's Policy "Human involvement" is consistent with SMC 8.40.060.B.4, which requires human review in the network company's internal deactivation review process.

9.    Uber's Policy "Expired documents" is not prohibited by the Ordinance.

10.    Uber's Policy "Failing a Real-Time ID Check" is not prohibited by the Ordinance.

11.    Uber's Policy "Drug testing program" is not prohibited by the Ordinance.

12.    Uber's Policy "Use of unapproved vehicles" is not prohibited by the Ordinance.

13.    Uber's Policy "Unsafe vehicles" is not prohibited by the Ordinance.

14.    Uber's Policy "Fraudulent activities" is not prohibited by the Ordinance.

15.    Uber's Policy "Identity fraud" is not prohibited by the Ordinance.

16.    Uber's Policy "Fraudulent duplicate accounts" is not prohibited by the Ordinance.

17.    Uber's Policy "Discrimination or refusing service" is not prohibited by the Ordinance. This conduct is unlawful under anti-discrimination and disability laws, so long as disclosure requirements are met

18.    Uber's Policy "Time-on-trip fraud" is not prohibited by the Ordinance.

19.    Uber's Policy "Protection from false allegations" is consistent with the Ordinance. SMC 8.40.050.A.2.e provides that deactivation policies "solely" based on "quantitative metric derived from aggregate customer ratings of an app-based worker's performance" are not reasonably related to the company's safe and efficient operations.

DECLARATION OF SARA O'CONNOR-KRISS IN
OPPOSITION TO MOTION FOR TEMPORARY
RESTRAINING ORDER - 2
CASE NO. 2:24-cv-02103 MJP

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

Case 2:24-cv-02103-MJP    Document 24    Filed 12/23/24    Page 3 of 5

20.     Some provisions in Uber's policy are consistent with the Ordinance, though not wholly so.

21.     Uber's Policy "03" is consistent with SMC 8.40.070, which requires the network company to inform workers of the reason for the deactivation. However, the Ordinance requires the basis for the deactivation even in serious cases ("egregious misconduct").

22.     Uber's Policy "Sexual misconduct or assault" is generally consistent with the Ordinance because deactivation for sexual misconduct or assault while providing services is "egregious misconduct." However, Uber's definition of sexual misconduct or assault may be broader than the Ordinance. To the extent the definitions are broader, they could be inconsistent with the Ordinance.

23.     Uber's Policy "Deactivations on other platforms" is generally consistent with the Ordinance because deactivation for sexual assault and physical assault fatalities are "egregious misconduct" and lawful bases for deactivation. To the extent Uber's definition of sexual assault is broader than the Ordinance, it could be inconsistent with the Ordinance.

24.     Uber's Policy "Advance Notice" is generally consistent with SMC 8.40.070.A, which requires 14 days advance notice, except in cases of "egregious misconduct" or when "required to comply with any applicable court order or local, state, or federal laws or regulations." SMC 8.40.050.C. However, it is unclear what is meant by "legal" reasons for deactivation. To the extent it is beyond the definition of "egregious misconduct" or not required by applicable court order, law, or regulation, and if the advance notice is less than 14 days, it is inconsistent with the Ordinance's advance notice requirement.

25.     Uber's Policy "Opportunity to provide additional information" is consistent with SMC 8.40.060.B, which requires an internal deactivation challenge process. SMC 8.40.050.A.3 also requires a fair and objective investigation prior to deactivation. However, according to Uber's policy, this recourse is only available to deactivated drivers: "Drivers or delivery people can only access the Review Center if their account has been deactivated." In Uber's TRO motion, it says

DECLARATION OF SARA O'CONNOR-KRISS IN
OPPOSITION TO MOTION FOR TEMPORARY
RESTRAINING ORDER - 3
CASE NO. 2:24-cv-02103 MJP

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

1   that a temporary suspension pending an investigation is not a deactivation. Thus, this recourse

2   does not cover all deactivations as defined by the Ordinance. However, the Uber policy states:

3   "Losing access, even temporarily, can be disruptive, so we review each report fairly and

4   promptly." This suggests that temporary loss of access is covered, but the footnote quoted above

5   suggests otherwise (and is consistent with their declarations sworn under penalty of perjury).

6        26.    Under Uber's Policy "Background checks," the criteria is based on city or state

7   law. So, abiding by the Ordinance is not inconsistent with Uber's policy. Although the definition

8   of "egregious misconduct" in the Ordinance is a non-exhaustive list, it must be "conduct in

9   connection with an app-based worker's provision of app-based services or use of the network

10  company's worker platform." Alternatively, actions outside of the provision of app-based services

11  could be "egregious" if the network company "can prove by a preponderance of the evidence that

12  the conduct directly relates to the app-based worker's fitness to provide app-based services or to

13  use the network company's worker platform." Thus, the mere fact of "a serious criminal charge"

14  or "recent felony offense" is insufficient for deactivation. The company must demonstrate how the

15  charge or conviction directly relates to providing services. However, the enumerated offense list in

16  Uber's policy is instructive in recognizing certain offenses as "egregious" when providing

17  services. The only offense directly in conflict with the Ordinance is deactivation based on

18  "multiple moving violations or accidents in the last three years." Others could be the basis for

19  deactivation if the offense occurred while the driver provided services, or the company meets its

20  burden of showing by a preponderance of the evidence that the conduct is directly related to the

21  worker's fitness to provide services.

22       27.    Uber's Policy "Ratings" may not conflict with the Ordinance. Deactivation based

23  "solely" on ratings is prohibited by the Ordinance. Uber has a quality improvement course that

24  could result in reactivation. If this is offered before deactivation as a condition of maintaining

25  access to the app, and it is not completed, the deactivation would not be based solely on low

26  ratings and could be consistent with the ordinance.

DECLARATION OF SARA O'CONNOR-KRISS IN
OPPOSITION TO MOTION FOR TEMPORARY
RESTRAINING ORDER - 4
CASE NO. 2:24-cv-02103 MJP

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

Docusign Envelope ID: 9F28C29A-5E70-4230-8D37-A9A7B9618B66

Case 2:24-cv-02103-MJP    Document 24    Filed 12/23/24    Page 5 of 5

28.  Uber's Policy "Cancellation abuse" may not conflict with the Ordinance. Policies to deactivate based on cancellations with cause per SMC 8.37.080.C are prohibited by the Ordinance. If the cancellations fall outside of this definition, this policy is not prohibited by the Ordinance.

29.  Uber's Policy "Food theft" may not conflict with the Ordinance. If the cancellations fall outside of the cancellation with cause definition, this policy is not prohibited by the Ordinance.

30.  Uber's Policy "Unsafe driving" is permitted under the Ordinance if it meets the "egregious misconduct" criteria. Deactivation "solely" based on ratings is prohibited by the Ordinance.

31.  Uber's Policy "Impaired or drowsy driving" is permitted under the Ordinance if it meets the "egregious misconduct" criteria. Deactivation "solely" based on ratings is prohibited by the Ordinance.

32.  Uber's Policy "Altercations and harassment" is permitted if it meets the "egregious misconduct" criteria. Deactivation "solely" based on ratings is prohibited by the Ordinance.

33.  Finally, there is only one provision of Uber's policy that violates the Ordinance without qualification.

34.  Uber's Policy "04" violates the Ordinance.  Under the ordinance, a worker has a right to challenge any action that constitutes a "deactivation" which would include any removal (including serious cases involving "egregious misconduct") from the app except for temporary suspensions of less than 48 hours for reasons unrelated to the worker's action or behavior.

I declare under penalty of perjury under the laws of the United States of America and the State of Washington that the foregoing is true and correct.

EXECUTED this 23rd day of December 2024, in Kent, Washington.

_Sara O'Connor-Kriss_
Sara O'Connor-Kriss

DECLARATION OF SARA O'CONNOR-KRISS IN
OPPOSITION TO MOTION FOR TEMPORARY
RESTRAINING ORDER - 5
CASE NO. 2:24-cv-02103 MJP

SUMMIT LAW GROUP, PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone 206.676.7000
Fax 206.676.7001

The Honorable Marsha J. Pechman

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8  | UBER TECHNOLOGIES, INC. and PORTIER, LLC,

9 |                              Plaintiffs,

10 |                    v.

11 | CITY OF SEATTLE,

12 |

13 |                              Defendant.

CASE NO. 2:24-cv-2103-MJP

**DEFENDANT'S OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER**

**NOTED ON MOTION CALENDAR: December 18, 2024**

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................................... 1

II.  FACTS ..................................................................................................................... 2

    A.  Uber is a business selling goods and services............................................. 2

    B.  The Ordinance............................................................................................. 2

        1.  The City Council's findings................................................................ 2

        2.  The Ordinance's requirements........................................................... 4

    C.  The City engaged in a robust legislative process......................................... 5

    D.  OLS rulemaking.......................................................................................... 6

    E.  Uber's new policy....................................................................................... 6

    F.  Uber is substantially regulated.................................................................... 7

    G.  Uber's last-minute lawsuit........................................................................... 7

III.  ARGUMENT ........................................................................................................... 8

    A.  Uber must satisfy a stringent standard. ...................................................... 8

    B.  Uber's claims are not likely to succeed. ..................................................... 9

        1.  Uber's compelled speech claim is meritless. ..................................... 9

        2.  The Ordinance does not impinge any association right. ..................... 16

        3.  The Ordinance is not unconstitutionally vague. ................................ 19

    C.  Uber is not likely to suffer irreparable harm.............................................. 23

    D.  The equities do not favor Uber and an injunction would not be in the public interest.............................................................................................. 24

    E.  The Ordinance is severable. ....................................................................... 25

IV.  CONCLUSION ...................................................................................................... 26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - i
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arcara v. Cloud Books, Inc.*,
  478 U.S. 696 (1986) ...................................................................................10

*Ariix, LLC v. NutriSearch Corp.*,
  985 F.3d 1107 (9th Cir. 2021) ...................................................................12

*Baird v. Bonta*,
  81 F4th 1036 (9th Cir. 2023) .....................................................................24

*Belle Maer Harbor v. Charter Twp. of Harrison*,
  170 F.3d 553 (6th Cir. 1999) ...............................................................21, 22

*Board of Directors of Rotary International v. Rotary Club of Duarte*,
  481 U.S. (1987) ..........................................................................................18

*Bolger v. Youngs Drug Products*,
  463 U.S. 60 (1983) .....................................................................................12

*Boy Scouts of Am. v. Dale*,
  530 U.S. 640 (2000) ..............................................................................16, 17

*Cal. Tchrs. Ass'n v. State Bd. of Educ.*,
  271 F.3d 1141 (9th Cir. 2001) ...................................................................20

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) .....................................................................23

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) .....................................................................8

*El Centro De La Raza v. State*,
  192 Wn.2d 103 (2018) ...............................................................................25

*Expressions Hair Design v. Schneiderman*,
  588 U.S. 37 (2017) .....................................................................................10

*Fla. Bar v. Went for It, Inc.*,
  515 U.S. 618 (1995) ...................................................................................11

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) .......................................................................9

*Gerberding v. Munro*,
  134 Wn.2d 188 (1998) ...............................................................................26

*Healy v. James*,
  408 U.S. 169 (1972) ...................................................................................16

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

*Hill v. Colorado*,
   530 U.S. 703 (2000) ...................................................................................20

*HomeAway.com, Inc. v. City of Santa Monica*,
   918 F.3d 676 (9th Cir. 2019) ....................................................................11

*Interpipe Contracting, Inc. v. Becerra*,
   898 F.3d 879 (9th Cir. 2018) ....................................................................10

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
   803 F.3d 389 (9th Cir. 2015) ...............................................................10, 11

*Johnson v. United States*,
   576 U.S. 591 (2015) ...................................................................................22

*Karlin v. Foust*,
   188 F.3d 446 (7th Cir. 1999) ....................................................................21

*League of Women Voters of Wash. v. State*,
   184 Wn.2d 393 (2015) ...............................................................................25

*Leonard v. City of Spokane*,
   127 Wn.2d 194 (1995)................................................................................25

*Lydo Enters., Inc. v. City of Las Vegas*,
   745 F.2d 1211 (9th Cir. 1984) ..................................................................24

*McGary v. Inslee*,
   No. C23-5388 BHS, 2023 WL 5822280 (W.D. Wash. Sep. 8, 2023)........23

*McMahon v. World Vision, Inc.*,
   704 F. Supp. 3d 1121 (W.D. Wash. 2023) ....................................16, 17, 18

*N.Y. State Club Ass'n, Inc. v. City of New York*,
   487 U.S. 1 (1988) .......................................................................................16

*Nat'l Ass'n for Fixed Annuities v. Perez*,
   217 F. Supp. 3d 1 (D.D.C. 2016)...............................................................21

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   585 U.S. 755 (2018) ...................................................................................15

*NetChoice, LLC v. Bonta*,
   113 F.4th 1101 (9th Cir. 2024)..................................................................14

*Plintron Techs. USA LLC v. Phillips*,
   No. C24-93, 2024 WL 553718 (W.D. Wash. Feb. 12, 2024)...........8, 9, 23, 24

*Rent-a-Center v. Canyon Television & Appliance*,
   944 F.2d 597 (9th Cir. 1991) ....................................................................24

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
   487 U.S. 781 (1988) ...................................................................................15

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - iii
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

*Roberts v. U.S. Jaycees,*
   468 U.S. 609 (1984) ..................................................................................16, 17, 19

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,*
   547 U.S. 47 (2006) ...................................................................................10, 11, 17

*San Francisco Apartment Ass'n v. City & Cnty. of San Francisco,*
   881 F.3d 1169 (9th Cir. 2018).........................................................................12, 13

*Sorrell v. IMF Health Inc.,*
   564 U.S. 552, 567 (2011). ...................................................................................12

*State v. Abrams,*
   163 Wn.2d 277 (2008)..........................................................................................25

*State v. Arlene's Flowers, Inc.,*
   193 Wn.2d 469 (2019)..........................................................................................17

*Tucson v. City of Seattle,*
   91 F.4th 1318 (9th Cir. 2024).................................................................19, 20, 23

*United States v. Ward,*
   No. CR-11-2123-RMP, 2013 WL 12203098 (E.D. Wash. Jan. 18, 2013)...................21

*United States v. Williams,*
   553 U.S. 285 (2008) ............................................................................................19

*Valle Del Sol Inc. v. Whiting,*
   709 F.3d 808 (9th Cir. 2013) ..............................................................................12

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
   455 U.S. 489 (1982) ......................................................................................20, 21

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ............................................................................................20

*Williams-Yulee v. Fla. Bar,*
   575 U.S. 433 (2015) ............................................................................................11

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................................................8, 24

*X Corp. v. Bonta,*
   116 F.4th 888 (9th Cir. 2024).......................................................................12, 13, 14

*Young v. Am. Mini Theatres, Inc.,*
   427 U.S. 50 (1976) ..............................................................................................20

**Statutes**

18 U.S.C. §922(d)(8) ...................................................................................................21
42 U.S.C. §12112 .........................................................................................................21
RCW 10.120.020 .........................................................................................................21

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - iv
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

RCW 46.72B.080 ................................................................................................7
RCW 46.72B.090(4) ...........................................................................................7
RCW 46.72B.110(1) ...........................................................................................7
RCW 49.46.300(15)(iii) ......................................................................................7
U.S. Const. amend. IV ......................................................................................21

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - v
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

## I.    INTRODUCTION

Plaintiffs Uber Technologies, Inc. and Portier, LLC ("Uber") bring this 11th hour action against the City of Seattle ("City") seeking to invalidate a worker-protection law.  Uber challenges Seattle's App-Based Worker Deactivation Rights Ordinance ("Ordinance"), passed in August 2023.  It requires Uber and other like business to treat app-based workers[1] fairly, by having a written policy explaining why Uber may remove them from its platform, explaining why Uber has deactivated them, prohibiting the removal of workers solely based on Uber's secret algorithms, and requiring an internal appeal process involving human beings.[2]  Uber represents that it has a "responsibility to ensure that our processes are fair, accurate, and transparent," that its "delivery people trust that" Uber is "doing the right thing,"[3] and it knows that its platform "is often an essential source of income for many" workers.  Dkt. 8 at 4:15.  Despite these representations, Uber sues claiming the City may not require a fair, accurate, and transparent process to protect workers.

Uber participated substantially in the City's consideration of protections for app-based workers which culminated in the City's adoption of the Ordinance and other worker-protection laws in August 2023.  Despite knowing for 16 months precisely what the Ordinance provides and knowing that the City's administrative regulations are not yet in effect, Uber filed a last-minute motion for temporary restraining order ("TRO") nearly 13 days before the Ordinance takes effect.  Uber claims the Ordinance creates "grave" First Amendment and Due Process "problems."

Its claims cannot justify a TRO.  Uber cannot show a likelihood of success on the merits of any of the three weak constitutional claims it asserts in its motion.  Uber faces no irreparable harm here if it complies with the Ordinance and protects its workers while its last-minute lawsuit is litigated in regular order.  The balance of equities does not favor Uber against the workers who

---

[1] An "app-based worker" has entered into an agreement to use a network company's platform to provide services for payment by the company.  Seattle Municipal Code ("SMC") 8.40.020.

[2] A "deactivation" is "the blocking of an app-based worker's access to the worker platform, changing an app-based worker's status from eligible to accept offers to perform services to ineligible, or other material restriction in access to the worker platform[.]"  SMC 8.40.020.

[3] https://www.uber.com/us/en/drive/driver-app/deactivation-review/ (last visited Dec. 19, 2024).

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 1
(CASE NO. 2:24-cv-2103-MJP)

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1  make Uber's platform so profitable for the company.  And granting Uber's last-minute request to

2  halt the Ordinance's basic protection of workers is not in the public interest.

3                                  **II.    FACTS**

4  **A.    Uber is a business selling goods and services.**

5          Uber is a sprawling company whose businesses include Uber Eats, a food delivery

6  platform that "connect[s] consumers and restaurants, grocers, and other merchants so they can buy

7  and sell meals, groceries, and other items[.]"[4]  Purchasers download the Uber Eats app and place

8  orders through the app.[5]  Uber's app then matches buyers and sellers with workers who pick up

9  and deliver the food.[6]

10          Uber collects the payment for this commercial transaction and remits a portion to the

11  worker.[7]  Uber workers make a national average of $19 hourly.[8]  Uber takes a cut of 20-30% of all

12  orders.[9]  Uber Eats generated $12.1 billion in revenue in 2023, an 11% year-on-year increase.[10]

13  **B.    The Ordinance.**

14          **1.    The City Council's findings.**

15          In August 2023, the Ordinance was passed.

16  https://clerk.seattle.gov/~archives/Ordinances/Ord_126878.pdf (the "Ordinance") (last visited

17  Dec. 19, 2024).  Based on input from all stakeholders and the City's analysis of the data, it aims to

18  protect workers from unwarranted deactivations.  *Id.* §1(C).

19

20

---

[4] https://www.uber.com/us/en/about/uber-offerings/?uclick_id=0a545c31-5139-4a66-8b07-4cb9d57d6d21 (last visited Dec. 20, 2024).

[5] https://www.upperinc.com/blog/how-much-does-uber-eats-pay-per-delivery/ (last visited Dec. 20, 2024).

[6] https://www.uber.com/us/en/about/uber-offerings/?uclick_id=0a545c31-5139-4a66-8b07-4cb9d57d6d21 (last visited Dec. 20, 2024).

[7] https://www.uber.com/us/en/drive/basics/how-payments-work/ (last visited Dec. 20, 2024).

[8] https://financebuzz.com/uber-eats-drivers-earnings (last visited Dec. 20, 2024)

[9] https://www.businessofapps.com/data/uber-eats-statistics/#:~:text=Uber%20Eats%20generated%20$12.1%20billion,Uber%20Eats%20in%2011%2C000%20cities (last visited Dec. 20, 2024).

[10] *Id.*

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 2
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1    The Ordinance is based on the City Council's key findings. Companies typically assign

2    and evaluate workers through algorithms. *Id.* §1(F) (citing *Working with Machines: The Impact of*

3    *Algorithmic and Data-Driven Management on Human Workers*, Proceedings of the 33rd Annual

4    ACM Conference on Human Factors in Computing Systems, Apr. 18, 2015, at 1603-12).

5    Algorithmic management creates significant challenges for workers, including information

6    asymmetries and extreme power imbalances. *Id.* §1(G) (citing *Explainer: Algorithmic*

7    *Management in the Workplace*, Data & Society, Feb. 2019). Workers frequently do not know how

8    they are to be evaluated. Algorithms dictating core aspects of workers' relationship with a

9    company can change unexpectedly, leading to arbitrary evaluations and unwarranted

10   deactivations. *Id.* §1(H) (citing *FTC Policy Statement on Enforcement Related to Gig Work*, Sept.

11   2022).

12   The Council also found that workers are subject to company policies that unilaterally

13   deactivate workers without access to a fair process or responsive company personnel with the

14   power to correct unwarranted deactivations. *Id.* §1(I). Companies do not apply clear performance

15   expectations or policies for deactivations, and often deactivate workers without explanation or

16   warning. *Id.* § 1(K) (citing *Essential but Unprotected: App-based Food Couriers in New York*

17   *City*, 2021, at 31-32). Workers are deactivated for low customer ratings, even though extensive

18   research finds that consumer-sourced rating systems are highly likely to be influenced by racial

19   bias and workers report deactivation based on customer harassment and false reports. *Id.* §1(L)

20   (citing *App-Based Workers Speak: Studies Reveal Anxiety, Frustration, and a Desire for Good*

21   *Jobs*, Oct. 2021, at 12, 18). Moreover, many companies do not have processes to reconsider a

22   deactivation based on a case-by-case human review and have little incentive to offer those

23   processes. *Id.* § 1(M) (citing *Fired by Bot at Amazon: "It's You Against the Machine"*,

24   Bloomberg, June 28, 2021; *Instacart shoppers demand answers over alleged wrongfully*

25   *deactivated accounts*, CNN Business, Apr. 30, 2021).

26

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 3
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

The Council found that companies perform recurring background checks on workers. However, companies do not provide clear guidance on background check criteria, methods for evaluating the relationship of criminal history record information to the performance of app-based service, procedures for correcting background check information, or procedures for appealing deactivations based on background check information. *Id.* §1(N). These problems are compounded by the high prevalence of background checks with errors, mismatched identities, and incomplete information due to scant oversight of background check information provided in the private market. *Id.* §1(P) (citing *How Criminal Background Checks Lead to Discrimination Against Millions of Americans*, The Washington Post, July 10, 2020). A common problem is that law enforcement agencies fail to update arrest or charge records with information about case outcomes. *Id.* §1(Q) (citing *Criminal Record Inaccuracies and the Impact of a Record Education Intervention on Employment-Related Outcomes*, U.S. Dep't of Labor, Jan. 2, 2020). Indeed, Uber concedes that "the checks of motor vehicle records on which Uber relies often do not contain fault attribution information." Dkt. 8 at 12.

### 2. The Ordinance's requirements.

As Uber has known for 16 months, the Ordinance's worker protection requirements take effect January 1, 2025. Companies "must inform" workers "in writing" of the company's deactivation policy, "defining what constitutes a violation that may result in deactivation." SMC 8.40.050(A)(1).

The policy "must be specific enough for" a worker "to understand what constitutes a violation and how to avoid violating the policy." *Id.* It "must be reasonably related to" the company's "safe and efficient operations." SMC 8.40.050(A)(2). The Ordinance provides many examples of policies that do not satisfy this standard. *Id.* For example, the company may not deactivate a worker based on her "availability to work or number of hours worked," her "cancellation of an offer with cause," her "contacting the network company," her "statements

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 4
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   regarding compensation and/or working conditions," her assertion of "legal rights," or "based

2   solely" on customer rating data. *Id.*

3        A company may not deactivate "a worker based on the results of a background check,

4   consumer report, driver record, or record of traffic infractions, except in cases of egregious

5   misconduct or where required by other applicable law."  SMC 8.40.050(A)(2)(h).  The Ordinance

6   provides detailed guidance as to the types of "egregious misconduct" that justify deactivation such

7   as endangering anybody's physical safety and threatening or harassing anybody.  SMC 8.40.020.

8   The company "may immediately deactivate" a worker to comply with any law or when the worker

9   has engaged in "egregious misconduct."  SMC 8.40.050(C).

10       The company must inform the worker of the reasons for deactivation.  SMC 8.40.070.  The

11   worker has a right to challenge any deactivation.  SMC 8.40.060.  The company must review and

12   respond to any such challenge.  SMC 8.40.060(B).

13       The City's Office of Labor Standards ("OLS") may not begin imposing penalties on

14   network companies for an "unwarranted deactivation" *until June 1, 2027*.  SMC 8.40.060(A),

15   8.40.130(B).  Likewise, *until June 1, 2027*, OLS may not enforce the Ordinance's investigation,

16   confirmation of violation, consistent application, proportionate penalty, or anti-discrimination

17   provisions.  SMC 8.40.130(B).

18   **C.**    **The City engaged in a robust legislative process.**

19       Uber "fiercely opposed" the City's consideration of regulations to protect workers from

20   deactivation through algorithms, without notice, explanation, or ability to appeal a deactivation to

21   a person.[11]

22       Uber participated extensively during the legislative process.  Allison Ford "participated in

23   communications, hearings, and Uber's written submissions regarding the Ordinance[.]"  Dkt. 13

24   ¶3.  She attended the hearings in May 2023 "and offered testimony on Uber's behalf" repeatedly.

25

26     [11] https://www.seattletimes.com/seattle-news/politics/uber-sues-seattle-over-driver-deactivation-law/ (last visited Dec. 21, 2024).

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 5
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   *Id.* ¶5 & Exs. 1-2. She expressed Uber's "commit[ment] to working together to further improve

2   the ordinance from its original draft" and the desired outcome of "protect[ing] workers and

3   provid[ing] them with the process they need[.]" *Id.*, Ex. 2. As the legislation was under

4   discussion, Ford acknowledged the changes made in response to Uber's feedback. 12/23/24

5   Marwaha Decl.

6   **D.    OLS rulemaking.**

7           Once the Ordinance was adopted, Uber "actively engaged with" OLS's consideration of

8   "proposed rules[.]" Dkt. 13 ¶¶3-4. That process "has spanned many months[.]" *Id.* For example,

9   four months ago, Uber "met with OLS and discussed" its "concerns[.]" *Id.* ¶10. Uber attended

10  many additional meetings with OLS and provided a "pre-rule comment to OLS" more than three

11  months ago. *Id.* ¶¶12, 19; *see also* 12/23/24 Middaugh Decl.

12  **E.    Uber's new policy.**

13          Before the Ordinance was adopted, Uber deactivated workers by algorithm without

14  explanation or meaningful avenue to appeal.[12] Drivers of color experienced a substantially higher

15  rate of deactivation than white drivers.[13] Most of these workers faced economic hardship after

16  Uber fired them.[14] Deactivated drivers worked on average four-and-a-half years for Uber.[15]

17          Three months *after* the Ordinance was adopted, Uber changed its process.[16] Uber says that

18  "[i]t's our responsibility" to "follows the law[.]"[17] It recognizes that when it "[b]lock[s] someone

19  from accessing their Uber account," that is "one of the most distressing moments that a driver or

20

21      [12] https://www.latimes.com/business/technology/story/2023-02-28/column-uber-and-lyfts-deactivation-policy-is-
    dehumanizing-and-unfair (last visited Dec. 20, 2024); https://cdn.craft.cloud/5cd1c590-65ba-4ad2-a52c-
22  b55e67f8f04b/assets/media/Fired-by-an-App-February-2023.pdf (last visited Dec. 20, 2024).
        [13] https://www.latimes.com/business/technology/story/2023-02-28/column-uber-and-lyfts-deactivation-policy-is-
23  dehumanizing-and-unfair (last visited Dec. 20, 2024).
        [14] *Id.*
24      [15] *Id.*
        [16] https://www.fastcompany.com/90981942/uber-is-revamping-its-driver-deactivation-process (last visited Dec. 20,
25  2024).
        [17] https://www.uber.com/blog/deactivations-principles/ (last visited Dec. 20, 2024).
26

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 6
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax:  (206) 676-7001

1    courier can experience."[18]  *For the first time*, "[a]fter a lot of listening and reflection," Uber agreed

2    to tell workers why their account was deactivated, to allow them a review of the decision, and to

3    share with the worker recordings to dispute unfair customer claims.[19]

4           In many ways, Uber's deactivation policy complies or does not conflict with the

5    Ordinance.  https://www.uber.com/us/en/drive/driver-app/deactivation-review/ (last visited

6    Dec. 20. 2024); 12/23/24 O'Connor-Kriss Decl. ¶¶4-19.  Some of Uber's provisions are consistent

7    with the Ordinance, though not wholly so.  O'Connor-Kriss Decl. ¶¶20-31.  Only *one* provision

8    violates the Ordinance.  *Id.* ¶¶33-34.

9    **F.     Uber is substantially regulated.**

10          Many regulations of network companies require the use of words.  For example, a June

11   2021 ordinance required agreements with restaurants for pick-up or delivery services.[20]  A June

12   2022 ordinance requires Uber to provide workers a notice of rights.  SMC 8.37.070, .100.  A

13   March 2023 ordinance requires Uber to provide workers a notice of rights created by OLS.  SMC

14   8.39.100.

15          Uber is subject to state regulation too.  It "must adopt a policy of nondiscrimination,"

16   RCW 46.72B.110(1), a "zero tolerance policy" with respect to drugs and alcohol and post this

17   policy to its website, RCW 46.72B.080, a compliant background check policy, RCW

18   46.72B.090(4), and a compliant agreement.  RCW 49.46.300(15)(iii).

19   **G.     Uber's last-minute lawsuit.**

20          Uber waited until the week before Christmas and 13 days before the Ordinance takes effect

21   to sue.  "Uber" ***did not*** "hope[] to avoid emergency motions practice in this matter, particularly at

22

23

---

24       [18] *Id.*

25       [19] *Id.*; https://www.fastcompany.com/90981942/uber-is-revamping-its-driver-deactivation-process (last visited Dec. 20, 2024).

26       [20] https://library.municode.com/wa/seattle/ordinances/municipal_code?nodeId=1092194 (last visited Dec. 19, 2024).

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 7
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

this time of year." Dkt. 8 at 3 n.1.  In response to Uber's notice just before it sued, the City

provided the following pre-filing response, only snippets of which Uber conveyed to the Court:

> It is the City's position that a Temporary Restraining Order is unnecessary.  We can represent that OLS will not pursue enforcement action immediately upon the January 1, 2025 effective date.  Since the passage of the Ordinance over a year ago, your client has been engaged with OLS as an active participant in the ongoing rulemaking process.  In response to network company feedback, including Uber, OLS plans to delay the effective date of the rules by 60-90 days.  This delay would provide network companies with time to implement necessary measures to comply with OLS rules, which should be published for public comment in late January.

> In the recent past, OLS has worked with app companies to have a soft launch for enforcement of new app-based worker ordinances. Instead of imposing penalties, OLS has provided education and outreach to workers and network companies and provided technical assistance for compliance concerns.  This soft launch and the delayed effective date of the rules demonstrates that there will be no harm arising out of any OLS enforcement to enjoin within the timeframe proposed for a preliminary injunction hearing, which was the concern raised during preliminary discussions....

12/23/24 Goldman Decl., Ex. 1.

## III.   ARGUMENT

**A.    Uber must satisfy a stringent standard.**

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Uber must establish: 1) a likelihood of success on the merits, 2) that it is likely to suffer irreparable harm in the absence of preliminary relief, 3) that the balance of equities tips in Uber's favor, **and** 4) that an injunction is in the public interest.  *Plintron Techs. USA LLC v. Phillips*, No. C24-93, 2024 WL 553718, *2 (W.D. Wash. Feb. 12, 2024).  "When the government is a party, these last two factors merge."  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 8
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

**B.    Uber's claims are <u>not</u> likely to succeed.**

Likelihood of success on the merits "is the most important" factor.  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).  "Because it is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits, [the court] need not consider the remaining three" elements.  *Id.* (internal quotation marks omitted).  Where the moving party offers only a conclusory argument without evidentiary support, it fails to meet its burden to demonstrate success on the merits.  *Plintron Techs.*, 2024 WL 553718 at *3.

Uber fails to satisfy this determinative threshold inquiry.

**1.    Uber's compelled speech claim is meritless.**

Uber claims the Ordinance compels speech in violation of the First Amendment because it requires Uber to speak and opine on issues with which it disagrees and adopt the City's view.  Uber erroneously equates complying with a law to opining on it.  Nothing prohibits Uber from stating that the policy is required by law and Uber disagrees with it.

Critically, Uber ignores the distinction between commercial and noncommercial speech in arguing that strict scrutiny should apply.  It mistakenly compares itself to social media companies and other actors at the center of the political stage who were compelled by legislation to express their own opinions or make statements on political issues.  But Uber's place under the First Amendment is more modest.  To the extent the Ordinance implicates speech, it is commercial speech, not subject to strict scrutiny and well within the bounds of the First Amendment.

**a.    The economic regulations do not implicate the First Amendment.**

Although Uber conflates them, it challenges two provisions.  One requires adoption of a conforming deactivation policy.  SMC 8.40.050(A)(2).  The other requires notifying workers of the policy.  SMC 8.40.050(A)(1).  The policy requirement regulates conduct, not speech.  It requires that "deactivation must be reasonably related to the network company's safe and efficient operation."  SMC 8.40.050(A)(2).  That some speech may, as a practical matter, be required for

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1 Uber to convey its policy or provide fair notice of it is of no consequence.  Laws governing

2 conduct that have only an incidental impact on speech do not trigger First Amendment scrutiny.

3      The First Amendment extends only to conduct that is inherently expressive.  *Rumsfeld v. F.*

4 *for Acad. & Institutional Rts., Inc*., 547 U.S. 47 (2006); *Interpipe Contracting, Inc. v. Becerra*,

5 898 F.3d 879, 895 (9th Cir. 2018).  "[T]he First Amendment does not prevent restrictions directed

6 at commerce or conduct from imposing incidental burdens on speech."  *Sorrell v. IMF Health Inc*.,

7 564 U.S.552, 567 (2011).  Regulating conduct that is facilitated by written or spoken language

8 does not abridge freedom of speech.  *Expressions Hair Design v. Schneiderman*, 588 U.S. 37, 47

9 (2017).

10      The threshold question is whether the desire to stifle speech motivated the regulation of

11 "conduct with a 'significant expressive element'" or "the ordinance has the inevitable effect of

12 'singling out those engaged in expressive activity.'" *Int'l Franchise Ass'n, Inc. v. City of Seattle*,

13 803 F.3d 389, 408 (9th Cir. 2015) (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 696, 706

14 (1986)).  Because neither the policy nor notice requirements single out those engaged in

15 expressive activity – such as newspapers or advocacy organizations – this case turns on the

16 "significant expressive element" standard.  Applying it, the Ninth Circuit rejected a First

17 Amendment challenge to the City's minimum wage ordinance because the regulated conduct

18 lacked a significant expressive element:

19
20        The ordinance … is not wholly unrelated to a communicative
       component, but that in itself does not trigger First Amendment
21        scrutiny ….  [T]he ordinance applies to businesses that have adopted
       a particular business model, not to any message the businesses
22        express.  It is clear that the ordinance was not motivated by a desire
       to suppress speech, the conduct at issue is not franchisee expression,
23        and the ordinance does not have the effect of targeting expressive
       activity.
24
*Id.* at 408-09 (cleaned up).
25

26

The two provisions challenged here regulate business dealings between companies and workers.  They are economic regulations that do not target speech or expressive conduct and were not motivated by a desire to suppress speech.  They are like the statute in *Rumsfeld* that required law schools – despite their opposition to the military's treatment of gay soldiers – to permit military recruitment of students.  *Rumsfeld* upheld the statute as a regulation of conduct, not speech, analogizing it to an anti-discrimination measure: the government "can prohibit employers from discriminating in hiring on the basis of race.  The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct."  *Rumsfeld*, 547 U.S. at 62.

Communicating a required worker-protection policy and providing notice of that policy do not implicate the First Amendment because the speech is incidental to the economic activity.  *See HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685-86 (9th Cir. 2019) (ordinance about housing and rental agreements regulated non expressive conduct despite incidental burdens on speech).  These provisions implicate no network company speech regarding its views on anything, let alone speech "with a significant expressive element."  *Int'l Franchise*, 803 F.3d at 408.  Uber is "free to discuss any issue with any person at any time," *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 452 (2015), including its disagreement with this economic regulation of its business.

Under controlling authority that Uber ignores, the policy and notice provisions regulate commercial conduct without implicating the First Amendment.

> **b.    If the First Amendment is implicated, these provisions concern commercial speech.**

If this Court finds the First Amendment implicated, the policy and notice provisions validly regulate commercial speech that is subject to lower scrutiny.  "Commercial speech enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression."  *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 623 (1995) (cleaned

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 11
(CASE NO. 2:24-cv-2103-MJP)

1    up); *accord Sorrell*, 564 U.S. at 579 (noting government's legitimate interest in protecting

2    consumers from commercial harms).

3          Uber points to *Bolger v. Youngs Drug Products*.  In that seminal commercial speech case,

4    the Court described the breadth of commercial speech: "an eight-page pamphlet discussing at

5    length the problem of venereal disease and the use and advantages of condoms in aiding the

6    prevention of venereal disease" was commercial speech though it did not expressly propose a

7    transaction and the only commercial element was a statement at the bottom of the last page noting

8    that "the pamphlet [was] contributed as a public service by … the distributor of Trojan-brand

9    prophylactics."  463 U.S. 60, 62 n.4, 68 (1983).  *Bolger* emphasized that even speech about

10    "important public issues" is entitled to less First Amendment protection when made in commercial

11    transactions.  *Id.* at 67-68.

12          Speech related to the protection of workers is commercial speech.  *See Ariix, LLC v.*

13    *NutriSearch Corp.*, 985 F.3d 1107, 1117 (9th Cir. 2021) ("Courts have found commercial speech"

14    when it concerns "benefits to employee compensation, improvements to a brand's image, general

15    exposure of a product, and protection of licensees' interests."); *San Francisco Apartment Ass'n v.*

16    *City & Cnty. of San Francisco*, 881 F.3d 1169, 1176-77 (9th Cir. 2018) ("a discussion between a

17    landlord and a tenant about the possibility of entering into a buyout agreement is commercial

18    speech, as it relates solely to the economic interests of the parties and does no more than propose

19    commercial transaction"); *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 819 (9th Cir. 2013) ("The

20    act of soliciting work as a day laborer may communicate a political message, but the primary

21    purpose of the communication is to advertise a laborer's availability for work and to negotiate the

22    terms of such work," which is "only commercial speech.").  The same is true of the policy and

23    notice provisions.  Any regulated speech is commercial, as it occurs within the context of, and is

24    inextricably linked to, a commercial transaction between the company and workers.

25          Courts "try to give effect to a common-sense distinction between commercial speech and

26    other varieties of speech."  *X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) (cleaned up).

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 12
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1    Factors favoring a finding of commercial speech are whether it is an advertisement, the speech

2    refers to a particular product, and the speaker's motivation is economic.  *Id.*  The first factor is

3    absent here, but the latter two are present – the provisions pertain only to Uber's delivery service,

4    and its motivation in retaining and terminating drivers is economic.  Common sense confirms that

5    the deactivation policy and worker notice are, at best, commercial speech that exclusively

6    concerns terminating commercial contracts.

7                    **c.    The policy and notice provisions satisfy commercial speech scrutiny.**

8            There are two lesser standards of review applied to commercial speech.  One applies to

9    *restrictions* on commercial speech.  *San Francisco Apartment*, 881 F.3d at 1177.  Uber correctly

10   recites the *Central Hudson* test as requiring the direct advancement of a substantial government

11   interest by means no more extensive than necessary to meet that interest.  Dkt. 18 at 17.  But Uber

12   does not complain of restrictions on its speech.

13           Uber instead complains of compelled speech – the policy it must adopt and the notice it

14   must give workers.  Where *compelled* commercial speech that is factual and noncontroversial is

15   involved, the less rigorous, reasonable-relation standard applies: "The government may compel

16   truthful disclosure in commercial speech as long as the compelled disclosure is 'reasonably

17   related' to a substantial governmental interest."  *San Francisco Apartment*, 881 F.3d at 1177; *see*

18   *also X Corp.*, 116 F.4th at 900 (akin to rational basis).  The limitations on deactivation and notice

19   are factual and uncontroversial.  If First Amendment interests are even implicated, the reasonable-

20   relation test is the standard of review, and it is amply satisfied.

21           Nevertheless, the Ordinance also passes scrutiny under *Central Hudson*.  It directly

22   advances substantial government interests, primary of which is protecting workers against

23   unwarranted deactivations.  The Ordinance does so through means that are no more extensive than

24   necessary to meet these interests.  The substantive deactivation requirements and the notice

25   provision explain to workers why Uber can and has deactivated them and how the worker can

26   obtain review of deactivation.  *See San Francisco Apartment*, 881 F.3d at 1178 (required

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 13
(CASE NO. 2:24-cv-2103-MJP)

Summit Law Group PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1   disclosures by landlords to tenants informing tenants of their rights in lease buyout negotiations

2   advances the government's substantial interest in increasing the fairness of lease buyout

3   negotiations).

4          Uber argues that the two provisions are broader than necessary because the City "could

5   have proscribed directly the grounds it disfavors[.]" Dkt. 8 at 17.  The City did so by proscribing

6   the substantive reasons why Uber may not deactivate a worker, which must be reflected in a

7   policy.  SMC 8.40.050(A)(2).  Moreover, the government interest in preventing unwarranted

8   deactivations cannot be effectively achieved unless workers are informed of the deactivation

9   policy and provided with the specific information and procedures pertaining to any actual

10  deactivation.

11              d.      **These two provisions are not subject to, but also would satisfy, strict
                        scrutiny.**

12         Uber's argument that strict scrutiny applies is wrong.  The cases on which it relies

13  involved parties who, unlike Uber, stand at the center of the political stage and were actually

14  compelled by law to opine or make statements on noncommercial matters.  In *X Corp.*, a social

15  media company was required by statute to "opine" in reports to the government on "politically

16  fraught" issues such as identifying "hate speech," "racism," "extremism," "radicalization," and

17  "foreign political interference," and to state whether it would moderate such content.  116 F.4th at

18  894, 899, 902.  Uber is not required to opine on any subject, let alone the core First Amendment

19  speech at issue in *X Corp.*

20         Similarly, in *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024), the statute required

21  on-line companies to report to the government and "opine on potential speech-based harms to

22  children, including harms resulting from the speech of third parties, disconnected from any

23  economic transaction."  *Id*. at 1119.  The court found this law to require core First Amendment

24  speech *about speech* and applied strict scrutiny.  *Id.* at 1121.

25

26

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 14
(CASE NO. 2:24-cv-2103-MJP)

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

ER-43

1    Strict scrutiny has also been applied to a law requiring anti-abortion pregnancy crisis

2  centers, contrary to their core mission, to provide their clients with a government-written script on

3  free or low-cost abortions provided by the state.  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,

4  585 U.S. 755 (2018); *see also Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781

5  (1988) (applying strict scrutiny to law regulating charitable solicitations).

6    Here, by contrast, the nominal speech required conveys only the permissible reasons for

7  terminating a contract between a for-profit business and its workers.  Uber is not being forced to

8  speak on political – or any – issues nor to express any opinion, political or commercial.  Uber is

9  only required to convey factual commercial information regarding the substantive basis for

10  deactivating workers as allowed by Seattle law.  Strict scrutiny does not apply.

11    Uber's list of examples illustrates that the Ordinance *does not* require Uber to express a

12  belief or opinion about anything.  Uber complains that the Ordinance requires it to "convey that it

13  does not believe consumer ratings have anything to do with its platform's safe and efficient

14  operation."  Dkt. 8 at 11.  Not only does the Ordinance not require Uber to state its belief about

15  anything, but it specifically allows for deactivation based on consumer ratings so long as

16  deactivation is not "solely" based on consumer ratings.  SMC 8.40.050(A)(2)(e).  Uber may tell

17  the world that its belief conflicts with the Ordinance's substantive standard and notice

18  requirement, just as it may tell the world that the minimum wage law and anti-discrimination laws

19  are bad policy.

20    Next Uber contends that the Ordinance requires it to announce a deactivation policy

21  "espousing – as if it were Uber's own view – the City's *opinion* that a courier's record of traffic

22  accidents bears no reasonable relationship … to safety[.]"  Dkt. 8 at 12.  Uber must simply inform

23  workers what the policy *is*.  Uber may say that the substance of the policy and the notice are

24  required by City law and espouse its "own view" disagreeing about the connection of traffic

25  accidents to safety, just as it may espouse its "own view" disagreeing with worker safety

26  requirements.

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 15
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    Uber also contends that the Ordinance requires it to adopt a deactivation policy "endorsing

2    the view" that systematically refusing or cancelling orders from certain consumers is not

3    discriminatory conduct.  Dkt. 8 at 13.  Just as an employer who informs workers of their rights

4    under anti-discrimination laws is neither endorsing the view that the law is wise nor stating the

5    employer's view about anything, so too Uber is not required to endorse the policy, only inform its

6    workers of it.  Uber may endorse any view, about anything, to anyone, anywhere.

7    Uber's other examples suffer from the same defects.

8    **2.    The Ordinance does not impinge any association right.**

9    Uber next contends that its First Amendment right to freedom of expressive association

10    protects its decision not to associate with workers who it deems worthy of deactivation.  It is

11    wrong.

12    "Among the rights protected by the First Amendment is the right of individuals to

13    associate to further their personal beliefs."  *Healy v. James*, 408 U.S. 169, 181 (1972).  "Freedom

14    of association … plainly presupposes a freedom not to associate."  *Roberts v. U.S. Jaycees*, 468

15    U.S. 609, 623 (1984).  But the "right to associate for expressive purposes is not … absolute."  *Id.*

16    Rather, "the nature and degree of constitutional protection afforded freedom of association may

17    vary depending on the extent to which … the constitutionally protected liberty is at stake in a

18    given case."  *Id.*  The right to associate does not mean "that in every setting in which individuals

19    exercise some discrimination in choosing associates, their selective process of inclusion and

20    exclusion is protected by the Constitution."  *N.Y. State Club Ass'n, Inc. v. City of New York*, 487

21    U.S. 1, 13 (1988).

22    "To determine whether [Uber] is protected by the First Amendment's freedom of

23    expressive association, the court 'must determine whether [Uber] engages in expressive

24    association.'"  *McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121, 1143 (W.D. Wash. 2023)

25    (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000)), *appeal filed* (May 22, 2024).

26    Although the First Amendment's protection is not reserved for advocacy groups, "there is only

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 16
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1    minimal constitutional protection of the freedom of commercial association." *Roberts*, 468 U.S. at

2    634 (O'Connor, J., concurring in part & concurring in the judgment). "The Constitution does not

3    guarantee a right to choose employees, customers, suppliers, or those with whom one engages in

4    simple commercial transactions, without restraint from the State." *Id.* Notably, "the Supreme

5    Court has never held that a commercial enterprise, open to the general public, is an 'expressive

6    association' for purposes of First Amendment protections." *State v. Arlene's Flowers, Inc.*, 193

7    Wn.2d 469, 533 (2019) (citing *Dale*, 530 U.S. at 648).

8         Uber does not engage in expressive association and its reliance on *Dale* is mistaken. The

9    plaintiff in *Dale* was the Boy Scouts – a non-profit, membership organization that challenged the

10   application of an antidiscrimination law to its membership policy. 530 U.S. at 648. The Court

11   held that the law violated the organization's associational right, in part, because the Boy Scouts

12   was *not* a "clearly commercial entit[y]" that would typically be subject to laws of public

13   accommodation. *Id.* at 657. Rather, the very *purpose* of the Boy Scouts was "to instill values in

14   young people," "both expressly and by example." *Id.* at 649-50. Uber, by contrast, does not

15   contract with workers "for the purpose of speaking," *Rumsfeld*, 547 U.S. at 68, but, rather, for the

16   purpose of conducting commercial transactions.

17        Uber's contractual relationship with its drivers is akin to that of an employer. Courts have

18   routinely rejected claims of associational rights asserted in the employment context. *McMahon*,

19   704 F. Supp. 3d at 1143-45 (collecting cases). In *McMahon*, a Judge from this Court considered a

20   non-profit religious organization's assertion that it held a First Amendment right to refuse to

21   associate with an employee who was in a same-sex marriage. World Vision asserted that its

22   "community associates together in expressive activities to further their shared stances," including

23   the organization's "marriage policy." *Id.* at 1143-44. It argued that the "forced inclusion" of an

24   employee who was in a same-sex marriage would significantly burden the organization's "right to

25   oppose or disfavor same-sex conduct or marriage." *Id.* at 1144 (internal quotation marks omitted).

26   This Court disagreed, concluding that antidiscrimination law "does not implicate World Vision's

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 17
(CASE NO. 2:24-cv-2103-MJP)

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1    expressive associational rights" because the organization's "very mission" was "not to oppose or

2    discourage same-sex marriage." *Id.* at 1144-45. World Vision had no associational right that was

3    infringed by its "forced" association with an employee whom it wished to fire.

4         Uber may place import on the safe operations of its business, but the company's "very

5    mission" is not to promote or advocate for its definition of safety. Even if Uber did engage in

6    expressive association, the Ordinance does not unconstitutionally burden its expression.

7         *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 539 (1987),

8    is instructive. Rotary International, a nonprofit corporation, was founded as "an organization of

9    business and professional men united worldwide who provide humanitarian service, encourage

10   high ethical standards in all vocations, and help build goodwill and peace in the world." *Id.* at

11   539. The organization refused membership to women because doing so resulted in an "aspect of

12   fellowship" among its members and allowed the organization "to operate effectively in foreign

13   countries with varied cultures and social mores." *Id.* at 541. The organization challenged a law

14   prohibiting sex discrimination, asserting, as Uber does here, that the law infringed on its right to

15   associate, including by selecting its members.

16        Like Uber, Rotary International articulated an expressive activity, an exclusionary

17   membership policy, and a connection between its expressive activities and its exclusionary policy.

18   Nevertheless, the Court determined that the organization failed to "demonstrate that admitting

19   women to Rotary Clubs will affect in any significant way the existing members' ability to carry

20   out their various purposes" or would require the clubs "to abandon their basic goals." *Id.* at 548.

21        Uber cannot establish that the Ordinance affects in any significant way its ability to

22   advocate for safe and reliable food deliveries. The company can continue to "stand for safety" by

23   publishing safety reports, host events to discuss safety innovations, seek feedback from experts

24   and stakeholders, and conduct background checks on platform workers. Dkt. 8 at 3-4. It can

25   voice its disagreement with the Ordinance and advocate for different safety standards. Limiting

26

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 18
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1  the circumstances under which a worker can be deactivated does not cause Uber to abandon its

2  basic goals as a business and, therefore, does not infringe on any associational rights.[21]

3        To the extent the Ordinance does impact the company's First Amendment association

4  right, infringements on the right to association "may be justified by regulations adopted to serve

5  compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through

6  means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623. "On its

7  face, the [Ordinance] does not aim at the suppression of speech, does not distinguish between

8  prohibited and permitted activity on the basis of viewpoint, and does not license enforcement

9  authorities to administer the statute on the basis of such constitutionally impermissible criteria."

10  *Id.* Rather, it was enacted to "protect[] and promote[] public health, safety, and welfare by

11  establishing protections against unwarranted deactivations for app-based workers" to "ensure[]

12  that such workers can perform their services in a safe and reliable manner and thereby promote[]

13  the welfare of the people[.]" Ordinance §1. This is a compelling interest, unrelated to the

14  suppression of ideas, that cannot be achieved through means significantly less restrictive of any

15  associational freedoms.

16      **3.**     **The Ordinance is not unconstitutionally vague.**

17        Nor is Uber likely to succeed on the merits of its vagueness claim.

18        An ordinance is unconstitutionally vague if it "fails to provide a person of ordinary

19  intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or encourages

20  seriously discriminatory enforcement" (the arbitrary enforcement theory). *United States v.*

21  *Williams*, 553 U.S. 285, 304 (2008). "The operative question under the fair notice theory is

22  whether a reasonable person would know what is prohibited by the law." *Tucson v. City of*

23  *Seattle*, 91 F.4th 1318, 1329 (9th Cir. 2024) (internal quotation marks omitted). As for arbitrary

24  enforcement, "a law is void for vagueness if it lack[s] any ascertainable standard for inclusion and

25

26     [21] Notably, Uber does not even argue that its "forced" association with workers would affect its ability to advocate a viewpoint. It alleges only mere economic consequences. Dkt. 10 ¶53.

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 19
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   exclusion, thereby authorizing or encouraging the authorities [to] arbitrarily prosecute one class of

2   persons instead of another." *Id.* (internal quotation marks omitted).

3        "The degree of vagueness that the Constitution tolerates … depends in part on the nature of

4   the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982).

5   Economic regulation is subject to a more lenient vagueness test as its subject matter is often

6   narrow "and because businesses, which face economic demands to plan behavior carefully, can be

7   expected to consult relevant legislation in advance of action.  Indeed, the regulated enterprise may

8   have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an

9   administrative process." *Id.*

10       By contrast, "[w]hen First Amendment freedoms are at stake, courts apply the vagueness

11  analysis more strictly," even permitting facial challenges. *Tucson*, 91 F.4th at 1329.  Still, "perfect

12  clarity and precise guidance have never been required even of regulations that restrict expressive

13  activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989); *Cal. Tchrs. Ass'n v. State Bd.*

14  *of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001) ("[E]ven when a law implicates First Amendment

15  rights, the constitution must tolerate a certain amount of vagueness.").  Rather, where free speech

16  rights are implicated, a statute is unconstitutionally vague on its face only if the "deterrent effect

17  on legitimate expression is … both real and substantial" *and* "the statute is [not] readily subject to

18  a narrowing construction by the state courts." *Tucson*, 91 F.4th at 1329-30 (quoting *Young v. Am.*

19  *Mini Theatres, Inc.*, 427 U.S. 50 (1976)).  "[S]peculation about possible vagueness in hypothetical

20  situations not before the Court will not support a facial attack on a statute when it is surely valid

21  'in the vast majority of its intended applications.'" *Hill v. Colorado*, 530 U.S. 703, 733 (2000)

22  (internal quotation marks omitted).

23       Uber raises a facial attack, claiming one provision of the Ordinance is unconstitutionally

24  vague because it requires Uber to create a "[r]easonable" deactivation policy.  Dkt. 8 at 19-21.

25  Uber argues that by using the word "reasonable," the Ordinance fails to provide fair notice of what

26  conduct is prohibited.  *Id.* at 19.  As a threshold matter, Uber itself suggested the City use the word

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 20
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1   "reasonable" in the Ordinance.  Dkt. 11, Ex. 6 at 3.  Next, Uber's participation in the rulemaking

2   process shows the Ordinance is precisely the type of economic regulation for which "the regulated

3   enterprise may have the ability to clarify the meaning of the regulation by its own inquiry,"

4   mitigating any real vagueness concerns.  *Vill. of Hoffman*, 455 U.S. at 498.  Even under the most

5   stringent of vagueness inquiries, Uber's claim fails for three other reasons.

6          *First*, under no version of the vagueness analysis is the Ordinance unconstitutional simply

7   because it uses the word "reasonable."  *See United States v. Ward*, No. CR-11-2123-RMP, 2013

8   WL 12203098, at *4 (E.D. Wash. Jan. 18, 2013) ("[A] statute is not void for vagueness merely

9   because it uses the word 'reasonable' or 'unreasonable.'") (internal quotation marks omitted).

10  "[T]he adjective 'reasonable' is, of course, ubiquitous in the law."  *Nat'l Ass'n for Fixed Annuities*

11  *v. Perez*, 217 F. Supp. 3d 1, 41 (D.D.C. 2016).  The U.S. Constitution proscribes "unreasonable"

12  searches and seizures.  U.S. Const. amend. IV.  Federal and state statues commonly require

13  businesses and individuals to act "reasonably."  *See, e.g.*, 42 U.S.C. §12112 ("reasonable

14  accommodations"); 18 U.S.C. §922(d)(8) ("reasonable cause," "reasonable fear"); RCW

15  10.120.020 ("reasonable care").  "It is thus unsurprising that the case law is replete with decisions

16  rejecting vagueness challenges, like that raised here, to the words 'reasonable,' 'reasonably,' and

17  'unreasonably.'" *Perez*, 217 F. Supp. 3d at 42 (citing cases); *see also, e.g.*, *Karlin v. Foust*, 188

18  F.3d 446, 465 (7th Cir. 1999).  In short, a word used in the Constitution to proscribe conduct is not

19  by its nature unconstitutionally vague.

20         The only case Uber cites for the proposition that "reasonable" is unconstitutionally vague

21  is readily distinguishable.  *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553 (6th Cir.

22  1999), involved an ordinance regulating the use of "bubbling devices" to keep a waterway from

23  freezing around boats and structures.  The ordinance limited the size of open water areas that a

24  bubbling device could create: the area "could not exceed a five-foot radius from the protected

25  object, or an area 'determined by the inspecting officer to be a reasonable radius.'"  *Id.* at 555.

26  Violation of the ordinance carried criminal penalties, including incarceration.  *Id.*  The ordinance

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 21
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1   was unconstitutionally vague because it gave enforcement officers "unlimited discretion" to find

2   violations and thus imposed no bar to arbitrary, discriminatory imposition of criminal sanctions.

3   *Id.* at 557-60. By stark contrast, the Ordinance does not impose criminal penalties or vest

4   enforcement officials with unlimited discretion. It requires companies to impose reasonable

5   policies or risk a civil penalty of $622.85 per aggrieved party, SMC 8.40.170(E), and offers

6   guidance as to what constitutes a reasonable and unreasonable policy.

7       *Second*, by enumerating a list of policies not reasonably related to safe and efficient

8   operations, the Ordinance provides *more*, not less, clarity. Uber invokes the hypothetical used in

9   *Johnson v. United States*, 576 U.S. 591 (2015): that while "shades of red" alone does not generate

10  confusion, "the phrase 'fire-engine red, light pink, maroon, *navy blue*, or colors that otherwise

11  involve shades of red' assuredly does so." *Id.* at 603. But far from calling navy blue a "shade of

12  red," and unlike the criminal sentencing statute in *Johnson*, the Ordinance includes a list of per se

13  unreasonable policies that are comprehensible and consistent with the Ordinance's stated purpose.

14      Uber quotes in *part* only two proscribed policies of the eight listed. Uber argues they are

15  so confusing as to render the entire Ordinance vague. Here are the two, *in full*: (1) "[a]ny policy

16  that would result in deactivation based *solely* on a quantitative metric derived from aggregate

17  customer ratings of an app-based worker's performance" and (2) "[a]ny policy that would

18  deactivate a worker based on the results of a background check, consumer report, driver record, or

19  record of traffic infractions, *except in cases of egregious misconduct or where required by other*

20  *applicable law."* SMC 8.40.050(A)(2) (emphasis added).

21      The Ordinance does not prevent network companies from ever deactivating workers based

22  on their driving record. In citing traffic infractions as an example, Uber conspicuously omits the

23  carveout for "egregious misconduct," the definition of which includes, as one example, accruing

24  three or more non-criminal moving violations in the past three years. SMC 8.40.020. Nor does

25  the Ordinance proscribe deactivations based on criminal conduct. *See., e.g.*, SMC 8.40.050(C)

26  (network company may immediately deactivate worker who has engaged in "egregious

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 22
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   misconduct"); SMC 8.40.020 (defining "egregious misconduct" to include, *inter alia*, behaviors

2   that endanger physical safety, intentionally cause economic harm, or are threatening, harassing, or

3   abusive).  Further, the Ordinance explains *why* these proscribed policies are not "reasonably

4   related" to safe and efficient operations through five pages of findings supported by empirical

5   data.  Ordinance §1.  Uber is not likely to succeed in proving the Ordinance somehow gives "next

6   to no guidance" as to what a policy may or may not contain by offering a clear list of prohibited

7   policies with explanations.

8       *Third*, the record shows that Uber understands what the Ordinance requires; it simply

9   disagrees with it.  Uber participated extensively in the legislative process.  In engaging with the

10  City, Uber disagreed with the limitations on the use of background checks, traffic violations, and

11  aggregate ratings, not confusion with what the Ordinance requires.  Dkt. 11 ¶¶19-20 & Exs. 1-10.

12  So too, in its motion, Uber does not identify any proposed policy it would introduce but for the

13  purportedly "vague" mandate.  Nor does Uber even hint at what expression would be "chilled."

14  Dkt. 8 at 21:9.  Rather, it wishes to enact policies it well understands are prohibited by the

15  Ordinance.  Dkt. 9 ¶¶20-21.

16      Uber fails to identify any "deterrent effect" of purported vagueness in the Ordinance, let

17  alone a "real and substantial" deterrent effect on "legitimate expression," as is required to succeed

18  on a facial challenge.  *Tucson*, 91 F.4th at 1329-30.

19  **C.   Uber is <u>not</u> likely to suffer irreparable harm.**

20      Even when there is a strong likelihood of success on the merits an injunction "cannot

21  issue" "if there is just a mere possibility of irreparable harm."  *McGary v. Inslee*, No. C23-5388

22  BHS, 2023 WL 5822280, *3 (W.D. Wash. Sep. 8, 2023).  "Speculative injury does not constitute

23  irreparable injury sufficient to warrant" preliminary injunctive relief.  *Caribbean Marine Servs.*

24  *Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  Thus, a TRO should be rejected where there is

25  no evidence "to suggest, or for the Court to rely on, that irreparable injury would occur if the

26  Court does not issue a TRO."  *Plintron Techs.*, 2024 WL 553718 at *4.  Moreover, a lengthy delay

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 23
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1   before seeking injunctive relief implies a lack of urgency and irreparable harm.  *Lydo Enters., Inc.*

2   *v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984).  Despite being an active and consistent

3   stakeholder since before passage of the Ordinance, Uber waited 16 months to bring this action.

4   This delay undermines the asserted need for a TRO.  *Plintron Techs.*, 2024 WL 553718 at *2

5   (party waiting to bring TRO within three months undermined claimed necessity).

6        Any harm Uber may suffer is not "irreparable."  As discussed above, the notion that Uber

7   will suffer "the loss of its constitutional rights," Dkt. 8 at 22:11, is not just speculative, but

8   baseless.  And it ends consideration for the requested TRO.  *Baird v. Bonta*, 81 F4th 1036, 1041

9   (9th Cir. 2023) (If a plaintiff "alleges a constitutional violation," the likelihood of success on the

10  merits factor is "usually decisive.").  The damages that concern Uber are "to its business and

11  reputation[.]"  Dkt. 8 at 22:19.  Still, even *real* assertions of possible economic damage do not

12  constitute irreparable injury.  *Rent-a-Center v. Canyon Television & Appliance*, 944 F.2d 597, 603

13  (9th Cir. 1991).

14  **D.**    **The equities do <u>not</u> favor Uber and an injunction would <u>not</u> be in the public interest.**

15       In assessing these final factors, the Court "must balance the competing claims of injury and

16  must consider the effect on each party of the granting or withholding of the requested relief."

17  *Winter*, 555 U.S. at 24.  If it were appropriate to get this far in the analysis, the balance of equities

18  and the public interest would point only in the City's direction.  It has a substantial interest in

19  protecting workers who are at the mercy of Uber's deactivation without warning, explanation, or

20  reasonable basis related to Uber's safe and efficient operations.  But, as Uber knew *before it filed*

21  *suit*, on January 1, 2025, OLS will not be enforcing any rules against Uber, as they are not yet in

22  effect.  12/23/24 Middaugh Decl. ¶3.  Likewise, on January 1, 2025, Uber will not be subject to

23  penalty imposed by OLS for any unwarranted deactivation, or failure to: conduct a pre-

24  deactivation investigation, demonstrate that a violation of its policy occurred, consistently apply

25  its rules, or impose a proportionate penalty because OLS does not have authority to enforce these

26  provisions until 2027.  SMC 8.40.130(B).

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 24
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

**E.     The Ordinance is severable.**

As Uber recognizes, severability of a local ordinance is a question of state law.  In making a severability determination, Washington courts consider "whether the constitutional and unconstitutional provisions are so connected … that it could not be believed that the legislature would have passed one without the other; or where the part eliminated is so intimately connected with the balance of the act as to make it useless to accomplish the purposes of the legislature." *State v. Abrams*, 163 Wn.2d 277, 285-86 (2008).

As to the first part, the inclusion of a severability clause, such as the Ordinance contains, SMC 8.40.250, "provide[s] the necessary assurance that the Legislature would have enacted the appropriate sections of the legislation despite the unconstitutional sections." *El Centro De La Raza v. State*, 192 Wn.2d 103, 132 (2018) (internal quotation marks omitted).

As to the second part, the challenged sections are not "so intertwined with the remainder of the [Ordinance] and so fundamental to the [Ordinance's] efficacy" as to render the entire thing "invalid." *League of Women Voters of Wash. v. State*, 184 Wn.2d 393, 412 (2015).  The Ordinance also establishes a right for workers to challenge their deactivation through a procedure established by the company, SMC 8.40.060, prohibits companies from retaliating against workers who exercise their rights, SMC 8.40.120, and establishes a private right of action for those injured by a violation of the Ordinance.  SMC 8.40.230.  The Ordinance also grants OLS rulemaking authority, enforcement power, and investigation power; establishes a navigation program; assesses penalties; and establishes an appeal procedure.  SMC 8.40.125-.220.  Uber does not challenge any of these provisions, and none depends on the requirement to adopt a deactivation policy.

The cases relied on by Uber to defeat severability are inapposite.  Uber neglected to state that both *League of Women Voters* and *Leonard v. City of Spokane*, 127 Wn.2d 194, 201-02 (1995), concerned legislation in which the *funding mechanism* was deemed unconstitutional.  The funding mechanism "represents the heart and soul" of a legislative enactment, which is rendered "virtually worthless without it." *Leonard*, 127 Wn.2d at 202; *accord League of Women Voters*,

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 25
(CASE NO. 2:24-cv-2103-MJP)

Summit Law Group PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    184 Wn.2d at 412.  Here, by contrast, even without the deactivation policy requirement, the

2    Ordinance as a whole "has not been rendered 'useless,' as required by the test for severability."

3    *Gerberding v. Munro*, 134 Wn.2d 188, 198 (1998).  To the extent the Court determines that any

4    section of the Ordinance is unconstitutional, it should sever only that portion.

5                                 **IV.   CONCLUSION**

6        The City requests that the Court deny Uber's motion.

7        DATED this 23rd day of December, 2024.

8                                              Respectfully submitted,

9                                              SUMMIT LAW GROUP PLLC
                                               Attorneys for Defendant City of Seattle
10

11                                             I CERTIFY THAT THIS MEMORANDUM CONTAINS
                                               8,394 WORDS, IN COMPLIANCE WITH THE LOCAL
12                                             CIVIL RULES.

13                                             By *s/ Jessica L. Goldman*
                                                   Jessica L. Goldman, WSBA #21856
14                                                 *jessicag@summitlaw.com*
                                                   Lawrence C. Locker, WSBA #15819
15                                                 Jesse L. Taylor, WSBA #51603
                                                   Eva Sharf Oliver, WSBA #57019
16                                                 Molly J. Gibbons, WSBA #58357
                                                   315 Fifth Avenue South, Suite 1000
17                                                 Seattle, WA  98104
                                                   Telephone: (206) 676-7000
18

19                                             ANN DAVISON
                                               Seattle City Attorney
20                                             Attorneys for the City of Seattle

21                                             By *s/Ghazal Sharifi*
                                                   Ghazal Sharifi, WSBA #47750
22                                                 *Ghazal.Sharifi@seattle.gov*

23

24

25

26

DEFENDANT'S OPPOSITION TO MOTION FOR
TEMPORARY RESTRAINING ORDER - 26
(CASE NO. 2:24-cv-2103-MJP)

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

UBER TECHNOLOGIES, INC. and PORTIER, LLC,

       Plaintiffs,

       v.

CITY OF SEATTLE,

       Defendant.

No. 2:24-cv-02103

**DECLARATION OF ALLISON FORD IN SUPPORT OF UBER'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, Allison Ford, declare as follows:

1.      My name is Allison Ford. I am over the age of 18, have personal knowledge of the facts stated in this declaration, and can competently testify to their truth.

2.      I am a Senior Public Policy Manager for Uber Technologies, Inc. ("Uber"), and have been in that role since September 2024. Prior to that, I was a Public Policy Manager for Uber for the Pacific Northwest Region, a role I held from the time that I joined Uber in August 2021. My responsibilities include managing public policy and public affairs for Uber throughout the Pacific Northwest region. This involves advocating for Uber's policy goals as well as managing relations with state and local governments, media communications, and community relations.

3.      I make this declaration in support of Uber's Motion for a Temporary Restraining Order and Preliminary Injunction, which seeks to temporarily restrain and preliminarily enjoin Defendants from enforcing the App-Based Worker Deactivation Rights Ordinance enacted by the City of Seattle in August 2023 and set to take effect on January 1, 2025 (the "Ordinance"). In connection with my role at Uber, I am familiar with the Ordinance and have participated in communications, hearings, and Uber's written submissions regarding the Ordinance and accompanying proposed rules regarding implementation and compliance (the "Model Rules").

DECLARATION OF ALLISON FORD
No. 2:24-cv-02103

1

4.      The Seattle City Council introduced a law regulating the deactivation of app-based workers in May 2023, and voted in favor of passing the law in August 2023.[1]  Since that time, Uber has been actively engaged with the City of Seattle and Seattle's Office of Labor Standards ("OLS," or the "Agency"), which has rulemaking and enforcement authority under the Ordinance.  Over the course of that engagement, which has spanned many months, Uber has consistently raised concerns that the Ordinance and Model Rules will lower the company's safety, quality, and privacy standards.

5.      In May 2023, the City Council held hearings about the proposed Ordinance.  I attended those hearings and offered testimony on Uber's behalf.  A true and complete copy of my testimony from the May 9, 2023 hearing is attached as **Exhibit 1** to this declaration.  A true and correct copy of my testimony from the May 23, 2023 hearing is attached as **Exhibit 2** to this declaration.

6.      The Ordinance was signed into law in August 2023.  For nearly eight months after its enactment, OLS did not take any steps to initiate the rulemaking process contemplated by the Ordinance.

7.      In the absence of any rulemaking action by OLS, Uber did not know all of the requirements it would need to comply with when the Ordinance went into effect.  OLS's lack of guidance was significant because the Ordinance leaves to OLS's discretion significant aspects of the regulation, such as the precise categories of records that need to be disclosed under Section 8.40.090.  Additionally, while Uber believes the Ordinance itself is fundamentally problematic and unconstitutional, Uber remained uncertain as to whether OLS's eventual rules might at least help ameliorate some of the most problematic aspects of the Ordinance, including, for instance, whether OLS would provide greater clarity as to what sorts of deactivation policies it considers to be "reasonably related" to a network company's "safe and efficient operations," as relevant to the requirements of Section 8.40.050 of the Ordinance.[2]

8.      On April 8, 2024, OLS emailed stakeholders, including Uber, to inform them that it planned to hold meetings to discuss the rulemaking process beginning in May 2024.  On May 1, 2024,

---

[1] History for Seattle City Council Bill No. 120580, Office of the City Clerk of Seattle Legislative Information Center, https://seattle.legistar.com/LegislationDetail.aspx?ID=6214973&GUID=20C5F7BD-7898-47C2-9854-E3A42FFCD664 (last visited Dec. 17, 2024).
[2] Ordinance § 8.40.050(A)(2).

DECLARATION OF ALLISON FORD                    2
No. 2:24-cv-02103

however, OLS informed stakeholders that it was postponing the start of those meetings. A true and complete copy of this email exchange is attached as **Exhibit 3** to this declaration.

9. More than three months later, on August 20, 2024, OLS informed Uber and other stakeholders that it would once again begin the rulemaking process. A true and correct excerpt of a copy of OLS's August 20, 2024 email is attached as **Exhibit 4** to this declaration.

10. On August 28, 2024, Uber and other stakeholders met with OLS and discussed the companies' concerns about their ability to assess and comply with the Ordinance and OLS's eventual implementing rules given the delayed rulemaking timeline. On September 6, 2024, those companies sent OLS an email reiterating their concerns about the timeline. A true and correct copy of this September 6, 2024 email is attached as **Exhibit 5** to this declaration.

11. OLS held its first meeting with stakeholders on September 11, 2024, during which it provided an overview of the Ordinance. I attended that meeting on behalf of Uber.

12. On September 18, 2024, Uber submitted a pre-rule comment to OLS. Because OLS had yet to issue final rules, Uber's comment asked OLS to adopt (1) a six-month grace period for the enforcement of all requirements in the Ordinance, and (2) for any rules that impose additional substantive requirements, an implementation date at least six months after the date of final rule publication. A true and complete copy of Uber's pre-rule comment is attached as **Exhibit 6** to this declaration.

13. On September 23, 2024, OLS began issuing the Model Rules piecemeal. OLS apologized for its delay in issuing the Model Rules. A true and correct copy of OLS's September 23, 2024 email is attached as **Exhibit 7** to this declaration.

14. The very next day, Uber and other companies followed up with OLS on the request for a grace period, given the ongoing delay in the rulemaking process. A true and correct copy of this email exchange with OLS is attached as **Exhibit 8** to this declaration.

15. OLS subsequently issued other pieces of its Model Rules on October 7, October 18, November 11, and December 10.

16. OLS held meetings to discuss its model rules on September 25, October 23, November 13, and December 11. Either I or a member of my team attended each of these meetings on behalf of Uber.

DECLARATION OF ALLISON FORD                    3
No. 2:24-cv-02103

17.     On October 9, 2024 and December 10, 2024, Uber submitted comments to OLS's Model Rules, as they were rolled out in a piecemeal fashion.  True and correct copies of Uber's October 9 comment (which Uber signed on October 8) and December 10 comment are attached as **Exhibit 9** and **Exhibit 10** to this declaration, respectively.

18.     As the rulemaking process dragged on and the Ordinance's January 1, 2025 effective date grew closer, Uber and other stakeholders continued to be concerned about their ability to timely assess and comply with the Ordinance and OLS rules.  On October 2, 2024 and October 4, 2024, Uber and other stakeholders held meetings with OLS and Deputy Mayor Greg Wong, respectively, during which they expressed their concerns over the implementation timeline.

19.     In total, I or another Uber representative have met with OLS or otherwise engaged with the Agency in connection with the Ordinance and subsequent rulemaking a total of 15 times since the law was enacted, making concerted efforts to (1) suggest reasonable modifications to OLS's Model Rules that would address some of the Ordinance's most problematic and unworkable provisions, and (2) propose that OLS adopt a reasonable grace period to allow companies to come into compliance following OLS's finalization of its implementing rules, particularly given the substantial delays in OLS's rulemaking process.  We were hopeful that these efforts would bear fruit and were committed to seeing that process through.

20.     Since the Ordinance was first announced, Uber has submitted multiple rounds of comments, offered testimony, and met with industry stakeholders and OLS representatives.  Uber has made substantial efforts to avoid the circumstance it presently finds itself in—on the eve of the Ordinance becoming effective, still without the benefit of any final implementing rules from OLS (or a date when they will be finalized), and without necessary fixes from the Agency on many of the issues Uber has identified as clearly problematic and inconsistent with its safety and privacy commitments.

DECLARATION OF ALLISON FORD                    4
No. 2:24-cv-02103

1   I declare under penalty of perjury under the laws of the United States that the foregoing is true

2   and correct.

3   EXECUTED this 17th day of December, 2024, at Seattle, Washington.

DocuSigned by:

*Allison Ford*

3D1802A6663AD461...

Allison Ford

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ALLISON FORD

5

No. _____

Docusign Envelope ID: F72C11C8-2AED-4D96-9EDA-4D9131BF69AE

# EXHIBIT 1

Good Morning Chair Herbold & Committee Members.

My name is Allison Ford, I am a Public Policy Manager for Uber here in Seattle.
I am calling today regarding the proposed Seattle App-Based Worker Deactivation Rights Ordinance.

I wanted to begin by thanking those Committee members and staff that have met with us regarding this proposed ordinance to hear our feedback and concerns.

Uber shares the values, intentions and motivations behind the proposed ordinance.
At the same time, we do have serious concerns with several provisions in the proposed draft that severely limit our ability to ensure a safe environment for customers, small business partners, and delivery workers.

Our primary concern is to ensure that our platform remains safe to use and that we retain the ability to protect the privacy of individuals that use our platform from exposing their personal information beyond what is necessary to temporarily complete an order.

We take the safety and reliability of our platform seriously and we require the ability to protect access to our platform from users that have displayed behavior or a pattern of behavior that could put the health, safety and economic wellbeing of individuals and small businesses in Seattle at risk.

We are hopeful for the continued opportunity to work with the ordinance sponsors and stakeholders to improve this draft with an outcome that protects workers and provides them with the process they need without sacrificing the safety and privacy of Seattle customers and small businesses.

Thank you for your time.

# EXHIBIT 2

Good Morning Chair Herbold & Committee Members.

My name is Allison Ford, I am a Public Policy Manager for Uber here in Seattle.

I am calling in this morning regarding the proposed App-Based Worker Deactivation Rights Ordinance.

I wanted to start by thanking the bill sponsors for their willingness to collaborate and accept important feedback on the impact this ordinance will have.

While we appreciate the intention of this policy and remain committed to working together to further improve the ordinance from its original draft, we are still concerned about several provisions that could severely limit our ability to ensure a safe environment for customers, small business partners, and delivery workers in Seattle..

Among our top concerns, is the requirement that app-based companies would have to release records that include personally identifiable information of customers and small businesses. This presents serious privacy and safety concerns to the thousands of customers and merchants on our platform in Seattle.

Additionally, the limitations this proposed ordinance puts on our ability to deactivate drivers with low-ratings, red flags in their background checks and potentially allowing drivers to remain on the platform two weeks before they are deactivated - also pose serious safety concerns.

Our primary focus is to ensure that our platform remains safe to use and that we retain the ability to protect the privacy of individuals that use our platform from exposing their personal information beyond what is necessary to temporarily complete an order.

We are hopeful for the continued opportunity to work with the ordinance sponsors and stakeholders to continue to improve this draft with an outcome that protects workers and provides them with the process they need without sacrificing the safety and privacy of Seattle customers and small businesses.

Thank you for your time.

# EXHIBIT 3



Allison Ford ██████ @uber.com>

## POSTPONED: stakeholder meetings re: Seattle's ABW Deactivation Rights Ordinance

Middaugh, Laine ██████ @seattle.gov>                                    Wed, May 1, 2024 at 9:11 AM
Cc: "Salazar, Diana" ██████ @seattle.gov>, "Levitas, Kerem" ██████ @seattle.gov>

Dear Stakeholder,

The Office of Labor Standards is postponing the start of stakeholder meetings to discuss rulemaking for the App-Based Worker Deactivation Rights Ordinance, and ***will not be meeting next Wednesday, May 8***. We will contact you with new dates and times as soon as they are scheduled.

As always, you can find more information about the App-Based Worker Deactivation Rights Ordinance on our website, or feel free to contact me if you have questions.

Thank you,

Laine



**Laine Middaugh**

Senior Policy Analyst

City of Seattle, Office of Labor Standards

M: ██████

810 Third Avenue, Suite 375

Seattle, WA 98104-1627
*she/her*

 @SeattleLaborStandards|  @OLS_SEA |  Seattle Office of Labor Standards - YouTube

*Emails sent to and from the City of Seattle are governed by the Washington Public Records Act, and may be subject to disclosure to a third-party requestor. To learn more please see Chapter 42.56 RCW and Privacy Statement.*

**From:** Middaugh, Laine
**Sent:** Friday, April 26, 2024 4:20 PM

Cc: Salazar, Diana <███████@seattle.gov>; Levitas, Kerem <███████@seattle.gov>
**Subject:** RE: upcoming stakeholder meetings re: Seattle's ABW Deactivation Rights Ordinance

Dear Stakeholder,

Thank you for your interest in discussing administrative rules for Seattle's App-Based Worker Deactivation Rights Ordinance. Next week, we will email you with calendar invites including links to all scheduled virtual meetings (dates/times listed below), along with information on how to apply for compensation. All meetings will include Spanish interpretation. Please let me know if you need any other language access or disability accommodations, or no longer want to participate in stakeholder meetings.

**Dates**: Wednesdays May 8, May 22, June 5, and June 26. An additional meeting may be held July 10 if needed.

**Time**: 10AM to 12PM

**Format**: Virtual Meetings

Thank you,

Laine



**Laine Middaugh**

Senior Policy Analyst

City of Seattle, Office of Labor Standards

M: █████████

810 Third Avenue, Suite 375

Seattle, WA 98104-1627
*she/her*

@SeattleLaborStandards| @OLS_SEA | Seattle Office of Labor Standards - YouTube

*Emails sent to and from the City of Seattle are governed by the Washington Public Records Act, and may be subject to disclosure to a third-party requestor. To learn more please see Chapter 42.56 RCW and Privacy Statement.*

---

**From:** Middaugh, Laine
**Sent:** Monday, April 8, 2024 2:32 PM
**Cc:** Salazar, Diana <███████@seattle.gov>; Levitas, Kerem <███████@seattle.gov>
**Subject:** upcoming stakeholder meetings re: Seattle's ABW Deactivation Rights Ordinance

Dear Stakeholder,

Seattle's Office of Labor Standards (OLS) is currently seeking workers, hiring entities, advocates, and other key stakeholders in Seattle's app-based work industry to participate in meetings re: administrative rulemaking for the City's new App-Based Worker Deactivation Rights Ordinance (ABWDR).

These meetings will help OLS identify important questions that need to be addressed in the rules and understand key concerns and considerations related to potential content of the rules. These meetings are *not* to voice agreement or disagreement with the law itself or for the purpose of changing the law.

**If you are interested in participating in stakeholder meetings, please complete this form by April 19.** You may be eligible for compensation from the City for your participation if you are not otherwise compensated for time spent (e.g. paid staffer appearing in official capacity).

**Dates**: Wednesdays May 8, May 22, June 5, and June 26. An additional meeting may be held July 10 if needed.

**Time**: 10AM to 12PM

**Format**: Virtual Meetings

Please visit our website for more information about the App-Based Worker Deactivation Rights Ordinance or contact me if you have questions about the rulemaking process.

We look forward to hearing from you,

Laine



**Laine Middaugh**

Senior Policy Analyst

City of Seattle, Office of Labor Standards

M: ███████████

810 Third Avenue, Suite 375

Seattle, WA 98104-1627
*she/her*

@SeattleLaborStandards | @OLS_SEA | Seattle Office of Labor Standards - YouTube

*Emails sent to and from the City of Seattle are governed by the Washington Public Records Act, and may be subject to disclosure to a third-party requestor. To learn more please see Chapter 42.56 RCW and Privacy Statement.*

# EXHIBIT 4



Allison Ford ██████ @uber.com>

## Fwd: RESCHEDULED: upcoming stakeholder meetings re: Seattle's ABW Deactivation Rights Ordinance

---------- Forwarded message ---------
From: **Middaugh, Laine** <██████ @seattle.gov>
Date: Tue, Aug 20, 2024 at 3:44 PM
Subject: RESCHEDULED: upcoming stakeholder meetings re: Seattle's ABW Deactivation Rights Ordinance
To: Salazar, Diana <██████ @seattle.gov>, Kamkar, Negheen <██████ @seattle.gov>
Cc: Siu, Lojania <██████ @seattle.gov>

Dear Stakeholder,

Seattle's Office of Labor Standards (OLS) is currently seeking workers, hiring entities, advocates, and other key stakeholders in Seattle's app-based work industry to participate in meetings re: administrative rulemaking for the City's new App-Based Worker Deactivation Rights Ordinance (ABWDR). **These meetings were originally scheduled to take place earlier in the year and have been rescheduled to begin next month.**

These meetings will help OLS identify important questions that need to be addressed in the rules and understand key concerns and considerations related to potential content of the rules. These meetings are *not* to voice agreement or disagreement with the law itself or for the purpose of changing the law.

**If you are interested in participating in stakeholder meetings, please complete this form by September 4.** If you already completed this from last Spring, you do not need to complete it again. You may be eligible for compensation from the City for your participation if you are not otherwise compensated for time spent (e.g. paid staffer appearing in official capacity).

**Dates**: Wednesdays September 25, October 9, October 23, and November 13. An optional orientation and overview of the law will be held on Wednesday September 11.

**Time**: 10AM to 12PM

**Format**: Virtual Meetings

Please visit our website for more information about the App-Based Worker Deactivation Rights Ordinance or contact us if you have questions about the rulemaking process. I will be on vacation 8/21 – 9/4, but my colleagues @Kamkar, Negheen and @Salazar, Diana will be available to answer questions while I'm away.


We look forward to hearing from you,

Laine





**Laine Middaugh**

Interim Policy Manager


City of Seattle, Office of Labor Standards

M: ▮▮▮▮▮▮▮▮▮

810 Third Avenue, Suite 375

Seattle, WA 98104-1627

s*he/her*

 @SeattleLaborStandards|  @OLS_SEA |  YouTube Seattle Office of Labor Standards - YouTube

*Emails sent to and from the City of Seattle are governed by the Washington Public Records Act, and may be subject to disclosure to a third-party requestor. To learn more please see Chapter 42.56 RCW and Privacy Statement.*



--
**Allison Ford**
Manager of Public Affairs & Policy | *PNW US*
Pronouns: *she/her*

Uber

# EXHIBIT 5



Allison Ford ███████ @uber.com>

## Thank you and follow up - Deactivations rulemaking timeline

███████ @taskrabbit.com>                                    Fri, Sep 6, 2024 at 10:47 AM
To: ███████ @seattle.gov
Cc: Laine ███████ @seattle.gov>, "Kamkar, Negheen" ███████ @seattle.gov>, "Siu, Lojania"
███████ @seattle.gov>, ███████ @doordash.com>, Allison Ford ███████ @uber.com>,
███████ @instacart.com>, ███████ @johnengber.com>,
███████ @soundviewstrategies.biz>, ███████ @cbestrategic.com>

Diana,

Thank you again for taking the time to meet with us to discuss the App-Based Worker Deactivation Rights Ordinance rulemaking process and timeline. We appreciated the opportunity to learn more about OLS's plans for the stakeholder process, and to share some of our concerns.

We are particularly concerned about the likely short period of time between the finalization of the rules (last stakeholder meeting Nov 13, 2024) and the effective date of the ordinance (Jan 1, 2025), leaving companies with potentially less than 30 days to implement the requirements and associated rules. We hope you will consider our request for a 6 month grace period for enforcement, which would give companies more time to comply.

Additionally, it would be helpful if OLS could provide the draft rules in their entirety up front, rather than sharing it piecemeal before each stakeholder meeting. Having the full text would enable stakeholders to develop and share more thoughtful, detailed feedback earlier in the process.

Finally, it would be helpful to know when rulemaking on the Network Company Fee Ordinance will begin, as it impacts our companies and could overlap with the deactivations rulemaking.

Thank you again for considering our requests. Please let us know if you need any additional information.

███████

--

███████ ███ ███████ **| Taskrabbit**

███ @taskrabbit.com



See available positions here.

# EXHIBIT 6

**Uber Technologies, Inc.**
1725 3rd St.
San Francisco, CA 94158

**To:**  Seattle Office of Labor Standards
ATTN: Laine Middaugh
810 Third Avenue, Suite 375
Seattle, WA 98104
laborstandards@seattle.gov
**Re:**  Pre-Rule Comment Regarding Seattle Municipal Code Chapter 8.40
**Date:**  September 18, 2024

**Introduction**

Uber appreciates the City's interest in enacting a framework that addresses concerns around app-based workers' access to earning opportunities through network companies. Based on Uber's experience working with the Drivers Union of Washington to develop an approach in this area for transportation network company drivers, which approach was approved by the State of Washington,[1] Uber writes to propose an initial set of recommendations regarding the Seattle Office of Labor Standards' ("OLS") development of workable rules to implement Seattle Municipal Code ("SMC") 8.40 (the "Ordinance"), as follows.

**1. Implementation timeline**

The wide-ranging scope and detail of this new law will require significant time and resources for Uber, and likely any covered network company, to build a new system to comply with the requirements. The rulemaking process itself has the potential to create additional operational burdens. We urge OLS to adopt both (i) a six-month grace period for enforcement of all requirements in the Ordinance and, (ii) for any rules that impose additional substantive requirements, an implementation date at least six months after the date of final rule publication. For example, if final rules are published on December 13, 2024, the effective date of any substantive requirements in such rules would be at the earliest June 13, 2025.

**2. Definition of "deactivation"**

Thoughtfully defining what constitutes a deactivation, which triggers myriad requirements and processes as set out in the Ordinance, is critical to ensuring workable regulation in this area.

As a threshold matter, we recommend clarification that a deactivation involves only a blocking of or material restriction in access to a worker platform that occurs after a worker has been activated on such platform. This clarification would bring these meanings of deactivation more clearly in line with the third meaning (changing a worker's status from eligible to ineligible).

We note that workers may lose access to the platform for administrative reasons—for example, the worker has not yet submitted an outstanding document. In that instance, Uber will send a timely notification letting the worker know that they need to submit the document. At the time of that notification, Uber

---

[1] *See* the Deactivation Appeals Process Agreement, executed September 20, 2023 (the "Washington TNC Deactivation Agreement").

expects that the loss of access will be remedied as soon as the worker submits the document. Only if the worker fails to take action to submit the document could the loss of access exceed 48 hours.

From Uber's perspective, this would not require a reconsideration process. Indeed, invoking the challenge procedure in such a case has the potential to inadvertently prolong the worker's loss of access.

Additionally, for these types of issues, it may be impossible for Uber to provide advance notice of the access restriction. For example, if a worker's software requires an update so that the Uber app can function, Uber may not have advance notice of the software issue.

We recommend clarification that access issues that the worker may self-resolve are not "deactivations" that would give rise to the availability of a challenge procedure or the considerable additional requirements related to "deactivations."

Similarly, certain conditions outside Uber's control that give rise to a temporary suspension may ultimately persist beyond 48 hours (e.g., inclement weather). We recommend clarification that in such cases temporary suspensions may continue so long as the network company regularly communicates to the worker the fact of and the reason for the ongoing temporary suspension.

Finally, we recommend clarifying that a "material restriction in access to the worker platform" means ineligibility to receive all or substantially all earning opportunities available through the worker platform.

Suggested language: "Deactivation" means the blocking of an app-based worker's access to the worker platform after activation, changing an app-based worker's status from eligible to accept offers to perform services to ineligible, or other material restriction in access to the worker platform that is effected by a network company after activation. A restriction will be considered material if it results in an app-based worker's ineligibility to receive all or substantially all earning opportunities available through the worker platform.

"Deactivation" does not include:
(i) A restriction in access that is resolvable through unilateral action by an app-based worker, regardless of the ultimate duration of the restriction;
(ii) A restriction in access that is contingent on an app-based worker's compliance with licensing, insurance, or other regulatory requirements; or
(iii) Any other temporary suspensions lasting less than 48 hours when the worker platform is unavailable to an app-based worker due to reasons unrelated to the action or behavior of the app-based worker and that are clearly communicated to the app-based worker at the time of the temporary suspension. Such reasons include but are not limited to: technology, software, or network outages; account access or security issues; routine maintenance; and inclement weather endangering the safety of app-based workers in performing services in Seattle. If the conditions giving rise to such reasons persist beyond 48 hours, the network company must regularly

communicate to the app-based worker the existence of the temporary suspension and the reason for the temporary suspension.

### 3. Definition of "egregious misconduct"

We appreciate the Ordinance's recognition of the various harms that may result from misconduct, including physical, economic, and emotional and psychological harms. We note that a network company may not be subject to "physical harm." We also recommend that any intentional harm, economic or otherwise, constitute egregious misconduct. We therefore propose a simplification that captures these harms while preserving logical consistency by including the endangerment of "safety" rather than "physical safety" and by including intentional "harm" rather than "economic harm."

Additionally, we recommend clarification that a network company's determination of intent to cause harm may be based on the network company's reasonable belief.

<u>Suggested language</u>: Consistent with SMC 8.40, "egregious misconduct" means an action or behavior by an individual app-based worker that: (1) endangers the safety of the customer, or a third person, the network company, or an animal; or (2) intentionally causes harm to the customer, a third person, or the network company; or (3) is threatening, harassing, or abusive to the customer, a third party, or the network company. A finding of intentional harm may be based on the network company's reasonable belief.

### 4. Clarification that fraud constitutes "egregious misconduct"

We recommend clarification that a violation of a network company's fraudulent use policy instituted pursuant to SMC 8.37.090 is conduct that intentionally causes harm to the customer, a third person, and/or the network company.

### 5. Determining "at-fault" collisions through challenge procedure

The Ordinance allows a worker's conduct related to traffic collisions to constitute egregious misconduct only if a worker has accumulated more than three at-fault collisions in the previous three years. We note that whether a collision was at-fault is not knowable based on the DMV records that are used for background checks. Therefore, Uber is unable to determine from results of a background check whether a worker has accumulated at-fault collisions.

In recognition of this reality, the Washington TNC Agreement provides that a collision will not count against a driver (as a moving violation) if, through the account deactivation appeals process, the driver can demonstrate that he or she was not at fault for the collisions.

We recommend clarification that the same process may apply here—specifically, that a network company may require a worker to provide evidence through the challenge procedure that collisions that formed the basis for a deactivation were not "at-fault."

*Uber Technologies, Inc. – Pre-Rule Comment Regarding Seattle Municipal Code Chapter 8.40*          3

Suggested language: Consistent with SMC 8.40, egregious misconduct shall not include conduct related to non-criminal moving violations as defined by WAC 308-104-160, as amended, or traffic collisions unless the app-based worker has accumulated more than three non-criminal moving violations or at-fault collisions in the previous three years. An app-based worker must demonstrate, through the internal deactivation challenge procedure, that the collisions forming the basis for the app-based worker's deactivation were not at-fault collisions.

## 6. Use of quantitative metrics derived from customer ratings

The ordinance disallows deactivations "based solely on a quantitative metric derived from aggregate customer ratings of an app-based worker's performance." As an initial matter, we note that this language is ambiguous, and recommend clarification that the prohibited policy is one that would deactivate a worker based solely on aggregate customer ratings (i.e., a worker's overall star rating).

At Uber, underlying the metric of aggregate customer ratings is substantive feedback from consumers regarding workers' activity on the platform—and this feedback is often specifically related to safety, fraud, misconduct, and other compliance issues. For this reason, we find that aggregate customer ratings can be an appropriate basis for restricting platform access.

Nevertheless, we recommend clarification that in the event a worker's aggregate customer ratings may not be the sole basis for a deactivation, such a metric may still be used in conjunction with other factors in a network company's determination that a deactivation is warranted.

Suggested language: Any policy that would result in a deactivation based solely on the aggregate quantitative customer ratings of an app-based worker's performance is not reasonably related to the network company's safe and efficient operations. A network company need not ignore aggregate customer ratings of an app-based worker's performance in determining that a deactivation is warranted.

## 7. Timeline for challenge procedure in case of immediate deactivation

The Ordinance requires a network company to respond to a deactivation challenge within 14 days with either evidentiary substantiation for the deactivation, a determination of no violation, or extraordinary circumstances (beyond the network company's control) that necessitate a delayed timeline.

We note that, if a worker is deactivated immediately pursuant to SMC 8.40.050(C), there may be conflicting timeframes for a network company to complete an investigation and respond to a worker's challenge to the deactivation. The Ordinance allows a network company to deactivate a worker due to egregious misconduct, and then complete an investigation within 14 days. If a worker immediately challenges a deactivation, however, the deadline to respond to a challenge may coincide with the network company's completion of the investigation, leaving insufficient time for the network company to compose the requisite response.

We recommend clarification that, in the case of an investigation that follows a deactivation, a network company has 14 days from the completion date of the investigation to prepare and submit a response to a worker's challenge. We also recommend OLS adopt rules similar to those in the Washington TNC Deactivation Agreement, which allows extensions of five calendar days if Uber requires additional time to respond to a worker's challenge.

### 8. Certified statements should not identify individuals

In certain instances the Ordinance requires a written statement certified by an individual at the network company with authority to reinstate the worker. Significant privacy and safety concerns may arise if an individual employee at the network company is named in communications to a worker regarding a deactivation. Accordingly, Uber uses anonymous identifiers such as the name of an internal team within Uber in communications with workers and merchants. Uber urges OLS to appreciate these concerns and clarify that any written statements certified by an individual at the network company with authority to reinstate the worker do not need to identify the individual by name.

Suggested language: Any written statement certified by an individual at the network company with authority to reinstate the app-based worker made pursuant to SMC 8.40.060(B)(4) or SMC 8.40.080(A) need not identify such individual by name to the app-based worker.

### 9. Limited record transparency in case of privacy and safety concerns

The Ordinance generally requires a network company to provide the records relied upon to substantiate deactivation, including further records substantiating a deactivation that come into the network company's possession after a worker is deactivated. The Ordinance allows a network company to anonymize information related to a customer or third party in order to avoid compromising a customer's or third party's safety, and allows for a summary of records if the deactivation is based solely on a complaint.

Summarizing records is critical to maintaining the trust of individuals who report conduct. Even if a deactivation is not based solely on a complaint, rules should allow a network company to provide a summary in any case where providing records themselves could compromise a customer's or third party's safety. Likewise, records that come into a network company's possession after deactivation should not be provided if they could compromise a customer's or third party's safety.

In addition, in the case of fraud, sharing identifying details of all incidents supporting the deactivation decision creates the risk of exploitation of Uber's methods to detect fraud.

In appreciation of these concerns, the Washington TNC Deactivation Agreement both allows for summaries and does not require Uber to share records or identify specific fraudulent conduct if doing so would threaten the integrity of Uber's fraud detection practices.

We urge OLS to adopt rules that allow a network company to summarize records if the information could compromise the customer's or a third party's safety, or could threaten the integrity of Uber's fraud detection practices.

Suggested language: Consistent with SMC 8.40.080(D), if the records substantiating deactivation involve information related to a customer or a third party and the network company reasonably believes that information could compromise the customer or third party's safety, the network company may take measures to anonymize information related to that customer or third party. Such measures may include providing a summary description of the records substantiating the deactivation.

If the records substantiating deactivation involve fraud and the network company reasonably believes that providing records relied upon by the network company to substantiate deactivation could compromise the network company's fraud detection practices, the network company may take measures to maintain the integrity of such practices, including by providing a summary description of the records substantiating deactivation.

Consistent with SMC 8.40.080(B), if further records substantiating a deactivation come into the network company's possession after the app-based worker is deactivated, such records shall be provided to the app based worker as soon as practicable and no later than 14 days from the date of the network company's receipt, unless such records could compromise a customer's or third party's safety.

**10. Request that OLS publish a notice of rights and required languages for translation**

We recommend that OLS create and publish a model notice of rights in English and any other required languages prior to the effective date of the Ordinance. This ensures consistency of information for workers and adequate time for network companies to develop or update the infrastructure necessary to provide the notice of rights as required by the Ordinance.

Relatedly, we recommend that OLS specify the required languages for translation of the deactivation policy, the description of the internal deactivation challenge procedure, and the notice of rights, based on the needs of app-based workers in Seattle.

**11. Data reporting on an aggregated basis**

Reporting disaggregated data imposes an unnecessary burden on network companies and is not necessary to monitor compliance with the Ordinance. We recommend that any data reporting requirements involve only aggregated data, including, as necessary, distributions at defined percentiles.

We look forward to participating in future discussions with OLS on this matter. Thank you for your consideration.

Sincerely,

/s/ _____

Allison Peck

Counsel, Uber Technologies, Inc.

████████@uber.com

# EXHIBIT 7



Allison Ford ███████ @uber.com>

## RE: Seattle App-Based Worker Deactivation rulemaking stakeholder meetings

**Middaugh, Laine** ███████ @seattle.gov>                                    Mon, Sep 23, 2024 at 4:21 PM
Cc: "Salazar, Diana" ███████ @seattle.gov>, "Kamkar, Negheen" ███████ @seattle.gov>, "Siu, Lojania"
███████ @seattle.gov>, "Berry, Star" ███████ @seattle.gov>, "Ruff, Meredith" ███████ @seattle.gov>

Dear Stakeholders,

We look forward to seeing you this Wednesday for our first meeting to discuss rules for Seattle's new App-Based Worker
Deactivation Rights Ordinance. The model rules for discussion are attached. For your reference, I have also attached
preliminary agendas for future meetings, a summary/cheat sheet for the deactivation law, and slides from our optional
orientation meeting held on September 11.

I do apologize for the unexpected delay in sending these materials. We will strive to provide materials one week ahead of
future meetings. On Wednesday, we will begin to discuss these model rules, but will also continue to welcome feedback
either through email or in future meetings throughout the stakeholder process.

**Upcoming Meeting: Deactivation Stakeholder Meeting #1**

**Date: Wednesday, September 25, 2024**

**Time: 10AM – 12PM PST**

**Meeting Link:**

Join Zoom Meeting

███████████████████

Meeting ID: ███████████

**Zoom Instructions:**

You can access the Zoom app from a smartphone, tablet or computer. When you log in, ensure your name is displayed for
OLS records and per diem tracking. Arrive at least 5 minutes early to troubleshoot your video and microphone. Please
remain muted until you have been recognized by the facilitator to avoid interruptions.

To provide feedback or to ask a question, you can place your comment in the "Chat" for visible text, or you can "Raise
your hand" to be recognized by the facilitator.

To raise your hand, tap **Reactions** 😀 then tap **Raise Hand** ✋.
The host will be notified that you've raised your hand.

**Important**: OLS staff will be taking notes of the stakeholder discussion. Please be mindful that while meetings are neither
video recorded nor publicly aired, all meeting notes and materials will be subject to Public Disclosure Requirements. If you

have any questions, please do not hesitate to contact Laine Middaugh or Diana Salazar.

We appreciate your participation and look forward to the meeting.

Thank you,

Laine



**Laine Middaugh**

Interim Policy Manager

City of Seattle, Office of Labor Standards

M: ███████████

810 Third Avenue, Suite 375

Seattle, WA 98104-1627
s*he/her*

 @SeattleLaborStandards|  @OLS_SEA |  Seattle Office of Labor Standards - YouTube

*Emails sent to and from the City of Seattle are governed by the Washington Public Records Act, and may be subject to disclosure to a third-party requestor. To learn more please see Chapter 42.56 RCW and Privacy Statement.*

**Disclaimer:** *This communication is for informational purposes only and is not for the purpose of providing legal advice, creating an agency decision or establishing an attorney-client relationship between the Office of Labor Standards and the recipient. Any responses to specific questions are based on the facts as we understand them and are not intended to apply to any other situations. If you need legal advice, please consult an attorney.*

---

**From:** Middaugh, Laine
**Sent:** Wednesday, September 11, 2024 12:02 PM
**Cc:** Salazar, Diana <████████ @seattle.gov>; Kamkar, Negheen <████████████ @seattle.gov>; Siu, Lojania <████████ @seattle.gov>; Berry, Star <████████ @seattle.gov>; Ruff, Meredith <████████████ @seattle.gov>
**Subject:** RE: Seattle App-Based Worker Deactivation rulemaking stakeholder meetings

Dear Stakeholders,

Thank you to all who were able to participate in this morning's optional overview of Seattle's App-Based Worker Deactivation Ordinance. We really appreciate your questions and feedback today and will use your comments to help us shape the structure and content of our upcoming stakeholder meetings. I have attached slides from our presentation for reference.

We look forward to seeing you (on Zoom) for our first rulemaking stakeholder meeting on September 25 and will send more information about that meeting next week, including some model rules for discussion.

Thanks again,

Laine



**Laine Middaugh**

Interim Policy Manager

City of Seattle, Office of Labor Standards

M: ▮▮▮▮▮▮▮▮▮

810 Third Avenue, Suite 375

Seattle, WA 98104-1627
*she/her*

📘 @SeattleLaborStandards| 🐦 @OLS_SEA | ▶️ Seattle Office of Labor Standards - YouTube

*Emails sent to and from the City of Seattle are governed by the Washington Public Records Act, and may be subject to disclosure to a third-party requestor. To learn more please see Chapter 42.56 RCW and Privacy Statement.*

---

**From:** Middaugh, Laine
**Sent:** Monday, September 9, 2024 11:50 AM
**Cc:** Salazar, Diana <▮▮▮▮▮▮@seattle.gov>; Kamkar, Negheen <▮▮▮▮▮▮@seattle.gov>; Siu, Lojania <▮▮▮▮▮▮@seattle.gov>
**Subject:** Seattle App-Based Worker Deactivation rulemaking stakeholder meetings

Dear Stakeholders,

Welcome to the App-Based Worker Deactivation rulemaking stakeholder process. You are confirmed as a participant.

Starting this week, the Seattle Office of Labor Standards (OLS) will facilitate one optional overview of the Deactivation Rights Ordinance, followed by four meetings to share information and engage with stakeholders in a virtual setting. Please

reply to this email if you need specific accommodations to access and engage in these virtual meetings, such as language interpretation services.

Following this email, you will receive calendar invites for all meetings with the Zoom log in information. Please RSVP to each item so OLS staff can track attendance. Except for the optional orientation, we will send out agendas with corresponding materials for your review prior to our meetings.

**Dates**: Wednesdays September 25, October 9, October 23, and November 13. An optional orientation and overview of the law will be held on Wednesday September 11.

**Time**: 10AM to 12PM

**Format**: Virtual Meetings

Please visit our website for more information about the App-Based Worker Deactivation Rights Ordinance or contact us if you have questions about the rulemaking process.

We look forward to hearing from you,

Laine



**Laine Middaugh**

Interim Policy Manager

City of Seattle, Office of Labor Standards

M: ▮▮▮▮▮▮▮▮

810 Third Avenue, Suite 375

Seattle, WA 98104-1627
s*he/her*

 @SeattleLaborStandards|  @OLS_SEA |  Seattle Office of Labor Standards - YouTube

*Emails sent to and from the City of Seattle are governed by the Washington Public Records Act, and may be subject to disclosure to a third-party requestor. To learn more please see Chapter 42.56 RCW and Privacy Statement.*

---

**4 attachments**

ABWDR Summary and Cheat Sheet.pdf
133K

DRAFT_ ABWDR stakeholder meeting agendas_20240923.pdf
64K

ABWDRO Overview Training.pdf
502K

Case 2:24-cv-02103-MJP    Document 13    Filed 12/19/24    Page 32 of 43

**9_25_24 Model Rules for ABWDRO.pdf**
269K

# EXHIBIT 8



Allison Ford ███████ @uber.com>

## Thank you and follow up - Deactivations rulemaking timeline

**Salazar, Diana** ███████ @seattle.gov>                                    Tue, Sep 24, 2024 at 9:39 AM
To: ███████ @taskrabbit.com>, "Middaugh, Laine" ███████ @seattle.gov>
Cc: "Kamkar, Negheen" ███████ @seattle.gov>, "Siu, Lojania" ███████ @seattle.gov>,
      ███████ @doordash.com>, Allison Ford ███████ @uber.com>, ███████ @instacart.com>,
      ███████ @johnengber.com>, ███████ @soundviewstrategies.biz>, ███████ @cbestrategic.com>

Hi ███████,

For the Network Company Fee, the contact is Beth Gappert, at Finance and Administrative Services. Her
email is ███████ @seattle.gov

We did receive an update from FAS, Beth informed us that they will start their implementation soon, network
companies should expect a letter in December with more information about the process. They also plan to
have a landing page on their website with more information in the coming weeks—we shared with their team
that we are getting asked and can link their website in ours as well to communicate. I can send an email to
the entire group that attended the 8/28 meeting.

Thank you for the other feedback, we will be discussing effective date of rules during future stakeholder
meetings.

Diana

**From:** ███████ @taskrabbit.com>
**Sent:** Tuesday, September 24, 2024 8:53 AM
**To:** Salazar, Diana < ███████ @seattle.gov>; Middaugh, Laine < ███████ @seattle.gov>;
      Kamkar, Negheen < ███████ @seattle.gov>; Siu, Lojania < r@seattle.gov>; ███████
      ███████ @doordash.com>; Allison Ford < ███████ @uber.com>; ███████ @johnengber.com>;
      ███████ @instacart.com>; ███████ @soundviewstrategies. >; ███████ @cbestrategic.com>
**Subject:** Re: Thank you and follow up - Deactivations rulemaking timeline

| CAUTION: External Email |
|---|

Diana and Laine,

We wanted to follow up on the below regarding the App-Based Worker Deactivation Rights Ordinance rulemaking process.
We hope you will consider our requests, particularly the 6 month grace period for enforcement.

**ER-89**

Thank you in advance for any feedback you can provide.


Best,

██████


On Fri, Sep 6, 2024 at 10:47 AM ████████████████████ @taskrabbit.com> wrote:

Diana,


Thank you again for taking the time to meet with us to discuss the App-Based Worker Deactivation Rights Ordinance rulemaking process and timeline. We appreciated the opportunity to learn more about OLS's plans for the stakeholder process, and to share some of our concerns.


We are particularly concerned about the likely short period of time between the finalization of the rules (last stakeholder meeting Nov 13, 2024) and the effective date of the ordinance (Jan 1, 2025), leaving companies with potentially less than 30 days to implement the requirements and associated rules. We hope you will consider our request for a 6 month grace period for enforcement, which would give companies more time to comply.


Additionally, it would be helpful if OLS could provide the draft rules in their entirety up front, rather than sharing it piecemeal before each stakeholder meeting. Having the full text would enable stakeholders to develop and share more thoughtful, detailed feedback earlier in the process.


Finally, it would be helpful to know when rulemaking on the Network Company Fee Ordinance will begin, as it impacts our companies and could overlap with the deactivations rulemaking.


Thank you again for considering our requests. Please let us know if you need any additional information.


██████


--

████████████████████████████████████████  |  **Taskrabbit**
████████ @taskrabbit.com

**ER-90**

Case 2:24-cv-02103-MJP     Document 13     Filed 12/19/24     Page 36 of 43

See available positions here.


--

| **Taskrabbit**

@taskrabbit.com

See available positions here.

# EXHIBIT 9

**Uber Technologies, Inc.**
1725 3rd St.
San Francisco, CA 94158

**To:**        Seattle Office of Labor Standards
            ATTN: Laine Middaugh
            810 Third Avenue, Suite 375
            Seattle, WA 98104
            laborstandards@seattle.gov
**Re:**        Comment Regarding Deactivation Rulemaking Stakeholder Meeting #1
**Date:**      October 8, 2024


**Introduction**

Following the Seattle Office of Labor Standards' ("OLS") Deactivation Rulemaking Stakeholder Meeting #1 on September 25, Uber writes to provide comments on the model rules implementing Seattle Municipal Code ("SMC") 8.40 (the "Ordinance") that OLS proposed during the stakeholder meeting, as follows. Uber appreciates the opportunity to comment on the model rules and looks forward to continued collaboration to ensure that any adopted rules are workable.

**1. App-based worker coverage**

We echo meeting participants' interest in revising the activation language in the model rules. We recommend language clarifying that a worker is covered by the Ordinance with respect to a particular network company after the worker's worker status *with such network company* is activated.

Suggested language: Activation. For the purposes of determining App-based worker coverage under SMC 8.40.030, the app-based worker's worker status must be activated with a network company prior to deactivation by such network company.

**2. Notice of rights**

Language translation may pose a significant operational challenge for network companies. In recognition of this challenge, the Washington Administrative Code requires transportation network companies to provide content to drivers in their preferred language, provided that such language is the preferred language of at least two percent of drivers who use the transportation network company's platform in Washington.[1] We recommend similar rules that require translation only for primary languages that represent at least two percent of workers on the network company platform in Seattle.

Suggested language: 2. Required languages for its translation. A network company shall make the Notice of Rights available to the app-based worker in English, and any language that the network company knows or has reason to know is the primary language of the app-based worker, provided that the primary language has been identified as the primary language of at least two percent of app-based workers who utilize the network company's platform in Seattle. If the Agency creates a model notice of

---

[1] *See* WAC 296-128-99010(31).

rights in English and other languages, the network company shall make the model notice of rights available in all such languages to all app based workers on the worker platform.

**3. Accessible system**

The model rules are ambiguous as to whether an accessible system must display specific numbers and percentages of offers relevant to determining coverage under the Ordinance. If this functionality were required, building it would entail an enormous amount of resources. Uber currently provides receipts and pay disclosures for offers completed or canceled in Seattle and outside Seattle, which together allow a worker to understand when they are covered by the Ordinance. We recommend rules that clarify that the accessible system must provide *information sufficient for a worker to understand* when they are covered by the Ordinance, which is consistent with the Ordinance language.

Uber also provides workers with in-app functionality to call and message network company personnel, but does not display actual phone numbers or email addresses. We recommend rules that do not prescribe the display of phone numbers or email addresses, so long as a worker may call or email network company personnel through the accessible system.

Additionally, as noted in the stakeholder meeting, applying a language requirement to the content that a network company must provide to a worker via the accessible system would pose an impracticable burden, especially in light of the timelines on which the network company must provide these records. The Ordinance imposes a translation requirement only with respect to a network company's deactivation policy and the notice of rights. *We urge OLS to honor the balance that the Ordinance strikes* between requiring certain key content in workers' primary language and appreciating the difficulty of translation of non-static content, by not imposing the language requirement on other contents provided through the accessible system.

<u>Suggested language</u>: 2. Requirements for Accessible System.

> a. The network company shall make the accessible system available via the worker platform.
> b. The network company shall make the accessible system accessible to the app-based worker from any location.
> c. An accessible system shall provide information sufficient for the app-based worker to understand:
> i. Notice of coverage by Chapter 8.40.030.A.1-2;
> ii. The number of offers completed or cancellations with cause in the previous 180 days;
> iii. The number of completed offers or cancellations with cause that involved performing services in Seattle in the previous 180 days;
> iv. The overall percentage of completed offers that involved performing services in Seattle in the previous 180 days;
> v. The app-based worker's receipts and/or payment disclosures for each offer performed or cancelled in the previous 180 days;

vi. The network company's deactivation policy;

vii. The network company's internal deactivation challenge procedure policy; and

viii. The means by which the app-based worker can directly communicate with the network company personnel by phone or email on issues related to the deactivation.

**4. Fair notice of deactivation policy**

Again, we urge OLS to honor the Ordinance's balance around translation requirements. If OLS imposes a translation requirement for the notice of the deactivation policy, as with the language requirement for the notice of rights and accessible system, we recommend rules that reflect similar provisions in the Washington Administrative Code for transportation network companies.

<u>Suggested language</u>: 3. Required languages for its translation. A network company shall make the notice of deactivation policy available to the app-based worker in English, and any language that the network company knows or has reason to know is the primary language of the app-based worker, provided that the primary language has been identified as the primary language of at least two percent of app-based workers who utilize the network company's platform in Seattle.

**5. Definitions covered in stakeholder meeting #1**

Device or application language settings are one of the most reliable ways to understand a user's primary language. We recommend rules clarifying that a network company may rely on such settings in the absence of contrary information provided by the worker.

<u>Suggested language</u>: "Primary language" means the language in which the app-based worker feels most comfortable  communicating. Each network company shall make a good faith effort to determine the primary languages of app-based workers accessing its worker platform. Unless the app-based worker communicates to the network company otherwise, the network company may rely on the settings of the device or application that the app-based worker uses to access the network company's smartphone application or online web portal.

We look forward to participating in future discussions with OLS on this matter. Thank you for your consideration.

Sincerely,

_/s/_____

Allison Peck
Counsel, Uber Technologies, Inc.
████████ @uber.com

# EXHIBIT 10

**Uber Technologies, Inc.**
1725 3rd St.
San Francisco, CA 94158

**To:**   Seattle Office of Labor Standards
ATTN: Laine Middaugh
810 Third Avenue, Suite 375
Seattle, WA 98104
laborstandards@seattle.gov

**Re:**   Comment Regarding Safety Concerns in Deactivation Model Rules

**Date:**   December 10, 2024

## Introduction

Uber writes to raise serious safety concerns with the model rules implementing Seattle Municipal Code ("SMC") 8.40 (the "Ordinance") that the Seattle Office of Labor Standards ("OLS") proposed in Deactivation Rulemaking Stakeholder Meeting #4 on November 13, 2024. Uber takes allegations of safety-related incidents, including reports of sexual assault and midconduct, extremely seriously. Our policies are designed to protect the privacy of reporters and reduce risk of retaliation. In collaboration with survivor advocate organizations we have adopted best practices for investigating sexual abuse reports, including integrating trauma-informed and survivor-centered approaches that allow us to conduct thorough investigations while mitigating the retraumatization of survivors.

**The requirements proposed in the model rules related to access to records impair Uber's ability to protect the anonymity of reporters and to effectively uphold our policies.**

We raised these concerns previously with the City Council during the legislative process for this ordinance and are disappointed to see the model rules further reduce privacy protections for reporters. Below we have detailed the specific language we find problematic and have provided recommendations that will provide deactivated workers with information sufficient to challenge deactivation decisions, without putting reporters at risk.

Uber will address additional concerns with the model rules in comments to follow.

## Safety and privacy concerns with model rules

The model rules require that a network company provide at least an "approximate geographic location shifted within 1000 feet from the precise location" of an incident. The model rules also require summaries of records and incidents to "be detailed enough such that the app-based worker has sufficient information to understand the incident," and to "include date, time, location and specific details of the incident such as direct comments from the customer or third party."

We have several concerns with these requirements:

- Users who report allegations of sexual misconduct or other serious safety incidents run the risk of retaliation if their personally identifiable information is made public. This may be especially important to users reporting an incident on a delivery platform when it is likely that the worker

**ER-97**

made a delivery to their home or place of work. Disclosing specific trip details such as date, time, and location (even if the address is shifted 1,000 feet) as well as a user's "direct comments" will provide workers with a concerningly clear picture of who reported them.

- In general, users who make reports of sexual misconduct do not do so with the expectation that this information may be shared directly with their accuser. This approach may directly violate the privacy and wishes of the survivor. Further, if we were to notify customers of the potential to share this information broadly it could suppress sexual assault reporting, risking the safety of all users.

- Direct comments from reporters and specific addresses are not essential to a driver's dispute of allegations made against them.

**<u>Recommendations</u>**

**We urge OLS to adopt the following recommendations to address these risks**:

1. **Exclusion for sexual assault, assault, harassment, and additional sensitive incidents**: We recommend excluding deactivations based on sexual assault, sexual misconduct, harassment, and other safety-related egregious misconduct (e.g., trafficking, domestic violence, child abuse, stalking) from the requirements outlined in the model rules listed above. An exclusion for sensitive safety incidents is critical to protecting the anonymity and safety of survivors and to effectively uphold our deactivation policies related to these issues.

2. **Modification of all provisions to maintain privacy for egregious misconduct**: We also recommend removing the requirement that we share direct comments, time of incident, and addresses within 1,000 feet with workers if a deactivation is based on egregious misconduct. Instead, sharing trip date, zip code, and summarized complaints for egregious misconduct deactivations should be permissible.

We are available to discuss these matters with OLS. Thank you for your consideration.

Sincerely,

_/s/_

Allison Peck
Counsel, Uber Technologies, Inc.
███████@uber.com

_Uber Technologies, Inc. – Comment Regarding Deactivation Rulemaking Stakeholder Meeting #1_          2

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

UBER TECHNOLOGIES, INC. and PORTIER, LLC,

      Plaintiffs,

      v.

CITY OF SEATTLE,

      Defendant.

No. 2:24-cv-2103

**DECLARATION OF DANIEL CRAWFORD IN SUPPORT OF UBER'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, Daniel Crawford, declare as follows:

1.      My name is Daniel Crawford.  I am over the age of 18, have personal knowledge of the facts stated in this declaration, and can competently testify to their truth.

2.      I am currently Senior Program Manager for Global Account Actioning at Uber Technologies, Inc. ("Uber").  I have worked at Uber since September 2016 and have been in my current position since November 2023.  My responsibilities include developing and maintaining Uber's processes for a variety of functions, including those related to the deactivation of courier accounts.

3.      I make this declaration in support of Uber's Motion for a Temporary Restraining Order and Preliminary Injunction, which seeks to temporarily restrain and preliminarily enjoin Defendants from enforcing the App-Based Worker Deactivation Rights Ordinance enacted by the City of Seattle in August 2023 and set to take effect on January 1, 2025 (the "Ordinance").[1]

4.      As part of my work for Uber, I am familiar with the Ordinance and the accompanying proposed rules regarding implementation and compliance issued by the Office of Labor Standards, as well as the steps Uber would have to take to comply with the Ordinance by the current implementation date of January 1, 2025.

_____

[1] Seattle, Wa., Ordinance 126878 (Aug. 14, 2023).

DECLARATION OF DANIEL CRAWFORD
No. 2:24-cv-2103

1

### I.    Uber Only Deactivates Courier Accounts When Necessary

5.    Uber is a technology company that operates a platform that connects consumers seeking ride and delivery services to drivers and couriers seeking to provide such services.

6.    Uber manages a complex delivery platform for courier services that allows millions of consumers across the globe to safely and efficiently receive restaurant orders, groceries, and other goods for delivery on demand.  And Uber provides millions of couriers with the opportunity to earn income by providing its networking services.  In any given city, thousands of couriers work at a given time.  Those couriers travel to homes and businesses at any hour of the day and engage in direct, face-to-face interactions with consumers.

7.    Uber takes its responsibility to maintain the safety and quality of services performed on its platform seriously.

8.    As part of this, and like other companies that facilitate courier services, Uber maintains policies and positions regarding the circumstances under which a courier should lose access to the Uber platform and the procedure by which Uber makes those determinations.[2]

9.    At the same time, Uber's business is built on facilitating consumers' and couriers' connections on the platform.  Consumers on Uber's platform value efficient delivery times, and thus, Uber's business model relies on having couriers on the platform with active accounts.  Therefore, Uber takes the decision to deactivate courier accounts seriously and considers deactivation to be a last resort.[3]

---

[2] *Deactivations*, Uber, https://www.uber.com/us/en/drive/driver-app/deactivation-review/ (last visited Dec. 18, 2024) (Uber's publicly posted deactivation policy); *Uber Community Guidelines*, Uber (Nov. 19, 2024) https://www.uber.com/legal/en/document/?country=united-states&lang=en&name=general-community-guidelines&uclick_id=12b99a8b-7b8b-4694-89df-ed092e6d41cb;  *see also Losing account access and your right to appeal*, Grubhub, https://driver.grubhub.com/account-violations-and-deactivation/ (last visited Dec. 18, 2024) (Grubhub's deactivation policy); *DashForce Service Provider Platform Access Policy*, DoorDash, https://help.doordash.com/dashers/s/article/DashForce-Deactivation-Policy?language=en_US (last visited Dec. 18, 2024) (DoorDash deactivation policy).

[3] *Deactivations*, *supra* ("We're strongly motivated to keep access to the Uber platform open and to help drivers and delivery people get online when they want to work."); Dara Khosrowshahi, *Becoming the fairest platform for flexible work,* Uber (Nov. 13, 2023) https://www.uber.com/blog/deactivations-principles/ (statement from Uber's CEO about Uber's approach to deactivations, explaining that "Blocking someone from accessing their Uber account is one of the most serious decisions we make as a company").

Uber also recognizes that because its platform is an essential source of income for many couriers, losing access to the platform is "one of the most distressing moments" that a courier can face.[4]  Uber thus does not deactivate courier accounts because it wants to, but only when the interests of promoting safety, ensuring quality, and eliminating fraudulent activity call for such action.  Uber continuously reviews and seeks to improve its deactivation policies and processes for accuracy, fairness, and in response to couriers' feedback, while also upholding its safety and privacy standards on the platform.

10.    While complaints and issues with courier services are rare in comparison to the scale of Uber's operations, consumers do report complaints and issues, ranging in severity from relatively minor (for example, rudeness) to quite severe (for example, fraud or assault).

11.    Uber's current deactivation policies and positions are consistent with its commitments to safety, privacy, quality, and fraud prevention.

## II.    Uber Temporarily Restricts Access or Deactivates Courier Accounts When the Courier Poses a Safety or Quality Risk

12.    Uber publicly posts its reasons for temporarily restricting or deactivating courier accounts.[5]

13.    With respect to a courier's access to the platform, Uber distinguishes between (i) failing to onboard to the platform, (ii) a temporary restriction of access to the platform, and (iii) a deactivation from the platform.

14.    A courier may fail to onboard, or may temporarily lose access, for a variety of reasons, including failing to offer the required login information or failing to meet minimum eligibility requirements, such as downloading the latest version of Uber's application or uploading proof of a valid driver's license.  A courier who temporarily loses access can typically regain access by providing the correct information or resolving the deficiency—*e.g.*, if the problem is an outdated version of the application, by downloading the latest version of the application; if the problem is expired documentation, by uploading valid proof of a license.  A courier's failure to onboard or loss of access due to their failure

[4] *Id.*

[5] *Deactivations*, *supra* (listing and explaining reasons).

to meet minimum eligibility requirements is distinct from a deactivation, in which Uber takes away a courier's account access.

15.    Uber may also temporarily restrict a courier's access while it conducts a review or investigation, including to confirm a courier's identity, review a courier's eligibility documentation, or investigate a report of courier misconduct.  All of these temporary restrictions, too, are distinct from a deactivation, in which Uber takes away a courier's account access.

16.    Two of the most common reasons for deactivation are failed background checks and problems with the documentation Uber requires couriers to submit.  Uber also deactivates courier accounts for consistently below-minimum aggregate consumer ratings, among other reasons.

### A.    Background Checks

17.    Uber believes that background check requirements for couriers are a central component of its safety program.[6]  To that end, couriers must undergo a background check before their first delivery, and they continue to undergo checks on at least an annual basis.[7]

18.    Uber uses a third party to conduct background checks of each courier on its platform as part of its commitment to safety.  Reasons for a failed background check may include serious criminal convictions; serious pending criminal charges; multiple moving violations, non-moving violations, or accidents within the last three years; and any serious driving violation, such as driving while intoxicated.[8] In the case of a failed background check, couriers have at least 7 days to address any inaccuracies with the third party that conducted the background check, as mandated by the federal Fair Credit Reporting Act.

19.    Couriers whose background checks show serious criminal convictions, such as robbery or kidnapping, are prohibited from making deliveries in order to protect consumers and the public from potentially dangerous situations in their homes and places of work.

---

[6] *Id.* (listing and explaining "Background checks" as a reason for deactivation).

[7] *Safety*, Uber, https://www.uber.com/us/en/safety/ (last visited Dec. 18, 2024) ("All drivers are background checked before their first trip," and "Uber rescreens drivers at least every year").

[8] *Deactivations*, *supra*.

DECLARATION OF DANIEL CRAWFORD              4
No. 2:24-cv-2103

20.    Uber also deactivates accounts of couriers whose background checks show driving record issues, including multiple collisions and/or presenting fraudulent vehicle registration or insurance documents.  Uber deactivates accounts of these couriers because it has determined that these issues are a safety signal and indicators of an unsafe driver.

**B.    Inadequate Documentation**

21.    Uber temporarily restricts access for couriers who do not submit proper documentation.[9] Uber requires couriers to upload current versions of certain documents, including driver's license, vehicle registration and insurance, and profile photo.[10]  Uber temporarily restricts access for couriers who do not satisfy these documentation requirements, in part because allowing such couriers to remain on Uber's platform risks the safety of consumers and the public, and compromises consumers' ability to receive deliveries from couriers who have confirmed their driving privileges.

22.    Uber periodically requires couriers to upload photos of themselves for identity verification.[11]  One common issue that can lead to a temporary restriction of access arises when a courier uploads a photo that does not match the photo of the individual displayed on their account profile.  In such cases, Uber cannot verify the identity of the person actually completing deliveries (and therefore also cannot verify that the person completing deliveries satisfies Uber's background check requirements).

**C.    Couriers With Below-Minimum Aggregate Ratings**

23.    Uber strives to ensure that consumers receive a high-quality, safe experience each time they place an order using the Uber platform.  To that end, consumers are able to provide a satisfied (or "thumbs up") rating or a dissatisfied (or "thumbs down") rating for a delivery.  Uber aggregates these

---

[9] *Id.* (listing and explaining "Expired documents" and other document-related issues as reasons for deactivation).

[10] *Required Documents for Drivers*, Uber, https://www.uber.com/us/en/drive/requirements/documents/?_csid=6X8cUVEeNECfZZjEbnO_Jw&city=washington-dc&state=a3bjsh1IrShgER6foAQoBDMzwCDOLBIvVTvn-0bj9BM%3D&uclick_id=df07b699-20e8-4f2b-9883-6c5d02602864#_ (last visited Dec. 18, 2024).

[11] *Identity Verification Checks*, Uber, https://help.uber.com/en/driving-and-delivering/article/identity-verification-checks?nodeId=75fb55dc-da08-41bb-b1cb-3229f2839956 (last visited Dec. 18, 2024).

ratings for each courier and compares the aggregate rating to the minimum aggregate rating requirement for the courier's delivery location.

24.     Uber contacts couriers to provide resources when their aggregate rating approaches the minimum for their delivery location.  The following image depicts the substance of the notice Uber sends to couriers who approach the minimum threshold:

25.     Uber deactivates accounts of couriers whose aggregate ratings are consistently below the minimum aggregate rating requirement in their delivery location, even after such a warning.[12]  In Uber's experience, below-minimum aggregate ratings are often correlated with safety, fraud, misconduct, and other quality issues.  For example, consumers generally give couriers "thumbs down" ratings when the courier was rude, was late to pick up an order and/or complete a delivery, or did not deliver the correct items.  Uber has also found that, in other cases, couriers may receive "thumbs down" ratings for making remarks or engaging in conduct that made the consumer feel unsafe.  Consumers may not have the time to complete a full report following an uncomfortable incident, and providing a "thumbs down" rating is the easiest way for the consumer to communicate to Uber that there was an issue with the courier's delivery services.

26.     Deactivations for below-minimum aggregate ratings consider the number of consumer ratings and the recency of each consumer rating.  Uber never deactivates a courier's account based on a single "thumbs down" consumer rating.

**D.     Other Reasons for Courier Account Deactivation**

27.     Uber also deactivates accounts of couriers for other safety- and quality-related reasons.  These reasons include unsafe driving, or exhibiting aggressive, confrontational, or harassing behavior.[13]

28.     Uber deactivates accounts of couriers who discriminate or make offensive remarks based on a consumer's protected characteristic, including race, color, disability, gender identity, sex, and sexual orientation.[14]  Uber "believe[s] in a world where movement should be accessible" to all.[15]  The company's Community Guidelines prohibit discrimination and "[Uber does not] tolerate racist or discriminatory

---

[12] *Deactivations*, *supra* (listing and explaining "Ratings" as a reason for deactivation).

[13] *Id.*

[14] *Id.*; *see also Uber's Community Guidelines*, Uber, https://www.uber.com/us/en/safety/uber-community-guidelines/ (last visited Dec. 18, 2024) (setting out guidelines against discriminatory and offensive behavior).

[15] *Values*, Uber, https://www.uber.com/us/en/careers/values/ (last visited Dec. 18, 2024).

DECLARATION OF DANIEL CRAWFORD          7
No. 2:24-cv-2103

conduct and behavior."[16]   Uber, therefore, may also deactivate accounts of couriers when it has information from which it can infer that the courier has violated these prohibitions against discrimination.

29.    Additionally, in the interests of the safety, efficiency, and trustworthiness of its platform, Uber's grounds for account deactivation include submitting "[a]ltered or false documents" and "assuming someone else's identity," among a host of other fraudulent activities.[17]   Fraud that can lead to deactivation includes both account-level conduct (for example, submitting fraudulent documents or creating fake or duplicate accounts), and trip-level conduct (for example, claiming unwarranted fees or charges or falsely claiming to complete a delivery).[18]

### III.    Uber's Process for Investigating and Reviewing Deactivations Is Tailored to the Circumstances

30.    It is important to Uber that couriers "have a clear explanation when they lose access, and feel they have a voice if their account is deactivated."[19]   Uber recognizes a "responsibility to ensure [its] processes are fair, accurate, and transparent," and that couriers and the public "trust we are doing the right thing."[20]   For this reason, Uber provides on its website public guidance to couriers regarding its deactivation practices, including advice about how couriers may resolve issues and avoid losing access to Uber's platform.

31.    Uber generally conducts an investigation in connection with most deactivations.[21]   One exception is when Uber deactivates a courier account for below-minimum aggregate ratings after the courier has already received prior warning of a low rating and prior warning that deactivation may occur in the event of additional low ratings.

---

[16] *Uber Community Guidelines, supra.*

[17] *Deactivations*, *supra.*

[18] *Id.* (listing and explaining "Fraudulent activities" as a reason for deactivation).

[19] Khosrowshahi, *supra.*

[20] *Id.*

[21] *Deactivations*, *supra* (explaining "Human involvement" in deactivation decisions).

DECLARATION OF DANIEL CRAWFORD                8
No. 2:24-cv-2103

32.     The length of an investigation varies depending on the type of incident and its severity. Uber strives to complete investigations as quickly as possible, while also ensuring that they are as thorough and complete as possible.

33.     When investigating an incident that could lead to deactivation, Uber generally aims to collect and assess relevant information from consumers in order to determine if deactivation is appropriate. Uber generally considers evidence in the courier's favor.[22]  For instance, in considering a report of assault, Uber will consider whether the courier's location data supports or refutes the allegations.

34.     Uber has also adopted best practices for investigating sexual abuse and sexual assault reports, including integrating trauma-informed and survivor-centered approaches that allow the company to conduct a thorough investigation while minimizing any further trauma to survivors of such abuse or assault.

35.     While a single serious report may lead to deactivation of an account, it is worth noting that the majority of reported incidents are less severe behaviors that may not warrant immediate loss of access to the platform.  Instead, such reports may warrant additional examination of the courier's history on the platform.

36.     Uber generally may take into account the courier's history on the platform, including the length of time the courier has provided deliveries on the platform and the number of deliveries completed. For example, Uber believes that a minor complaint against a courier who has completed tens of thousands of deliveries over many years without incident should be considered within the broader context of that courier's history on the platform.

37.     The timing of Uber's investigation of a deactivation, and its relationship to if and when the courier loses access to the platform, also varies depending on the nature of the report or issue.  For example, in cases of serious safety incidents, Uber will temporarily restrict the courier's account access while the company conducts an investigation.  This practice reflects Uber's determination that such couriers may pose an immediate risk to the public and customers (*i.e.*, consumers and merchants).

---

[22] *Id.* (explaining "Protection from false allegations" for couriers and opportunity for couriers to provide "information to support their case").

DECLARATION OF DANIEL CRAWFORD                    9
No. 2:24-cv-2103

38.    In other cases, such as low consumer ratings, Uber will inform the courier of the complaint and may provide tips to help the courier avoid similar complaints in the future, without deactivating or temporarily restricting the account.

39.    Uber's practices and policies relating to the timing of any review—and whether it takes place before or after a courier loses access—reflect the company's assessment about how quickly a courier engaged in concerning behavior must be removed from its platform in order to meet Uber's safety and quality standards.

40.    If a courier's account is deactivated, Uber makes every effort to be clear and consistent in its communications and transparent about the reasons behind the decision.[23]

41.    Uber will not provide couriers with all of the details related to the deactivation of their account, however, when doing so poses a risk to consumers or others, or poses a significant fraud risk to Uber, its customers (*i.e.*, consumers and merchants), or the public.  For example, where a courier's account is deactivated based on a report of sexual assault, Uber will not provide the courier with information that could identify the reporting consumer or reveal their location.  In cases of fraud, Uber may limit the information it provides the courier because it does not want to provide couriers with information that might allow them to evade Uber's fraud-detection mechanisms in the future.

42.    Couriers generally have the ability to seek review, via the "Review Center," of a deactivation decision that takes away their access for more than 7 days and that the courier cannot resolve on their own.[24]

43.    During a review of a deactivation decision, couriers have the opportunity to provide additional information about the incident or issue, such as their comments or video recordings.[25]

---

[23] *Id.* ("If any loss of access occurs, Uber will make every effort to be clear, empathetic, and consistent in our communications and specific and transparent about the reasons behind our decision, except where doing so poses a risk to other users.").

[24] *Id.* ("Outside of the most serious cases, drivers and delivery people [*i.e.*, couriers] should have the ability to request a review of any decision that removes access for more than 7 days and can't be resolved by the driver or delivery person [*i.e.*, courier] on their own."); *see also* Khosrowshahi, *supra* (statement from Uber's CEO about initiatives in deactivation review).

[25] *Deactivations*, *supra* (explaining couriers' "Opportunity to provide additional information" during the review process).

### IV.   Uber's Business Operations Will Be Significantly Prejudiced If the Ordinance Goes Into Effect On January 1

44.   Uber's business operations will be significantly prejudiced if the Ordinance goes into effect on January 1, 2025.

45.   *First*, the Ordinance would require Uber to keep on its platform couriers whose accounts it would otherwise deactivate for failing to satisfy the company's safety, efficiency, and quality standards. This includes, for example, couriers who have had three not-at-fault accidents in the past three years and the lowest-performing couriers with consistently below-minimum aggregate consumer ratings.

46.   Although Section 8.40.050 of the Ordinance allows a network company to deactivate couriers' accounts when doing so is "reasonably related to [a] network company's safe and efficient operations," it also states that deactivation because of "a background check, consumer report, driver record, or record of traffic infractions" is not so reasonably related "except in cases of egregious misconduct or where required by other applicable law."[26]  The definition of "egregious misconduct" in the Ordinance excludes traffic collisions unless the courier has "accumulated more than three non-criminal moving violations or at-fault collisions in the previous three years."[27]

47.   But in Uber's experience, couriers with, for example, four accidents (regardless of fault) in the prior three years pose a safety risk to Uber's consumers, the public, and others while carrying out their deliveries.  In this regard, Uber recognizes that often, issues that come to its attention are an indication of a larger pattern of underperformance and/or misconduct that was previously undetected.  For example, multiple accidents may suggest that the courier is consistently inattentive to traffic patterns and other potential safety considerations on the road.

48.   The Ordinance would also force Uber to associate with couriers who are the worst performers, as it precludes "deactivation based solely on a quantitative metric derived from aggregate customer ratings."[28]   Consistently low aggregate ratings, however, are generally correlated with

---

[26] Ordinance § 8.40.050(A)(2).

[27] *Id.* § 8.40.020.

[28] *Id.* § 8.40.050(A)(2)(e).

significant quality and efficiency issues (*e.g.*, not delivering the ordered food, or delivering the items late) or safety issues (*e.g.*, interpersonal conflict). For instance, Uber has observed that consumers and merchants will often provide a dissatisfied (or "thumbs down") rating, but relatively seldom will report complaints. The Ordinance thereby subjects merchants and consumers to a continued risk of low-quality service, with obvious reputational risk for Uber.

49.    Courier ratings can also be evaluated on a statistical level relative to the courier's previous performance and that of other couriers. Based on Uber's experience and analyses of data and trends over time, couriers with consistently low aggregate ratings also are more likely to be correlated with other consumer reports or safety incidents on the platform.

50.    For these reasons, absent the Ordinance, Uber would not permit couriers with consistently low aggregate ratings to make deliveries or interact with consumers at their homes and businesses.

51.    The Ordinance also requires Uber to keep couriers on its platform who systematically refuse or cancel orders from consumers, as it precludes deactivation on the basis of a courier's "acceptance or rejection of any individual offer, any types of offers, or any number or proportion of offers . . . ."[29] Uber's Community Guidelines prohibit "discriminating on the basis of . . . an Uber Eats user's [*i.e.*, consumer's] delivery location," adding that "intentionally refusing or canceling requests . . . solely for the purpose of avoiding a particular neighborhood due to the characteristics of the people or businesses that are located in that area, is not allowed."[30] Uber deactivates courier accounts when it has information from which it can infer that the courier has violated these prohibitions against discrimination, and it needs to maintain flexibility to do so. The Ordinance prevents Uber from having that flexibility.

52.    Even where Uber's reason for deactivation is deemed appropriate under the Ordinance, Uber will be forced under the regulation to permit couriers to make deliveries and interact with its customers (*i.e.,* consumers and merchants) for another two weeks by virtue of Section 8.40.070(A), which requires a company to provide 14 days' notice of a deactivation. This includes couriers who have below-minimum aggregate consumer ratings, and couriers with multiple collisions and traffic violations.

---

[29] *Id.* § 8.40.050(A)(2)(b).

[30] *Uber Community Guidelines*, *supra*.

53.     Being forced to associate with couriers who are unsafe and otherwise poor performers will hamper Uber's ability to provide efficient and safe deliveries to consumers. A courier who knows he is facing account deactivation 14 days later will likely be less motivated to uphold Uber's safety and reliability standards during that period.

54.     **Second**, Uber will suffer reputational harm if it is forced to lower its standards and permit couriers on its platform who do not exemplify its safety and quality values. Both safety and quality are a core part of Uber's brand and reputation. Uber has repeatedly and publicly affirmed its commitment to public safety and the safety of all consumers, including in its mission statement, in the Community Guidelines that all users of the platform must abide by, and in publicly available safety reports.[31] Consumers and other members of the public expect that couriers, who drop off deliveries at their homes and businesses, will be courteous and safe. But if Uber is required to associate with couriers who it believes to be unsafe, it may lose the trust of consumers. Uber will likewise lose the trust of consumers if it cannot maintain the quality of courier services by deactivating accounts of the worst performers, who generally have issues such as not delivering items, delivering incorrect items, or acting unprofessionally in their interactions with consumers.

55.     **Third**, because the Ordinance is vague and unclear in many respects, Uber will have to choose between risking the safety of its consumers or being subject to enforcement for violating the Ordinance. For example, although the Ordinance permits deactivation when a courier has more than three "at-fault" collisions in the last three years,[32] Uber, like other companies in the industry, does not have a direct method for assessing fault in each collision. Uber learns of motor vehicle accidents through the State of Washington's Department of Motor Vehicles, which only reports whether a collision has occurred and does not assign fault. Thus, Uber does not have the information it needs to determine whether couriers meet even the low standard of safety and quality that the Ordinance deems a permissible basis for deactivation. Uber will therefore have to decide between permitting couriers who have more than three

---

[31] *Values*, *supra*; *Uber's Community Guidelines*, *supra*; *Uber's US Safety Report*, Uber, https://www.uber.com/us/en/about/reports/us-safety-report/ (last visited Dec. 18, 2024).
[32] Ordinance § 8.40.020.

DECLARATION OF DANIEL CRAWFORD          13
No. 2:24-cv-2103

1    collisions to remain on its platform because it cannot ascertain how many of those collisions were "at

2    fault" or risking violation of the Ordinance in order to ensure the safety of consumers and the public.

3    56.    ***Fourth***, because the Ordinance requires Uber to provide couriers with evidence

4    substantiating its deactivation decisions, Uber faces an impossible choice where providing such

5    information would be harmful to the company's operations—and by extension, to consumers.    For

6    example, while Uber currently deactivates the accounts of couriers who commit fraud, it guards its fraud-

7    detection processes closely.    If Uber were to continue to deactivate the accounts of couriers on this basis,

8    in order to satisfy the deactivation-notice requirements in Section 8.40.070 and 8.40.080 of the Ordinance,

9    Uber would necessarily have to reveal its fraud-detection processes in some cases, thereby providing a

10    roadmap for future fraudsters and, in turn, threatening the safety and integrity of the platform and its

11    consumers by opening it up to more fraud.    As a result, the Ordinance puts Uber to an untenable choice:

12    it must either decide that it will no longer deactivate couriers' accounts on the basis of fraud, or maintain

13    this as a basis for deactivation but risk revealing its fraud detection methodologies.    Either way, Uber will

14    be significantly and irreparably harmed.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DANIEL CRAWFORD                14
No. 2:24-cv-2103

1    I declare under penalty of perjury under the laws of the United States that the foregoing is true

2    and correct.

3        EXECUTED this 18th day of December, 2024, at San Francisco, California.

4

5

6        Daniel Crawford

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DANIEL CRAWFORD          15
No. 2:24-cv-2103

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

|  |  |
|---|---|
| UBER TECHNOLOGIES, INC. and PORTIER, LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>CITY OF SEATTLE,<br><br>    Defendant. | No. 2:24-cv-2103<br><br>**DECLARATION OF HANNAH NILLES IN SUPPORT OF UBER'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

I, Hannah Nilles, declare as follows:

1.    My name is Hannah Nilles.  I am over the age of 18, have personal knowledge of the facts stated in this declaration, and can competently testify to their truth.

2.    My current role is Director, Head of Safety – Americas at Uber Technologies, Inc. ("Uber").  I have been in this position since August 2024, and have worked at Uber in other safety-related roles since August 2019.  My responsibilities include overseeing Uber's safety operations across the United States, Canada, and Latin America.  I oversee a 35-person team that develops processes, policies, and solutions for key safety issues that Uber faces.

3.    I make this declaration in support of Uber's Motion for a Temporary Restraining Order and Preliminary Injunction, which seeks to temporarily restrain and preliminarily enjoin Defendants from enforcing the App-Based Worker Deactivation Rights Ordinance, enacted by the City of Seattle in August 2023 and set to take effect on January 1, 2025 (the "Ordinance").[1]

4.    I am familiar with the Ordinance and the accompanying proposed rules regarding implementation and compliance issued by the Office of Labor Standards (the "Model Rules").

---

[1] Seattle, Wa., Ordinance 126878 (Aug. 14, 2023).

DECLARATION OF HANNAH NILLES        1
No. 2:24-cv-2103

I.    **Uber Prioritizes the Safety of Consumers, Couriers, and the Public**

5.     Because person-to-person connections are the foundation of Uber's business, Uber believes that safety must be at the core of its mission.  At its scale, Uber reflects the world in which it operates, including with respect to safety matters.  Accordingly, a fundamental tenet of Uber's mission statement is to make safety "a top priority every single day."[2]

6.     Uber makes this commitment to safety clear to the public, by stating that the company "care[s] deeply about the safety of the millions of people using our platform" and that "[s]afety is embedded in our cultural values."[3]  One of the core values described in Uber's Values Statement includes to "stand for safety" by making "Uber safer for everyone using our platform."[4]

7.     Uber also maintains publicly available Community Guidelines that govern the conduct of anyone who uses the platform.  These Guidelines focus on three tenets: treat everyone with respect, follow the law, and help "keep one another safe."[5]  The Guidelines note that Uber is "hard at work every day to help create safer experiences for everyone."[6]  Uber tells consumers and couriers that violating the Community Guidelines, including Uber's safety-related Guidelines, could lead to temporarily or permanently losing access to the platform through deactivation of their account.[7]  The potential paths to

---

[2] *Values*, Uber, https://www.uber.com/us/en/careers/values/ (last visited Dec. 17, 2024).

[3] Uber, 2021–2022 US Safety Report 3, https://uber.app.box.com/s/lea3xzb70bp2wxe3k3dgk2ghcyr687x3?uclick_id=7b682b1a-ca30-4310-b88c-e7d072cd23fc (last visited Dec. 17, 2023)

[4] *Values*, *supra*.

[5] *Uber's Community Guidelines*, Uber, https://www.uber.com/us/en/safety/uber-community-guidelines/ (last visited Dec. 17, 2024).

[6] *Uber Community Guidelines,* Uber (Nov. 19, 2024), https://www.uber.com/legal/en/document/?name=general-community-guidelines&country=united-states&lang=en&uclick_id=12b99a8b-7b8b-4694-89df-ed092e6d41cb (Uber's full Community Guidelines).

[7] *Deactivations*, Uber, https://www.uber.com/us/en/drive/driver-app/deactivation-review/ (last visited Dec. 17, 2024) ("All users of the platform (including riders, Uber Eats users [*i.e.*, consumers], and restaurants) can lose access" for violating Community Guidelines).

losing access to Uber's platform, including low consumer ratings, failing to drive safely and carefully, quality issues, and fraud, are described in more detail on Uber's website.[8]

8.    Uber also voices its commitment to safety in a number of other ways.[9]  For example, beginning in 2019, Uber set an industry standard by publishing public safety reports related to its mobility operations in the United States.[10]  These reports include information about Uber's actions related to safety and data on serious safety incidents reported while using Uber's platform.  Uber chooses to publish this data to demonstrate its commitment to safety, to maintain and encourage accountability, and to improve safety on the platforms of Uber and other industry members.

9.    As another example, Uber hosts an annual "Only on Uber" event for drivers (on its mobility platform) and couriers (on its delivery platform) that is led by Uber executives.[11]  At this event, executives discuss with drivers and couriers the company's latest safety initiatives and innovations—some of which are driven by feedback the company gathers from couriers and drivers.  The event is attended and led by Uber's most senior leadership and demonstrates that the commitment to safety comes from the very top of the organization.

---

[8] *Id.*

[9] *Safety*, Uber, https://www.uber.com/us/en/safety/ (last visited Dec. 17, 2024).

[10] *Uber's US Safety Report*, Uber, https://www.uber.com/us/en/about/reports/us-safety-report/ (last visited Dec. 17, 2024); *see also* Tony West, *Uber Delivers Second U.S. Safety Report* (June 1, 2022), https://www.uber.com/newsroom/2022-us-safety-report/ (post by Uber Chief Legal Officer Tony West about Uber's U.S. Safety Report for 2019–2020); Tony West, *Sharing to Build a Safer Industry* (Mar. 11, 2021), https://www.uber.com/newsroom/industry-sharing-safety/ (announcing Uber's partnership in a program for sharing information about safety incidents, which Uber committed to doing in its first U.S. Safety Report).

[11] *Only on Uber*, Uber, https://www.uber.com/us/en/u/only-on-uber/ (last visited Dec. 17, 2024); *see also* Dara Khosrowshahi, *Only on Uber: Helping to make driving and delivering safer, fairer, and easier*, Uber (Sept. 17, 2024), https://www.uber.com/newsroom/onlyonuber24/ (post by Uber CEO Dara Khosrowshahi about 2024 event); Dara Khosrowshahi, *Only on Uber: Becoming the best—and fairest—platform for flexible work* (Nov. 13, 2023), https://www.uber.com/newsroom/onlyonuber23/ (post by Uber CEO Dara Khosrowshahi about 2023 event).

DECLARATION OF HANNAH NILLES                3
No. 2:24-cv-2103

10.     Uber has also convened and is regularly advised by a Safety Advisory Board that provides the company with external expertise and perspective on safety issues.[12]  The Safety Advisory Board is comprised of leading industry experts on safety, including, for example, a former U.S. Secretary of Homeland Security and a former senior member of the Occupational Safety and Health Administration.[13]  Uber convened this Advisory Board in recognition of the fact that its work on safety is never done, and based on its desire to source feedback from leaders whose expertise enriches Uber's development and implementation of best-in-class safety measures for its platform.[14]

**II.     Uber's Commitment to Safety Extends to Its Courier Services**

11.     Uber understands that both couriers and consumers value having a safe experience on the platform and that safety is an important component of the success of delivery services facilitated through Uber.

12.     Uber often speaks publicly about the steps it takes to ensure the safety of couriers.  Uber is aware that its platform both contributes to and relies on road safety.  It thus seeks to help protect couriers on the roads by offering couriers educational programming on road safety and safe deliveries, and developing special features for couriers using two-wheeled vehicles such as "bike-friendly navigation."[15]

---

[12] *Uber Strengthens its Safety Advisory Board with Two New Members*, Uber (Mar. 13, 2024), https://www.uber.com/newsroom/uber-strengthens-its-safety-advisory-board/ ("We founded the Uber Safety Advisory Board in 2015 to provide critical external counsel on our approach to safety management, processes, and technologies.").

[13] *Id.* (stating composition of Uber's current Safety Advisory Board).

[14] Uber, 2024 Environmental, Social, and Governance Report 26, https://s23.q4cdn.com/407969754/files/doc_downloads/2024/04/Uber-2024-Environmental-Social-and-Governance-Report.pdf (last visited Dec. 17, 2024) (explaining Uber's work with Safety Advisory Board).

[15] *Road safety*, Uber, https://www.uber.com/us/en/safety/road-safety/  (last visited Dec. 17, 2024); *Deliver with confidence*, Uber, https://www.uber.com/us/en/deliver/safety/ (last visited Dec. 17, 2024); *Prioritizing safety while delivering*, Uber, https://www.uber.com/us/en/deliver/basics/before-you-start/staying-safe-with-the-uber-app/ (last visited Dec. 17, 2024).

DECLARATION OF HANNAH NILLES                    4
No. 2:24-cv-2103

Uber has also developed information related to maintaining respectful interactions with couriers that it will be sharing with couriers, merchants, and consumers.[16]

13.    Uber has spoken about and adopted safety measures that are also designed to keep consumers and the general public safe.  These measures include in-app safety features for both consumers and couriers and background checks for couriers before they ever take a trip, at least every year thereafter, and through the use of technology to look for issues in between.[17]  Courier quality and safety is important to Uber because, when performing third-party delivery services, couriers are not only driving on public roads but also interacting with both merchants (providing the food or other goods) and consumers receiving the deliveries, and the nature of these interactions is important to building and maintaining consumer trust.

14.    Uber also develops policies and practices to address serious safety incidents that may occur on the platform.  Uber recognizes that such serious incidents can represent real traumas, and has gone to great lengths to establish policies that are trauma-informed and informed by expert guidance. This includes providing agent training in phone investigation skills, trauma-informed support, identifying racism and discrimination in customer service, and addressing difficult conversations with precision and care.[18]  Uber also worked with the National Sexual Violence Resource Center, the Urban Institute, and RALIANCE to create a taxonomy to categorize and count sexual assault incidents in a behaviorally specific manner that is standard in research around sexual violence.[19]

### III.    Uber Safeguards the Privacy of Consumers and Couriers

---

[16] Khosrowshahi, *Only on Uber: Helping to make driving and delivering safer, fairer, and easier*, *supra*
[17] *Safety*, *supra*.

[18] Uber, US Safety Report 2021-2022, *supra*, at 8.

[19] *Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault*, RALIANCE, https://www.raliance.org/report_posts/helping-industries-to-classify-reports-of-sexual-harassment-sexual-misconduct-and-sexual-assault/ (last visited Dec. 17, 2024) (link to joint report of RALIANCE and the Urban Institute in partnership with Uber); Chad Sniffen, *Three Lessons Businesses Can Learn from Uber's Collecting and Reporting Sexual Assault Data*, National Sexual Violence Resource Center (Dec. 6, 2019), https://www.nsvrc.org/blogs/three-lessons-businesses-can-learn-ubers-collecting-and-reporting-sexual-assault-data.

DECLARATION OF HANNAH NILLES                5
No. 2:24-cv-2103

15.     Uber is committed to earning and keeping the trust of couriers and consumers who use its platform by protecting their privacy and safeguarding their personal data.  This commitment is reflected in Uber's Privacy Principles, which establish the foundation of Uber's privacy practices.[20]

16.     The Privacy Principles require that Uber protect users' data by "provid[ing] reasonable and appropriate safeguards to prevent loss, and unauthorized use or disclosure, of personal data."[21]

17.     Uber has also in its application "a series of privacy and data security features to help users understand and control how [it] use[s] their data."[22]  These features include, for example, the ability for consumers to get a copy of their personal data and to see the personal information that is shared with a courier.

## IV.    The Ordinance Is Inconsistent with Uber's Commitments to Safety and Privacy

18.     The Ordinance is inconsistent with Uber's commitments to safety and privacy.

19.     For example, I understand that the Ordinance prohibits Uber from deactivating couriers based on "the results of a background check, consumer report, driver record, or record of traffic infractions, except in cases of egregious misconduct or where required by other applicable law."[23]  The definition of "egregious misconduct" in the Ordinance excludes traffic collisions unless the courier has "accumulated more than three non-criminal moving violations or at-fault collisions in the previous three years."[24]

20.     Uber has determined, however, that drivers who have been involved in a number of collisions, even if they were not found to be at fault, pose a safety risk to the public and consumers.

21.     The Ordinance also prohibits Uber from deactivating a courier "based solely on a quantitative metric derived from aggregate customer ratings of an app-based worker's performance."[25]

---

[20] *Privacy*, Uber, https://www.uber.com/global/en/privacy/overview/ (last visited Dec. 17, 2024).
[21] *Id.*
[22] Ruby Zefo, *Living Up to Our Privacy Principles: Introducing Uber's Privacy Center*, Uber (Jan. 18, 2022), https://www.uber.com/newsroom/privacycenter/.
[23] Ordinance § 8.40.050(A)(2)(h).
[24] *Id.* § 8.40.020.
[25] *Id.* § 8.40.050(A)(2)(e).

DECLARATION OF HANNAH NILLES                6
No. 2:24-cv-2103

But Uber has determined that consistent ratings below our threshold for minimum aggregate consumer ratings of a courier often correlate with other issues. Consumers with a poor experience may be reluctant to write a formal complaint—whether for fear of getting a courier in trouble, or personally identifying themselves to a courier by providing negative feedback—so they may use ratings as a way to convey their experience. When a single courier receives scores of negative ratings, Uber views that as substantive feedback and a proxy for safety and other quality issues. Among other safety and quality issues that these ratings may reflect, for example, consumers might submit a "dissatisfied" rating where their courier didn't match the courier's photo in the app (suggesting the person who completed the delivery was not the individual who satisfied Uber's background check requirements), or where the courier acted unprofessionally.

22.      As another example, the Ordinance compels Uber to provide to deactivated couriers all evidence substantiating Uber's decision to deactivate, including but not limited to the "date, time, and location" of all incidents supporting the deactivation decision and a "copy of the evidence the network company considered in the deactivation decision."[26] This is information Uber does not provide to deactivated couriers as doing so contravenes its commitments to safety and privacy.

23.      Although the Ordinance permits Uber to anonymize certain information that it "reasonably believes . . . could compromise [a] customer or third party's safety,"[27] sharing the date, time, and location of an incident with a deactivated courier—even in redacted or anonymized form—risks allowing a courier to identify the reporting consumer, thereby endangering the consumer's personal safety and violating the consumer's privacy. This is especially concerning where the deactivation was the result of sexual assault, violence, or harassment, as the deactivated courier may be more likely to retaliate against the consumer, and disclosing details about the incident, including the date, time, and location, could lead to further physical or other harms.

24.      For these and other reasons, if Uber was made to comply with the requirements of the Ordinance, it would be forced to communicate positions on safety and privacy—including, specifically, a

---

[26] *Id.* §§ 8.40.070(A)(3), 8.40.080(A).
[27] *Id.* § 8.40.080(D).

DECLARATION OF HANNAH NILLES              7
No. 2:24-cv-2103

position about what sorts of reasons for deactivation are and are not reasonably related to safety and efficiency—that is not consistent with Uber's policies, positions, values, beliefs, and public statements. This would, in turn, erode the trust Uber has built with consumers and couriers alike, and undermine the public commitments and pronouncements Uber has made to prioritize safety, privacy, and quality on its platform.

DECLARATION OF HANNAH NILLES                          8
No. 2:24-cv-2103

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED this 18th day of December, 2024, at San Francisco, California.

DocuSigned by:

*Hannah Nilles*

F7C755666C8E493

Hannah Nilles

DECLARATION OF HANNAH NILLES
No. 2:24-cv-2103

9

**ER-122**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| UBER TECHNOLOGIES, INC. and PORTIER, LLC, | |
| Plaintiffs, | No. 2:24-cv-2103 |
| v. | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| CITY OF SEATTLE, | |
| Defendant. | |

Plaintiffs Uber Technologies, Inc. and Portier, LLC (collectively, "Uber") bring this suit under 42 U.S.C. § 1983 for declaratory and injunctive relief against Defendant the City of Seattle (the "City") and allege as follows:

## INTRODUCTION

1.    Through its App-Based Worker Deactivation Rights Ordinance (the "Ordinance"), Mun. Code, ch. 8.40 and § 3.02.125, the City of Seattle seeks to impose an unconstitutional regime of compelled speech, forced association, indecipherable government mandate, sweeping disclosure demand, and impairment of contract rights on companies like Uber.

2.    Uber is a technology company that operates a platform connecting people seeking ride and delivery services to drivers and couriers who seek to provide them.  For delivery services, the platform also connects couriers with merchants, who are seeking delivery services for their goods.  This widely-used platform allows millions of people around the globe to hail rides within minutes and, relevant here, to use Uber Eats for ordering food, beverages, and other goods for

COMPLAINT - 1
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1  delivery on demand.  And it provides millions of drivers and couriers with the opportunity to earn

2  income by providing those services, and provides merchants with an additional market

3  opportunity.

4        3.     This case implicates Uber's delivery platform.  Every day, through its Uber Eats

5  marketplace, Uber connects Seattle consumers with independent couriers and merchants to

6  facilitate the delivery of meals, groceries, and more.  Managing this complex and dynamic delivery

7  platform requires Uber to make prompt decisions based on real-world and real-time consumer

8  feedback and other information about couriers' actions on and off the platform.  Couriers drive

9  through busy streets, go to people's homes, and have face-to-face interactions at any hour of the

10  day.  Uber's decisions—which include determining when a courier's access to the Uber platform

11  should be deactivated—are based on robust policies tailored to its platform to promote safety,

12  privacy, reliability, quality, non-discrimination, and a positive merchant and consumer experience.

13        4.     The Seattle City Council wants Uber to adopt different policies, however.  Its

14  overriding priority is to ensure that couriers remain on Uber's platform.  And to be sure, that is

15  one of Uber's goals too: Uber has every incentive to keep couriers on the platform.  But in some

16  cases, based on its experience, judgment, and values, Uber has struck a balance different from the

17  one the City prefers.  To take a few examples: Uber believes that ensuring consumers receive

18  reliable, efficient, and, above all, safe deliveries is more important than allowing couriers with

19  consistently low consumer ratings—a sign of serious performance and/or safety issues—to keep

20  disappointing consumers.  The City does not.  Uber believes it is important that couriers on its

21  platform should not refuse to deliver to particular neighborhoods based on the characteristics of

22  the people or businesses there.  The City does not.  And Uber believes that guarding against fraud,

23  and protecting consumers who may have been victimized from retaliation, should take precedence

24  over giving every courier with a deactivated account every document or detail on which a

25  deactivation determination is based, no matter how sensitive.  But the City, once again, does not.

26        5.     Understandably, though, the City does not want to be in the complex business of

27  directly deciding which courier accounts should be deactivated and which should not.  Such

COMPLAINT - 2
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

micromanagement would make it easy for residents to hold the city government accountable for the consequences if their deliveries become unreliable, or even worse, if people are hurt on the roads or at their doors.  To avoid that problem, the City has enacted, and is about to implement, an unprecedented Ordinance that offloads its new vision to companies like Uber—who must themselves announce specific policies that threaten these consequences.  In doing so, the City walks straight into grave constitutional problems.

6.    The Ordinance compels Uber to speak—and to voice the City's views, not Uber's own, even when those views would suggest to the world that Uber is not fully committed to the quality of the services provided on its own platform, or worse, to safety and privacy.  To the extent it leaves Uber any choice in what to say about important and often controversial matters, the City offers vague standards and confusing guidance that further chill Uber's speech.  It forces Uber to associate with couriers whose presence on the platform undermines its commitments and reputation, and it substantially impairs Uber's contractual relations with those couriers.  And finally, to ensure that Uber sticks to the City's script, the Ordinance requires Uber to turn over an array of sensitive, confidential business information.  Whatever objectives the City may have, it cannot pursue them in defiance of the First, Fourth, and Fourteenth Amendments and the Contracts Clause of the U.S. Constitution.

7.    In the year-and-a-half between the Ordinance's enactment and the effective date, the City has slow-walked its implementation and resisted providing guidance.  Now, on the eve of an unconstitutional new regime, and still without answers from the City, Uber has no other option than to seek relief from this Court.

**PARTIES**

8.    Plaintiff Uber Technologies, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.

9.    Plaintiff Portier, LLC is a wholly owned subsidiary of Uber Technologies, Inc. and enters into agreements with restaurants, merchants, and couriers to facilitate the delivery of food, beverages, and other goods.

COMPLAINT - 3
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

10.     Defendant the City of Seattle is a municipality in the State of Washington.  It enacted the Ordinance through its City Council and will enforce the Ordinance through its Office of Labor Standards ("OLS" or the "Agency").

## JURISDICTION AND VENUE

11.     This Court has original subject-matter jurisdiction under 28 U.S.C. § 1331 because Uber's causes of action arise under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution and the Contracts Clause of Article I, Section 10 of the U.S. Constitution.

12.     The Court may award declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2022, as well as any other equitable relief it deems appropriate under its inherent powers.

13.     Venue is proper in the Western District of Washington under 28 U.S.C. § 1391(b)(1) because Defendant the City of Seattle is located within this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Uber's claims occurred in this District.

## FACTUAL ALLEGATIONS

14.     In any given city, thousands of couriers deliver food, groceries, and other goods from merchants at a given time.  Those couriers travel to homes and businesses at any hour of the day and engage in direct, face-to-face interactions with consumers.

15.     Uber launched its delivery marketplace in the City of Seattle in 2015.  Many independent couriers who provide delivery services in Seattle facilitated by the Uber Eats platform have had accounts with Uber since before the Ordinance was enacted.

**I.    Uber Values Safety, Privacy, and Quality**

16.     In order to carry out its operations at the massive scale that it does and at the high standard that it seeks, Uber has built its business on foundational values that include safety, privacy, reliability, quality, and accessibility.  Uber has made prominent, public commitments to these values.  It then follows through on those commitments every day.

COMPLAINT - 4
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

### A.     Uber is Committed to Safety

17.     Because person-to-person connections are the foundation of Uber's business, Uber believes that safety must be at the core of its mission.  At its scale, Uber reflects the world in which it operates, including with respect to safety matters.  Accordingly, a fundamental tenet of Uber's mission statement is to make safety "a top priority every single day."[1]

18.     Uber makes this commitment to safety clear to the public, by stating that the company "care[s] deeply about the safety of the millions of people using our platform" and that "[s]afety is embedded in our cultural values."[2]  One of the core values described in Uber's Values Statement includes to "stand for safety" by making "Uber safer for everyone using our platform."[3]

19.     Uber also maintains publicly available Community Guidelines that govern the conduct of anyone who uses the platform.  These Community Guidelines focus on three tenets: treat everyone with respect, follow the law, and help "keep one another safe."[4]  The Community Guidelines note that Uber is "hard at work every day to help create safer experiences for everyone."[5]  Uber tells consumers and couriers that violating the Community Guidelines, including Uber's safety-related Community Guidelines, could lead to temporarily or permanently losing access to the platform through deactivation of their accounts.[6]  The potential paths to losing access

---

[1] *Values*, Uber, https://www.uber.com/us/en/careers/values/ (last visited Dec. 17, 2024).

[2] Uber, 2021-2022 US Safety Report 3, https://uber.app.box.com/s/lea3xzb70bp2wxe3k3dgk2ghcyr687x3?uclick_id=7b682b1a-ca30-4310-b88c-e7d072cd23fc (last visited Dec. 17, 2023).

[3] *Values*, *supra*.

[4] *Uber's Community Guidelines*, Uber, https://www.uber.com/us/en/safety/uber-community-guidelines/ (last visited Dec. 17, 2024).

[5] *Uber Community Guidelines,* Uber (Nov. 19, 2024), https://www.uber.com/legal/en/document/?name=general-community-guidelines&country=united-states&lang=en&uclick_id=12b99a8b-7b8b-4694-89df-ed092e6d41cb (Uber's full Community Guidelines).

[6] *Deactivations*, Uber, https://www.uber.com/us/en/drive/driver-app/deactivation-review/ (last visited Dec. 17, 2024) ("All users of the platform (including riders, Uber Eats users [*i.e.*, consumers], and restaurants) can lose access" for violating Community Guidelines).

COMPLAINT - 5
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

to Uber's platform, including low consumer ratings, failing to drive safely and carefully, quality issues, and fraud, are described in more detail on Uber's website.[7]

20.     Uber also voices its commitment to safety in a number of other ways.[8]  For example, beginning in 2019, Uber set an industry standard by publishing public safety reports related to its mobility operations in the United States.[9]  These reports include information about Uber's actions related to safety and data on serious safety incidents reported while using Uber's platform.  Uber chooses to publish this data to demonstrate its commitment to safety, to maintain and encourage accountability, and to improve safety on the platforms of Uber and other industry members.

21.     As another example, Uber hosts an annual "Only on Uber" event for drivers (on its mobility platform) and couriers (on its delivery platform) that is led by Uber executives.[10]  At this event, executives discuss with drivers and couriers the company's latest safety initiatives and innovations—some of which are driven by feedback the company gathers from couriers and drivers.  The event is attended and led by Uber's most senior leadership and demonstrates that the commitment to safety comes from the very top of the organization.

22.     Uber has also convened and is regularly advised by a Safety Advisory Board that provides the company with external expertise and perspective on safety issues.[11]  The Safety

---

[7] *Id.*

[8] *Safety*, Uber, https://www.uber.com/us/en/safety/ (last visited Dec. 17, 2024).

[9] *Uber's US Safety Report*, Uber, https://www.uber.com/us/en/about/reports/us-safety-report/ (last visited Dec. 17, 2024); *see also* Tony West, *Uber Delivers Second U.S. Safety Report* (June 1, 2022), https://www.uber.com/newsroom/2022-us-safety-report/ (post by Uber Chief Legal Officer Tony West about Uber's U.S. Safety Report for 2019-2020); Tony West, *Sharing to Build a Safer Industry* (Mar. 11, 2021), https://www.uber.com/newsroom/industry-sharing-safety/ (announcing Uber's partnership in a program for sharing information about safety incidents, which Uber committed to doing in its first U.S. Safety Report).

[10] *Only on Uber*, Uber, https://www.uber.com/us/en/u/only-on-uber/ (last visited Dec. 17, 2024); *see also* Dara Khosrowshahi, *Only on Uber: Helping to make driving and delivering safer, fairer, and easier*, Uber (Sept. 17, 2024), https://www.uber.com/newsroom/onlyonuber24/ (post by Uber CEO Dara Khosrowshahi about 2024 event); Dara Khosrowshahi, *Only on Uber: Becoming the best—and fairest—platform for flexible work* (Nov. 13, 2023), https://www.uber.com/newsroom/onlyonuber23/ (post by Uber CEO Dara Khosrowshahi about 2023 event).

[11] *Uber Strengthens its Safety Advisory Board with Two New Members*, Uber (Mar. 13, 2024), https://www.uber.com/newsroom/uber-strengthens-its-safety-advisory-board/ ("We founded the

COMPLAINT - 6
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Advisory Board is comprised of leading industry experts on safety, including, for example, a former U.S. Secretary of Homeland Security and a former senior member of the Occupational Safety and Health Administration.[12] Uber convened this Advisory Board in recognition of the fact that its work on safety is never done, and based on its desire to source feedback from leaders whose expertise enriches Uber's development and implementation of best-in-class safety measures for its platform.[13]

23.    Uber understands that both couriers and consumers value having a safe experience on the platform and that safety is an important component of the success of delivery services facilitated through Uber.

24.    Uber often speaks publicly about the steps it takes to ensure the safety of couriers. Uber is aware that its platform both contributes to and relies on road safety.  It thus seeks to help protect couriers on the roads by offering couriers educational programming on road safety and safe deliveries, and developing special features for couriers using two-wheeled vehicles such as "bike-friendly navigation."[14]  Uber has also developed information related to maintaining respectful interactions with couriers that it will be sharing with couriers, merchants, and consumers.[15]

25.    Uber has spoken about and adopted safety measures that are also designed to keep consumers and the general public safe.  These measures include in-app safety features for both consumers and couriers and background checks for couriers before they ever take a trip, at least

---

Uber Safety Advisory Board in 2015 to provide critical external counsel on our approach to safety management, processes, and technologies.").

[12] *Id.* (stating composition of Uber's current Safety Advisory Board).

[13] Uber, 2024 Environmental, Social, and Governance Report 26, https://s23.q4cdn.com/407969754/files/doc_downloads/2024/04/Uber-2024-Environmental-Social-and-Governance-Report.pdf (last visited Dec. 17, 2024) (explaining Uber's work with Safety Advisory Board).

[14] *Road safety*, Uber, https://www.uber.com/us/en/safety/road-safety/ (last visited Dec. 17, 2024); *Deliver with confidence*, Uber, https://www.uber.com/us/en/deliver/safety/ (last visited Dec. 17, 2024); *Prioritizing safety while delivering*, Uber, https://www.uber.com/us/en/deliver/basics/before-you-start/staying-safe-with-the-uber-app/ (last visited Dec. 17, 2024).

[15] Khosrowshahi, *Only on Uber: Helping to make driving and delivering safer, fairer, and easier*, *supra*

COMPLAINT - 7
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

every year thereafter, and through the use of technology to look for issues in between.[16] Courier quality and safety is important to Uber because, when performing third-party delivery services, couriers are not only driving on public roads but also interacting with both merchants (providing the food or other goods) and consumers receiving the deliveries, and the nature of these interactions is important to building and maintaining consumer trust.

26.     Uber also develops policies and practices to address serious safety incidents that may occur on the platform.  Uber recognizes that such serious incidents can represent real traumas, and has gone to great lengths to establish policies that are trauma-informed and informed by expert guidance.  This includes providing agent training in phone investigation skills, trauma-informed support, identifying racism and discrimination in customer service, and addressing difficult conversations with precision and care.[17]  Uber also worked with the National Sexual Violence Resource Center, the Urban Institute, and RALIANCE to create a taxonomy to categorize and count sexual assault incidents in a behaviorally specific manner that is standard in research around sexual violence.[18]

### B.     Uber Protects the Privacy of Consumers and Couriers

27.     Uber is committed to earning and keeping the trust of couriers and consumers who use its platform by protecting their privacy and safeguarding their personal data.  This commitment is reflected in Uber's Privacy Principles, which establish the foundation of Uber's privacy practices.[19]

---

[16] *Safety*, *supra*.

[17] Uber, US Safety Report 2021-2022, *supra*.

[18] *Helping Industries to Classify Reports of Sexual Harassment, Sexual Misconduct, and Sexual Assault*, RALIANCE, https://www.raliance.org/report_posts/helping-industries-to-classify-reports-of-sexual-harassment-sexual-misconduct-and-sexual-assault/ (last visited Dec. 17, 2024) (link to joint report of RALIANCE and the Urban Institute in partnership with and Uber); Chad Sniffen, *Three Lessons Businesses Can Learn from Uber's Collecting and Reporting Sexual Assault Data*, National Sexual Violence Resource Center (Dec. 6, 2019), https://www.nsvrc.org/blogs/three-lessons-businesses-can-learn-ubers-collecting-and-reporting-sexual-assault-data.

[19] *Privacy*, Uber, https://www.uber.com/global/en/privacy/overview/ (last visited Dec. 17, 2024).

COMPLAINT - 8
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

ER-130

28.     The Privacy Principles require that Uber protect users' data by "provid[ing] reasonable and appropriate safeguards to prevent loss, and unauthorized use or disclosure, of personal data."[20]

29.     Uber has also in its application "a series of privacy and data security features to help users understand and control how [it] use[s] their data."[21]  These features include, for example, the ability for consumers to get a copy of their personal data and to see the personal information that is shared with a courier.

30.     Uber's efforts to safeguard the data of consumers and couriers extend to Uber's disclosure of such data to regulators.  For example, as described in its Government Transparency Report, Uber works closely with regulators to minimize the amount of information shared that could potentially identify any individual.[22]

31.     Importantly, Uber safeguards the personal data of consumers to protect them from physical and other harm.  For this reason, Uber does not release to couriers the date, time, and location of a consumer complaint.  Releasing such data—even in an anonymized fashion—may inadvertently reveal information that can be used to identify the consumer who made the report, risking their physical safety.  Such disclosures are particularly concerning for Uber's delivery business, given that couriers often interact with consumers at their homes and businesses.

32.     Uber also safeguards data about the couriers who use its platform, including data about the number of couriers who work in a particular market, where those couriers reside, couriers' contact information, the number of couriers whose accounts are deactivated, and the company's reasons for deactivating courier accounts.  Uber considers much of this information to

---

[20] *Id.*

[21] Ruby Zefo, *Living Up to Our Privacy Principles: Introducing Uber's Privacy Center*, Uber (Jan. 18, 2022), https://www.uber.com/newsroom/privacycenter/.

[22] *Government Transparency Report: Regulatory Requests*, Uber, https://www.uber.com/us/en/about/reports/transparency/regulatory/?uclick_id=2547e942-a587-4b6c-a1b9-c52bf67b4d2a (last visited Dec. 13, 2024) ("For each requirement, we work closely with the local authority to understand the legal basis for their request and determine which data is most useful and necessary, seeking to minimize the amount of information that could potentially identify an individual.").

COMPLAINT - 9
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1  be sensitive and confidential and does not voluntarily disclose it for several reasons, including

2  because Uber considers this information to be competitively sensitive.

3  **II.    Uber's Deactivation Policies and Positions**

4        33.    Through years of experience, Uber has formed beliefs on the complex set of

5  behaviors and indicators that should result in couriers' account deactivation—that is, their loss of

6  access to Uber's platform.  Consumers on Uber's platform value efficient delivery times, and thus,

7  Uber's business model relies on having couriers on the platform with active accounts.  Therefore,

8  Uber takes the decision to deactivate courier accounts seriously and considers deactivation to be a

9  last resort.[23]  Uber also recognizes that because its platform is an essential source of income for

10  many couriers, losing access to the platform is "one of the most distressing moments" that a courier

11  can face.[24]  Uber thus does not deactivate courier accounts because it wants to, but only when the

12  interests of promoting safety, ensuring quality, and eliminating fraudulent activity call for such

13  action.  Uber continuously reviews and seeks to improve its deactivation policies and processes

14  for accuracy, fairness, and in response to couriers' feedback, while also upholding its safety and

15  privacy standards on the platform.

16        34.    While complaints and issues with courier services are rare in comparison to the

17  scale of Uber's operations, consumers do report complaints and issues, ranging in severity from

18  relatively minor (for example, rudeness) to quite severe (for example, fraud or assault).

19        35.    Uber's current deactivation policies and positions are consistent with its

20  commitments to safety, privacy, quality, and fraud prevention.

21

22

23

24  [23] *Deactivations*, *supra* ("We're strongly motivated to keep access to the Uber platform open and to help drivers and delivery people get online when they want to work."); Dara Khosrowshahi,

25  *Becoming the fairest platform for flexible work,* Uber (Nov. 13, 2023) https://www.uber.com/blog/deactivations-principles/ (statement from Uber's CEO about Uber's

26  approach to deactivations, explaining that "Blocking someone from accessing their Uber account is one of the most serious decisions we make as a company").

27  [24] *Id.*

COMPLAINT - 10
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**A.    Uber Temporarily Restricts Access or Deactivates Courier Accounts When the Courier Poses a Safety or Quality Risk**

36.    Uber publicly posts its reasons for temporarily restricting or deactivating courier accounts.[25]

37.    With respect to a courier's access to the platform, Uber distinguishes between (i) failing to onboard to the platform, (ii) a temporary restriction of access to the platform, and (iii) a deactivation from the platform.

38.    A courier may fail to onboard, or may temporarily lose access, for a variety of reasons, including failing to offer the required login information or failing to meet minimum eligibility requirements, such as downloading the latest version of Uber's application or uploading proof of a valid driver's license.  A courier who temporarily loses access can typically regain access by providing the correct information or resolving the deficiency—*e.g.*, if the problem is an outdated version of the application, by downloading the latest version of the application; if the problem is expired documentation, by uploading valid proof of a license.  A courier's failure to onboard or loss of access due to their failure to meet minimum eligibility requirements is distinct from a deactivation, in which Uber takes away a courier's account access.

39.    Uber may also temporarily restrict a courier's access while it conducts a review or investigation, including to confirm a courier's identity, review a courier's eligibility documentation, or investigate a report of courier misconduct.  All of these temporary restrictions, too, are distinct from a deactivation, in which Uber takes away a courier's account access.

40.    Two of the most common reasons for deactivation are failed background checks and problems with the documentation Uber requires couriers to submit.  Uber also deactivates courier accounts for consistently below-minimum aggregate consumer ratings, among other reasons.

---

[25] *Deactivations*, *supra* (listing and explaining reasons).

COMPLAINT - 11
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

### 1. Background Checks

41.    Uber believes that background check requirements for couriers are a central component of its safety program.[26]  To that end, couriers must undergo a background check before their first delivery, and they continue to undergo checks on at least an annual basis.[27]

42.    Uber uses a third party to conduct background checks of each courier on its platform as part of its commitment to safety.  Reasons for a failed background check may include serious criminal convictions; serious pending criminal charges; multiple moving violations, non-moving violations, or accidents within the last three years; and any serious driving violation, such as driving while intoxicated.[28]  In the case of a failed background check, couriers have at least 7 days to address any inaccuracies with the third party that conducted the background check, as mandated by the federal Fair Credit Reporting Act.

43.    Couriers whose background checks show serious criminal convictions, such as robbery or kidnapping, are prohibited from making deliveries in order to protect consumers and the public from potentially dangerous situations in their homes and places of work.

44.    Uber also deactivates accounts of couriers whose background checks show driving record issues, including multiple collisions and/or presenting fraudulent vehicle registration or insurance documents.  Uber, like other companies in the industry, does not have a direct method for assessing fault in each collision.  Uber learns of motor vehicle accidents through the State of Washington's Department of Motor Vehicles, which only reports whether a collision has occurred and does not assign fault.

45.    Uber deactivates accounts of couriers whose background checks show driving record issues because it has determined that these issues are a safety signal and indicators of an unsafe driver.

---

[26] *Id.* (listing and explaining "Background checks" as a reason for deactivation).

[27] *Safety*, *supra* ("All drivers are background checked before their first trip," and "Uber rescreens drivers at least every year").

[28] *Deactivations*, *supra*.

COMPLAINT - 12
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

### 2.     Inadequate Documentation

46.     Uber temporarily restricts access for couriers who do not submit proper documentation.[29]   Uber requires couriers to upload current versions of certain documents, including a driver's license, vehicle registration and insurance, and profile photo.[30]   Uber temporarily restricts access for couriers who do not satisfy these documentation requirements, in part because allowing such couriers' accounts to remain active on Uber's platform risks the safety of consumers and the public, and compromises consumers' ability to receive deliveries from couriers who have confirmed their driving privileges.

47.     Uber periodically requires couriers to upload photos of themselves for identity verification.[31]   One common issue that can lead to a temporary restriction of access arises when a courier uploads a photo that does not match the photo of the individual displayed on their account profile.   In such cases, Uber cannot verify the identity of the person actually completing deliveries (and therefore also cannot verify that the person completing deliveries satisfies Uber's background check requirements).

### 3.     Couriers With Below-Minimum Aggregate Ratings

48.     Uber strives to ensure that consumers receive a high-quality, safe experience each time they place an order using the Uber platform.   To that end, consumers are able to provide a satisfied (or "thumbs up") rating or a dissatisfied (or "thumbs down") rating for a delivery.   Uber aggregates these ratings for each courier and compares the aggregate rating to the minimum aggregate rating requirement for the courier's delivery location.

---

[29] *Id.* (listing and explaining "Expired documents" and other document-related issues as reasons for deactivation).

[30] *Required Documents for Drivers*, Uber, https://www.uber.com/us/en/drive/requirements/documents/?_csid=6X8cUVEeNECfZZjEbnO_Jw&city=washington-dc&state=a3bjsh1IrShgER6foAQoBDMzwCDOLBIvVTvn-0bj9BM%3D&uclick_id=df07b699-20e8-4f2b-9883-6c5d02602864#_ (last visited December 13, 2024).

[31] *Identity Verification Checks*, Uber, https://help.uber.com/en/driving-and-delivering/article/identity-verification-checks?nodeId=75fb55dc-da08-41bb-b1cb-3229f2839956 (last visited Dec. 15, 2024).

COMPLAINT - 13
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

49.     Uber contacts couriers to provide resources when their aggregate rating approaches the minimum for their delivery location.  The following image depicts the substance of the notice Uber sends to couriers who approach the minimum threshold.

50.     Uber deactivates accounts of couriers whose aggregate ratings are consistently below the minimum aggregate rating requirement in their delivery location, even after such a warning.[32]  In Uber's experience, below-minimum aggregate ratings are often correlated with safety, fraud, misconduct, and other quality issues.  For example, consumers generally give couriers "thumbs down" ratings when the courier was rude, was late to pick up an order and/or complete a delivery, or did not deliver the correct items.  Uber has also found that, in other cases,

---

[32] *Deactivations*, *supra* (listing and explaining "Ratings" as a reason for deactivation).

COMPLAINT - 14
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

couriers may receive "thumbs down" ratings for making remarks or engaging in conduct that made the consumer feel unsafe.  Consumers may not have the time to complete a full report following an uncomfortable incident, and providing a "thumbs down" rating is the easiest way for the consumer to communicate to Uber that there was an issue with the courier's delivery services.

51.     Deactivations for below-minimum aggregate ratings consider the number of consumer ratings and the recency of each consumer rating.  Uber never deactivates a courier's account based on a single "thumbs down" consumer rating.

**4.     Other Reasons for Courier Account Deactivation**

52.     Uber also deactivates accounts of couriers for other safety- and quality-related reasons.  These reasons include unsafe driving, or exhibiting aggressive, confrontational, or harassing behavior.[33]

53.     Uber deactivates accounts of couriers who discriminate or make offensive remarks based on a consumer's protected characteristics, including race, color, disability, gender identity, sex, and sexual orientation.[34]  Uber "believe[s] in a world where movement should be accessible" to all.[35]  The company's Community Guidelines prohibit discrimination and Uber does not "tolerate racist or discriminatory conduct and behavior."[36]  Uber, therefore, may also deactivate accounts of couriers when it has information from which it can infer that the courier has violated these prohibitions against discrimination.

54.     Additionally, in the interests of the safety, efficiency, and trustworthiness of its platform, Uber's grounds for account deactivation include submitting "[a]ltered or false documents" and "assuming someone else's identity," among a host of other fraudulent activities.[37]  Fraud that can lead to deactivation includes both account-level conduct (for example, submitting

---

[33] *Id.*

[34] *Id.*; *see also Uber's Community Guidelines*, *supra* (setting out guidelines against discriminatory and offensive behavior).

[35] *Values*, *supra*.

[36] *Uber Community Guidelines*, *supra*.

[37] *Deactivations*, *supra*.

COMPLAINT - 15
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1  fraudulent documents or creating fake or duplicate accounts), and trip-level conduct (for example,

2  claiming unwarranted fees or charges or falsely claiming to complete a delivery).[38]

3      **B.    Uber's Process for Investigating and Reviewing Deactivations Is Tailored to**

4          **the Circumstances**

5      55.    It is important to Uber that couriers "have a clear explanation when they lose access,

6  and feel they have a voice if their account is deactivated."[39]  Uber recognizes a "responsibility to

7  ensure [its] processes are fair, accurate, and transparent," and that couriers and the public "trust

8  we are doing the right thing."[40]  For this reason, Uber provides on its website public guidance to

9  couriers regarding its deactivation practices, including advice about how couriers may resolve

10  issues and avoid losing access to Uber's platform.

11      56.    Uber generally conducts an investigation in connection with most deactivations.[41]

12  One exception is when Uber deactivates a courier account for below-minimum aggregate ratings

13  after the courier has already received prior warning of a low rating and prior warning that

14  deactivation may occur in the event of additional low ratings.

15      57.    The length of an investigation varies depending on the type of incident and its

16  severity.  Uber strives to complete investigations as quickly as possible, while also ensuring that

17  they are as thorough and complete as possible.

18      58.    When investigating an incident that could lead to deactivation, Uber generally aims

19  to collect and assess relevant information from consumers in order to determine if deactivation is

20  appropriate.   Uber generally considers evidence in the courier's favor.[42]   For instance, in

21  considering a report of assault, Uber will consider whether the courier's location data supports or

22  refutes the allegations.

23  _____

24  [38] *Id.* (listing and explaining "Fraudulent activities" as a reason for deactivation).

   [39] Khosrowshahi, *Becoming the fairest platform for flexible work*, *supra*.

25  [40] *Id.*

26  [41] *Deactivations*, *supra* (explaining "Human involvement" in deactivation decisions).

27  [42] *Id.* (explaining "Protection from false allegations" for couriers and opportunity for couriers to provide "information to support their case").

COMPLAINT - 16
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

59.     Uber has also adopted best practices for investigating sexual abuse and sexual assault reports, including integrating trauma-informed and survivor-centered approaches that allow the company to conduct a thorough investigation while minimizing any further trauma to survivors of such abuse or assault.

60.     While a single serious report may lead to deactivation of an account, it is worth noting that the majority of reported incidents are less severe behaviors that may not warrant immediate loss of access to the platform.  Instead, such reports may warrant additional examination of the courier's history on the platform.

61.     Uber generally may take into account the courier's history on the platform, including the length of time the courier has provided deliveries on the platform and the number of deliveries completed.  For example, Uber believes that a minor complaint against a courier who has completed tens of thousands of deliveries over many years without incident should be considered within the broader context of that courier's history on the platform.

62.     The timing of Uber's investigation of a deactivation, and its relationship to if and when the courier loses access to the platform, also varies depending on the nature of the report or issue.  For example, in cases of serious safety incidents, Uber will temporarily restrict the courier's account access while the company conducts an investigation.  This practice reflects Uber's determination that such couriers may pose an immediate risk to the public and customers (*i.e.*, consumers and merchants).

63.     In other cases, such as low consumer ratings, Uber will inform the courier of the complaints and may provide tips to help the courier avoid similar complaints in the future, without deactivating or temporarily restricting the account.

64.     Uber's practices and policies relating to the timing of any review—and whether it takes place before or after a courier loses access—reflect the company's assessment about how quickly a courier engaged in concerning behavior must be removed from its platform in order to meet Uber's safety and quality standards.

COMPLAINT - 17
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1      65.    If a courier's account is deactivated, Uber makes every effort to be clear and

2  consistent in its communications and transparent about the reasons behind the decision.[43]

3      66.    Uber will not provide couriers with all of the details related to their deactivation,

4  however, when doing so poses a risk to consumers or others, or poses a significant fraud risk to

5  Uber, its customers (*i.e.*, consumers and merchants), or the public.  For example, where a courier

6  is deactivated based on a consumer report of sexual assault, Uber will not provide the courier with

7  information that could identify the reporting consumer or reveal their location.  In cases of fraud,

8  Uber may limit the information it provides the courier because it does not want to provide couriers

9  with information that might allow them to evade Uber's fraud-detection mechanisms in the future.

10      67.    Couriers generally have the ability to seek review, via the "Review Center," of a

11  deactivation decision that takes away their access for more than 7 days and that the courier cannot

12  resolve on their own.[44]

13      68.    During a review of a deactivation decision, couriers have the opportunity to provide

14  additional information about the incident or issue, such as their comments or video recordings.[45]

15  **III.    The City's Deactivation Ordinance**

16      69.    In August of 2023, the Seattle City Council enacted and the Mayor signed the App-

17  Based Worker Deactivation Rights Ordinance.  Mun. Code, ch. 8.40 and § 3.02.125.  Section 2 of

18  the Ordinance—which is set to take effect on January 1, 2025—applies to network companies

19  "that facilitate work performed by 250 or more app-based workers worldwide," Ordinance

20

21

---

22  [43] *Id.* ("If any loss of access occurs, Uber will make every effort to be clear, empathetic, and
    consistent in our communications and specific and transparent about the reasons behind our

23  decision, except where doing so poses a risk to other users.").

24  [44] *Id.* ("Outside of the most serious cases, drivers and delivery people [*i.e.*, couriers] should have
    the ability to request a review of any decision that removes access for more than 7 days and can't

25  be resolved by the driver or delivery person [*i.e.*, courier] on their own."); *see also* Khosrowshahi,
    *Becoming the fairest platform for flexible work*, *supra* (statement from Uber's CEO about

26  initiatives in deactivation review).

27  [45] *Deactivations*, *supra* (explaining couriers' "Opportunity to provide additional information"
    during the review process).

COMPLAINT - 18
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    § 8.40.040(A), and seeks to regulate the deactivation of app-based workers by such companies,

2    including couriers who use Uber's platform in Seattle.[46]

3        70.    The Ordinance authorizes OLS to make rules to implement the Ordinance and to

4    enforce its provisions, including by imposing significant penalties.  *See* Ordinance §§ 8.40.125,

5    8.40.20, 8.40.130, 8.40.150, 8.40.160, 8.40.170.  It also provides a private right of action.  *See*

6    Ordinance § 8.40.230.

7        71.    The Ordinance defines "deactivation" broadly to include any "blocking of an app-

8    based worker's access to the worker platform, changing an app-based worker's status from eligible

9    to accept offers to perform services to ineligible, or other material restriction in access to the

10   worker platform that is effected by a network company."  Ordinance § 8.40.020.  The Ordinance

11   thus regulates not only deactivations of app-based workers' accounts, but also temporary

12   restrictions of access.

13       72.    The Ordinance states that it seeks to "protect[] and promote public health, safety,

14   and welfare by establishing protections against unwarranted deactivations for app-based workers."

15   Ordinance § 1(C).  But the Ordinance offloads the City's vision of what amounts to an

16   "unwarranted deactivation"—and the harmful effects that vision is likely to bring about—onto

17   companies like Uber by forcing them to announce policies that espouse the City's views as if they

18   were the companies' own.

19   **A.    The Ordinance Mandates that Uber Adopt a Deactivation Policy Espousing**

20   **the City's Own Views**

21       73.    One of the Ordinance's key provisions is Section 8.40.050.  It provides that, before

22   a covered company deactivates any app-based worker's account, it must inform the worker of its

23   "deactivation policy, defining what constitutes a violation that may result in deactivation."

24

25   _____

26   [46] Drivers who use Uber's platform to transport passengers are not covered by the Ordinance, as
     Washington state law already regulates their relationship with Uber.  *See* Ordinance § 8.40.020
27   (excluding from relevant definitions "transportation network compan[ies]" as defined under state
     law and trips dispatched through such a company's platform).

COMPLAINT - 19
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

Ordinance § 8.40.050(A)(1).  Thus, if a company expects to ever need to deactivate a courier's account, it must maintain and announce a deactivation policy.

74.    That policy must meet a series of City-prescribed requirements.  It "must be specific enough for an app-based worker to understand what constitutes a violation and how to avoid violating the policy."  *Id.*  And it must be a "[r]easonable policy," under which grounds for deactivation must be "reasonably related to the network company's safe and efficient operations." Ordinance § 8.40.050(A)(2).

75.    The Ordinance does not define the term "reasonably related" or otherwise say what a "[r]easonable policy" is.  Ordinance § 8.40.050(A)(2).  Instead, it provides a list of "[e]xamples of policies" that the City deems "not reasonably related" to "safe and efficient operations," but stresses that such policies "are not limited to" these "[e]xamples."  *Id.*

76.    The Ordinance's list of impermissible example policies includes "[a]ny policy that would result in deactivation based solely on a quantitative metric derived from aggregate customer ratings of an app-based worker's performance."  Ordinance § 8.40.050(A)(2)(e).

77.    In Uber's experience, though, consistently low consumer ratings often reflect serious performance or safety issues.  The Ordinance thus effectively requires Uber to communicate, as its own policy, that it does not believe consumer ratings have anything to do with its platform's safe or efficient operations—even though Uber, based on its experience and considered judgment, *does* believe they are related.

78.    The Ordinance's list of policies that the City deems not "reasonably related" to "safe and efficient operations" also includes "[a]ny policy that would deactivate a worker based on the results of a background check, consumer report, driver record, or record of traffic infractions, except in cases of egregious misconduct or where required by other applicable law." Ordinance § 8.40.050(A)(2)(h).  The Ordinance defines "egregious misconduct" narrowly to include certain enumerated crimes, but to exclude "conduct related to . . . traffic collisions unless the app-based worker has accumulated more than three non-criminal moving violations or at-fault collisions in the previous three years."  Ordinance § 8.40.020.

COMPLAINT - 20
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

79.     The Ordinance thus forces Uber to jettison its existing guidance and instead announce a deactivation policy espousing—as if it were Uber's own view—*the City*'s opinion that a courier's record of traffic accidents bears no reasonable relationship to safety except in specific, government-defined circumstances.  Moreover, in the State of Washington, the checks of motor vehicle records on which Uber relies often do not contain accident fault attribution information.  So, because Uber lacks access to the fault attribution data necessary to prove those circumstances, the Ordinance effectively forces Uber—notwithstanding its commitment to prioritizing safety—to adopt a policy embracing the view that the vast majority of traffic collisions will not warrant deactivation.

80.     The Ordinance also proscribes as lacking the necessary relationship to safety or efficiency any policy that "would result in a deactivation based on . . . acceptance or rejection of any individual offer, any types of offers, or any number of proportion of offers."  Ordinance § 8.40.050(A)(2)(b).

81.     In other words, the Ordinance appears to require Uber to adopt a deactivation policy endorsing the view that systematically refusing or canceling orders from consumers in certain locations or with certain protected characteristics is not discriminatory conduct worthy of deactivation.  Such a policy, though, is fundamentally inconsistent with Uber's mission and values.

**B.     The Ordinance Forces Uber to Disclose Sensitive Information to Couriers Whose Accounts are Deactivated, Or Otherwise to Retain Those Couriers on its Platform**

82.     Another provision of the Ordinance, Section 8.40.070, likewise compels Uber to espouse the City's views at the expense of Uber's own.  Under that provision, 14 days before a deactivation (in most cases), or on the effective date of the deactivation (in egregious cases), Uber must provide the "app-based worker" with a "notice of deactivation" including, among other information, "[t]he reasons for deactivation"; the "policy that was violated"; "the specific incident or pattern of incidents that violated the deactivation policy"; and "[a]ny and all records relied upon to substantiate deactivation."  Ordinance §§ 8.40.070(A)(1), (3).

COMPLAINT - 21
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

83.     On its face, the Ordinance allows Uber to "take measures to anonymize" certain information that it "reasonably believes . . . could compromise [a] customer or third party's safety," and to provide only a "summary description" when "a complaint from a customer or third party is the sole basis for deactivation."  Ordinance § 8.40.080(D).  But it is far from clear from the Ordinance how—or even whether—companies may "anonymize" or "summar[ize]" incident date, time, and location information.  Nor has OLS finalized any rules clarifying what "measures" companies may take.

84.     Although Uber makes every reasonable effort to be clear and candid about the reason for a deactivation, in some cases, these requirements appear to force Uber to make a difficult choice: either disclose sensitive information it would otherwise keep confidential or, to avoid doing so, allow couriers whose accounts it would like to deactivate to continue using its platform.

85.     For example, consider a courier whose account has been deactivated because a consumer has made a credible report to Uber that the courier sexually assaulted her at her home upon making a delivery.  The Ordinance's disclosure requirements will force Uber, notwithstanding its safety and privacy commitments, to turn over to the courier "[a]ny and all records relied upon to substantiate deactivation," Ordinance § 8.40.070(A)(3), including the consumer's report and the "date, time, and location" of the alleged assault, Ordinance § 8.40.080(A).  Such information leads the alleged perpetrator straight back to his accuser.  To protect consumers' safety and privacy, Uber does not currently turn over such information.  Yet the only way Uber can avoid making that disclosure under the Ordinance is to maintain the courier's access to the platform—even though the Ordinance itself correctly recognizes that sexual assault is "egregious misconduct" warranting immediate deactivation.  Ordinance § 8.40.020.

86.     Or suppose Uber deactivates a courier's account for engaging in fraudulent activity.  The records Uber is forced to turn over to that former courier may well reveal Uber's closely-guarded techniques for detecting fraud, providing future fraudsters with a roadmap to avoid getting caught.  Again, Uber does not currently reveal that information.  But it can only avoid doing so under the Ordinance by maintaining the courier's platform access and thus allowing the potential

COMPLAINT - 22
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1  fraud to continue on the platform—even though fraud, like sexual assault, constitutes "egregious

2  misconduct," Ordinance § 8.40.020, and even though fraudulent activity may pose a safety risk,

3  especially to the extent it involves a courier assuming a false identity on the platform.

4        **C.**      **The Ordinance Requires Uber to Turn Over Records to OLS**

5        87.    The Ordinance further mandates that covered network companies "affirmatively

6  transmit to the Agency such records as required by rules issued by the Director, on at least a

7  quarterly basis until July 1, 2026, and at least every six months thereafter."  Ordinance

8  § 8.40.090(A).

9        88.    This provision authorizes OLS to demand several categories of records, including

10  records related to the number of deactivations, the number of couriers challenging their

11  deactivations, the reasons for deactivations, the company's deactivation policy and internal

12  deactivation challenge procedures, and "[a]ny other records that the Director determines are

13  material and necessary to effectuate the purposes of" the Ordinance.  Ordinance § 8.40.090(A)(1).

14        89.    In November 2024, OLS proposed draft rules implementing these requirements.[47]

15  These Model Rules call for still more granular data to be disclosed, including (1) the total weekly

16  number of couriers where at least 25% of their work involved services in Seattle, (2) the total

17  number of couriers whose primary address falls within each Census Tract, (3) the zip codes and

18  partial phone numbers of couriers in Seattle who use Uber's platform, (4) the total weekly numbers

19  of deactivations and reinstatements, and (5) the reasons for those deactivations.  Uber expects OLS

20  to adopt and finalize these rules, including the categories proposed in the November 2024 Model

21  Rules.

22        90.    These are categories of data that Uber considers to be confidential and sensitive,

23  and that it does not voluntarily disclose with respect to courier services.[48]  *First*, certain categories

24  _____

25  [47] These draft rules, together with other draft rules proposed by the agency (described in Part IV below), are herein referred to as the "Model Rules."

26  [48] Another of the City's ordinances—the App-Based Worker Minimum Payment Ordinance, Mun. Code, ch. 8.37—requires Uber to turn over some similar records to the City.  *See id.* § 8.37.070(G).

27  Uber's first full production of records under this requirement is due on January 31, 2025.  Uber objected to this production requirement during the rulemaking process and continues to object and

COMPLAINT - 23
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

are competitively sensitive.  Seattle's courier services market is highly competitive, with other companies competing with Uber to attract couriers to their platforms.  Uber's competitors can use the data Uber would provide to OLS (which they might seek through a public records request or other means), coupled with other metrics or their own internal data, to gain a competitive advantage.  For example, based on knowing the weekly number of couriers on Uber's application, competitors can extrapolate directional signals regarding Uber's revenue and volume of business in Seattle.  Competitors might also use the zip codes and partial phone numbers of couriers on Uber's platform to contact them, in order to recruit couriers away from Uber and onto their own platforms.  And because these competitors would have knowledge of Uber's rate of deactivations and reasons for those deactivations, they would be armed in their efforts with information about how to modify their own deactivation policies in order to retain a competitive edge.

91.    *Second*, Uber values the privacy of both couriers and consumers, and tries to minimize the disclosure of information to third parties or regulators when that information can be used to identify an individual.  Third parties conceivably could obtain, via a public records request, the zip codes and partial phone numbers provided to OLS, and couple that with other information to learn the identities of couriers on Uber's platform.

92.    *Third*, the information at issue could also be used to undermine Uber's business operations.  For example, to the extent that Uber will be required to provide detailed information about the threshold at which it will deactivate a courier's account for fraud, its methodology for investigating complaints or assessing deactivation challenges, or the number of consumer complaints that will trigger the deactivation process, that information can be used by couriers on Uber's platform to develop strategies to evade detection and account deactivation in the future.

---

reserve its rights to challenge the requirement.  To date, Uber has provided only a small sample of records as mandated by the City's rules implementing the requirement, without prejudice to the continued confidential treatment of the balance of the records.

COMPLAINT - 24
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

93.    The Ordinance does not provide for any sort of judicial process before Uber may be forced to turn over these records.  Nor does it provide any opportunity for Uber to seek review, from OLS or otherwise, prior to disclosure.

## IV.    The City Slow-Walks the Rulemaking Process, Despite Uber's Engagement

94.    The Seattle City Council first introduced a law regulating the deactivation of app-based workers in May 2023, and voted in favor of passing that law in August 2023.[49]  Since that time, Uber has been actively engaged with the City and OLS.  Over the course of that engagement, which has spanned many months, Uber has consistently raised concerns that the Ordinance and Model Rules will lower the company's safety, quality, and privacy standards.

95.    In May 2023, the City Council held hearings about the proposed Ordinance.  Uber attended those hearings and offered testimony.  The Ordinance was signed into law in August 2023.  For nearly eight months after its enactment, OLS did not take any steps to initiate the rulemaking process contemplated by the Ordinance.

96.    Particularly in the absence of any rulemaking action by OLS, Uber could not understand all of the requirements it would be expected to comply with when the Ordinance went into effect.  OLS's lack of guidance was significant because the Ordinance leaves to OLS's discretion significant aspects of the regulation, such as the precise categories of records that need to be disclosed under Section 8.40.090.  Additionally, while Uber believes the Ordinance itself is fundamentally problematic and unconstitutional, Uber remained uncertain as to whether OLS's eventual rules might at least help ameliorate some of the most problematic aspects of the Ordinance, including, for instance, whether OLS would provide greater clarity as to what sorts of deactivation policies it considers to be "reasonably related" to a network company's "safe and efficient operations," as relevant to the requirements of Section 8.40.050 of the Ordinance.[50]

---

[49] History for Seattle City Council Bill No. 120580, Office of the City Clerk of Seattle Legislative Information Center, https://seattle.legistar.com/LegislationDetail.aspx?ID=6214973&GUID=20C5F7BD-7898-47C2-9854-E3A42FFCD664 (last visited Dec. 17, 2024).

[50] Ordinance § 8.40.050(A)(2).

COMPLAINT - 25
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

97.    On April 8, 2024, OLS emailed stakeholders, including Uber, to inform them that it planned to hold meetings to discuss the rulemaking process beginning in May 2024.  On May 1, 2024, however, OLS informed stakeholders that it was postponing the start of those meetings.

98.    More than three months later, on August 20, 2024, OLS informed Uber and other stakeholders that it would once again begin the rulemaking process.

99.    On August 28, 2024, Uber and other stakeholders met with OLS and discussed the companies' concerns about their ability to assess and comply with the Ordinance and OLS's eventual implementing rules given the delayed rulemaking timeline.  On September 6, 2024, those companies sent OLS an email reiterating their concerns about the timeline.

100.    OLS held its first meeting with stakeholders on September 11, 2024, during which it provided an overview of the Ordinance.

101.    On September 18, 2024, Uber submitted a pre-rule comment to OLS.  Because OLS had yet to issue final rules, Uber's comment asked OLS to adopt (1) a six-month grace period for the enforcement of all requirements in the Ordinance, and (2) for any rules that impose additional substantive requirements, an implementation date at least six months after the date of final rule publication.

102.    On September 23, 2024, OLS began issuing the Model Rules piecemeal.  OLS apologized for its delay in issuing the Model Rules.

103.    The very next day, Uber and other companies followed up with OLS on the request for a grace period, given the ongoing delay in the rulemaking process.

104.    OLS subsequently issued other pieces of its Model Rules on October 7, October 18, November 11, and December 10, 2024.

105.    OLS held meetings to discuss its Model Rules on September 25, October 23, November 13, and December 11, 2024.  Uber attended each of these meetings.

106.    On October 9, 2024 and December 10, 2024, Uber submitted comments to OLS's Model Rules, as they were rolled out in a piecemeal fashion.

COMPLAINT - 26
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

107.    As the rulemaking process dragged on and the Ordinance's January 1, 2025 effective date grew closer, Uber and other stakeholders continued to be concerned about their ability to timely assess and comply with the Ordinance and OLS rules.  On October 2, 2024 and October 4, 2024, Uber and other stakeholders held meetings with OLS and Deputy Mayor Greg Wong, respectively, during which they expressed their concerns over the implementation timeline.

108.    Since the Ordinance was first announced, Uber has submitted multiple rounds of comments, offered testimony, and met with industry stakeholders and OLS representatives.  Uber has made substantial efforts to avoid the circumstance it presently finds itself in—on the eve of the Ordinance becoming effective, still without the benefit of any final implementing rules from OLS (or a date when they will be finalized), and without necessary fixes from the Agency on many of the issues Uber has identified as clearly problematic and inconsistent with its safety and privacy commitments.

## COUNT I:  VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION (COMPELLED SPEECH) (42 U.S.C. § 1983)

109.    Uber re-alleges and incorporates by reference all allegations set forth in paragraphs 1-108 above.

110.    The First Amendment to the U.S. Constitution, applicable to state and local governments through the Fourteenth Amendment's Due Process Clause, protects the right to free speech, including the rights to not speak and to not express a view with which a person disagrees. It "plainly violate[s] the First Amendment" for the City to "enact[] as a direct regulation of speech" a requirement that Uber "have a policy" endorsing its preferred message. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 210, 213 (2013).

111.    The Ordinance does just that.  The heart of the Ordinance is its requirement that Uber announce a policy detailing what considerations warrant deactivating a courier's account. But the Ordinance does not even give Uber the freedom to choose the content of its own policy. It must instead issue a policy consistent with *the City's* view of what is "reasonably related" to

COMPLAINT - 27
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    Uber's "safe and efficient operations."  Ordinance § 8.40.050(A)(2).  This is nothing more than a
2    "rule of compelled speech."  *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781,
3    798 (1988).

4        112.    The Ordinance's deactivation policy requirement directs Uber to "express a view,"
5    *at least* "implicitly," in two different respects.  *X Corp. v. Bonta*, 116 F.4th 888, 901 (9th Cir.
6    2024).  First, it requires Uber to express the overarching view that any triggers that might not be
7    considered "reasonably related" to "safe and efficient" operations (such as, perhaps, violations of
8    anti-discrimination policies) can never be sound justifications for deactivations.  And, second, it
9    forces Uber to opine on what *is* "reasonably related" to safety and efficiency—in other words, to
10   opine on the important and controversial question of what considerations should justify a loss of
11   access to Uber's widely-used platform.

12       113.    Even worse, the Ordinance requires Uber to adopt and espouse as its own policy
13   *the City*'s views on that question, even when Uber would articulate a different view if free to do
14   so.  It also locks Uber into articulating those views indefinitely—even though Uber is continuously
15   reviewing and improving its deactivation policies for accuracy, fairness, and in response to
16   couriers' feedback, while also upholding its safety and privacy standards.

17       114.    As one example, the Ordinance prohibits Uber from announcing a deactivation
18   policy that would "result in a deactivation based solely on a quantitative metric derived from
19   aggregate customer ratings."  Ordinance § 8.40.050(A)(2)(e).  Instead, Uber must effectively
20   communicate, as its own policy, that it does not believe consumer ratings have anything to do with
21   its platform's safe or efficient operations—even though Uber, based on its experience and
22   considered judgment, *does* believe they are related.

23       115.    Section 8.40.070, which requires Uber to provide couriers whose accounts are
24   deactivated with an array of information, compels still more speech inconsistent with Uber's
25   beliefs.  The "forced disclosure" of this information—such as "[t]he reasons for deactivation," the
26   specific "policy that was violated," "the specific incident or pattern of incidents that violated the
27   deactivation policy," and "[a]ny and all records relied upon to substantiate deactivation,"

COMPLAINT - 28
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Ordinance § 8.40.070(A)(1), (3)—constitutes speech. *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1117 (9th Cir. 2024). And these records will necessarily reflect the views embodied in the City-mandated deactivation policy.

116. Moreover, in some cases, disclosing them will require Uber to set aside its own beliefs and communicate the City's instead—for example, when Uber must turn over to a courier whose account was deactivated based on a credible report of sexual assault records that could lead him straight back to the consumer who reported the assault to Uber, or when Uber must provide documents revealing its closely-guarded techniques for detecting fraud to a courier deactivated for engaging in fraudulent activity. Needless to say, these are sensitive disclosures that Uber would much "rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

117. In these ways and more, the Ordinance "alters the content of [Uber's] speech" by forcing it to trumpet the City's preferred tune. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (cleaned up). This compelled speech violates the First Amendment.

## COUNT II: VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION (FREEDOM OF ASSOCIATION) (42 U.S.C. § 1983)

118. Uber re-alleges and incorporates by reference all allegations set forth in paragraphs 1-117 above.

119. The First Amendment protects the freedom of "expressive association"—that is, the right to "associate" with others "for the purpose of speaking." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 68 (2006). "The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

120. The Ordinance restricts Uber's ability to express itself. It forces Uber, a leading voice on the sensitive matters upon which deactivations are often based, to keep active on its

COMPLAINT - 29
(2:24-cv-2103)

platform—indefinitely—couriers who it would otherwise disassociate from for safety, reliability, reputational, or other reasons, consistent with its public commitments.

121.    The Ordinance undermines Uber's expression even when it *allows* Uber to deactivate a courier's account.  Except in cases of "egregious misconduct," the Ordinance requires Uber to allow couriers to remain active on the platform for 14 days even where the City *agrees* Uber may justifiably have their accounts deactivated.  *See* Ordinance §§ 8.40.070(A), (C).

**COUNT III: VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION (VAGUENESS) (42 U.S.C. § 1983)**

122.    Uber re-alleges and incorporates by reference all allegations set forth in paragraphs 1-121 above.

123.    The Due Process Clause of the Fourteenth Amendment requires that governments provide entities with "fair notice of what conduct is prohibited."  *United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008).  And where, as here, potentially vague provisions "threaten[] to inhibit the exercise of constitutionally protected rights" such as "the right of free speech or of association," an even "more stringent" inquiry is appropriate, *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc*., 455 U.S. 489, 499 (1982), "to ensure that ambiguity does not chill protected speech," *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012).

124.    The Ordinance does not come close to providing the fair notice the Due Process Clause requires.  It requires Uber to promulgate a "[r]easonable policy" regarding deactivation.  Ordinance § 8.40.050(A)(2).  But no "commonly accepted meaning exists for the term 'reasonable.'" *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 558 (6th Cir. 1999).

125.    The Ordinance's requirement that policies allow only deactivations "reasonably related" to Uber's "safe and efficient operations" does not solve the problem.  Ordinance

COMPLAINT - 30
(2:24-cv-2103)

1  § 8.40.050(A)(2). All it does is limit the subject matter, clarifying that a policy must say

2  "reasonable" things about safety and efficiency (as opposed to anything else).

3      126.    Yet the Ordinance provides no clarifying definition of "reasonably related."

4  Instead, it offers up only a non-exhaustive list of example policies that the City considers *not*

5  "reasonably related" to safety or efficiency. But one would think that some of the examples—

6  such as policies triggering deactivation based on "a quantitative metric derived from aggregate

7  customer ratings of an app-based worker's performance," or based on "the results of a background

8  check, consumer report, driver record, or record of traffic infractions"—would easily qualify as

9  "reasonably related" to "safe and efficient operations." Ordinance §§ 8.40.050(A)(2)(e), (h). By

10  coupling an inherently vague phrase with this "confusing list of examples," Section 8.40.050

11  "combin[es] indeterminacy" and "produces more unpredictability and arbitrariness than the Due

12  Process Clause tolerates." *Johnson v. United States*, 576 U.S. 591, 598, 603 (2015).

13  **COUNT IV: VIOLATION OF THE CONTRACTS CLAUSE OF ARTICLE I, SECTION**

14  **10 OF THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)**

15      127.    Uber re-alleges and incorporates by reference all allegations set forth in paragraphs

16  1-126 above.

17      128.    The Contracts Clause of the U.S. Constitution restricts state and local governments

18  from enacting laws "impairing the Obligation of Contracts." U.S. Const., art. I, § 10, cl. 1.

19

20      129.    Uber's existing contracts with couriers include provisions affording Uber broad

21  discretion to deactivate those couriers' accounts. These provisions are a key means of protecting

22  both Uber and the consumers who receive deliveries from couriers on Uber's platform, often at

23  their home or business addresses.

24      130.    The Ordinance substantially impairs Uber's existing contractual relationships with

25  couriers in Seattle who use its platform by imposing a significant, non-foreseeable restriction on

26  Uber's contractual right to exercise broad discretion with respect to deactivations. Moreover, even

27  after Uber has made the decision that a courier's account must be deactivated, the Ordinance

COMPLAINT - 31
(2:24-cv-2103)

requires Uber to allow that courier access to the platform for an additional 14 days, except in the case of egregious misconduct. When Uber entered into contracts with couriers, it could not reasonably have foreseen the City's unprecedented intrusion into Uber's deactivation decisions. That restriction upsets the reasonable expectations Uber had when it entered into these contracts and prevents Uber from safeguarding its rights under them.

131.    Nor is this impairment an appropriate and reasonable way to advance any significant and legitimate public purpose. The Ordinance's sweeping definition of "deactivation," narrow definition of "egregious misconduct," refusal to allow Uber to address issues revealed by consumer ratings, and extensive disclosure requirements are poorly tailored to protecting law-abiding capable couriers, yet they introduce serious safety, privacy, quality, and reliability concerns. The Ordinance thus violates the Contracts Clause.

## COUNT V: VIOLATION OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

132.    Uber re-alleges and incorporates by reference all allegations set forth in paragraphs 1-131 above.

133.    The Fourth Amendment protects against unreasonable searches and seizures by the government. When a person or company "seeks to preserve something as private," and the "expectation of privacy is one that society is prepared to recognize as reasonable," the Fourth Amendment protects that privacy interest. *Carpenter v. United States*, 585 U.S. 296, 304 (2018) (cleaned up).

134.    The Ordinance authorizes OLS to demand that Uber "affirmatively transmit" a variety of private and confidential records to OLS on a recurring basis. Ordinance § 8.40.090. The Model Rules that Uber expects OLS will adopt and finalize demand still further disclosures of records and information. These records contain sensitive business information and couriers' personal information that Uber, consistent with its longstanding commitment to privacy, closely guards and does not generally disclose to third parties or government regulators.

COMPLAINT - 32
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

135.    Uber's expectation of privacy in these records is reasonable.  "Businesses do not ordinarily disclose, and are not expected to disclose, the kind of commercially sensitive information" the Ordinance would make Uber turn over.  *Patel v. City of Los Angeles*, 738 F.3d 1058, 1062 (9th Cir. 2013), *aff'd*, 576 U.S. 409 (2015) (cleaned up).

136.    The Ordinance's turn-over mandate thus constitutes a search, and the Fourth Amendment's reasonableness requirement applies.  "Searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 419 (2015) (cleaned up).  But the Ordinance does not provide for judicial process prior to disclosure.  And no Fourth Amendment exception applies; in particular, the Ordinance's production requirements do not constitute "administrative" searches, because the Ordinance does not afford Uber "an opportunity to obtain precompliance review before a neutral decisionmaker." *Id.* at 420.  These compelled disclosures therefore violate the Fourth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Issue a temporary restraining order enjoining Section 2 of the Ordinance, and ordering that Section 2 of the Ordinance shall not be enforced against Plaintiffs based on any acts or omissions, including any alleged non-compliance with the requirements of the ordinance, that occur during the time in which the injunction is in effect;

B.    Issue a preliminary and permanent injunction enjoining Section 2 of the Ordinance, including prohibiting enforcement by Defendant and its employees, agents, and successors, including but not limited to the Office of Labor Standards;

C.    Enter a judgment declaring that the Ordinance violates Uber's right to free speech and free association under the First Amendment to the U.S. Constitution, that the Ordinance violates Uber's right to due process under the Fourteenth Amendment to the U.S. Constitution, that the Ordinance violates Uber's rights under the

COMPLAINT - 33
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1    Contracts Clause of the U.S. Constitution, and that the Ordinance violates Uber's

2    right to be free from unreasonable searches under the Fourth Amendment to the

3    U.S. Constitution;

4    D.    Award Plaintiffs costs, including reasonable attorneys' fees; and

5    E.    Grant such other and further relief as the Court deems just and proper.

6

DATED this 18th day of December, 2024.

7

8                                    *Attorneys for Plaintiffs Uber Technologies, Inc.*
                                     *and Portier, LLC*

9

10                                   Davis Wright Tremaine LLP

11                                   By */s/ Robert J. Maguire*
                                        Robert J. Maguire, WSBA #29909

12                                   By */s/ Theo A. Lesczynski*
                                        Theo A. Lesczynski, WSBA #59780

13                                      920 Fifth Avenue, Suite 3300
                                        Seattle, WA  98104-1610

14                                      Telephone: 206-757-8064
                                        Fax: 206-757-7064

15                                      E-mail: robmaguire@dwt.com
                                               theolesczynski@dwt.com

16

17                                   Covington & Burling LLP

18                                      Stacey Grigsby (*phv forthcoming*)
                                        David Zionts (*phv forthcoming*)

19                                      Neha Jaganathan (*phv forthcoming*)
                                        Alexander Cave (*phv forthcoming*)

20                                      One CityCenter 850 Tenth Street, NW
                                        Washington, DC 20001

21                                      E-mail: sgrigsby@cov.com
                                               dzionts@cov.com

22                                             njaganathan@cov.com
                                               acave@cov.com

23

24                                      Neema Sahni (*phv forthcoming*)
                                        1999 Avenue Of The Stars, Ste 3500

25                                      Los Angeles, CA 90067
                                        E-mail: nsahni@cov.com

26

27

COMPLAINT - 34
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**CERTIFICATE OF SERVICE**

On December 18, 2024, I served a copy of the foregoing document on the following in the manner indicated:

SCHEEREEN DEDMAN
Seattle City Clerk
600 4th Ave, 3rd Floor,
Seattle, WA 98104
Cityclerkfiling@seattle.gov
MOS_Legalservice@seattle.gov

☐ Messenger
☐ U.S. Mail, postage prepaid
☐ Federal Express
☐ Fax
☒ ECF and/or EMAIL

DATED this 18th day of December, 2024.

By: *s/ Robert J. Maguire*
Robert J. Maguire, WSBA #29909

COMPLAINT - 35
(2:24-cv-2103)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

The Honorable Marsha J. Pechman

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| UBER TECHNOLOGIES, INC. and PORTIER, LLC,<br><br>        Plaintiffs,<br><br>MAPLEBEAR INC. d/b/a INSTACART,<br><br>        Plaintiff-Intervenor<br><br>    v.<br><br>CITY OF SEATTLE,<br><br>        Defendant. | No. 2:24-cv-02103-MJP<br><br>PRELIMINARY INJUNCTION APPEAL<br><br>NOTICE OF APPEAL OF ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION |

NOTICE OF APPEAL OF ORDER DENYING MOTION FOR
PRELIMINARY INJUNCTION
(No. 2:24-cv-02103-MJP)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1    **PLEASE TAKE NOTICE** that Plaintiffs-Appellants Uber Technologies, Inc. and Portier,

2   LLC hereby appeal to the United States Court of Appeals for the Ninth Circuit from this Court's

3   Order Denying Plaintiffs' Motion for Preliminary Injunction, issued on December 31, 2024 (Dkt.

4   34).

5          DATED this 13th day of January, 2025.

6

7                                         *Attorneys for Plaintiffs Uber Technologies, Inc.*
                                          *and Portier, LLC*
8
                                          Davis Wright Tremaine LLP
9
                                          By */s/ Robert J. Maguire*
10                                           Robert J. Maguire, WSBA #29909
                                             Theo A. Lesczynski, WSBA #59780
11                                           920 Fifth Avenue, Suite 3300
                                             Seattle, WA  98104-1610
12                                           Telephone: 206-757-8064
                                             Fax: 206-757-7064
13                                           E-mail: robmaguire@dwt.com
                                                      theolesczynski@dwt.com
14

15                                        Covington & Burling LLP

16                                        By */s/ Stacey Grigsby*
                                             Stacey Grigsby (admitted *pro hac vice*)
17                                           David Zionts (admitted *pro hac vice*)
                                             Neha Jaganathan (admitted *pro hac vice*)
18                                           Alexander Cave (admitted *pro hac vice*)
                                             One CityCenter 850 Tenth Street, NW
19                                           Washington, DC 20001
                                             E-mail: SGrigsby@cov.com
20                                                    DZionts@cov.com
                                                      NJaganathan@cov.com
21                                                    ACave@cov.com

22                                        Neema Sahni (admitted *pro hac vice*)
                                          1999 Avenue Of The Stars, Ste 3500
23                                        Los Angeles, CA 90067
                                          E-mail: NSahni@cov.com
24

25

26

27

NOTICE OF APPEAL OF ORDER DENYING PLAINTIFFS' MOTION FOR            Davis Wright Tremaine LLP
PRELIMINARY INJUNCTION                                              L AW  O FFICES
(No. 2:24-cv-02103-MJP)                                             920 Fifth Avenue, Suite 3300
                                                                   Seattle, WA  98104-1610
                                                                   206.622.3150 main · 206.757.7700 fax

# REPRESENTATION STATEMENT

Pursuant to Ninth Circuit Rule 3-2(b), Plaintiffs-Appellants Uber Technologies, Inc. and Portier, LLC identify the following parties to this action, and their counsel of record:

**1.      Plaintiffs Uber Technologies, Inc. and Portier, LLC**

Robert J. Maguire
Theo A. Lesczynski
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
Telephone: 206-757-8064
Fax: 206-757-7064
E-mail: robmaguire@dwt.com
         theolesczynski@dwt.com

Stacey Grigsby
David Zionts
Neha Jaganathan
Alexander Cave
COVINGTON & BURLING LLP
One CityCenter 850 Tenth Street, NW
Washington, DC 20001
Telephone: 203-662-6000
E-mail: SGrigsby@cov.com
         DZionts@cov.com
         NJaganathan@cov.com
         ACave@cov.com

Neema Sahni
COVINGTON & BURLING LLP
1999 Avenue Of The Stars, Ste 3500
Los Angeles, CA 90067
Telephone: 424-332-4800
E-mail: NSahni@cov.com

**2.      Intervenor Plaintiff Maplebear Inc. d/b/a Instacart**

Alexander Thomas MacDonald
LITTLER MENDELSON PC (DC)
815 Connecticut Ave. NW Suite 400
Washington, DC 20006
Telephone: 202-772-2502
Email: amacdonald@littler.com

Douglas Edward Smith
LITTLER MENDELSON PC (WA)
600 University St
Ste 3200
Seattle, WA 98101-3122
Telephone: 206-623-3300

NOTICE OF APPEAL OF ORDER DENYING PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
(No. 2:24-cv-02103-MJP)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Email: desmith@littler.com

**3.**     **Defendant City of Seattle**

Jessica L Goldman
Lawrence Carl Locker
Jesse Lee Taylor
Eva Sharf Oliver
Molly J Gibbons
SUMMIT LAW GROUP
315 5th Ave S
Ste 1000
Seattle, WA 98104
Telephone: 206-676-7000
Email: jessicag@summitlaw.com
       larryl@summitlaw.com
       jesset@summitlaw.com
       evao@summitlaw.com
       mollyg@summitlaw.com

Ghazal Sharifi
SEATTLE CITY ATTORNEY'S OFFICE
701 Fifth Avenue
Suite 2050
Seattle, WA 98104-7097
Telephone: 206-684-8217
Email: Ghazal.Sharifi@seattle.gov

DATED this 13th day of January, 2025.

*Attorneys for Plaintiffs Uber Technologies, Inc. and Portier, LLC*

Davis Wright Tremaine LLP

By */s/ Robert J. Maguire*
       Robert J. Maguire, WSBA #29909
       Theo A. Lesczynski, WSBA #59780
       920 Fifth Avenue, Suite 3300
       Seattle, WA  98104-1610
       Telephone: 206-757-8064
       Fax: 206-757-7064
       E-mail: robmaguire@dwt.com
              theolesczynski@dwt.com

NOTICE OF APPEAL OF ORDER DENYING PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
(No. 2:24-cv-02103-MJP)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

2    Covington & Burling LLP

3    By /s/ Stacey Grigsby
        Stacey Grigsby (admitted *pro hac vice*)
4        David Zionts (admitted *pro hac vice*)
        Neha Jaganathan (admitted *pro hac vice*)
5        Alexander Cave (admitted *pro hac vice*)
        One CityCenter 850 Tenth Street, NW
6        Washington, DC 20001
        E-mail: SGrigsby@cov.com
7                DZionts@cov.com
                NJaganathan@cov.com
8                ACave@cov.com

9        Neema Sahni (admitted *pro hac vice*)
        1999 Avenue Of The Stars, Ste 3500
10       Los Angeles, CA 90067
        E-mail: NSahni@cov.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

NOTICE OF APPEAL OF ORDER DENYING PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
(No. 2:24-cv-02103-MJP)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

**CERTIFICATE OF SERVICE**

2      On January 13, 2025, I served a copy of the foregoing document on all parties of record

3  via CM/ECF:

4

5                                By: *s/ Robert J. Maguire*
                                    Robert J. Maguire

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

NOTICE OF APPEAL OF ORDER DENYING PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
(No. 2:24-cv-02103-MJP)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

APPEAL

# U.S. District Court
## United States District Court for the Western District of Washington (Seattle)
## CIVIL DOCKET FOR CASE #: 2:24−cv−02103−MJP

Uber Technologies Inc et al v. City of Seattle
Assigned to: Judge Marsha J. Pechman
Case in other court:  9th Circuit Court of Appeals, 25−00231
Cause: 42:1983 Civil Rights Act

Date Filed: 12/18/2024
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Uber Technologies Inc**                     represented by     **Alexander James Cave**
COVINGTON & BURLING LLP (DC)
ONE CITY CENTER
850 TENTH STREET NW
WASHINGTON, DC 20001
202−662−6000
Email: acave@cov.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Meir Zionts**
COVINGTON & BURLING LLP (DC)
ONE CITY CENTER
850 TENTH STREET NW
WASHINGTON, DC 20001
202−662−5987
Fax: 202−778−5987
Email: dzionts@cov.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neema Sahni**
COVINGTON & BURLING LLP
1999 AVENUE OF THE STARS
LOS ANGELES, CA 90067
424−332−4800
Fax: 424−332−4749
Email: nsahni@cov.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neha Jaganathan**
COVINGTON & BURLING LLP (NY)
THE NEW YORK TIMES BUILDING
620 EIGHTH AVENUE
NEW YORK, NY 10018
212−841−1000
Email: njaganathan@cov.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stacey Grigsby**
COVINGTON & BURLING LLP (DC)
ONE CITY CENTER
850 TENTH STREET NW
WASHINGTON, DC 20001
202−662−5775
Email: sgrigsby@cov.com

**ER-164**

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Theo A Lesczynski**
DAVIS WRIGHT TREMAINE LLP
920 FIFTH AVE STE 3300
SEATTLE, WA 98104
206−622−3150
Fax: 206−757−7700
Email: theolesczynski@dwt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert J Maguire**
DAVIS WRIGHT TREMAINE (SEA)
920 FIFTH AVE
STE 3300
SEATTLE, WA 98104−1610
206−622−3150
Fax: 206−757−7700
Email: robmaguire@dwt.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Portier LLC**                    represented by    **Alexander James Cave**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Meir Zionts**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neema Sahni**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neha Jaganathan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stacey Grigsby**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Theo A Lesczynski**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert J Maguire**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Plaintiff**

**Maplebear Inc**
*doing business as*
Instacart

represented by **Alexander Thomas MacDonald**
LITTLER MENDELSON PC (DC)
815 CONECTICUT AVE. NW SUITE 400
WASHINGTON, DC 20006
202−772−2502
Email: amacdonald@littler.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Douglas Edward Smith**
LITTLER MENDELSON PC (WA)
600 UNIVERSITY ST
STE 3200
SEATTLE, WA 98101−3122
206−623−3300
Fax: 206−447−6965
Email: desmith@littler.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**City of Seattle**

represented by **Jessica L Goldman**
SUMMIT LAW GROUP
315 5TH AVE S
STE 1000
SEATTLE, WA 98104
206−676−7000
Fax: FAX 206−676−7001
Email: jessicag@summitlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eva Sharf Oliver**
SUMMIT LAW GROUP
315 5TH AVE S
STE 1000
SEATTLE, WA 98104
206−676−7016
Fax: 206−676−7001
Email: evao@summitlaw.com
*ATTORNEY TO BE NOTICED*

**Ghazal Sharifi**
SEATTLE CITY ATTORNEY'S OFFICE
701 FIFTH AVENUE
SUITE 2050
SEATTLE, WA 98104−7097
206−684−8217
Email: Ghazal.Sharifi@seattle.gov
*ATTORNEY TO BE NOTICED*

**Jesse Lee Taylor**
SUMMIT LAW GROUP
315 5TH AVE S
STE 1000
SEATTLE, WA 98104
208−946−6586

Fax: 206−676−7001
Email: jesset@summitlaw.com
*ATTORNEY TO BE NOTICED*

**Lawrence Carl Locker**
SUMMIT LAW GROUP
315 5TH AVE S
STE 1000
SEATTLE, WA 98104
206−676−7000
Fax: 206−676−7001
Email: larryl@summitlaw.com
*ATTORNEY TO BE NOTICED*

**Molly J Gibbons**
SUMMIT LAW GROUP
315 5TH AVE S
STE 1000
SEATTLE, WA 98104
206−676−7101
Email: mollyg@summitlaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/18/2024 | 1 | COMPLAINT against defendant(s) City of Seattle (Receipt # AWAWDC−8765745) Attorney Robert J Maguire added to party Uber Technologies Inc(pty:pla), Attorney Robert J Maguire added to party Portier LLC(pty:pla) filed by Uber Technologies Inc, Portier LLC. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Maguire, Robert) (Entered: 12/18/2024) |
| 12/18/2024 | 2 | CORPORATE DISCLOSURE STATEMENT indicating ~~no~~ Corporate Parents and/or Affiliates. Portier, LLC is a wholly−owned subsidiary of Uber. Filed pursuant to Fed.R.Civ.P 7.1(a)(1). Filed by Uber Technologies Inc, Portier LLC. (Maguire, Robert) Modified on 12/20/2024 to add relationship information not added at case opening. (MIH). (Entered: 12/18/2024) |
| 12/18/2024 | 3 | APPLICATION OF ATTORNEY Stacey Grigsby FOR LEAVE TO APPEAR PRO HAC VICE for Plaintiffs Uber Technologies Inc, Portier LLC (Fee Paid) Receipt No. AWAWDC−8765747 (Maguire, Robert) (Entered: 12/18/2024) |
| 12/18/2024 | 4 | APPLICATION OF ATTORNEY David Zionts FOR LEAVE TO APPEAR PRO HAC VICE for Plaintiffs Uber Technologies Inc, Portier LLC (Fee Paid) Receipt No. AWAWDC−8765748 (Maguire, Robert) (Entered: 12/18/2024) |
| 12/18/2024 | 5 | APPLICATION OF ATTORNEY Neha Jaganathan FOR LEAVE TO APPEAR PRO HAC VICE for Plaintiffs Uber Technologies Inc, Portier LLC (Fee Paid) Receipt No. AWAWDC−8765750 (Maguire, Robert) (Entered: 12/18/2024) |
| 12/18/2024 | 6 | APPLICATION OF ATTORNEY Alexander Cave FOR LEAVE TO APPEAR PRO HAC VICE for Plaintiffs Uber Technologies Inc, Portier LLC (Fee Paid) Receipt No. AWAWDC−8765751 (Maguire, Robert) (Entered: 12/18/2024) |
| 12/18/2024 | 7 | APPLICATION OF ATTORNEY Neema Sahni FOR LEAVE TO APPEAR PRO HAC VICE for Plaintiffs Uber Technologies Inc, Portier LLC (Fee Paid) Receipt No. AWAWDC−8765752 (Maguire, Robert) (Entered: 12/18/2024) |
| 12/18/2024 | 8 | MOTION for Temporary Restraining Order *and Preliminary Injunction*, filed by Plaintiffs Uber Technologies Inc, Portier LLC. Oral Argument Requested. (Attachments: # 1 Proposed Order) Noting Date 12/18/2024, (Maguire, Robert) (Entered: 12/18/2024) |
| 12/18/2024 | 9 | DECLARATION of Hannah Nilles filed by Plaintiffs Uber Technologies Inc, Portier LLC re 8 MOTION for Temporary Restraining Order *and Preliminary Injunction* (Maguire, Robert) (Entered: 12/18/2024) |

| 12/18/2024 | 10 | DECLARATION of Daniel Crawford filed by Plaintiffs Uber Technologies Inc, Portier LLC re 8 MOTION for Temporary Restraining Order *and Preliminary Injunction* (Maguire, Robert) (Entered: 12/18/2024) |
|---|---|---|
| 12/18/2024 | 11 | **SEALED** ~~DECLARATION of Allison Ford filed by Plaintiffs Uber Technologies Inc, Portier LLC re 8 MOTION for Temporary Restraining Order~~ *and Preliminary Injunction* (Maguire, Robert) Modified on 12/19/2024 sealed and stricken at request of filer, will be re−filed with redactions (CDA). (Entered: 12/18/2024) |
| 12/19/2024 | | NOTICE of Docket Text Modification re 11 Declaration, : At request of filer, entry is stricken and will be re−filed. (CDA) (Entered: 12/19/2024) |
| 12/19/2024 | | Judge John H. Chun added. (HH) (Entered: 12/19/2024) |
| 12/19/2024 | 12 | NOTICE of Appearance by attorney(s) Jessica L Goldman, Lawrence C. Locker, Jesse L. Taylor, Eva S. Oliver, Molly J. Gibbons and Ghazal Sharifi, on behalf of Defendant City of Seattle. (Goldman, Jessica) Modified on 12/20/2024 to add Attorney not added when NOA filed. NEFs from 12/19/24 to present re−generated to attorneys. (MIH). (Entered: 12/19/2024) |
| 12/19/2024 | 13 | DECLARATION of Allison Ford filed by Plaintiffs Uber Technologies Inc, Portier LLC re 8 MOTION for Temporary Restraining Order *and Preliminary Injunction* (Maguire, Robert) (Entered: 12/19/2024) |
| 12/19/2024 | 14 | NOTICE *of Intent to Respond* re 8 MOTION for Temporary Restraining Order *and Preliminary Injunction* ; filed by Defendant City of Seattle. (Goldman, Jessica) (Entered: 12/19/2024) |
| 12/19/2024 | 15 | MINUTE ORDER: This case is hereby transferred to the Honorable Marsha J. Pechman, Senior United States District Judge. Judge John H. Chun no longer assigned to case. Authorized by Judge John H. Chun. (SB) (Entered: 12/19/2024) |
| 12/19/2024 | 16 | ORDER re 6 Application for Leave to Appear Pro Hac Vice. The Court ADMITS Attorney Alexander James Cave for Plaintiffs Portier LLC, and Uber Technologies Inc, by Clerk Ravi Subramanian. No document associated with this docket entry, text only.

*NOTE TO COUNSEL: Local counsel agrees to* **sign all filings** *and to be prepared to handle the matter, including the trial thereof, in the event the applicant is unable to be present on any date scheduled by the court, pursuant to LCR 83.1(d).*(HH) (Entered: 12/19/2024) |
| 12/19/2024 | | Application for Leave to Appear Pro Hac Vice 5 , Application for Leave to Appear Pro Hac Vice 7 , Application for Leave to Appear Pro Hac Vice 3 , Application for Leave to Appear Pro Hac Vice 4 by attorney Stacey Grigsby, David Zionts, Neha Jaganathan, and Neema Sahni will not be processed at this time. The Pro Hac attorney must submit a Pro Hac Vice access request via Manage My Account on PACER, under the Maintenance tab. See page 2 of the Pro Hac Vice Application Guide for detailed instructions. Please contact the Attorney Admissions Clerk at 206−370−8400 or WAWD_Admissions@wawd.uscourts.gov with additional questions. (Ad hoc Attorney Stacey Grigsby, David Zionts, Neha Jaganathan, and Neema Sahni) (HH) (Entered: 12/19/2024) |
| 12/19/2024 | 17 | ORDER on Defendant's Request to Respond to TRO. Defendant must file its response by no later than 4:00 PM on Monday, 12/23/2024. The Court has directed its Courtroom Deputy to work with the Parties to schedule a hearing on the Motion for Temporary Restraining Order at a convenient time on 12/31/2024. The hearing will be conducted by remote means. Signed by Judge Marsha J. Pechman. (SB) (Entered: 12/19/2024) |
| 12/20/2024 | 18 | Summons Electronically Issued as to Defendant City of Seattle. (MIH) (Entered: 12/20/2024) |
| 12/20/2024 | 19 | ORDER re 7 Application for Leave to Appear Pro Hac Vice, 4 Application for Leave to Appear Pro Hac Vice, 5 Application for Leave to Appear Pro Hac Vice, 3 Application for Leave to Appear Pro Hac Vice. The Court ADMITS Attorneys Stacey Grigsby, David Meir Zionts, Neha Jaganathan, and Neema Sahni for Plaintiff Uber Technologies Inc and Portier LLC, by Clerk Ravi Subramanian. No document |

| | | |
|---|---|---|
| | | associated with this docket entry, text only. |
| | | *NOTE TO COUNSEL: Local counsel agrees to **sign all filings** and to be prepared to handle the matter, including the trial thereof, in the event the applicant is unable to be present on any date scheduled by the court, pursuant to LCR 83.1(d)*.(HH) (Entered: 12/20/2024) |
| 12/20/2024 | | Set Hearings: The court will provide remote audio public access for this hearing. Access information can be found on the court's Calendar page at least 24 hours prior to the hearing. TRO Hearing set for 12/31/2024 at 09:00 AM before Judge Marsha J. Pechman. This hearing will be held remotely using ZoomGov. (GC) (Entered: 12/20/2024) |
| 12/23/2024 | 20 | RESPONSE, by Defendant City of Seattle, to 8 MOTION for Temporary Restraining Order *and Preliminary Injunction*. (Attachments: # 1 Proposed Order)(Goldman, Jessica) (Entered: 12/23/2024) |
| 12/23/2024 | 21 | DECLARATION of Jessica L. Goldman filed by Defendant City of Seattle re 8 MOTION for Temporary Restraining Order *and Preliminary Injunction* (Goldman, Jessica) (Entered: 12/23/2024) |
| 12/23/2024 | 22 | DECLARATION of Jasmine Marwaha filed by Defendant City of Seattle re 8 MOTION for Temporary Restraining Order *and Preliminary Injunction* (Goldman, Jessica) (Entered: 12/23/2024) |
| 12/23/2024 | 23 | DECLARATION of Laine Middaugh filed by Defendant City of Seattle re 8 MOTION for Temporary Restraining Order *and Preliminary Injunction* (Goldman, Jessica) (Entered: 12/23/2024) |
| 12/23/2024 | 24 | DECLARATION of Sara O'Connor−Kriss filed by Defendant City of Seattle re 8 MOTION for Temporary Restraining Order *and Preliminary Injunction* (Goldman, Jessica) (Entered: 12/23/2024) |
| 12/23/2024 | 25 | NOTICE of Appearance by attorney Douglas Edward Smith on behalf of Intervenor Maplebear Inc. d/b/a Instacart. (Smith, Douglas) (Entered: 12/23/2024) |
| 12/23/2024 | 26 | Unopposed MOTION to Intervene , filed by Intervenor Maplebear Inc. d/b/a Instacart. (Attachments: # 1 Proposed Order) Noting Date 12/23/2024, (Smith, Douglas) (Entered: 12/23/2024) |
| 12/23/2024 | 27 | MEMORANDUM filed by Intervenor Maplebear Inc. d/b/a Instacart re 26 Unopposed MOTION to Intervene (Smith, Douglas) (Entered: 12/23/2024) |
| 12/23/2024 | 28 | DECLARATION of Angela Jacobs filed by Intervenor Maplebear Inc. d/b/a Instacart re 26 Unopposed MOTION to Intervene (Smith, Douglas) (Entered: 12/23/2024) |
| 12/24/2024 | 29 | Intervenor COMPLAINT filed by Maplebear Inc. d/b/a Instacart.(Smith, Douglas) (Entered: 12/24/2024) |
| 12/24/2024 | 30 | APPLICATION OF ATTORNEY Alex MacDonald FOR LEAVE TO APPEAR PRO HAC VICE for Intervenor Maplebear Inc. d/b/a Instacart (Fee Paid) Receipt No. AWAWDC−8772337 (Smith, Douglas) (Entered: 12/24/2024) |
| 12/26/2024 | 31 | ORDER granting Plaintiff−Intervenor's 26 Unopposed Motion for Permissive Intervention. Instacart is permitted to join this case as a plaintiff for the purpose of pursuing the constitutional and statutory claims stated in its intervenor's complaint. Instacart will not submit any substantive briefing related to the temporary restraining order scheduled for a hearing on 12/31/2024. Signed by Judge Marsha J. Pechman. (SB) (Entered: 12/26/2024) |
| 12/26/2024 | 32 | ORDER re 30 Application for Leave to Appear Pro Hac Vice. The Court ADMITS Attorney Alexander Thomas MacDonald for Intervenor Maplebear Inc. d/b/a Instacart, by Clerk Ravi Subramanian. No document associated with this docket entry, text only. *NOTE TO COUNSEL: Local counsel agrees to **sign all filings** and to be prepared to handle the matter, including the trial thereof, in the event the applicant is unable to be present on any date scheduled by the court, pursuant to LCR 83.1(d)*.(HH) (Entered: 12/26/2024) |

| 12/31/2024 | 33 | MINUTE ENTRY for proceedings held before Judge Marsha J. Pechman− Dep Clerk: *Grant Cogswell*; Pla Counsel: *Robert Maguire, Stacey Grigsby, Randall Haimovici, Alex MacDonald (Plaintiff−Intervenor)*; Def Counsel: *Jessica Goldman, Ghazal Sharifi*; CR: *Nickie Drury*; Time of Hearing: *9:00AM*; Courtroom: *Zoom*; **TRO Hearing** held on 12/31/2024. The Court hears oral argument on Plaintiff's MOTION for Temporary Restraining Order and Preliminary Injunction (dkt. 8 ). After hearing argument, the Court takes this matter under advisement and will issue a written ruling by the end of the business day. (GC) (Entered: 12/31/2024) |
|---|---|---|
| 12/31/2024 | 34 | ORDER denying Plaintiffs' 8 Motion for Temporary Restraining Order and Preliminary Injunction. The Court DENIES the Motion as to both requests. Signed by Judge Marsha J. Pechman. (Attachments: # 1 Ordinance) (KRA) (Entered: 12/31/2024) |
| 01/02/2025 | 35 | TRANSCRIPT REQUEST by Defendant City of Seattle for proceedings held on 12/31/2024 re 33 TRO Hearing,,. Requesting Attorney: Ghazal Sharifi.<br><br>Posting of this Transcript Order form does not constitute an official request for transcript(s). If you have not already done so, you MUST contact the individual court reporter(s), Nickoline Drury (nickoline_drury@wawd.uscourts.gov, 206−370−8508) to make payment arrangements and secure your desired delivery time. (Sharifi, Ghazal) (Entered: 01/02/2025) |
| 01/08/2025 | 36 | ANSWER to 1 Complaint, by City of Seattle.(Goldman, Jessica) (Entered: 01/08/2025) |
| 01/10/2025 | 37 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of TRO Hearing held on 12/31/2024 before Judge Marsha J. Pechman.<br><br>Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at www.wawd.uscourts.gov.<br><br>To purchase a copy of the transcript, contact court reporter Nickoline Drury, nickoline_drury@wawd.uscourts.gov, 206−370−8508.<br><br>Release of Transcript Restriction set for 4/10/2025, (ND) (Entered: 01/10/2025) |
| 01/13/2025 | 38 | NOTICE OF APPEAL to Ninth Circuit (25−228) re 34 Order on Motion for Temporary Restraining Order by Plaintiffs Uber Technologies Inc, Portier LLC. $605, receipt number AWAWDC−8795118 (cc: USCA) (Maguire, Robert) Modified on 1/15/2025 to add CCA#. (RE). (Entered: 01/13/2025) |
| 01/13/2025 | 39 | NOTICE OF APPEAL to Ninth Circuit (25−231) re 34 Order on Motion for Temporary Restraining Order by Intervenor Plaintiff Maplebear Inc. $605, receipt number AWAWDC−8795288 (cc: USCA) (Smith, Douglas) Modified on 1/15/2025 to add CCA#. (RE). Modified on 1/15/2025 to edit CCA#. (RE). (Entered: 01/13/2025) |
| 01/14/2025 | 40 | ANSWER to 29 Intervenor Complaint by City of Seattle.(Goldman, Jessica) (Entered: 01/14/2025) |
| 01/14/2025 | 41 | TIME SCHEDULE ORDER/USCA CASE NUMBER (25−228) as to 38 Notice of Appeal, filed by Portier LLC, Uber Technologies Inc. (RE) Modified on 1/15/2025 edit party/appeal info. (RE). (Entered: 01/15/2025) |
| 01/14/2025 | 42 | TIME SCHEDULE ORDER/USCA CASE NUMBER (25−231) as to 39 Notice of Appeal, filed by Maplebear Inc. (RE) (Entered: 01/15/2025) |
| 01/16/2025 | 43 | Stipulated MOTION *and [Proposed] Order to Stay Pending Appeal*, filed by Plaintiff Uber Technologies Inc. Noting Date 1/16/2025, (Maguire, Robert) (Entered: 01/16/2025) |

| 01/21/2025 | 44 | NOTICE *Regarding Ordering of Transcript Pursuant to Circuit Rule 10−3.1(c)* ; filed by Plaintiffs Uber Technologies Inc, Portier LLC. (Maguire, Robert) (Entered: 01/21/2025) |
|---|---|---|
| 01/22/2025 | 45 | NOTICE *Regarding Transcript* ; filed by Intervenor Plaintiff Maplebear Inc. (Smith, Douglas) (Entered: 01/22/2025) |
| 01/22/2025 | 46 | REPRESENTATION STATEMENT, (25−231) by Intervenor Plaintiff Maplebear Inc, (re: 39 Notice of Appeal,.) (Smith, Douglas) (Entered: 01/22/2025) |
| 01/24/2025 | 47 | STAY ORDER re Parties' 43 Stipulated Motion to Stay Pending Appeal. The Court hereby STAYS proceedings in this case pending final resolution of the appeals noticed by Plaintiffs Uber Technologies, Inc. and Portier, LLC, and by Plaintiff−Intervenor Maplebear Inc. d/b/a/ Instacart. (Dkt. Nos. 38 — 39 .) The Parties are ORDERED to file a joint status report within 10 days of issuance of the Ninth Circuit's mandate on the appeals or any order or notice terminating the appeals. Signed by Judge Marsha J. Pechman. (KRA) (Entered: 01/24/2025) |

No. 25-228

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UBER TECHNOLOGIES, INC. AND PORTIER, LLC,

*Plaintiffs-Appellants*,

and

MAPLEBEAR INC. D/B/A INSTACART,

*Intervenor-Plaintiff,*

v.

CITY OF SEATTLE,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Western District of Washington
No. 2:24-cv-02103-MJP
Hon. Marsha J. Pechman

REPLY BRIEF OF PLAINTIFFS-APPELLANTS
UBER TECHNOLOGIES, INC. AND PORTIER, LLC

Neema Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067
(424) 332-4800

Robert J. Maguire
Theo A. Lesczynski
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
(206) 757-8094

Stacey K. Grigsby
David M. Zionts
Neha Jaganathan
Alexander J. Cave
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Attorneys for Plaintiffs-Appellants Uber Technologies, Inc. and Portier, LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ..................................................................................... 1

ARGUMENT ............................................................................................ 2

I.    At Every Step of the First Amendment Analysis, The City's Arguments Depend on Distorting the Ordinance's Operation and Effect....................................................................................................... 2

    A.    The City Ignores that the Challenged Provisions Directly Compel and Regulate Written Communications. ............................... 2

    B.    The Challenged Provisions Are Not Notice of Rights Requirements........................................................................................ 6

    C.    Uber Cannot Comply Without Conveying Opinions on Sensitive and Controversial Matters. ................................................ 7

II.    The Challenged Provisions Trigger First Amendment Scrutiny Because They Directly and Facially Regulate Pure Speech......................... 11

    A.    The Challenged Provisions Regulate Speech Directly, Not Incidentally.................................................................................... 11

    B.    The City's "Expressive Conduct" Test Is Irrelevant to Pure Speech Regulations Like the Challenged Provisions......................... 16

    C.    The City's Contention that the Deactivation Policy Requirement Regulates Speech About Unlawful Transactions Is Incorrect and Circular........................................................................ 19

III.    The Challenged Provisions Are Subject to Heightened First Amendment Scrutiny, And Cannot Survive It. ............................................ 20

    A.    The Challenged Provisions Do Not Regulate "Purely Factual and Uncontroversial" Speech......................................................... 20

    B.    The Challenged Provisions Cannot Survive Even Intermediate Scrutiny. ...................................................................... 23

    C.    In Any Event, Strict Scrutiny Applies and the Challenged Provisions Do Not Survive It. ......................................................... 25

        1.    The City does not meaningfully dispute that the challenged provisions regulate Uber's speech based on its content.................................................................................. 25

i

2. The challenged provisions do not regulate mere commercial speech. ................................................... 26

3. The challenged provisions fail strict scrutiny. ......................... 29

IV. The Deactivation Policy Requirement Denies Uber Fair Notice of What It May Say. .......................................................................... 30

V. Key Ordinance Provisions Are Intertwined With, and Dependent On, The Unconstitutional Provisions. ................................................. 33

VI. The Remaining Factors Favor a Preliminary Injunction. ............... 35

CONCLUSION ................................................................................ 37

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996)...................................................................14, 23

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013)...................................................................11, 22

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) ...........................................................36

*Anderson v. City of Hermosa Beach*,
  621 F.3d 1051 (9th Cir. 2010) ........................................................4, 17

*Arcara v. Cloud Books, Inc.*,
  478 U.S. 697 (1986).........................................................................17

*Ariix, LLC v. NutriSearch Corp.*,
  985 F.3d 1107 (9th Cir. 2021) ...........................................................28

*Baird v. Bonta*,
  81 F.4th 1036 (9th Cir. 2023) .......................................................35, 36

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001)...........................................................................3

*Bolger v. Youngs Drug Prods. Corp.*,
  463 U.S. 60 (1983).......................................................................26, 28

*Cal. Tchrs. Ass'n v. State Bd. of Educ.*,
  271 F.3d 1141 (9th Cir. 2001) .......................................................30, 31

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
  447 U.S. 557 (1980).........................................................................25

*Chamber of Com. v. SEC*,
  85 F.4th 760 (5th Cir. 2023) .............................................................22

*Citizens United v. FEC*,
  558 U.S. 310 (2010).........................................................................31

*CompassCare v. Hochul*,
  125 F.4th 49 (2d Cir. 2025) ..............................................................16

*CTIA - The Wireless Ass'n v. City of Berkeley*,
  928 F.3d 832 (9th Cir. 2019) .......................................................22, 35

iii

*Expressions Hair Design v. Schneiderman*,
   581 U.S. 37 (2017) ........................................................................17, 18

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) ..............................................................................32

*First Resort, Inc. v. Herrera*,
   860 F.3d 1263 (9th Cir. 2017) ...............................................................27

*Hall by Hall v. Niemer*,
   97 Wash.2d 574 (Wash. 1982) ..............................................................34

*Holder v. Humanitarian L. Project*,
   561 U.S. 1 (2010) ..................................................................................14

*HomeAway.com, Inc. v. City of Santa Monica*,
   918 F.3d 676 (9th Cir. 2019) ...........................................................16, 17

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
   515 U.S. 557 (1995) ................................................................................9

*IMDb.com Inc. v. Becerra*,
   962 F.3d 1111 (9th Cir. 2020) ...............................................................28

*Italian Colors Rest. v. Becerra*,
   878 F.3d 1165 (9th Cir. 2018) ...............................................................23

*Leonard v. City of Spokane*,
   127 Wash.2d 194 (Wash. 1995) ......................................................33, 34

*McCullen v. Coakley*,
   573 U.S. 464 (2014) ........................................................................26, 30

*Menotti v. City of Seattle*,
   409 F.3d 1113 (9th Cir. 2005) ...............................................................29

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024) ..............................................................................23

*Nat'l Ass'n of Wheat Growers v. Bonta*,
   85 F.4th 1263 (9th Cir. 2023) ...............................................................20

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   585 U.S. 755 (2018) ..............................................................................17

*NetChoice, L.L.C. v. Paxton*,
   49 F.4th 439 (5th Cir. 2022) .................................................................22

*NetChoice, LLC v. Bonta*,
   113 F.4th 1101 (9th Cir. 2024) .......................................................*passim*

iv

*R.A.V. v. City of St. Paul,*
   505 U.S. 377 (1992)............................................................14

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015)........................................................25, 26

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,*
   547 U.S. 47 (2006)........................................................12, 13

*S.F. Apartment Ass'n v. City & Cnty. of San Francisco,*
   881 F.3d 1169 (9th Cir. 2018) ..........................................16

*Texas v. Johnson,*
   491 U.S. 397 (1989)..........................................................17

*United States v. Stevens,*
   559 U.S. 460 (2010)..........................................................17

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989)..........................................................23

*X Corp. v. Bonta,*
   116 F.4th 888 (9th Cir. 2024) ....................................*passim*

*Y.Y.G.M. SA v. Redbubble, Inc.,*
   75 F.4th 995 (9th Cir. 2023) .............................................36

*Yim v. City of Seattle,*
   63 F.4th 783 (9th Cir. 2023) .............................................13

*Zauderer v. Office of Disciplinary Couns. of Sup. Ct. of Ohio,*
   471 U.S. 626 (1985)..........................................................20

**Statutes**

Seattle Mun. Code §8.37.050............................................24

Seattle Mun. Code §8.37.100............................................24

Seattle Mun. Code §8.40.020..............................................3

Seattle Mun. Code §8.40.050.......................................*passim*

Seattle Mun. Code §8.40.060.......................................*passim*

Seattle Mun. Code §8.40.070.......................................*passim*

Seattle Mun. Code §8.40.080.......................................*passim*

Seattle Mun. Code §8.40.100...................................6, 21, 24

Seattle Mun. Code §8.40.140..............................................4

Seattle Mun. Code §14.19.030 ....................................................................9

Seattle Mun. Code §14.27.050 ....................................................................9

**Regulations**

Seattle Human Rights Rules, ch. 260, *available at*
https://www.seattle.gov/
documents/Departments/LaborStandards/SHRR%20260%20Final
%20Rules%203.26.25.pdf ....................................................................10

**Other Authorities**

SMC 8.40 2025 Notice of Rights, Seattle Office of Lab. Standards,
https://www.seattle.gov/documents/Departments/LaborStandards/
OLS_AppBasedWorkers_Deactivation2024_11x17poster_Final%2
0%281%29.pdf (last accessed Mar. 31, 2025). ............................................6, 24

Statement, RALIANCE (Mar. 12, 2025),
https://www.raliance.org/press_post/raliance-statement-on-
protecting-survivor-privacy-when-reporting-app-based-workers/ ....................10

## INTRODUCTION

The City does not and cannot deny that its Ordinance directly and facially requires Uber to write a policy on the sensitive subject of courier account deactivations—and limits what Uber may say in its own policy. That is more than enough to trigger strict scrutiny. Nor does, or can, the City explain why it could not have achieved its economic goals without such extensive burdens on Uber's speech. It just asserts as much, ignoring the obvious alternative of an ordinance that—like virtually all economic regulation—directly regulates companies' conduct without compelling them to make policy statements. Without a persuasive explanation on that score, the City cannot carry its burden under even intermediate scrutiny, much less strict scrutiny.

Nonetheless, the City insists—as the district court held—that the Ordinance does not even *implicate* the First Amendment. Every turn the City takes to get there is wrong. It distorts what the challenged provisions do, focusing instead on unchallenged provisions and more general statutory aims. It outright ignores First Amendment caselaw, including a decision this Court issued last year, unmistakably rejecting that very approach. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024). It invokes an irrelevant test applicable to expressive conduct, rather than pure speech like written policies. And on, and on. And all the while, the City appears at

1

ease with the fact that its position would unleash governments to compel opinion-laden speech on even the most controversial of topics.

But non-responsive and alarming as the City's arguments are, this case remains straightforward. The City has compelled Uber to speak on a sensitive matter. It has restricted what Uber may say. And it cannot explain why it needed to choose these speech-regulating means to achieve its economic ends. The First Amendment does not tolerate that, and the district court legally erred in concluding otherwise. This Court should reverse and remand with instructions to enter a preliminary injunction.

## ARGUMENT

I.   **At Every Step of the First Amendment Analysis, The City's Arguments Depend on Distorting the Ordinance's Operation and Effect.**

A.   **The City Ignores that the Challenged Provisions Directly Compel and Regulate Written Communications.**

Uber challenges the Ordinance's deactivation policy requirement, SMC §8.40.050(A), and explanation and substantiation requirements, *id.* §§8.40.070-080. In attempting to evade meaningful First Amendment scrutiny, the City hardly mentions what these provisions do. Instead, it casts the whole Ordinance as an ordinary "economic regulation," City Br. 33—a "regulation of conduct aimed at protecting workers from unwarranted deactivation," *id.* at 18. *See also, e.g.*, *id.* at 22-23, 28-29, 31, 33, 40, 41, 47-49.

2

But whatever the Ordinance as a whole is "aimed" at, the deactivation policy requirement directs covered network companies, like Uber, to draft and announce a written "deactivation policy, defining what constitutes a violation [of the policy] that may result in deactivation." SMC §8.40.050(A)(1). Any observer would understand that policy to be the network company's own speech—after all, the Ordinance calls it "the network company's written deactivation policy." *Id.* The requirement also *limits* that speech by barring any specific deactivation policy the City considers not "reasonably related" to "safe and efficient operations" and deeming eight specific policies unreasonable under that standard. *Id.* §8.40.050(A)(2), (A)(2)(a)-(h). And the explanation and substantiation requirements force network companies to provide "written statement[s]" articulating their policies' application to specific facts, and to disclose records substantiating their decisions. *Id.* §§8.40.070(A), 8.40.080(A).

These provisions can only be "characterized as … regulation[s] of pure speech"—they do not regulate conduct at all. *Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001); *see* Uber Br. 24-29. The Ordinance, to be sure, *separately* regulates conduct—most notably, Section 8.40.060(A) proscribes "unwarranted deactivation[s]." But the City never disputes that it can penalize Uber just for having an unreasonable *policy*, separate from any individual, unwarranted deactivation. Uber Br. 25-26. Further, since "unwarranted" deactivations are those that "do[] not comply with Section 8.40.050," SMC §8.40.020, even that prohibition depends

3

almost entirely on the deactivation policy requirement.  As the City admits, Section 8.40.060(A) "prohibits [Uber] from deactivating a worker on a ground *inconsistent with the company's policy*."  City Br. 28 (emphasis added); *accord id.* at 8, 26; Uber Br. 7, 26 n.6, 56.

The one exception proves the rule.  As the City observes (at 70), Section 8.40.050(B) labels "unwarranted" any deactivation that is "intended to or results in discrimination."  Together, Sections 8.40.050(B) and 8.40.060(A) directly prohibit discriminatory deactivations—without mandating, or referring to, company policies. *That* is a conduct regulation.  Section 8.40.050(A) is not:  it compels Uber to write a policy and limits what Uber can say in it, and does nothing more.

An example illustrates the point.  As Uber explained (at 11, 13-14), the deactivation policy requirement appears to deem unreasonable Uber's policy against discriminatory refusals to deliver to certain neighborhoods, and prohibits Uber from including that specific ground in its deactivation policy.  Below, the City seemed to confirm as much, ER-45, and it has not disavowed that view.  So if Uber maintained this policy as part of "the network company's written deactivation policy," SMC §8.40.050(A)(1), the City could immediately penalize Uber—even if Uber never deactivates an account for discriminatory refusals.  *See id.* §8.40.140.  Put differently, it could punish Uber solely for what Uber's written policy says—"pure speech," *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1059 (9th Cir. 2010)—

4

even if Uber never undertook any "unwarranted deactivation." A provision with that consequence can only be a speech regulation.[1]

The City never disputes Uber's description of the nuts and bolts of the challenged provisions. Instead, it and its *amici* seem to suggest they are irrelevant because "[t]he Ordinance" as a whole is an "economic regulation." City Br. 19; *see also* Lawyers Br. 3; Localities Br. 2. That is wrong as a matter of First Amendment doctrine, as Uber explained (at 23-29) and elaborates below, *see infra* pp.11-16. It is equally troubling as a matter of First Amendment principles. When the government regulates speech, it can skirt political accountability and distort public debate in ways it cannot when regulating only conduct. Uber Br. 32-36. The City dismisses those consequences as "a (short) parade of horribles." City Br. 24. But tellingly, the City never actually denies that under the feckless First Amendment it envisions, nothing would stop governments from using the City's model to regulate all kinds of speech, including (or perhaps especially) speech concerning the most controversial subjects.

---

[1] The City notes in passing that the deactivation policy requirement applies only to network companies that wish to engage in deactivations. City Br. 27-28 (citing SMC §8.40.050(A)). But it does not squarely say this forecloses First Amendment review, and appropriately so. Governments cannot avoid First Amendment scrutiny by imposing speech regulations conditional on engaging in certain conduct—an approach that would eviscerate the free speech rights of anyone in a line of work a government disfavors.

## B.    The Challenged Provisions Are Not Notice of Rights Requirements.

The City and its *amici* also repeatedly describe the challenged provisions as impacting speech only by requiring companies to "advise workers of their rights." *Id.* at 49; *see also id.* at 29, 44, 47-49, 56; Lawyers Br. 7-12; Localities Br. 4-11.

Also wrong. The Ordinance does contain a provision, Section 8.40.100 (entitled "Notice of rights"), requiring network companies to "affirmatively provide each app-based worker with a written notice of rights established by this Chapter 8.40." SMC §8.40.100(A). Specifically, companies must distribute the "model notice of rights" that OLS created (reproduced in the Addendum to this brief for the Court's convenience). *Id.*[2]

But Uber does not challenge Section 8.40.100; it challenges the deactivation policy requirement (Section 8.40.050(A)) and explanation and substantiation requirements (Sections 8.40.070 and 8.40.080). These requirements demand that Uber speak in a way going far beyond "advis[ing] workers of their rights." City Br. 49. To satisfy the deactivation policy requirement, Uber must write a policy, in its own name, "defining what constitutes a violation that may result in deactivation"— subject to the prohibition on policies not "reasonably related" to "safe and efficient

---

[2] *See* SMC 8.40 2025 Notice of Rights, Seattle Office of Lab. Standards, https://www.seattle.gov/documents/Departments/LaborStandards/OLS_AppBased Workers_Deactivation2024_11x17poster_Final%20%281%29.pdf (last accessed Mar. 31, 2025).

operations"—and communicate that policy to couriers. SMC §8.40.050(A)(1)-(2). And to comply with the explanation and substantiation requirements, Uber must draft "written statement[s]" explaining how it applied its policy to particular facts, and it must disclose records substantiating that application. *Id.* §§8.40.070(A), 8.40.080(A).

### C. Uber Cannot Comply Without Conveying Opinions on Sensitive and Controversial Matters.

Relatedly, the City claims that Uber need not "opine about anything," "explicitly" or "implicitly," to comply with the challenged provisions. City Br. 33 (emphasis omitted); *see also id.* at 35, 47, 54-55.

Again, not so. Last year, this Court explained that the content of a company's report "detail[ing] [its] policies and actions" concerning certain categories of content will inevitably "express a view," at least "implicitly," by "conveying whether [the] company believes certain categories should be defined and proscribed." *X Corp. v. Bonta*, 116 F.4th 888, 899, 901 (9th Cir. 2024). The same is true here: the content of a "network company's deactivation policy, defining what constitutes a violation that may result in deactivation," SMC §8.40.050(A)(1), will inevitably "express a view," at least "implicitly," on what warrants deactivating a courier's account—a question implicating a balance of safety, efficiency, privacy, and more considerations, together with couriers' economic interests. By including particular deactivation grounds in its own policy, Uber conveys the view that they warrant

7

deactivation and are reasonably related to safety and efficiency. By issuing a policy excluding certain grounds, Uber conveys the opposite view. *See* Uber Br. 38-39.

Those views hardly concern anodyne matters. The City's view, for instance, is that even the lowest consumer ratings never alone warrant deactivation because they may be unreliable. City Br. 7. Likewise, it believes background checks are not reliable enough to warrant deactivation except in extremely narrow circumstances. *Id.* at 7-8, 63. Uber disagrees: it believes aggregate consumer ratings are generally reliable indicators that, when persistently low, often reflect serious quality or safety problems. And it believes that a courier involved in repeated traffic collisions cannot be trusted to safely traverse busy streets. Uber Br. 12-13. The point is not who is right. It is that these are weighty issues of public concern, about which Uber is being compelled to speak in its own name, through "the network company's written deactivation policy," SMC §8.40.050(A)(1). The City never squarely disputes as much.

Yet, unlike even the district court, *see* ER-11, the City never acknowledges that Uber's deactivation policy will necessarily convey views on these issues. Hewing instead to its "economic regulation" theme, the City analogizes the Ordinance to "minimum wage, anti-discrimination, occupational safety, and labor laws," and points out that compliance with those laws does not require expressing opinions. City Br. 33. Maybe not, but only because such laws generally do not

8

mandate policy statements. They say things like "Schedule 1 employers shall pay each employee an hourly minimum wage of at least $11.00," SMC §14.19.030(A), or "[a]n employer shall not require an employee to perform room cleanings totaling more than the maximum floor space in a workday that is eight hours or longer," SMC §14.27.050(A). Uber challenges very different provisions, which require (and regulate) written policy statements on contentious subjects. *See supra* pp.2-10.

The City (at 35-36) also insists that observers need not attribute the views reflected in "the network company's written deactivation policy," SMC §8.40.050(A)(1), to the network company announcing it because the company may state in its policy that it opposes the Ordinance's restrictions on its speech. But that ignores that Uber is affirmatively obligated to craft a "[r]easonable policy" including a statement of all triggers it believes warrant deactivation and are reasonably related to safety and efficiency, subject to the Ordinance's prohibitions of specific policies, *id.* §8.40.050(A)(2)(a)-(h). Uber cannot seriously be expected to disclaim the views reflected by what it chooses to put in that policy. And even as to the message Uber conveys by *omitting* certain triggers, forcing Uber to disclaim the views reflected by its own policy to avoid misattribution "compromise[s]" Uber's "right to autonomy over the message" by requiring it to "affirm in one breath that which [it] den[ies] in the next." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 576 (1995) (cleaned up).

9

As for the explanation and substantiation requirements, the City never articulates how Uber can issue a "written statement" explaining "[t]he reasons for deactivation" and "the network company's policy that was violated," SMC §8.40.070(A), (A)(1), without reaffirming that the violation warrants deactivation and expressing "opinions about" its "polic[y]" (namely, what precisely the policy means as applied). *X Corp.*, 116 F.4th at 901; Uber Br. 41-42. Nor does the City deny that these requirements compel Uber to disclose the details of reported sexual assaults to couriers whose accounts it deactivates for allegedly committing those assaults. *Id.* at 42; SMC §§8.40.070(A)(1), (3), 8.40.080(A). If it is possible for Uber to do so without conveying indifference toward survivor privacy and safety—contrary to Uber's deeply-held beliefs, *see* ER-108, 120—the City has not said how.[3]

---

[3] Organizations dedicated to ending sexual violence share Uber's perspective. *See* Statement, RALIANCE (Mar. 12, 2025), https://www.raliance.org/press_ post/raliance-statement-on-protecting-survivor-privacy-when-reporting-app-based-workers/. And the implementing rules the City finally promulgated this past week (which take effect in June) do not resolve the problem. *See* Seattle Human Rights Rules (SHHR), ch. 260, *available at* https://www.seattle.gov/ documents/Departments/LaborStandards/SHRR%20260%20Final%20Rules%203. 26.25.pdf. Like the Ordinance itself, the Rules permit some degree of anonymization, but without specific guidance and still requiring sufficient "detail[]." SHHR 160.5(a)-(b). Uber has explained why the Ordinance's anonymization provisions are insufficient to protect consumers. *See* ER-120.

## II. The Challenged Provisions Trigger First Amendment Scrutiny Because They Directly and Facially Regulate Pure Speech.

### A. The Challenged Provisions Regulate Speech Directly, Not Incidentally.

As Uber showed in its opening brief and above, the deactivation policy requirement and the explanation and substantiation requirements directly and facially compel and regulate written disclosures of information about the circumstances under which Uber will deactivate courier accounts and Uber's reasons for specific deactivations. *See* Uber Br. 19-29; *supra* pp.2-10. The consequence is clear: as this Court reaffirmed in *NetChoice*, "the forced disclosure of information … triggers First Amendment scrutiny." 113 F.4th at 1117.

Uber began its opening brief with that unqualified rule, and returned to it often. *See* Uber Br. 1, 20, 22, 30-31. But the City and its *amici* never mention it. Nor do they grapple with the Supreme Court's guidance that a "direct regulation of speech" demanding that a speaker "have a policy" on a controversial matter would not just trigger the First Amendment, but "plainly violate" it. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 210, 213 (2013) (*AOSI*).

Instead, as earlier described, the City abstracts away from the challenged provisions. On the City's telling, the Ordinance's "substantive regulations"— apparently meaning conduct-regulating provisions, principally the ban on "unwarranted deactivation[s]," SMC §8.40.060(A)—reflect the Ordinance's "focus"

11

on the "protection of workers from unwarranted deactivation." City Br. 2, 19; *see id.* at 27-29. Accordingly, the City says, the Ordinance as a whole "regulates conduct," *id.* at 19, and any effect on speech is merely "incidental," *id.* at 23-24, 26-33; *see also* Lawyers Br. 3; Localities Br. 15-18.

This Court has already rejected that approach. In *NetChoice*, California argued that the speech effects of the challenged provision—which required reports from internet businesses on how their services might harm children—were merely "incidental to [the law's] legitimate goals." 113 F.4th at 1116. This Court disagreed, holding that the provision triggered First Amendment scrutiny because it demanded "the forced disclosure of information." *Id.* at 1117. And it explained that it could not "ignore" that fact "simply because other parts of the [law] may primarily or exclusively regulate non-expressive conduct." *Id.* What mattered was that "[t]he primary effect *of the [reporting] provision*"—if not the whole law—was "to compel speech, distinguishing it from statutes where the compelled speech was 'plainly incidental to the law's regulation of conduct.'" *Id.* (cleaned up, emphasis added) (quoting *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006) (*FAIR*)). Simply and unequivocally (but, again, unmentioned by the City or its *amici*): government "cannot insulate a specific provision of law" from First Amendment scrutiny "by bundling it with other, separate provisions that do not implicate the First Amendment." *Id.* So while the City may critique Uber (at 27)

12

for "isolat[ing]" the challenged provisions' operation and effect, that is exactly what the First Amendment demands.[4]

Indeed, the City's sweeping understanding of "incidental" speech regulation has *no* apparent basis in law. Neither the City nor its *amici* musters one case holding that a provision that directly and facially regulates speech—let alone compels it— affects speech merely "incidentally" just because the government claims the "focus" of the whole law is on conduct. That is no surprise: if all it took to avoid First Amendment scrutiny was bundling compulsions of speech with conduct regulations advancing similar aims until the speech regulations seem minor by comparison, governments would have nearly limitless power to compel private speakers to spout the party line on even the most controversial issues. Uber Br. 32-36.

Instead, as Uber has explained (at 26-27), a provision's impact on speech is "incidental" only when the provision itself "make[s] a course of conduct illegal" (i.e., facially regulates conduct, not speech), but that "conduct [is] in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *FAIR*, 547 U.S. at 62 (cleaned up). For example, "a law against treason" incidentally

---

[4] In insisting otherwise, the City cites only a case noting that statutory context is relevant to "determin[ing] the scope" of a speech-regulating provision. *Yim v. City of Seattle*, 63 F.4th 783 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 693 (2024) (emphasis added). That is an unremarkable statutory interpretation principle, not a revolutionary First Amendment doctrine.

impacts speech to the extent it bars "telling the enemy the Nation's defense secrets." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992); *see* Uber Br. 24, 26-27 (collecting other examples from caselaw). The challenged provisions here, though, do not impact speech "incidentally"—they regulate *only* speech.

Nor do any broader aims of the Ordinance license the City to freely regulate speech. Apparently thinking otherwise, the City casts the Ordinance as "a regulation of conduct aimed at protecting workers from unwarranted deactivation," City Br. 18, and intimates that when laws are "aimed at the employment relationship," the government's ends justify whatever means it chooses, City Br. 20 (cleaned up); *see also* Lawyers Br. 4; Localities Br. 4.[5]

But "the First Amendment directs that government may not suppress speech as easily as it may suppress conduct, and that speech restrictions cannot be treated as simply another means that the government may use to achieve its ends." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 512 (1996) (plurality opinion). That is so even when "urgent objective[s] of the highest order," like fighting terrorism, are at stake. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010). The point of First Amendment scrutiny, after all, is to determine *whether* the ends justify the

---

[5] Couriers using Uber's platform are independent contractors, not employees. Because that distinction does not affect the First Amendment analysis, Uber uses the City's terminology when quoting its brief.

14

speech-regulating means. Laws allegedly "aimed at the employment relationship"—
or anything else relating to "public health, safety, and welfare," City Br. 21 (cleaned
up)—enjoy no special exemption.

Accepting that the First Amendment applies when governments directly
regulate speech does not mean, as the City's *amici* seemingly warn, that many police
power regulations trigger First Amendment scrutiny, let alone fail it. Lawyers Br.
2-3, 14-15, Localities Br. 2-3, 11. Far from it. To take a pair of examples: the Seattle
minimum wage and workplace safety provisions quoted above, *see supra* p.9, do not
compel companies to issue policy statements, explain how they implement their
policies, or disclose information substantiating their decisions. They directly and
facially regulate only conduct, not speech, and so do not trigger First Amendment
scrutiny.

To be sure, the City's *amici* identify many laws that *do* directly regulate
speech, and so do trigger some form of First Amendment scrutiny. But there is
nothing unusual about that, and Uber's position does not make those laws
unconstitutional *en masse*. The overwhelming majority of the laws *amici* cite, *see*
Lawyers Br. 8-12; Localities Br. 5-11, are (unlike the provisions challenged here)
conventional notice of rights laws. Such laws *are* subject to First Amendment
scrutiny, but generally the most lenient form, and they generally survive it. *See, e.g.*,

15

*S.F. Apartment Ass'n v. City & Cnty. of San Francisco,* 881 F.3d 1169, 1177-78 (9th Cir. 2018); *CompassCare v. Hochul*, 125 F.4th 49, 64-67 (2d Cir. 2025).

What is telling is that, across three briefs warning that the sky will fall if this Court does not discard the "well-established" principle that "the forced disclosure of information … triggers First Amendment scrutiny," *NetChoice*, 113 F.4th at 1117, the City and its *amici* identify no common practice of governments needing to compel opinion-laden policy statements by private actors to achieve their economic ends. And for all the laws they cite, *amici* fail to identify even one case holding that a law directly compelling speech—whether through a notice of rights requirement or, as here, something much more, *see supra* pp.6-7—triggers *no* First Amendment scrutiny at all.

### B. The City's "Expressive Conduct" Test Is Irrelevant to Pure Speech Regulations Like the Challenged Provisions.

Because the City ignores that the challenged provisions directly and facially compel and regulate pure speech, it ends up invoking an irrelevant test. To decide whether the First Amendment is triggered, the City says (at 20), the Court must determine "whether conduct with a significant expressive element drew the legal remedy or the ordinance has the inevitable effect of singling out those engaged in expressive activity." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019) (cleaned up). The City complains that "Uber has ignored" that test, and asserts it is not satisfied. City Br. 20; *see also* Localities Br. 17-18.

16

Of course Uber ignored it. That test determines whether *conduct* is sufficiently expressive to warrant First Amendment protection. *See HomeAway.com*, 918 F.3d at 684 (noting that fact "[t]hat the Ordinance regulates 'conduct' is not alone dispositive" immediately before applying City's test); *see also Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 702-04 (1986). But the challenged provisions here do not regulate expressive conduct—they directly compel (and, in the case of the deactivation policy requirement, also restrict) the use of "the written … word"—i.e., "pure speech." *Anderson*, 621 F.3d at 1058-59 (cleaned up).

That means the First Amendment applies. Unlike expressive conduct, "pure speech is entitled to First Amendment protection unless it falls within one of the 'categories of speech … fully outside the protection of the First Amendment,'" like obscenity, fighting words, or defamation. *Id.* at 1058 (omission in original) (quoting *United States v. Stevens*, 559 U.S. 460, 471 (2010)); *see also Texas v. Johnson*, 491 U.S. 397, 406 (1989) ("The government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word."). That is why this Court did not even mention the City's test in *NetChoice* (which involved compelled written reports)—and why the Supreme Court has not done so in pure speech cases. *See, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018) (*NIFLA*); *Expressions Hair Design v. Schneiderman*, 581 U.S. 37 (2017).

17

As for the cases that do provide useful guidance—this Court's decision in *NetChoice*, and the Supreme Court's in *Expressions*, both of which applied First Amendment scrutiny to direct regulations of pure speech—the City's attempted distinctions fall flat. As noted, the City never confronts *NetChoice*'s key holdings. It says only that *NetChoice* is unlike this case because the law at issue "requir[ed] online businesses to 'opine on potential *speech-based* harms to children … *disconnected from any economic transaction*'" and "'deputize[d] covered businesses into serving as censors.'" City Br. 31 (emphasis in original) (quoting *NetChoice*, 113 F.4th at 1118-19). But the City's first point is a reason this Court gave for applying *strict* scrutiny—not *any* First Amendment scrutiny. *See* 113 F.4th at 1119. And its second was one of two independent reasons the Court gave for applying First Amendment scrutiny—the first being that the reporting provision "clearly compel[led] speech." *Id.* at 1117. The challenged provisions here do so too, and so likewise trigger First Amendment scrutiny.

The City has even less to say about *Expressions*. As Uber explained (at 27-28), the Supreme Court there held that a regulation of economic subject matter—prices—triggered First Amendment scrutiny because it "regulat[ed] the communication of prices rather than prices themselves." 581 U.S. at 48. The challenged provisions here are similar: they regulate communications about deactivation grounds rather than deactivation grounds themselves. The City's only

18

response is to incorrectly assume its conclusion: that the Ordinance merely "regulates conduct." City Br. 31.

### C. The City's Contention that the Deactivation Policy Requirement Regulates Speech About Unlawful Transactions Is Incorrect and Circular.

In a final attempt to escape First Amendment scrutiny, the City contends that "Uber has no First Amendment right to tell workers that they may be deactivated for a reason prohibited by law." *Id.* at 25; *see also* Localities Br. 23. That argument again overlooks that the deactivation policy requirement affirmatively obligates Uber to speak. Uber Br. 19-20, 22; *see supra* p.9. So the City's point would matter little even if persuasive.

Yet it is not persuasive either, because it assumes that the City's speech restrictions comply with the First Amendment. Aside from the prohibition on discriminatory deactivations, SMC §8.40.050(B), nothing in the Ordinance directly proscribes deactivations for any "reason prohibited by law." It proscribes deactivations for any reasons prohibited by *Uber's policy*, the content of which the City regulates. As the City elsewhere admits, the Ordinance only "prohibits [Uber] from deactivating a worker on a ground inconsistent with the company's policy" as compelled and regulated by the deactivation policy requirement. City Br. 28; *see also supra* pp.3-4. In other words, the Ordinance bars Uber from engaging in conduct inconsistent with the *speech* the City directly demands and limits—not the

19

other way around. The City's claim—effectively that "Uber has no First Amendment right to tell workers that they may be deactivated for a reason [that it is not allowed to include in its policy]"—is thus circular, as it assumes that the City may constitutionally compel Uber to announce a company policy, and forbid Uber from saying certain things in that policy, in the first place.

## III. The Challenged Provisions Are Subject to Heightened First Amendment Scrutiny, And Cannot Survive It.

### A. The Challenged Provisions Do Not Regulate "Purely Factual and Uncontroversial" Speech.

The City next insists that if it must grapple with the First Amendment at all, it should face only the lenient form of First Amendment scrutiny, "akin to a rational basis test," applicable to "compelled commercial speech that is 'purely factual and uncontroversial.'" *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1266 (9th Cir. 2023); *see Zauderer v. Office of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985). Even assuming the "commercial" label applies here—and it does not, *see infra* pp.26-29—the speech the City compels is anything but purely factual and uncontroversial.

As Uber explained (at 45-46), that label, and the lenient scrutiny that comes with it, is reserved for forced disclosures of hard, proven facts, like the existence of a particular right or safety risk. The City mostly does not fight that premise. It instead contends that far from "requir[ing] Uber to opine on any subject," the

20

Ordinance requires Uber to "tell its workers of … City-mandated rights" under the Ordinance. City Br. 47; *see also id.* at 47-49. But as explained, Section 8.40.100—the Ordinance's "Notice of rights" provision—does that. *See supra* p.6. The challenged provisions, by contrast, require Uber to offer, at least implicitly, opinions on sensitive questions of judgment, like the question of which triggers are both sufficiently serious to warrant deactivation and reasonably related to safety and efficiency. *See supra* pp.6-10; Uber Br. 38-42.

In that regard, this case is like *X Corp.* At issue there was a requirement that social media platforms prepare reports "detailing their [terms of service] and content-moderation practices including, if at all, how the terms of service define and address" specific categories of content. 116 F.4th at 894. Because preparing those reports required "implicitly opining on whether and how certain controversial categories of content should be moderated," *id.* at 901, this Court held that the requirement compelled more than purely factual and uncontroversial speech, *id.* at 900-03.

The same is true here: preparing the "network company's deactivation policy, defining what constitutes a violation that may result in deactivation," SMC §8.40.050(A)(1), requires implicitly opining on whether and how particular safety, efficiency, and other issues should be addressed. Those "subjective opinions," *NetChoice*, 113 F.4th at 1120, are not purely factual. Nor are they uncontroversial.

If Uber said its policy is to deactivate courier accounts whenever consumer ratings persist below a minimum threshold, the City would certainly view that as controversial. The speech the City has compelled is no less controversial just because Uber must *omit* that point from the policy it announces. When the government has forced speakers to "take sides in a heated political controversy," *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 848 (9th Cir. 2019), the controversy does not disappear just because the government also makes it illegal for speakers to take positions it dislikes.[6]

Ultimately, the City resorts to arguing that it does not matter whether the required speech demands expressing opinions, because "'[f]orcing a company to explain the reason for its actions is a purely factual disclosure.'" City Br. 48 (quoting *Chamber of Com. v. SEC*, 85 F.4th 760, 769 (5th Cir. 2023)). But that argument is irrelevant to the deactivation policy requirement. And as far as it affects the explanation and substantiation requirements, the City does not explain how it can be squared with *X Corp.* (or *NetChoice*). Moreover, the Fifth Circuit case the City cites is no longer good law: it merely restated a rule established in *NetChoice, L.L.C. v.*

---

[6] The City's contrary understanding appears limitless. On its logic, a law compelling a non-profit to say "our policy is to oppose prostitution" would compel purely factual and uncontroversial speech—since the non-profit would, after all, have such a policy (because the government told it to). *Cf. AOSI*, 570 U.S. at 213.

*Paxton*, 49 F.4th 439, 446, 485 (5th Cir. 2022), which the Supreme Court vacated last year, *Moody v. NetChoice, LLC*, 603 U.S. 707, 745 (2024).

### B. The Challenged Provisions Cannot Survive Even Intermediate Scrutiny.

The City next contends that at most, the challenged provisions are subject to intermediate scrutiny because they regulate only commercial speech. City Br. 34-41, 49-50. The challenged provisions are in fact subject to strict scrutiny. *See infra* pp.25-29. But the Court need not decide which level of scrutiny applies, because even assuming that intermediate scrutiny applies, the City does not carry its "'heavy'" burden under that test. *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1176 (9th Cir. 2018) (quoting *44 Liquormart*, 517 U.S. at 516).

The City first contends that the challenged provisions survive intermediate scrutiny because the Ordinance merely "prohibits only unlawful communications." City Br. 50-51. But again, that both ignores that the Ordinance compels Uber to speak in the first place, and assumes the conclusion that the City may constitutionally restrict the content of Uber's deactivation policy. *See supra* pp.19-20. If the First Amendment does anything, it prohibits government from just declaring "communications" "unlawful."

Beyond that, the City hardly attempts to carry its burden. Most notably, it flunks intermediate scrutiny's key requirement that a law not "burden substantially more speech than is necessary to further" its interests. *Ward v. Rock Against Racism*,

23

491 U.S. 781, 799 (1989). The City's argument, in its entirety, is that "without the Challenged Provisions, workers would not know why and how they may be deactivated, both of which are key to protecting workers from unlawful deactivations." City Br. 52-53. But that is obviously wrong: the City could have accomplished that much by enacting an ordinance replacing the challenged provisions with a direct prohibition of deactivations on the grounds the City disfavors, and a requirement that those grounds be listed in the Section 8.40.100 notice of rights. The City never explains why that approach would not have sufficed—even though Uber identified it in its opening brief (at 48).

The City knows well that a policy mandate, with all its extra burdens on speech, is not necessary to achieve these goals. After all, it imposed no policy requirement respecting discriminatory deactivations; it just directly prohibited them, *see* SMC §§8.40.050(B), 8.40.060(A), and required notice of this protection, *see id.* §8.40.100; *see also* Addendum (model notice of rights: companies "[c]annot subject you to … deactivation that is intended to or results in discrimination"). Similarly, when the City adopted an "App-Based Worker Minimum Payment Ordinance," it directly regulated conduct—by providing that "a network company shall compensate app-based workers" based on a formula, SMC §8.37.050(A)—and mandated a "notice of rights" stating "the applicable minimum … amount," *id.* §8.37.100(B)(1).

Why, then, was it necessary to force Uber to announce its own "reasonable" deactivation policy, to conform that policy to the City's views rather than its own, and to justify in writing individual determinations under that policy? The City does not say. It thus fails to show that the challenged provisions are "not more extensive than is necessary" in regulating Uber's speech. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980).

### C. In Any Event, Strict Scrutiny Applies and the Challenged Provisions Do Not Survive It.

#### 1. The City does not meaningfully dispute that the challenged provisions regulate Uber's speech based on its content.

The City does not appear to contest that, as Uber explained (at 36-45), the challenged provisions regulate "particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Instead, besides contending that the provisions regulate commercial speech (addressed in the next section), the City tries only to nitpick Uber's strict scrutiny citations.

That gets the City nowhere. The City contends (at 53) that Uber improperly cited non-commercial strict scrutiny cases in arguing that even *commercial* speech regulations trigger strict scrutiny if content-based. But Uber never argued that at all. *See* Uber Br. at 16, 43 (acknowledging otherwise). And the distinctions the City attempts to draw between this case and those Uber cites are irrelevant: the City does

not dispute that the challenged provisions regulate speech based on content (or, in the case of the deactivation policy requirement, viewpoint), so they are subject to strict scrutiny unless they regulate commercial speech.

But anyway, those factual distinctions are illusory. Contrary to the City's assertion (at 54), as in *X Corp.*, Uber is being required to at least "implicitly opin[e]" on controversial matters. 116 F.4th at 901; *supra* pp.7-10. And to the extent the City suggests (at 54-55) that the speech compelled in *X Corp.*, *NetChoice*, and *NIFLA*, because of its content, was entitled to greater protection than the speech compelled here, that contravenes the basic point of the First Amendment. Aside from entirely unprotected speech (like obscenity) and commercial speech, the First Amendment does not disfavor particular speech based on content. Rather, to preserve "an uninhibited marketplace of ideas," *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (cleaned up), it subjects laws that do so to strict scrutiny, *Reed*, 576 U.S. at 163.

> 2.  *The challenged provisions do not regulate mere commercial speech.*

As Uber showed (at 36-47), Uber's deactivation policy and individual deactivation explanations do not "propose … commercial transaction[s]," but instead convey "subjective opinions" regarding sensitive questions, *NetChoice*, 113 F.4th at 1119; *see supra* pp.7-10. And none of the factors courts assess in close cases, *see Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 64-67 (1983), are

satisfied here. The challenged provisions therefore regulate *non*-commercial speech, and the City fails to show otherwise.

The City begins with the startlingly broad assertion that the regulated speech is commercial because "[e]mployer speech related to the protection of workers is commercial speech." City Br. 36. That is not the commercial speech test. *See First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir. 2017) ("the commercial transaction test is the test for identifying commercial speech" (cleaned up)). And for good reason. Otherwise, laws compelling companies to make policy statements for or against DEI, or restricting speech endorsing or opposing particular laws regulating workplaces, would be exempt from strict scrutiny.

Nor does the regulated speech "exclusively concern[] terminating commercial contracts." City Br. 37. An account deactivation terminates a commercial relationship, but that does not mean that everything Uber is compelled to *say about* deactivations does so, too. As Uber has explained, the City can penalize Uber for having a non-compliant policy even if Uber never deactivates an account on a ground the City disapproves. *See supra* pp.3-5.

Nor do the *Bolger* factors suggest that the regulated speech is commercial. The City concedes on the first factor, and its only arguments on the others are that the challenged provisions "pertain only to Uber's delivery service" and that "[Uber's] primary motivation in retaining and terminating workers is economic."

27

City Br. 38. If that were enough, most everything a business says about its business would be commercial speech—even, for example, Uber's speech urging the City to revise the Ordinance. *See, e.g.*, ER-62, ER-64. That speech "pertain[ed]" to Uber Eats, after all, and the Ordinance affects Uber's business. As this Court put it in rejecting an argument with similar implications, "[p]rotection under the First Amendment cannot be vitiated so easily." *X Corp.*, 116 F.4th at 902.

In truth, neither remaining *Bolger* factor is satisfied. Begin with the third. What matters for that factor is not whether Uber is economically motivated to deactivate courier accounts (though it generally is not, Uber Br. 10); it is whether "economic benefit [is] the primary purpose *for speaking*," *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1117 (9th Cir. 2021) (emphasis added). But here, the City is both *compelling* Uber to speak and preventing Uber from speaking as it wishes. The City offers no response to Uber's point (at 45) that it would speak differently if free to do so.

That leaves the second factor: whether the speech "refer[s] to a particular product." *IMDb.com Inc. v. Becerra,* 962 F.3d 1111, 1122 (9th Cir. 2020). But this factor alone does not render speech commercial. *Bolger*, 463 U.S. at 66. And the regulated speech here does not "refer to a particular product" in the sense *Bolger* contemplates just because it "pertains" to Uber Eats. That analysis does nothing to identify what the *Bolger* factors exist to identify: advertisements, clear or disguised.

*See id.* at 66–68. By the City's logic, strict scrutiny would not apply to a law compelling Uber to disparage its own platform—say, by announcing upon users opening the app that "Uber Eats is bad for America because it makes unhealthy food too readily available"—because that statement would "pertain" to Uber Eats.

### 3. *The challenged provisions fail strict scrutiny.*

The City barely argues that strict scrutiny is satisfied. It first asserts that it has a compelling interest in "protecting health, safety, and welfare." City Br. 55. That is a legitimate goal, but not one the Supreme Court has held justifies a direct, content-based restriction of speech. The City's cited cases (at 55-56)—upholding, for example, governmental interests in restoring security after violent protests, *see Menotti v. City of Seattle*, 409 F.3d 1113, 1143 n.57 (9th Cir. 2005)—hardly endorse a sweeping power to restrict speech to serve general economic interests.

The City's narrow tailoring argument—that "[p]rohibiting the reasons upon which Uber may deactivate workers would not be nearly as effective" unless Uber is compelled to "notify its workers of the lawful bases for which it may deactivate them and the requirements of Seattle law," City Br. 56—is even weaker. Perhaps that explains the need for a *notice of rights* provision. But the challenged provisions are not notice of rights requirements—again, a *different* provision plays that role—and the City offers no reason why the *policy*, *explanation*, and *substantiation*

requirements are "the least restrictive means" of achieving its interests, *McCullen*, 573 U.S. at 478. They are not. *See supra* pp.23-25.

## IV. The Deactivation Policy Requirement Denies Uber Fair Notice of What It May Say.

The City fares no better defending the vagueness of its mandate to announce a "reasonable policy." SMC §8.40.050(A)(2).

The City first asserts (at 56-58) that a facial vagueness challenge is improper, or that Uber must prove that the deactivation policy requirement is vague in all, or the vast majority of, its applications. But "facial vagueness challenges are appropriate if the statute clearly implicates free speech rights." *Cal. Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1149 (9th Cir. 2001). When that is so, the standard is relaxed: "whether a substantial amount of legitimate speech will be chilled," "judged in relation to what the statute clearly proscribes." *Id.* at 1151-52. Further, "courts apply the vagueness analysis more strictly, requiring statutes to provide a greater degree of specificity and clarity." *Id.* at 1150; *see* Uber Br. 50-51. Since the deactivation policy requirement regulates Uber's speech, *see supra* pp.11-20; Uber Br. 19-36, more stringent vagueness scrutiny applies. *See Cal. Tchrs. Ass'n*, 271 F.3d at 1148-55.

Whether the requirement that Uber's deactivation policy be "reasonably related" to its "safe and efficient operations," SMC §8.40.050(A)(2), is facially vague must be "judged in relation" to what that requirement "clearly proscribes."

*Cal. Tchrs. Ass'n*, 271 F.3d at 1151. But it "clearly" proscribes little: it condemns just eight specific deactivation grounds. SMC §8.40.050(A)(2)(a)-(h). As to the near-limitless universe of other potential grounds for deactivation? It offers only those same eight examples. Yet as Uber explained (at 52-55), those examples confuse rather than clarify, because among them are grounds that *do* seem at least *reasonably* related to safety or efficiency.

Perhaps recognizing Uber's predicament, the City first says Uber should seek administrative guidance from OLS. City Br. 59. But the notion that Uber should ask for permission before speaking evokes "governmental practices of the sort that the First Amendment was drawn to prohibit." *Citizens United v. FEC*, 558 U.S. 310, 335 (2010). It also ignores that the City rebuffed stakeholders and failed to issue rules before the Ordinance took effect. *See* ER-58-59. Administrative guidance is not much use if the administrators refuse to provide it.[7]

The City next mischaracterizes Uber's argument. Uber is not arguing that novel laws using reasonableness standards are always unconstitutionally vague. City Br. 60-61. It is arguing that the deactivation policy requirement is vague because no judicial or administrative guidance, tradition, or industry custom clarifies

---

[7] As noted, *see supra* n.3, the City has finally promulgated implementing rules. But those rules do not clarify what the City thinks it means for a policy to "reasonably relate" to "safe and efficient operations."

its indeterminate standard, *and* the little statutory context that exists only further confuses.

When it confronts *that* argument, the City has little to say. It mostly quibbles over the precise scope of two specific policy prohibitions Uber has identified as confusing—relating to consumer ratings and background checks, SMC §8.40.050(A)(2)(e), (h)—and points to legislative findings explaining why the City included them. City Br. 62-63. The City's reasons for disfavoring those grounds is not the point. It is that to "a person of ordinary intelligence," *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (cleaned up), exceedingly and persistently low aggregate consumer ratings, and background checks that turn up driving records full of collisions, would seem to be paradigmatic indicators that a policy author could at least *reasonably* think relate to safety and efficiency. And it is fanciful to suggest that Uber has sufficient notice because it can try to divine what the City will think of whatever (potentially unreliable or inconclusive) "empirical data," City Br. 64, may exist respecting countless other possible deactivation policies.

Ultimately, missing from the City's brief is anything justifying its assertion that the reasonable policy requirement is "clear in the vast majority of its intended applications." *Id.* So the City flips the script, faulting Uber for supposedly failing to identify what speech the requirement's vagueness chills. *See id.* at 65. The

32

answer is most everything beyond the eight specific policies explicitly prohibited by the Ordinance.

## V. Key Ordinance Provisions Are Intertwined With, and Dependent On, The Unconstitutional Provisions.

As Uber explained (at 55-58), because the deactivation policy requirement is the "heart and soul" of the Ordinance, the rest of the Ordinance cannot be severed from it. Nothing the City says shows otherwise.

First, the City notes the Ordinance's severability clause. But that cannot save a law when an unconstitutional provision is inextricably intertwined with and fundamental to the law's efficacy. *See, e.g.*, *Leonard v. City of Spokane*, 127 Wash.2d 194, 201-02 (Wash. 1995).

Next, the City identifies a set of mostly ancillary provisions that do not mention the deactivation policy requirement. City Br. 69-70. To be clear, at least one—the right to challenge an "unwarranted" deactivation, SMC §8.40.060(B)—*is* intertwined with the policy requirement, because that right is all but empty without the deactivation policy requirement to give content to the concept of "unwarranted" deactivation. Uber Br. 57. But regardless, the question that matters is whether "the legislature would have passed" whatever remains after removing the

unconstitutional provision and those provisions that logically depend on it.  *Leonard*,

127 Wash.2d at 201 (cleaned up).[8]

The City Council would not have done so here.  The City incants  that the

Ordinance is about "protecting workers from unwarranted deactivation."  City Br.

18; *see also id.* at 2, 5, 14-15, 19, 21-22, 26, 28, 47, 52.  Yet it does not deny that the

prohibition on "unwarranted" deactivations, Section 8.40.060(A), cannot function

(except as to discriminatory deactivations, *see* SMC §8.40.050(B)) without the

deactivation policy requirement that gives it content.  *See supra* pp.3-4.  Indeed, the

City *omits* Section 8.40.060(A) from its list of supposedly severable provisions.  It

also omits the explanation and substantiation requirements, Sections 8.40.070 and

8.40.080, even assuming they are not independently unconstitutional.  It instead

identifies mostly enforcement and remedies provisions.  City Br. 70.  But the City

Council would not have enacted a standalone enforcement bill shorn of the critical

provisions to be enforced.  Enforcement of the whole Ordinance should therefore be

enjoined.  And at the very least, enforcement of the specific provisions Uber has

identified here and in its opening brief (at 56-57 & n.9)—including the bar on

---

[8] Nor is it the case (as the City suggests, at 70-71) that only unconstitutional *funding* provisions can trigger severance under that test; Washington law does not impose that limitation.  *See Hall by Hall v. Niemer*, 97 Wash.2d 574, 582-84 (Wash. 1982).

unwarranted deactivations and the explanation and substantiation requirements, none of which the City contends is severable—should be enjoined.

## VI.    The Remaining Factors Favor a Preliminary Injunction.

The City does not meaningfully contest that if Uber is likely to succeed on the merits, it is suffering *per se* irreparable harm.  In passing (at 65), the City notes that a "mere assertion of First Amendment rights" is not enough, but the sole case it cites distinguished *asserting* First Amendment rights from establishing a likely violation. *See CTIA*, 928 F.3d at 851.  Nor must Uber prove a chilling effect, City Br. 66-67— a requirement that would make no sense in a compelled speech case.  When a plaintiff shows a likely constitutional violation, "a finding of irreparable harm follows inexorably."  *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (cleaned up).

The City next insists that Uber is not suffering irreparable harm because it assertedly "disregard[ed] the Ordinance" by declining to change its deactivation policy.  City Br. 66-67.  The City is incorrect—Uber has adjusted its Seattle deactivation policy—but that is beside the point.  This Court is reviewing an order issued on December 31, 2024, based on the record then before the district court. That record contains nothing about Uber's actions since.  More fundamentally, the City's conclusion would not follow even if its premise were correct.  When a law is likely unconstitutional, a plaintiff faces a "Hobson's choice" between surrendering

35

its constitutional rights (by immediately complying) and risking enforcement action (by exercising those rights); that choice itself is irreparable harm. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009).

The City also contends (at 67) that Uber cannot be suffering irreparable harm because it supposedly waited too long to sue. Uber sued before the Ordinance took effect on January 1, 2025. And had Uber sued earlier, it risked a ripeness objection given the ongoing rulemaking process. ER-57-59. Nor was there any significant delay: Uber actively sought to address many of its concerns through the rulemaking process, but sued as soon as it became clear that the City would not do so before the Ordinance took effect. ER-58-59. Regardless, "delay is but a single factor to consider in evaluating irreparable injury," and "courts are loath to withhold relief solely on that ground." *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1006 (9th Cir. 2023), *cert. denied,* 144 S. Ct. 824 (2024) (cleaned up). And the City points to no case suggesting that purported delay overrides the *per se* irreparable harm of a likely constitutional violation.

Finally, since "it is always in the public interest to prevent the violation of a party's constitutional rights," *Baird*, 81 F.4th at 1040 (cleaned up), the City offers no explanation of how the public interest could favor withholding relief if the Ordinance likely violates the Constitution. *See* City Br. 67-68.

36

## CONCLUSION

The Court should reverse and remand with instructions to enter a preliminary injunction.

Date: April 1, 2025

Robert J. Maguire
Theo A. Lesczynski
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
(206) 757-8094
robmaguire@dwt.com
theolesczynski@dwt.com

/s/ David M. Zionts
Stacey K. Grigsby
David M. Zionts
Neha Jaganathan
Alexander J. Cave
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
sgrigsby@cov.com
dzionts@cov.com
njaganathan@cov.com
acave@cov.com

Neema Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067
(424) 332-4800
nsahni@cov.com

*Attorneys for Plaintiffs-Appellants Uber Technologies, Inc. and Portier, LLC*

37

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-228

I am the attorney or self-represented party.

**This brief contains** | 8,379 | **words,** including | 0 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

⦿ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☒ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/David M. Zionts | **Date** | 4/1/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*

# ADDENDUM

## TABLE OF CONTENTS

SMC 8.40 2025 Notice of Rights, Seattle Office of Lab. Standards,
https://www.seattle.gov/documents/Departments/LaborStandards/OLS
_AppBasedWorkers_Deactivation2024_11x17poster_Final%20%281
%29.pdf (last accessed Mar. 31, 2025)....................................................... A-1

**THIS LAW PROTECTS COVERED APP-BASED WORKERS REGARDLESS OF IMMIGRATION STATUS.**
**Covered network companies must comply with this law. Retaliation is illegal. Effective January 1, 2025.**

# App-Based Worker Deactivation Rights (ABWDR) Ordinance
# SMC 8.40 2025 Notice of Rights
### Effective January 1, 2025

The mission of the Office of Labor Standards is to advance labor standards through thoughtful community and business engagement, strategic enforcement and innovative policy development, with a commitment to race and social justice.



This poster must be displayed in a noticeable area at the workplace, in English and the language(s) spoken by workers. The Office of Labor Standards provides translations, interpretations, and accommodations for people with disabilities.

## YOU ARE COVERED IF:

- At least 25% of your completed offers and/or offers that you cancelled with cause during the 180 days before deactivation involved performing services in Seattle for a covered network company; **or**

- Your deactivation was related to an incident or incidents that occurred while performing services in Seattle for a covered network company.

**Not all workers who use App-Based Platforms for work are covered by this law. For more information scan here:**



https://www.seattle.gov/laborstandards/ordinances/app-based-worker-ordinances/app-based-worker-deactivation-rights-ordinance

## AS A COVERED APP-BASED WORKER YOU HAVE THE RIGHT TO:

- Receive fair notice of a deactivation policy describing what actions could lead to deactivation and a procedure for challenging deactivation.
  - The deactivation policy must be reasonably related to the company's safe and efficient operations.

- Challenge deactivation through the network company's internal deactivation challenge procedure, no matter where the incident leading to the deactivation occurred.

- 14 days' notice before deactivation, except in the case of egregious misconduct or if required by law in which case companies can deactivate you immediately.
  - The notice should tell you the reason(s) for deactivation, including the specific incident(s) that violated the company's policy, and provide all records the network company relied on and considered to make its decision about deactivating you.

## NETWORK COMPANIES:

- Cannot subject you to "unwarranted" deactivation, including deactivation that is intended to or results in discrimination.

- Must investigate claims that you violated the company's policies before deactivating you and must show that, more likely than not, you violated the policy.

- Must apply rules, policies, and penalties around deactivation in a consistent way.

- May only deactivate you when it is reasonably related to the violation and must consider the circumstances of your work.

- May immediately deactivate you in order to comply with laws, regulations, or due to egregious misconduct.

- Are required to create a system to help you understand whether or not you are covered under this ordinance.

- Must provide you with this notice of rights in English and your known primary language through a smartphone application, email, or an online web portal.

## KNOW YOUR RIGHTS:

**RETALIATION IS PROHIBITED**
You have the right to be protected from retaliation (negative action) against you for enjoying or exercising the above rights.

**RIGHT TO FILE A COMPLAINT**
You have a right to make a complaint with the Office of Labor Standards (OLS) or to file a lawsuit after challenging your deactivation through the company's internal procedures.



**Prior to June 1, 2027, OLS will have limited authority to enforce some of the rights in this law. For additional details, scan here:**

https://www.seattle.gov/laborstandards/ordinances/app-based-worker-ordinances/app-based-worker-deactivation-rights-ordinance

Workers can seek other avenues of relief for those rights that OLS cannot yet enforce.



**Seattle** Office of Labor Standards

**CONTACT OLS:**

**NETWORK COMPANIES**
Obtain technical assistance and/or receive training

**APP-BASED WORKERS**
File a complaint with OLS or file a lawsuit in court

## 206-256-5297
www.seattle.gov/laborstandards

810 THIRD AVE, SUITE 375, SEATTLE, WA 98104
HOURS: 8:00 AM – 4:00 PM (MON–FRI)
LABORSTANDARDS@SEATTLE.GOV

