**Nos. 25-228 and 25-231**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UBER TECHNOLOGIES, INC. AND PORTIER, LLC,

*Plaintiffs-Appellants,*

and MAPLEBEAR INC. D/B/A INSTACART,

*Intervenor-Plaintiff,*

v.

CITY OF SEATTLE,

*Defendant-Appellee.*

_____

UBER TECHNOLOGIES, INC. AND PORTIER, LLC,

*Plaintiffs,*

and MAPLEBEAR INC. D/B/A INSTACART,

*Intervenor-Plaintiff-Appellant,*

v.

CITY OF SEATTLE,

*Defendant-Appellee.*

On Appeals from the United States District Court
for the Western District of Washington
No. 2:24-cv-02103-MJP, Hon. Marsha J. Pechman

## JOINT PETITION FOR REHEARING EN BANC

| | |
|---|---|
| Alexander T. MacDonald | Stacey K. Grigsby |
| LITTLER MENDELSON, P.C. | David M. Zionts |
| Workplace Policy Institute | COVINGTON & BURLING LLP |
| 815 Connecticut Avenue, NW | One CityCenter |
| Suite 400 | 850 Tenth Street, NW |
| Washington, DC 20006 | Washington, DC 20001 |
| (202) 772-2505 | (202) 662-6000 |
| *Counsel for Plaintiff-Appellant* | Robert J. Maguire |
| *Maplebear, Inc. d/b/a Instacart* | DAVIS WRIGHT TREMAINE LLP |
| | 920 Fifth Avenue, Suite 3300 |
| | Seattle, WA 98104 |
| | (206) 757-8094 |
| | *Counsel for Uber Plaintiffs-Appellants* |

*Additional Counsel Listed on Signature Page*

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants Uber Technologies, Inc. and Portier, LLC (together, "Uber"), by their undersigned counsel, state that Uber Technologies, Inc. is a publicly held corporation with no parent company. Based solely on SEC filings regarding beneficial ownership of Uber Technologies, Inc.'s stock, Uber Technologies Inc. is unaware of any shareholder who beneficially owns ten percent or more of Uber Technologies, Inc.'s outstanding stock. Portier, LLC is a wholly-owned subsidiary of Uber Technologies, Inc.

Date: April 8, 2026

/s/ David M. Zionts
David M. Zionts

*Counsel for Uber Plaintiffs-Appellants*

In accordance with Federal Rule of Appellate Procedure 26.1, Appellant Maplebear Inc. d/b/a Instacart states that it has no parent corporation and that no publicly held corporation holds more than 10% of its stock.

Date: April 8, 2026

/s/ Alexander T. MacDonald
Alexander T. MacDonald

*Counsel for Plaintiff-Appellant Maplebear, Inc. d/b/a Instacart*

i

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENTS ....................................................... i

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION AND RULE 40(B)(2) STATEMENT ..................................... 1

BACKGROUND ....................................................................................... 4

    A.    Seattle's Policy Requirement ................................................. 4

    B.    The Divided Panel Decision ................................................. 6

REASONS FOR GRANTING REHEARING ........................................... 8

I.    Rehearing Is Warranted to Reestablish that Direct Regulation of Pure Speech Triggers First Amendment Scrutiny. ................................... 8

    A.    The Majority Contravened Precedent Holding that Pure Speech, Including Writing, Is Protected Speech. .............................. 9

    B.    The Majority Contravened Precedent Establishing that Direct Speech Regulation Cannot Be a Mere "Incidental" Burden. ............. 11

    C.    The Majority's Errors Will Confuse First Amendment Review and Enable Abuse. ...................................................... 14

II.    Rehearing Is Warranted to Reestablish that Compelled Expression of Opinion Does Not Survive *Zauderer*. ........................................ 15

CONCLUSION ....................................................................................... 19

CERTIFICATE OF COMPLIANCE

EXHIBIT A – OPINION, DATED MARCH 4, 2026

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ................................................................................ 15

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*,
916 F.3d 749 (9th Cir. 2019) ................................................... 3, 16, 19

*Anderson v. City of Hermosa Beach*,
621 F.3d 1051 (9th Cir. 2010) ........................................ 2, 8, 9, 10, 11

*Arcara v. Cloud Books, Inc.*,
478 U.S. 697 (1986) .............................................................................. 6, 10

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*,
33 F.4th 1107 (9th Cir. 2022) .................................................................. 6

*Bartnicki v. Vopper*,
532 U.S. 514 (2011) ..................................................................................... 9

*California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
29 F.4th 468 (9th Cir. 2022) .................................................................. 17

*Chiles v. Salazar*,
No. 24-539, 607 U.S. __ (March 31, 2026) .............................. 4, 12, 13, 14, 16

*CompassCare v. Hochul*,
125 F.4th 49 (2d Cir. 2025) .................................................................... 10

*CTIA-The Wireless Ass'n v. City of Berkeley*,
873 F.3d 774 (9th Cir. 2017) ......................................................... 15, 19

*CTIA-The Wireless Ass'n v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) ............................................................ 3, 17

*Expressions Hair Design v. Schneiderman*,
581 U.S. 37 (2017) ...................................................................... 12, 13, 14

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) .................................................................. 10

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
   515 U.S. 557 (1995) .......................................................................18

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024) .......................................................................15

*Nat'l Ass'n of Wheat Growers v. Bonta*,
   85 F.4th 1263 (9th Cir. 2023) .......................................................18

*NetChoice, LLC v. Bonta*,
   113 F.4th 1101 (9th Cir. 2024) ......................... 2, 8, 10, 12, 13, 14, 17

*NIFLA v. Becerra*,
   585 U.S. 755 (2018) .......................................................................10

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*,
   475 U.S. 1 (1986) ...........................................................................18

*Rumsfeld v. FAIR*,
   547 U.S. 47 (2006) ..............................................................2, 11, 12, 14

*S.F. Apartment Ass'n v. City & Cnty. of San Francisco*,
   881 F.3d 1169 (9th Cir. 2018) .......................................................10

*Texas v. Johnson*,
   491 U.S. 397 (1989) .........................................................................9

*United States v. O'Brien*,
   391 U.S. 367 (1968) .........................................................................9

*United States v. Stevens*,
   559 U.S. 460 (2010) .......................................................................10

*World Wide Rush v. City of Los Angeles*,
   606 F.3d 676 (9th Cir. 2010) .........................................................19

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
   471 U.S. 626 (1985) ........................................... 3, 4, 6, 15, 16, 18, 19

**Statutes**

Seattle Mun. Code §8.40.020 ................................................................5

Seattle Mun. Code §8.40.050 .........................................................5, 8, 11

iv

Seattle Mun. Code §8.40.060 ................................................................5, 11

Seattle Mun. Code §8.40.100 ...................................................................17

Seattle Mun. Code §8.40.130 .....................................................................6

## INTRODUCTION AND RULE 40(B)(2) STATEMENT

According to a divided panel of this Court, a law that "compel[s] and dictate[s] the content of a written communication" does not regulate speech and warrants no First Amendment scrutiny. Op.16. That startling conclusion is as wrong as it sounds, as Judge Bennett explained in dissent. The majority's speech-is-not-speech holding contravenes numerous controlling precedents. So does its alternative holding, which neuters First Amendment review of compelled commercial speech by transmuting a government mandate to express *subjective opinions* into anodyne, purely factual disclosure requirements. En banc rehearing is warranted.

A Seattle ordinance targets Uber, Instacart, and other platforms that connect consumers to couriers delivering food and goods. The specific provision at issue compels such companies to draft and disseminate "written deactivation polic[ies]" detailing when they may deactivate couriers' accounts (*i.e.*, restrict their platform access), and bars the writing and distribution of any policies not "reasonably related" to "safe and efficient operations." Op.16 nn.5-6. The majority "agree[d]" the Ordinance "requires [companies] 'to draft and provide workers a written' deactivation policy." Op.16 n.6. And while a *separate* provision regulates the conduct of deactivations (largely by making it unlawful for a company to violate its own policy), "the requirement to promulgate a deactivation policy of a certain kind

1

[is] distinct and separately enforceable." Op.36 (dissent). The policy requirement is a "speech regulation," plain and simple. Op.37 (dissent).

Concluding that the First Amendment applies to this speech regulation should have been straightforward under binding precedent. "[T]he written … word"—which this Court has called "pure speech"—is "entitled to First Amendment protection." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1058 (9th Cir. 2010) (cleaned up). And it is "well-established that the forced disclosure of information, even purely commercial information, triggers First Amendment scrutiny." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1117 (9th Cir. 2024). That is no less true when a law compelling speech "bundl[es]" that requirement "with other, separate provisions that do not." *Id.* It doubtless follows that a mandate to write and disseminate a policy triggers *some* First Amendment scrutiny.

Not anymore. Ignoring the elementary rule that writing is speech, the panel "applie[d] the wrong test": it took the test for determining when expressive *conduct* (like flag-burning) is protected, and applied it to words on a page. Op.37 (dissent). Then it reinvented the concept of incidental burdens. Precedent requires asking whether the challenged provision regulates conduct and happens to impact speech as a byproduct. *See, e.g.*, *Rumsfeld v. FAIR*, 547 U.S. 47, 62 (2006). Instead, the majority considered the policy requirement's speech impact "incidental" because it seemed minor compared to a separate conduct-regulating provision bundled with

2

it—an approach that *NetChoice* expressly forecloses. The jarring result: the majority "disagree[d]" that the "drafting and publication of [a company] policy is speech within the meaning of the First Amendment." Op.16 n.6 (cleaned up). This departure from precedent gives governments of all stripes a roadmap for compelling speech while evading *any* First Amendment scrutiny.

The reimagining of First Amendment doctrine did not stop there. As an alternative holding, the majority diluted review of compelled commercial speech under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985). This Court has struggled with when to apply *Zauderer*, but when it applies, "it is exceptionally important that the compelled speech be purely factual." *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 767 (9th Cir. 2019) (Christen, J., concurring in part and in judgment); *see also id.* at 756 (en banc); *CTIA-The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 844-45 (9th Cir. 2019). The panel defanged that limit. The Ordinance "requires [companies] to formulate and publish their *opinions* on what behaviors or standards are reasonably related to safety or to efficiency" and warrant deactivation. Op.40 (dissent) (emphasis added). Yet the majority deemed that just fine because once a company expresses those opinions, it becomes "literally true" that they constitute the company's policy. Op.23 n.9. By that circular logic, any requirement to opine can be recharacterized

3

as "purely factual." Op.23. And to top it off, the majority declared new exceptions to *Zauderer* that threaten further doctrinal confusion.

So: with the majority opinion on the books, "pure speech" becomes non-expressive conduct, direct speech regulation becomes "incidental" burden, controversial opinion becomes incontrovertible fact, and *Zauderer* becomes a rubber stamp. In announcing these rules, the majority unceremoniously discarded Supreme Court and Ninth Circuit precedent, leaving judges and litigants in this Circuit to hack through a confusing First Amendment thicket.

This state of affairs cries out for intervention. Since the panel's decision, the Supreme Court reminded courts to carefully police government "effort[s] to recast speech as conduct." *Chiles v. Salazar*, No. 24-539, 607 U.S. __, Slip Op.13 (March 31, 2026). The panel decision rewards and encourages exactly that. If the First Amendment has nothing to say about a provision of law mandating "you must write about this, but you cannot say that," something has gone seriously wrong. En banc rehearing is warranted to restore the First Amendment principles the panel upturned.

**BACKGROUND**

A. **Seattle's Policy Requirement**

Uber, Instacart, and other app-based platforms connect consumers seeking deliveries of food and goods with couriers. On rare occasions, these platforms must

4

deactivate a courier's account for safety, performance, or other reasons pursuant to policies that reflect their experience and beliefs.

A Seattle ordinance compels covered "network compan[ies]" to inform couriers "in writing of the network company's deactivation policy, defining what constitutes a violation that may result in deactivation." Seattle, Wash., Ordinance 126878 (Aug. 14, 2023) (partially codified at Seattle Mun. Code (SMC), ch. 8.40 and §3.02.125), §8.40.050(A)(1). "[T]he network company's written deactivation policy" must be "reasonably related to the network company's safe and efficient operations." *Id.* §8.40.050(A)(1)-(2).[1]

That written policy requirement is the Ordinance's foundation. A separate provision bars "unwarranted deactivation[s]," *id.* §8.40.060(A), the main definition of which is "a deactivation that does not comply with [§]8.40.050"—the policy requirement. *Id.* §8.40.020. The Ordinance regulates deactivation principally by compelling companies to write policies, making it "unlawful to speak a policy that is unrelated to safe and efficient operations," and then making it "unlawful for a company to violate its own deactivation policy." Op.43 (dissent).

The Ordinance took effect in 2025, but enforcement phases in over time. Until June 2027, Seattle may not punish companies for conducting "unwarranted"

---

[1] The written policy cannot allow, *e.g.*, "deactivation based solely on a quantitative metric derived from aggregate customer ratings." SMC §8.40.050(A)(2)(e).

5

deactivations. It can already punish companies for violating the standalone mandate to write and disseminate a reasonable policy. *Id.* §§8.40.130(A)-(B).

## B.     The Divided Panel Decision

Uber and Instacart sued Seattle and requested preliminary relief, alleging, *inter alia*, that the policy requirement violates the First Amendment. Op.10-11. The district court denied relief, concluding that the Ordinance "regulates conduct" with at most "incidental" effects on speech. ER-12-13.

A divided panel affirmed. The majority first held that the policy requirement triggers *no* First Amendment scrutiny. Op.12-19. Relying on cases about expressive conduct rather than pure speech, *see, e.g.*, *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986), it insisted that the Ordinance's "core" effect and "stated purpose" is "preventing unwarranted deactivations"—*i.e.*, conduct. Op.13, 15. Concluding that "[a]ny burden on speech" was "incidental," it held the policy requirement exempt from First Amendment scrutiny. Op.19.

As an "alternative" holding, the majority concluded that the policy requirement at most compels commercial speech and survives review under *Zauderer*. Op.19-25.[2] It reasoned that the required policies disclose "purely factual

---

[2] Each alternative holding is binding until overturned. *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107, 1117 (9th Cir. 2022).

6

and uncontroversial information": "once a deactivation policy is issued, it will be 'literally true'" that it is the company's policy. Op.22-23 & n.9 (cleaned up).[3]

Judge Bennett dissented in relevant part. He explained that Seattle "requires [Uber and Instacart] to draft and provide workers a written 'deactivation policy,'" and "[t]he drafting and publication of such a policy is speech," triggering First Amendment scrutiny. Op.34-35. He observed that the majority "applie[d] the wrong test," because the policy requirement regulates "speech itself," not expressive conduct. Op.35 n.3, 37. And that speech regulation was direct rather than "incidental," because "[t]he prohibition on unwarranted deactivations and the requirement to promulgate a deactivation policy of a certain kind are distinct and separately enforceable." Op.36.

Judge Bennett continued that there are "[a]t the very least … serious question[s]" whether the policy requirement can survive, because "[t]he speech compelled here is not purely factual and uncontroversial information." Op.40, 43. The Ordinance "requires … formulat[ing] and publish[ing] … opinions on what behaviors or standards are reasonably related to safety or to efficiency" and warrant deactivation. Op.40. Those opinions "are likely to be controversial," "because safety and efficiency are often in tension," and company policies need to balance those values (and others). *Id.* Since the district court erred on the threshold speech-

---

[3] The panel unanimously rejected a vagueness challenge. Op.25-28.

7

versus-conduct question, Judge Bennett would have remanded to "redo" the analysis. Op.34.

## REASONS FOR GRANTING REHEARING

### I.    Rehearing Is Warranted to Reestablish that Direct Regulation of Pure Speech Triggers First Amendment Scrutiny.

The Ordinance's policy requirement directly commands private parties to draft a "written deactivation policy," write it in a particular way (ensuring it is "reasonably related" to "safe and efficient operations"), and "inform" couriers of it "in writing."  SMC §8.40.050(A)(1)-(2).  As every panel member agreed, that provision "compel[s] and dictates the content of … written communication[s]." Op.16 (majority) (cleaned up); *accord* Op.34-36 (dissent).  Yet the majority nonetheless held that it regulates only "nonexpressive conduct," imposes at most "incidental" burdens on speech, and triggers *no* First Amendment scrutiny.  Op.19.

That surprising holding contradicts countless precedents of the Supreme Court and this Court.  It obliterates the distinction between "pure speech" and expressive conduct, drawn in cases like *Anderson*.  And it dramatically expands the concept of "incidental" speech burdens to encompass direct speech regulations, disregarding the lessons of cases like *NetChoice*.  Left undisturbed, it will foster significant and unnecessary confusion in this Circuit—and provide a playbook for governments to manipulate public debate on controversial issues, free from First Amendment challenge.

**A.** **The Majority Contravened Precedent Holding that Pure Speech, Including Writing, Is Protected Speech.**

In concluding that a written communication is "nonexpressive activity," Op.16, the majority "applie[d] the wrong test," Op.37 (dissent). First Amendment doctrine distinguishes between "purely expressive activity" (or "pure speech") and "conduct that merely contains an expressive component." *Anderson*, 621 F.3d at 1059 (emphases omitted); *see also Texas v. Johnson*, 491 U.S. 397, 402-04 (1989); *United States v. O'Brien*, 391 U.S. 367, 376 (1968). The former includes acts necessarily involving communication, like "movies," "paintings," and "tattooing," *Anderson*, 621 F.3d at 1060-61—and, of course, "the written or spoken word," *Johnson*, 491 U.S. at 406. "If the acts of disclosing and publishing information do not constitute speech, it is hard to imagine what does fall within that category." Op.35 (dissent) (cleaned up) (quoting *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2011)). Expressive conduct, by contrast, includes "conduct that can" but "does not necessarily" "express an idea." *Anderson*, 621 F.3d at 1059; *see, e.g.*, *Johnson*, 491 U.S. at 402-06 (flag-burning).

The majority collapsed this distinction. Seattle's policy requirement regulates "pure speech"—all agree that it expressly compels the drafting and dissemination of "writing," *i.e.*, paradigmatic "purely expressive activity." *Anderson*, 621 F.3d at 1059. Precedent dictated a bright-line rule: "pure speech is entitled to First Amendment protection unless it falls within one of the 'categories of speech ... fully

9

outside the protection of the First Amendment,'" like defamation. *Anderson*, 621 F.3d at 1058 (quoting *United States v. Stevens*, 559 U.S. 460, 471 (2010)).

Disregarding that precedent, the majority asked whether the regulated "conduct includes a 'significant expressive element that drew the legal remedy in the first place.'" Op.12 (quoting *Arcara*, 478 U.S. at 706). That flexible test allows consideration of a law's "stated purpose," *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019)—here, in the majority's view, preventing unwarranted deactivations, Op.13-15. But that test applies only when asking whether expressive *conduct* triggers First Amendment scrutiny. *See, e.g.*, *HomeAway.com*, 918 F.3d at 684-85. It makes no sense applied to a law regulating pure speech, which is always "purely expressive," *Anderson*, 621 F.3d at 1059, no matter what a judge thinks of its value, *see Stevens*, 559 U.S. at 470.

The majority identified no case applying that test to a law regulating pure speech. In fact, consistent with *Anderson*, courts invariably subject such laws to First Amendment scrutiny without mentioning the majority's test. *See, e.g.*, *NIFLA v. Becerra*, 585 U.S. 755, 766-73 (2018); *NetChoice*, 113 F.4th at 1117-18. They do so even when the law requires only a disclosure that certain rights exist under law. *See S.F. Apartment Ass'n v. City & Cnty. of San Francisco,* 881 F.3d 1169, 1176-78 (9th Cir. 2018); *CompassCare v. Hochul*, 125 F.4th 49, 62, 64 (2d Cir. 2025) (law requiring that employer "include … notice of employee rights" if it

10

"chooses to provide an employee handbook" "is a content-based regulation of speech" (cleaned up)).

Because the Ordinance's policy requirement directly regulates "writing words down," *Anderson*, 621 F.3d at 1062, it regulates "speech subject to the First Amendment," Op.36 (dissent). The majority's contrary holding defies controlling precedent.

**B.     The Majority Contravened Precedent Establishing that Direct Speech Regulation Cannot Be a Mere "Incidental" Burden.**

In concluding that the Ordinance's speech burdens are "incidental," Op.19, the majority departed from still more precedent.

A provision of law may burden speech incidentally, and thereby avoid First Amendment scrutiny, only when it "make[s] a course of *conduct* illegal," and that "conduct [is] in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *FAIR*, 547 U.S. at 62 (emphasis added) (citation omitted). A good example is the Ordinance's ban on discriminatory deactivations. SMC §8.40.060(A) (banning unwarranted deactivations); §8.40.050(B) (discriminatory deactivation considered unwarranted). That facially regulates conduct—deactivating accounts for a proscribed reason. That conduct might be "carried out by means of language," *FAIR*, 547 U.S. at 62 (citation omitted)—telling couriers that their account is being deactivated—but that is "plainly incidental to the [provision's] regulation of conduct." *Id.* Similarly, a price-control law for

11

sandwiches would "indirectly" burden speech; "a store would likely have to put '$10' on its menus or have its employees tell customers that price," but only as an "incidental" byproduct of the price regulation. *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017).

The majority's incidental-burden conclusion diverges from the way the Supreme Court uses that concept. The policy requirement does not "make a course of conduct illegal." *FAIR*, 547 U.S. at 62 (citation omitted). It is a "speech regulation" that is "distinct and separately enforceable" from the Ordinance's conduct-regulating prohibition on unwarranted deactivations. Op.36-37 (dissent); *see also* Op.42-43 (dissent) (explaining that the Ordinance regulates deactivations by separately making it "unlawful for a company to violate its own deactivation policy," while the policy requirement stands on its own as a "direct regulation of speech itself").

Seattle's decision to make a speech regulation the linchpin of this regulatory scheme is no doubt unusual. But courts "cannot 'ignore'" an overt speech regulation because the government's "stated purpose" is regulating conduct. Op.37 (dissent) (quoting *NetChoice*, 113 F.4th at 1117). "[S]peech does not become conduct just because the State may call it that." *Chiles*, Slip Op.12. What matters is what the speech-regulating provision actually does. In *Expressions* (which the majority never mentioned), the Supreme Court observed that "a typical price regulation" might

12

burden speech only incidentally but held that a law "regulating the communication of prices rather than prices themselves … regulates speech." 581 U.S. at 47-48. Just so here: regulating the communication of deactivation policies, rather than just the conduct of deactivations, regulates speech.[4]

The panel decision also directly contravened *NetChoice*. This Court held that a provision whose "primary effect" is regulating speech cannot be recast as "incidental[ly]" burdening speech based on the broader law that houses it. 113 F.4th at 1117. Governments "cannot insulate a specific provision of law" from First Amendment scrutiny "by bundling it with other, separate provisions that do not implicate the First Amendment." *Id.* As with *Expressions*, the majority's conduct-not-speech analysis never mentions *NetChoice*. Yet it did exactly what *NetChoice* rejected, exempting a speech regulation from First Amendment scrutiny because Seattle bundled it with a separate conduct regulation. The Supreme Court recently removed any doubt that *NetChoice* is right and the panel majority is wrong: "Just because a law may *generally* function as a regulation of conduct does not exempt it from demanding First Amendment review" when a government directly targets "speech alone." *Chiles*, Slip Op.16 (cleaned up).

---

[4] Rather than center speech regulation, Seattle could have proscribed "unwarranted deactivations", coupled with the "notice of rights" "that is separately required by a distinct [provision]." Op.38, 40 (dissent). Instead, Seattle chose to directly regulate written policies.

Under *FAIR*, *Expressions*, *Chiles*, and *NetChoice*, the policy requirement is a "compulsion of speech" that is "*not* incidental to" the Ordinance's separate "prohibition on unwarranted deactivations," and consideration of the "statutory purpose" "is inapplicable here." Op.36, 38 (dissent). The full Court should restore the "well-established" rule that "the forced disclosure of information, even purely commercial information, triggers First Amendment scrutiny," even if "other parts of [the Ordinance] may primarily or exclusively regulate non-expressive conduct." *NetChoice*, 113 F.4th at 1117.

### C. The Majority's Errors Will Confuse First Amendment Review and Enable Abuse.

The majority's departure from precedent sows serious doctrinal confusion. Deciding whether the First Amendment applies to a provision directly regulating pure speech used to be simple: it does. But now, courts in this Circuit will have to analyze the whole law in which the provision was enacted; discern whether its other provisions regulate conduct and whether doing so is the law's purpose; and if so, determine—exactly how is unclear—whether the conduct regulation is so central that the speech-regulating provision should be brushed aside as "incidental." Judicial resources should not be wasted on such an amorphous exercise, which will inevitably lead to contradictory results.

Worse, the majority's reasoning is a how-to manual for governments to achieve their desired ends without having to justify their speech-regulating means:

14

Pick a controversial issue; require speakers to opine on it, but declare some opinions out-of-bounds; add a provision barring speakers from violating their government-mandated policy statements; toss in a statement that the statutory purpose is to regulate conduct; and enforce the speech requirement without any First Amendment scrutiny. The pernicious speech regulations that could result are endless. Governments might compel companies to make written policy statements opining on fair wages, under the guise of regulating wages themselves. Employers, unions, or universities could all be obliged to write and communicate policies endorsing, or disavowing, hot-button cultural positions.

That is not the law, and the better for it. "However imperfect the private marketplace of ideas," worse is government distorting it by "coercing speakers to provide more of some views or less of others." *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024); *cf. 303 Creative LLC v. Elenis*, 600 U.S. 570, 589 (2023). En banc rehearing is warranted to correct this doctrinal confusion and ensure that government cannot directly compel speech free from *any* First Amendment scrutiny.

## II. Rehearing Is Warranted to Reestablish that Compelled Expression of Opinion Does Not Survive *Zauderer*.

The panel's alternative holding also warrants rehearing. *Zauderer* is an exception to ordinary First Amendment review, which this Court has previously expanded over thoughtful objections. *See, e.g.*, *CTIA-The Wireless Ass'n v. City of Berkeley*, 873 F.3d 774, 776-77 (9th Cir. 2017) (Wardlaw, J., dissenting from denial)

15

(agreeing with panel dissent of Friedland, J.); *Am. Beverage Ass'n*, 916 F.3d at 767-69 (Nguyen, J., concurring in judgment); *id.* at 766-67 (Christen, J., concurring in part and in judgment). Even so—perhaps especially so—a critical safeguard has remained: compelled commercial speech must be "purely factual" and "noncontroversial" to satisfy *Zauderer*. *Am. Beverage Ass'n*, 916 F.3d at 756 (en banc). As the Supreme Court recently instructed, "less searching review" applies only to the "*narrow* category[y]" of "laws that require speakers to disclose *only factual, noncontroversial* information." *Chiles*, Slip Op.11 (emphases added).

The panel nullified that crucial limit. The "purely factual" criterion is "exceptionally important" because it protects against compelled expression of the government's favored opinions. *Am. Beverage Ass'n*, 916 F.3d at 767 (Christen, J., concurring in part and in judgment). The majority held this requirement satisfied because the policy requirement mandates companies disclose only the "details of [their] deactivation policies," which "will be 'literally true'" once issued. Op.23 & n.9. By that warped logic, any government-compelled policy statement will be "purely factual," because there will always "be a 'fact' as to what the policy says" once spoken. Op.40 n.7 (dissent). The panel majority's reasoning shrinks an exceptionally important doctrinal bulwark to almost nothing.

For the "purely factual" requirement to have meaning, it must require compelled speech disclosing *objective facts* existing *independent* of that speech.

16

That is exactly what this Court's precedents have required. *See NetChoice*, 113 F.4th at 1120 (government-compelled statements of businesses' "subjective opinions" about their services not "purely factual and uncontroversial"); *California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478-79 (9th Cir. 2022) (warning that acrylamide is "known" to State to cause cancer not "purely factual" because State did not know that); *CTIA*, 928 F.3d at 846-47 (warning regarding radiation exposure "purely factual" because content was "literally true").[5] But formulating a deactivation policy requires *judgments* about "the best balance of safety, efficiency, and other values" and "what behaviors or standards are reasonably related to safety or to efficiency"—questions with no objectively true answers. Op.40 & n.7 (dissent). A company's "subjective opinions" about when deactivation furthers safety and efficiency are no more "purely factual" than its opinions on controversial culture-war topics; they do not become "purely factual" because the government compels uttering the opinion as company policy. *See NetChoice*, 113 F.4th at 1120.

The majority also made it nearly impossible for speech to qualify as "controversial." To do so, it posited, the speech's subject must involve a political controversy on the level of abortion. Op.23. Few issues will meet that standard,

---

[5] The Ordinance separately compels such disclosures: §8.40.100 requires sharing a notice of rights. As Judge Bennett explained, the policy requirement is different. Op.40 (dissent).

explaining why this Court has never required that much. Instead, it has held that a warning that a chemical is carcinogenic is "controversial" if subject to scientific debate. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1278 (9th Cir. 2023). The speech Seattle compels can hardly be *less* controversial than that: deactivation policies reflect sensitive judgments on which "[d]ifferent stakeholders—including users, workers, employees, shareholders, and traffic authorities—are bound to have different perspectives on where the best balance lies." Op.40 (dissent).

Further gutting *Zauderer* (and engendering more doctrinal confusion), the panel suggested two brand-new ways to satisfy it, each contrary to precedent. First, the majority declared that any constitutional problem is "dispel[led]" if the government allows speakers to state disagreement with the views they have been compelled to voice. Op.24 n.9. That alarming notion conflicts with more Supreme Court precedent, which teaches that leaving it to a speaker to disclaim a government-compelled statement "compromise[s]" the speaker's "right to autonomy over the message" by forcing the speaker "'to affirm in one breath that which [it] den[ies] in the next.'" *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 576 (1995) (quoting *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1, 16 (1986) (plurality opinion)). Second, the majority insisted that *Zauderer* is satisfied if the government "regulates at most speech related to" unlawful conduct. Op.24. But as Judge Bennett explained, that is an exception to

18

the ordinary test for *restrictions* of commercial speech. It makes sense that governments can ban advertising contraband. It makes no sense to fashion a new exception to *Zauderer* to allow *compelled* speech that happens to relate to purportedly unlawful conduct. *See* Op.41 (dissent) (citing *World Wide Rush v. City of Los Angeles*, 606 F.3d 676, 684–85 (9th Cir. 2010)).[6]

The panel majority's alternative holding is as concerning as its primary one. Ordinarily, "[i]f the multitudinous governing bodies in [this] Circuit desire to compel speech from their citizens, they should show a substantial state interest and use narrowly tailored means to achieve it." *CTIA*, 873 F.3d at 777 (Wardlaw, J., dissenting from denial). Even under the *Zauderer* exception, "[w]hen the government takes the momentous step of mandating that its message be delivered by private parties, it is exceptionally important that the compelled speech be purely factual." *Am. Beverage Ass'n*, 916 F.3d at 767 (Christen, J., concurring in part and in judgment). Without rehearing, the *Zauderer* exception will swallow the First Amendment rule, and government speech mandates will become just another tool in the toolbox, rather than the constitutionally momentous measures they are.

## CONCLUSION

The Court should grant rehearing en banc.

---

[6] The majority also applied this exception in a "circular and incorrect" manner. Op.42-43 (dissent).

Date: April 8, 2026

Respectfully submitted,

/s/ Alexander T. MacDonald

/s/ David M. Zionts

Alexander T. MacDonald
LITTLER MENDELSON, P.C.
Workplace Policy Institute
815 Connecticut Avenue, NW
Suite 400
Washington, DC 20006
(202) 772-2505
amacdonald@littler.com

Douglas E. Smith
LITTLER MENDELSON, P.C.
One Union Square
600 University Street
Suite 3200
Seattle, WA 98101
(206) 381-4906
desmith@littler.com

*Counsel for Plaintiff-Appellant
MapleBear, Inc. d/b/a Instacart*

Stacey K. Grigsby
David M. Zionts
Neha Jaganathan
Alexander J. Cave
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
sgrigsby@cov.com
dzionts@cov.com
njaganathan@cov.com
acave@cov.com

Neema Sahni
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067
(424) 332-4800
nsahni@cov.com

Robert J. Maguire
Theo A. Lesczynski
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
(206) 757-8094
robmaguire@dwt.com
theolesczynski@dwt.com

*Counsel for Uber Plaintiffs-Appellants*

20

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form: https://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** 25-228

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel

rehearing/petition for rehearing en banc/response to petition is *(select one)*:

◉ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** 4,194 .
*(Petitions and responses must not exceed 4,200 words)*

**OR**

○ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** s/David M. Zionts **Date** April 8, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 11** *Rev. 12/01/24*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form: https://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** 25-231

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel

rehearing/petition for rehearing en banc/response to petition is *(select one)*:

◉ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** 4,194 .
*(Petitions and responses must not exceed 4,200 words)*

**OR**

○ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** s/Alexander T. MacDonald     **Date** April 8, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 11**                                                                 *Rev. 12/01/24*

# Exhibit A

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UBER TECHNOLOGIES, INC.; PORTIER, LLC, | No. 25-228 |
| *Plaintiffs - Appellants*, | D.C. No. 2:24-cv-02103-MJP |
| and | |
| MAPLEBEAR INC., doing business as Instacart, | OPINION |
| *Intervenor-Plaintiff*, | |
| v. | |
| CITY OF SEATTLE, | |
| *Defendant - Appellee*. | |

| | |
|---|---|
| UBER TECHNOLOGIES, INC., PORTIER, LLC, | No. 25-231 |
| *Plaintiffs*, | D.C. No. 2:24-cv-02103-MJP |
| and | |
| MAPLEBEAR INC., doing business as Instacart, | |

*Intervenor-Plaintiff - Appellant*,

v.

CITY OF SEATTLE,

*Defendant - Appellee.*

Appeals from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted July 10, 2025
Seattle, Washington

Filed March 4, 2026

Before: Susan P. Graber, Richard R. Clifton, and Mark J.
Bennett, Circuit Judges.

Opinion by Judge Clifton;
Partial Dissent by Judge Bennett

# SUMMARY*

## First Amendment

The panel affirmed the district court's denial of a motion by Uber Technologies, Inc. and Maplebear Inc. for a preliminary injunction to enjoin the City of Seattle from enforcing Seattle's App-Based Worker Deactivation Rights Ordinance (the "Ordinance"), which applies to network companies that provide a platform for customers to hire temporary workers and prohibits unwarranted deactivations of these app-based workers' accounts.

Section 8.40.050.A of the Ordinance requires (1) that a network company "inform" any app-based worker "in writing" of the company's deactivation policy and (2) that the deactivation policy be "reasonably related" to the company's "safe and efficient operations." Plaintiffs, two network companies that rely on app-based workers for their businesses, alleged that the Ordinance compels speech in violation of the First Amendment, and that it is unconstitutionally vague.

The panel held that the Ordinance does not regulate speech subject to protection under the First Amendment because the Ordinance regulates nonexpressive conduct—the unwarranted deactivation of worker accounts. The fact that the Ordinance, in plaintiffs' words, necessarily "compel[s] and dictate[s] the content of a written communication" does not transform a law regulating

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

4          UBER TECHNOLOGIES, INC. V. CITY OF SEATTLE

nonexpressive activity into one that infringes speech, and any burden on speech is incidental.

Alternatively, even if the Ordinance is interpreted to regulate speech, that speech would be commercial speech, and the Ordinance's regulation of it would overcome the applicable lower level of First Amendment scrutiny. Because the Ordinance regulates deactivation standards and requires companies to communicate those standards to their workers, the panel applied the test articulated in *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651 (1985).

As to the Ordinance's first requirement that network companies inform app-based workers of their deactivation policies, the panel held that it meets the test drawn from *Zauderer*, because the provision is reasonably related to Seattle's goal to keep app-based workers informed and employed while keeping the public safe, does not purport to compel speech on controversial issues, and is not unduly burdensome.

Concerning the Ordinance's second requirement that the deactivation policies be "reasonably related" to the companies' "safe and efficient operations", the panel concluded that provision is not an impermissible regulation of speech, because it regulates speech related to what Seattle has designated as unlawful activity: the unwarranted deactivations of worker accounts.

The panel further held that the Ordinance is not unconstitutionally vague because it provides fair notice to a person of ordinary intelligence as to what grounds for deactivation are reasonably related to safety and efficiency.

UBER TECHNOLOGIES, INC. V. CITY OF SEATTLE               5

Accordingly, the panel held that because Plaintiffs are unlikely to succeed on the merits of their claim, the district court did not abuse its discretion when it denied the preliminary injunction.

Dissenting in part, Judge Bennett agreed with the majority that the Ordinance is not unconstitutionally vague. However, in his view the Ordinance deactivation policy requirement compels speech and is thus subject to the First Amendment. While he agreed with the majority's alternative reasoning that the speech at issue is commercial speech subject to intermediate scrutiny, Plaintiffs raised serious questions going to the merits. He would therefore vacate and remand to have the district court redo its analysis on the merits and reexamine the *Winter* preliminary injunction factors in light of a determination that the Ordinance is subject to intermediate scrutiny, and in light of the current facts.

---

### COUNSEL

David M. Zionts (argued), Stacey K. Grigsby, Alexander J. Cave, and Neha Jaganathan, Covington & Burling LLP, Washington, D.C.; Neema Sahni, Covington & Burling LLP, Los Angeles, California; Robert J. Maguire and Theo A. Lesczynski, Davis Wright Tremaine LLP, Seattle, Washington; for Plaintiffs-Appellants.

Alexander T. MacDonald (argued), Littler Mendelson PC, Washington, D.C.; Douglas E. Smith, Littler Mendelson PC, Seattle, Washington; for Intervenor-Plaintiff-Appellant.

Jessica L. Goldman (argued), Jesse L. Taylor, Lawrence C. Locker, Molly J. Gibbons, and Eva S. Oliver, Summit Law Group PLLC, Seattle, Washington; Ghazal Sharifi, Assistant City Attorney; Ann Davison, City Attorney; Seattle City Attorney's Office, Seattle, Washington; for Defendant-Appellee.

Jason W. Anderson, Mark C. Lamb, and Nicholas A. Carlson, Carney Badley Spellman PS, Seattle, Washington, for Amicus Curiae Washington Food Industry Association.

Adam G. Unikowsky and Jonathan J. Marshall, Jenner & Block LLP, Washington, D.C.; Jonathan D. Urick and Audrey Beck, U.S. Chamber Litigation Center, Washington, D.C.; for Amicus Curiae the Chamber of Commerce of the United States.

Jonathan B. Miller and Naomi Tsu, Public Rights Project, Oakland, California; Robert Taylor, City Attorney, Office of the Portland City Attorney, Portland, Oregon; Heather Ferbert, San Diego City Attorney, Office of the San Diego City Attorney, San Diego, California; for Amici Curiae Local Governments.

Jessica A. Skelton and W. Scott Ferron, Pacifica Law Group LLP, Seattle, Washington, for Amicus Curiae International Municipal Lawyers Association.

# OPINION

CLIFTON, Circuit Judge:

The City of Seattle enacted Ordinance 126878 (the "Ordinance") in 2023.[1] It added a new chapter 8.40 to the Seattle Municipal Code, titled the "App-Based Worker Deactivation Rights Ordinance." Applying to "network companies" that provide a platform for customers to hire temporary workers, like delivery drivers, the Ordinance prohibits "unwarranted deactivations" of these app-based workers' accounts. Seattle, Wash., Ordinance 126878, § 8.40 (Aug. 14, 2023). The law is Seattle's attempt to address what it perceives to be the instability of the gig economy and the consequent vulnerability of delivery workers.

Uber Technologies, Inc., including its wholly owned subsidiary Portier, LLC ("Uber"), and Maplebear Inc. ("Instacart") (collectively, "Plaintiffs") are two network companies that rely on app-based workers for their businesses. They claim that the Ordinance violates their constitutional rights in two ways: it impermissibly infringes on their protected speech, and it is void for vagueness. They appeal the district court's denial of their motion for a preliminary injunction to enjoin enforcement of the Ordinance against them.

We conclude that the Ordinance does not regulate speech subject to protection under the First Amendment because the Ordinance regulates nonexpressive conduct—the unwarranted deactivation of worker accounts. Even if the

---

[1] Relevant portions of the Ordinance are attached as an appendix to this opinion.

Ordinance is interpreted to regulate speech, that speech would be commercial speech, and the Ordinance's regulation of it would overcome the applicable lower level of First Amendment scrutiny. As for the vagueness challenge, we conclude that the Ordinance is not unconstitutionally vague, because a person of ordinary intelligence would understand its meaning. Accordingly, the district court did not abuse its discretion when it denied Plaintiffs' request for a preliminary injunction, and we affirm.

## I.   Background

Uber and Instacart are large companies in the growing gig economy. Plaintiffs and other companies like them connect workers with customers, then take a cut of payments made by the customers. Relevant to the Ordinance, Uber and Instacart act largely as delivery services. (The Ordinance does not apply to certain categories of app-based workers, like rideshare drivers, which is what many people may immediately think of as "Uber." Ordinance § 8.40.020.) Their workers pick up orders from restaurants, or retailers, or even other customers on the app. The workers also can operate as personal shoppers by going to businesses like grocery stores, browsing for items, and delivering those items to customers.

Both workers and customers access those services through accounts on apps built by the network companies. While Uber and Instacart are the parties to bring this challenge, any app-based worker regulation affects more than just the users of those two platforms. As of 2021, sixteen percent of adults in the United States have earned money via an online gig platform. Monica Anderson et al., *The State of Gig Work in 2021*, PEW RSCH. CTR. (Dec. 8,

2021), https://www.pewresearch.org/internet/2021/12/08/the-state-of-gig-work-in-2021/ (last visited Oct. 29, 2025).

Seattle's Ordinance prohibits deactivations of app-based workers for reasons that its drafters deemed unwarranted. Ordinance § 8.40.060.A. Plaintiffs do not challenge that prohibition but instead challenge the constitutionality of certain provisions of the Ordinance, in particular section 8.40.050, titled "Deactivation requirements." That section requires (1) that a network company "inform" any app-based worker "in writing" of the company's deactivation policy and (2) that the deactivation policy be "reasonably related" to the company's "safe and efficient operations." *Id.* § 8.40.050.A.1–2.

The Ordinance includes a list of eight example policies that are not reasonably related to safety and efficiency. *Id.* § 8.40.050.A.2.a–h. The list includes policies that would result in a deactivation "based solely on a quantitative metric derived from aggregate customer ratings" or "based on the results of a background check, consumer report, driver record, or record of traffic infractions, except in cases of egregious misconduct or where required by other applicable law." *Id.* § 8.40.050.A.2.e, h.[2]

---

[2] "Egregious misconduct" is defined as:

> [A]n action or behavior by an individual app-based worker that: (1) endangers the physical safety of the customer, or a third person, the network company, or an animal; or (2) intentionally causes economic harm to the customer, a third person, or the network company; or (3) is threatening, harassing, or abusive to the customer, a third party, or the network company.

The Ordinance applies only to internal communications with app-based workers. It does not require that the companies communicate any deactivation policies to the general public. Nor does it require that the companies communicate their agreement with such policies. The companies may describe the policies as being required by the Ordinance.

Seattle's stated purpose for enacting the Ordinance is to "protect[] and promote[] public health, safety, and welfare." *Id.* § 1.C. Minimum labor standards are recognized as helping both employers, by improving worker performance and quality, and workers, by increasing job stability. *Id.* § 1.E, W. But network companies' growing reliance on algorithms leads, Seattle says, to "arbitrary evaluations and unwarranted deactivations." *Id.* § 1.H. Establishing "clear performance expectations," limitations on deactivations predicated on quantitative metrics and possibly inaccurate background checks, and a legal right to challenge unwarranted deactivations are all attempts to regulate reliance on automatic, algorithmic determinations of worker-eligibility. *See id.* § 1.I–L, P, U.

Uber filed this action seeking a temporary restraining order and preliminary injunction against the Ordinance shortly before it was set to take effect. It alleged three claims,

---

... [It] includes but is not limited to ... failing to maintain a valid state driver's license . . . .

... [It] shall not include conduct related to non-criminal moving violations ... or traffic collisions unless the app-based worker has accumulated more than three non-criminal moving violations or at-fault collisions in the previous three years.

*Id.* § 8.40.020.

two of which are pursued in this appeal: that the Ordinance compels speech in violation of the First Amendment, and that it is unconstitutionally vague.[3] Instacart moved to intervene and, in doing so, agreed to forego independent briefing on the temporary restraining order before the district court.

The district court held that the Ordinance regulates the deactivation of worker accounts, with any effects on speech or expression being "incidental to its worker-related conduct goals." The court concluded that the Ordinance was not void because the term "reasonable" was not vague, and any discrepancies in interpretation were rooted in a "fundamental disagreement" between Uber and Seattle over what policies are reasonably related to safe and efficient operations. After determining that Uber did not show a likelihood of establishing any constitutional violation, the district court found neither irreparable harm nor a balance of equities or public interest tipping in Uber's favor. It denied the motion for a temporary restraining order and preliminary injunction.

Uber and Instacart appealed. A stay pending final resolution of the appeals, entered by the district court based on a stipulation of the parties, is currently in place.

We have jurisdiction under 28 U.S.C. § 1292(a)(1). A district court's denial of a preliminary injunction is reviewed for abuse of discretion, a "limited and deferential" standard. *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004); *see also X Corp. v. Bonta*, 116 F.4th 888, 897 (9th

---

[3] The third claim cited in the complaint, that the Ordinance restricts Uber's expressive associational rights in violation of the First Amendment, has not been argued in this appeal.

Cir. 2024). The underlying issues of law that led to that decision, such as whether the Ordinance compels speech or merely regulates conduct, are reviewed de novo. *See Harris*, 366 F.3d at 760.

## II. First Amendment claims

Uber and Instacart argue that Seattle's Ordinance compels pure, content-based speech in violation of the First Amendment in two ways. First, the notice requirement compels speech by forcing the companies to communicate their deactivation policies and decisions in writing and make them accessible to workers. Second, the deactivation standards regulate that speech's content by requiring that the companies' policies be, in the words of the Ordinance, "reasonably related" to "safe and efficient operations."

### A. Conduct

As the parties bringing the challenge, Plaintiffs "bear[] the burden 'to demonstrate that the First Amendment even applies.'" *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 112 (9th Cir. 2024) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984)), *cert. denied*, 145 S. Ct. 1958 (2025). They fail to do so. The Ordinance regulates conduct, not speech.

While "freedom of speech prohibits the government from telling people what they must say," *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 61 (2006), not every law that results in a burden on speech is subject to scrutiny as a regulation of speech. Restrictions on conduct are subject to scrutiny only if the conduct includes a "significant expressive element that drew the legal remedy in the first place." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986). Here, the conduct that draws the remedy is the

unwarranted deactivation of worker accounts. When conduct is nonexpressive, as is the case here, it is not subject to First Amendment scrutiny. *B & L Prods.*, 104 F.4th at 110; *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).

When determining whether a law regulates sufficiently expressive conduct, a court may consider both the "inevitable effect of a [law] on its face" and the law's "stated purpose." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019) (quoting *Sorrell*, 564 U.S. at 565). We consider both in turn.

The inevitable effect of the Ordinance is to ensure that network companies devise policies that do not result in unwarranted deactivations of app-based workers' accounts. At its core, then, the Ordinance regulates a business agreement between two parties: the network company and the worker who uses the company's platform to obtain gigs. A business agreement between two parties is not conduct with a significant expressive element. *See B & L Prods.*, 104 F.4th at 114 (holding that acceptance of an offer to sell firearms on state property is not conduct with a significant expressive element); *HomeAway.com*, 918 F.3d at 685 (holding that booking a short-term rental through an online platform is not conduct with a significant expressive element); *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015) ("A business agreement or business dealings between a franchisor and a franchisee is not conduct with a 'significant expressive element.'"); *see also Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 946 (2018) (Kagan, J., dissenting) (noting that the Supreme Court "has rejected all attempts" to make a First Amendment issue out of basic employment matters).

The Ordinance's stated purpose is to "protect[] and promote[] public health, safety, and welfare by establishing protections against unwarranted deactivations for app-based workers." Ordinance § 1.C. It does so by requiring network companies to inform app-based workers of what actions might lead to deactivation, Ordinance § 8.40.050.A.1, presumably so they can conform their conduct to the companies' expectations, and by prohibiting policies that might lead to unwarranted deactivation, *id.* § 8.40.050.A.2. The Ordinance's goal is to keep app-based workers informed and employed while keeping the public safe. *See id.* § 1. Nothing in the text of the Ordinance suggests an intent to restrict speech.[4]

---

[4]   The partial dissent takes issue with our reading of the Ordinance's stated purpose, arguing that it "is more ambiguous than the majority says." Partial Dissent at 38. The partial dissent appears to concede that "protect[ing] and promot[ing] public health, safety, and welfare," Ordinance § 1.C, is the Ordinance's stated purpose, but it adds another purpose to the mix—"to compel [P]laintiffs' publication of deactivation policies." Partial Dissent at 38**.** We disagree with that reading for two reasons.

First, the text of subsection 1.H, which the partial dissent cites in support of the additional purpose it proffers, simply reflects Seattle's *finding* that "[a]pp-based workers often do not have the information they need to know about how they will be evaluated." That subsection does not displace the central purpose of the Ordinance, stated earlier in subsection 1.C. Rather, it merely serves as one among many findings that Seattle considered when enacting the Ordinance.

Second, and more fundamentally, even assuming that subsection 1.H does announce *a* purpose of the Ordinance, the partial dissent's reading isolates a small part of the law, and, in doing so, misses the central purpose animating the Ordinance. In the First Amendment context, the fact that other purposes may be *inferred* from a law's text does not bar us from recognizing that the law has a central *stated* purpose. *Cf. HomeAway.com*, 918 F.3d at 685 ("The Ordinance itself makes clear that the City's 'central and significant goal . . . is

Plaintiffs urge us to look beyond the law's stated purpose and to focus solely on the contested provisions. They argue that subsections 8.40.050.A.1–2 do not prevent them "from deactivating courier accounts on any ground, and the fact that a *separate* provision addresses account deactivations does not mean no First Amendment scrutiny applies." But this reading ignores the placement of these provisions "in the context of the Ordinance as a whole." *Yim v. City of Seattle*, 63 F.4th 783, 792 (9th Cir. 2023) (quoting *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1274 (9th Cir. 2017)). To read these provisions independently from the Ordinance would be to orphan them from their purpose: preventing unwarranted deactivations.[5]

––––––––––––––––––––––––––––

preservation of its housing stock and preserving the quality and nature of residential neighborhoods.'" (alteration in original)). Our reading that the Ordinance's central purpose is to "protect[] and promot[e] public health, safety, and welfare" is reinforced by the fact that, unlike any other provision in section 1, the purpose articulated in subsection 1.C is attributed to "[t]his ordinance," that is, to the entirety of the law. Ordinance § 1.C. Additionally, the words "health," "safety," and "welfare" are repeated throughout the Ordinance with a regularity that further underscores their centrality and significance to the Ordinance as a whole. *See, e.g.*, *id.* § 1.B ("public health, safety, and welfare"); *id.* § 1.C (same); *id.* § 1.V ("safety"); *id.* § 1.W ("welfare" and "health").

Moreover, the Ordinance does not require Plaintiffs to communicate a deactivation policy to anyone other than the workers affected by it and does not require Plaintiffs to state their agreement with or support for the limitations imposed by the City. Those points further demonstrate that the central purpose of the Ordinance is to regulate the terms of network companies' deactivation of app-based workers, not to compel network companies' speech.

[5] The partial dissent relies on the delayed ability of Seattle's Office of Labor Standards to fine network companies for violating the Ordinance's prohibition on unwarranted deactivations, *see* Ordinance § 8.40.130.B, to argue that the requirement that network companies promulgate

The fact that the Ordinance, in Plaintiffs' words, necessarily "compel[s] and dictate[s] the content of a written communication" does not transform a law regulating nonexpressive activity into one that infringes speech. [6]

---

deactivation policies that are reasonably related to the companies' safe and efficient operations is not incidental to the substantive provisions of the Ordinance, Partial Dissent at 36–37. To the contrary, the delay demonstrates that the substantive provisions are what count. An affected app-based worker can sue a network company for any violation of any provision of the Ordinance. *Id.* §§ 8.40.060.C, 8.40.230. The Office also can enforce immediately the requirements that network companies create internal procedures for app-based workers to challenge deactivations, *id.* § 8.40.060.B.1, that network companies provide relevant records to workers who bring such challenges, *id.* § 8.40.080, that network companies provide a written notice of rights under the Ordinance to every app-based worker (a requirement that Plaintiffs do not challenge), *id.* § 8.40.100, and that network companies not retaliate against workers who exercise their rights under the Ordinance, *id.* § 8.40.120.B. The delay on which the partial dissent relies merely reflects Seattle's policy decision to punish violators for unwarranted deactivations, by fining them, only later. Forbearance of financial punishment does not logically suggest that informing app-based workers about the kinds of conduct that can lead to deactivation is more than incidental to establishing their right to be free from unwarranted deactivation. Instead, this delay suggests only that the City cares more about encouraging compliance with the substance of the new Ordinance than about punishing violators.

[6]    Any suggestion in the partial dissent to the contrary is mistaken. The partial dissent observes that the Ordinance requires Plaintiffs "to draft and provide workers a written" deactivation policy. Partial Dissent at 34–35. We agree that it does. *See* Ordinance § 8.40.050.A.1. The partial dissent then concludes that "[t]he drafting and publication of such a policy is speech" within the meaning of the First Amendment. Partial Dissent at 35. We disagree.

As a threshold matter, the fact that speech may ensue incidentally from a government regulation that otherwise concerns nonexpressive conduct—here, network companies' deactivation of app-based workers' accounts—does not mean that such "speech" receives protection under

the First Amendment. The Supreme Court not only has concluded that nonexpressive conduct is undeserving of First Amendment protection, but also has held that not all activity conducted with an intent to express an idea amounts to speech within the meaning of the First Amendment. *See, e.g.*, *United States v. O'Brien*, 391 U.S. 367, 376 (1968) (rejecting the notion that, "whenever the person engaging in the conduct intends thereby to express an idea," the person engages in speech under the First Amendment). We have followed suit. *See, e.g.*, *Edge v. City of Everett*, 929 F.3d 657, 669 (9th Cir. 2019) (holding that the plaintiffs' wearing of bikinis while working was not protected by the First Amendment because there was not a "'great likelihood' that their intended messages related to empowerment and confidence will be understood by those who view them"). That is why, even if the Ordinance were understood to be "not wholly unrelated to a communicative component," "that in itself [would] not trigger First Amendment scrutiny." *Int'l Franchise Ass'n*, 803 F.3d at 408.

Nor is the partial dissent's invocation of *X Corp.* persuasive in support of its conclusion that the Ordinance's requirement that network companies promulgate deactivation policies compels such companies to engage in commercial speech. Partial Dissent at 35. In *X Corp.*, as the partial dissent notes, we observed that a social media company's posting of its "existing [terms of service] and content moderation policies" was commercial speech. 116 F.4th at 901. But that observation was dictum. On appeal, the plaintiff challenged only the relevant statute's requirements that social media companies submit to the state semiannual reports detailing their content-moderation practices and the ways in which their terms of service address, *inter alia*, hate speech or racism, and that social media companies not materially omit or misrepresent required information in such reports. *Id.* at 894, 898. Accordingly, we did not consider the statute's requirement that social media companies publicly post their existing terms of service. *Id.* Moreover, in *X Corp.*, we reaffirmed that commercial speech generally is "speech that does no more than propose a commercial transaction," *id.* at 900 (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)), and that the "commercial speech analysis is fact-driven," *id.* (quoting *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir. 2017)), thereby rejecting any sweeping suggestion that would have the unwarranted consequence of designating much, if not all, activity with commercial indicia as commercial speech that implicates the First Amendment. Regardless, as

"[C]ompelled changes in conduct—which might incidentally compel changes in speech—are not reviewed as content-based speech restrictions." *Olympus Spa v. Armstrong*, 138 F.4th 1204, 1216 (9th Cir. 2025). Plaintiffs can still voice their displeasure with the Ordinance's standards, even while complying with them. Nothing prevents Plaintiffs from releasing statements, posting notices, or engaging the press in discussions about what grounds for deactivation they believe are reasonably related to the safety and efficiency of their businesses, including those grounds that the Ordinance explicitly identifies as *not* related to safety and efficiency. They can even include in the communications to their workers, alongside the required statements of their deactivation policies, a statement that they disagree with the Ordinance's requirements and the City's assessment of what is reasonably related to safe and efficient operations. That is their right. But it is not their right to disregard a valid economic regulation that targets neither speech nor expressive conduct that is protected by the First Amendment. *See Int'l Franchise Ass'n*, 803 F.3d at 408.

Like a law that prohibits employers from discriminating on account of race, which requires removal of signs and advertisements saying "White Applicants Only," the incidental speech requirement here "hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." *Rumsfeld*, 547 U.S. at 62; *see also Olympus Spa*, 138 F.4th at 1216 (holding that a law that prevented a spa from denying admission to transgender women, which required the spa to change its conflicting admissions policy, did not trigger First Amendment

---

discussed in Part II.B of this opinion, even assuming that the Ordinance regulates commercial speech, it satisfies the applicable level of scrutiny.

scrutiny). Instead, the Ordinance is like any well-established anti-discrimination or workplace safety law: it requires private companies to conform their internal policies to minimum standards and to communicate those policies. The Ordinance thus ensures that Plaintiffs are unable to carry out an unlawful course of conduct by creating and disseminating illegal deactivation policies. *Rumsfeld*, 547 U.S. at 62. "When 'the only inevitable effect, and the stated purpose' of a statute is to regulate nonexpressive conduct, our inquiry is essentially complete." *B & L Prods.*, 104 F.4th at 116 (quoting *HomeAway.com*, 918 F.3d at 685). The Ordinance governs nonexpressive conduct. Any burden on speech is incidental.

## B. Commercial Speech

In the alternative, Seattle argues that, if the Ordinance regulates speech, then it is commercial speech subject to lower scrutiny under the First Amendment. Plaintiffs insist that the regulated speech is pure speech about controversial issues and not commercial speech.

We agree with Seattle that even if the Ordinance regulates speech, it is speech that "simply propose[s] a commercial transaction."[7] *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 760 (1976) (quoting *Bigelow v. Virginia*, 421 U.S. 809, 822 (1975)). We have already held that speech related to hiring people who "perform temporary work" is commercial speech. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 817–18 (9th Cir. 2013); *see also Pittsburgh Press Co. v. Pittsburgh Comm'n on*

---

[7] For purposes of this section of the opinion, we assume, without deciding, that Plaintiffs are correct in their assertion that the Ordinance regulates speech.

*Hum. Rels.*, 413 U.S. 376, 387–88 (1973) (holding that employment advertisements are commercial speech); *Greater Phila. Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 137 (3d Cir. 2020) (holding that speech involving a "proposal of possible employment" is commercial speech).

Our precedents establishing that hiring communications can be commercial speech cover the purported speech at issue here. That speech is communication by Uber or Instacart to temporary app-based workers about the proposed terms of engagement, including the standards for deactivation or termination of those workers' accounts. The Ordinance's challenged provisions regulate how and when a platform may prevent a worker from accessing its service to seek employment. Whatever speech might be regulated by the Ordinance is directly related to employment, however temporary.

Plaintiffs invoke two recent decisions by this court to argue that the Ordinance should be subject to greater scrutiny than that applied to commercial speech. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1111, 1121 (9th Cir. 2024); *X Corp.*, 116 F.4th at 894, 898. Both cases involved state laws that regulated the speech of social media companies by requiring that they submit reports to the government that identified harmful speech and described what the companies were doing to address the problem. That requirement distinguishes these cases from the one before us. In both *NetChoice* and *X Corp.*, we held that the reports were not commercial speech subject to intermediate scrutiny, but instead were compelled speech subject to strict scrutiny, because they required businesses to provide their *own* conclusions about "highly controversial issues of public concern." *NetChoice*, 113 F.4th at 1120; *see X Corp.*, 116 F.4th at 901–03. We noted that these reports required

businesses to go beyond "opining about their products or services," *NetChoice*, 113 F.4th at 1120, and instead communicate their "opinions *about* and reasons *for* those policies," *X Corp.*, 116 F.4th at 901 (emphasis added).

Here, the Ordinance regulates Plaintiffs' deactivation policies and requires communication of the policies to the workers subject to them. Unlike the social media companies—which were required to speak on topics "disconnected from any economic transaction" like hate speech, online harassment, and content harmful to children, *NetChoice*, 113 F.4th at 1119—Plaintiffs are not subject to a directive to produce a report. Instead, they must modify their deactivation policies, if necessary to comply with the Ordinance, and communicate those policies to their app-based workers.

The reporting requirement differs in another key area. Under both laws at issue in *NetChoice* and *X Corp*, social media companies were required to produce communications for an outside party: the government. Here, the Ordinance applies only to internal communications between a company and its app-based workers. It is a modern version of established workplace disclosure laws—it makes no difference whether such a disclosure occurs on bulletin boards, via distribution of employee handbooks, or in an online portal that only app-based workers may access. *See CompassCare v. Hochul*, 125 F.4th 49, 65 (2d Cir. 2025) ("[S]uch notice requirements are part of 'a longstanding tradition in this country' supported by a 'historical warrant.'" (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795, 792 (2011))).

Assuming that the Ordinance does regulate commercial speech, we conclude that the Ordinance satisfies the

attending, lower level of scrutiny. Commercial speech is still subject to constitutional protections. We determine what protection that speech receives depending on whether the government is restricting or compelling speech. [8] *Am. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 755 (9th Cir. 2019) (en banc).

Under our precedent, we apply one of two separate Supreme Court tests to laws regulating commercial speech. *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 842 (9th Cir. 2019). When the government restricts or prohibits commercial speech, we apply the test established in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980). When the government compels disclosure of commercial speech, we apply the standard from *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651 (1985). Here, because the Ordinance regulates deactivation standards and requires companies to communicate those standards to their workers, the appropriate test is the one articulated in *Zauderer*.

Subsection 8.40.050.A.1—which requires network companies to inform app-based workers of their deactivation policies—meets the test drawn from *Zauderer*. "[T]he government may compel truthful disclosure in commercial speech as long as the compelled disclosure is reasonably related to a substantial governmental interest and involves purely factual and uncontroversial information that relates to

---

[8] During oral argument, both Plaintiffs requested that we resolve the case before us on the merits rather than remand to the district court. The record is sufficiently developed for us to decide how the law applies, so we do. *See X Corp.*, 116 F.4th at 898 (rejecting the district court's application of *Zauderer* and instead applying strict scrutiny).

the service or product provided." *CTIA*, 928 F.3d at 842 (citation modified). Additionally, if such compelled disclosure is "unjustified or unduly burdensome," it might not pass constitutional muster. *Zauderer*, 471 U.S. at 651.

"There is no question that protecting the health and safety of [workers] is a substantial governmental interest." *CTIA*, 928 F.3d at 845. The provision requires network companies to inform workers of what situations may lead to account deactivation and resulting lost income, which is reasonably related to Seattle's goals. The notice is purely factual and concerns only the service provided, because it contains details of a company's deactivation policies. Because the disclosure does not "force [Plaintiffs] to take sides in a heated political controversy," *id*. at 848, or purport to compel speech on—or analogous to—matters we have previously identified to be controversial, *see, e.g.*, *id.* at 845 (noting abortion as a matter of controversy), it is noncontroversial.[9] Further, the notice requirement can be

_____

[9]    The partial dissent asserts that the content of network companies' deactivation policies is not purely factual and uncontroversial because the Ordinance "requires more than a mere notice of rights"; the partial dissent claims that it also requires Plaintiffs to "publish their opinions on what behaviors or standards are reasonably related to safety or to efficiency." Partial Dissent at 40. We are unpersuaded by this characterization. For one thing, once a deactivation policy is issued, it will be "literally true." Whether or not the network company issuing the deactivation policy would have devised its policy differently had the City enacted different labor regulations, or no regulations at all, the policy will truthfully and accurately identify the conduct of app-based workers that could lead to deactivation. The policy will reflect facts. *CTIA*, 928 F.3d at 847.

More broadly, as we recently observed, "a purely factual statement does not become controversial simply because it 'can be tied in some way to a controversial issue.'" *Foothills Christian Ministries v. Johnson*, 148 F.4th 1040, 1054 (9th Cir. 2025) (quoting *CTIA*, 928 F.3d at 845),

satisfied by a single webpage and is therefore not unduly burdensome.

Subsection 8.40.050.A.2—which requires that the deactivation policies be "reasonably related" to the companies' "safe and efficient operations"—regulates at most speech related to what Seattle has designated as unlawful activity: the unwarranted deactivations of worker accounts. Any challenge involving the restriction of commercial speech must first satisfy a threshold inquiry that the communication be "neither misleading nor related to unlawful activity." *World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 684 (9th Cir. 2010) (quoting *Cent. Hudson*, 447 U.S. at 564). Even if we accept Plaintiffs'

---

*petition for cert. filed*, No. 25-802 (U.S. Jan. 5, 2026). That observation applies here. The recognition that the concepts of safety and efficiency could generate differing views among various stakeholders in the context of devising deactivation policies, *see* Partial Dissent at 40, is insufficient to render the required disclosure of the deactivation policies controversial. *See id.* ("[A] compelled statement is controversial when it takes 'sides in a heated political controversy,' and forces the speaker 'to convey a message fundamentally at odds with its mission.'" (quoting *CTIA*, 928 F.3d at 845)).

It also bears emphasis that, if a network company disagrees with the Ordinance's examples of policies that are not reasonably related to safe and efficient operations, the company may elect to express its disagreement, even alongside the policy itself. This matters because the ability to register one's disagreement, even while complying with the Ordinance, dispels any "forced association" between the discloser (the network company) and the disclosure (the Ordinance-compliant deactivation policy), thereby undermining any suggestion of compulsion. *See Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 153 F.4th 795, 812 (9th Cir. 2025) (quoting *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005)), *petition for cert. filed*, No. 25-1018 (U.S. Feb. 24, 2026).

contention that the Ordinance regulates commercial speech, it is not an impermissible regulation of that speech.[10]

Plaintiffs have not demonstrated that the Ordinance violates the First Amendment.

## III.  Vagueness claim

A municipal ordinance violates the Fourteenth Amendment if it either fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited," or if it is so standardless that it may be applied in an arbitrary or discriminatory manner. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)). Plaintiffs make much of the fact that "law[s] interfere[ing] with the right of free speech" are subject to a

---

[10] The partial dissent faults us for conflating the two tests for commercial speech. Partial Dissent at 41. Specifically, it observes that the threshold inquiry of whether the purported speech relates to unlawful activity is an element of the *Central Hudson* test for regulation of commercial speech, not the *Zauderer* test for compulsion of commercial speech. Partial Dissent at 41. The threshold inquiry is indeed an element of *Central Hudson*, and we do not purport to import it into *Zauderer*. Rather, in considering Plaintiffs' assertion that *Central Hudson* applies, we conclude that their argument falters at *Central Hudson*'s doorstep. This matters because we have already observed that *Zauderer* sets forth a "more permissive standard" than that articulated in *Central Hudson*. *See Pharm. Rsch. & Mfrs. of Am.*, 153 F.4th at 808; *see also id.* at 810–11 (explaining that, if a "law[] that compel[s] certain information to be communicated directly from one private entity to another" regulates commercial speech, "courts apply either intermediate scrutiny," pursuant to *Central Hudson*, "or a lower level of scrutiny akin to rational basis review," pursuant to *Zauderer*). Plaintiffs fail to show that the Ordinance violates the First Amendment even under the more rigorous test in *Central Hudson*; *a fortiori*, the Ordinance passes the more permissive standard in *Zauderer*.

"stringent" application of that test. *Id*. at 499. As explained above, however, we reject Plaintiffs' premise that the Ordinance restricts speech. Instead, we are guided by the Supreme Court's standard for economic regulation, which is "subject to a less strict vagueness test . . . because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Id.* at 498.

Plaintiffs argue that the Ordinance's deactivation standard provision in subsection 8.40.050.A.2 is void for two reasons. First, the word "reasonable" does not supply adequate guidance to follow the law. Second, the examples of what is *not* reasonably related to safety and efficiency are so contradictory as to be more confusing than clarifying. We are unpersuaded by both arguments.

The term "reasonable" is a well-established standard that is widely employed in both statutory and common law. As the district court pointed out, Plaintiffs must satisfy a reasonableness inquiry to succeed on their vagueness claim. Additionally, the Ordinance's text supplements the term by delineating between what is and is not a permissible reason to deactivate an account. *See First Resort*, 860 F.3d at 1274 ("[I]mprecise terms may avoid vagueness problems when used in combination with terms that provide sufficient clarity." (quoting *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1021 (9th Cir. 2010))). For example, the bar on deactivations based on customer ratings is limited by the word "solely." Ordinance § 8.40.050.A.2.e. ("Any policy that would result in a deactivation based *solely* on a quantitative metric derived from aggregate customer ratings of an app-based worker's performance[.]" (emphasis added)).

Seattle passed the Ordinance out of its concern that companies like Uber and Instacart relied on algorithms to deactivate accounts automatically. Its concern was magnified by the City's belief that customer ratings are "highly likely" to be influenced by bias against workers of certain races and ethnicities. *Id.* § 1.L. For those reasons, the Ordinance dictates that an account deactivation may not be based "solely" on customer ratings. *Id.* § 8.40.050.A.2.e. Deactivation based on more than that—for instance, including review of comments that accompany customer ratings—is not prohibited.

Plaintiffs may be right that a person of ordinary intelligence could "*reasonably* think [that quantitative metrics] relate to safety and efficiency," but that same person could also understand, once the concern for discrimination was identified, that deactivation based *solely* on customer ratings is unreasonable. We also note that the services covered by the Ordinance and at issue here are delivery services, not ridesharing. An Uber rideshare passenger has an obvious basis to evaluate the safety of a ride; the recipient of a delivery by Uber Eats does not. Because of this distinction, Seattle may have thought it wise to designate customer ratings as a less reliable indicator to assess safety and efficiency in the context of delivery services. Regardless of the policy considerations the City took into account when enacting the Ordinance, in the context of a vagueness challenge, what matters is not whether a person of ordinary intelligence would *agree* with the content of or motivations for a law, but rather whether they would *understand* its dictates. Here, given the clarity afforded to the word "reasonable" when that word is read within the context of neighboring text and provisions in the Ordinance, we conclude that they would.

Plaintiffs' arguments that the other examples are more confusing than clarifying fare no better. There are multiple throughlines of policies in the list of examples. One of them is safety. The bar on deactivations based on background checks creates a carveout for reports that raise evidence of "egregious misconduct," *id.* § 8.40.050.A.2.h, or any "action or behavior" that involves physical, economic, or emotional harm, *id.* § 8.40.020. So, too, with the bar on deactivations related to driving records: the Ordinance contains a carveout for unsafe behavior, *id.* § 8.40.050.A.2.h, as defined by more than three "moving violations or at-fault collisions" in less than three years, *id.* § 8.40.020. These limitations help to make clear what is and is not permitted under the law.

The Ordinance provides fair notice to a person of ordinary intelligence as to what grounds for deactivation are reasonably related to safety and efficiency. Plaintiffs may disagree with standards imposed by the Ordinance or may wish for more unfettered discretion in terminating a worker or deactivating an account, but that does not make the regulation vague.

## IV. Conclusion

The Supreme Court has said, "[P]laintiff[s] seeking a preliminary injunction must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The first factor is "the most important." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quoting *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020)). If a movant cannot show a likelihood of success on the merits, then a court "need not

consider the other factors." *Id.* (quoting *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017)).

The Ordinance regulates the conduct of deactivating worker accounts, not speech. But even if we accept Plaintiffs' contention that the Ordinance regulates speech, it is commercial speech, and the Ordinance overcomes the appropriate level of scrutiny under the First Amendment. Plaintiffs also fail to show that the law is unconstitutionally vague. Because Plaintiffs are unlikely to succeed on the merits of their claim, the district court did not abuse its discretion when it denied the preliminary injunction.

By affirming the authority of Seattle to enact and enforce the Ordinance, we do not express a view on the merits of the policy. Seattle has decided to enact the Ordinance, and the policy judgments reflected in the Ordinance are the City's. Plaintiffs are not required to agree with this or any other regulation but remain subject to them.

**AFFIRMED.**

## APPENDIX

### Seattle, Wash., Ordinance 126878, § 8.40.050 (Aug. 14, 2023)[11]

8.40.050 Deactivation requirements

A. A network company shall adopt the following measures prior to deactivating an app-based worker, except as provided in subsections 8.40.050.C and 8.40.050.D:

1. Fair notice of deactivation policy. A network company must inform the app-based worker in writing of the network company's deactivation policy, defining what constitutes a violation that may result in deactivation. The network company's written deactivation policy must be specific enough for an app-based worker to understand what constitutes a violation and how to avoid violating the policy. The deactivation policy must be available to the app-based worker in English and any language that the network company knows or has reason to know is the primary language of the app-based worker. The deactivation policy must be accessible to the app-based worker at least three years after deactivation. The Director may issue rules governing the form and description of the deactivation policy, the manner of its distribution, and required languages for its translation.

2. Reasonable policy. The policy that may lead to a deactivation must be reasonably related to the network

---

[11] *Ordinance 126878*, Off. of the City Clerk, https://clerk.seattle.gov/search/ordinances/126878 (last visited Oct. 29, 2025).

company's safe and efficient operations. Examples of policies that are not reasonably related to the network company's safe and efficient operations include, but are not limited to:

> a. Any rule or policy that would result in a deactivation based on an app-based worker's availability to work or number of hours worked, consistent with subsection 8.37.080.A.1;

> b. Any policy that would result in a deactivation based on an app-based worker's acceptance or rejection of any individual offer, any types of offers, or any number or proportion of offers, consistent with subsection 8.37.080.A.2;

> c. Any policy that would result in a deactivation based on an app-based worker's cancellation of an offer with cause, consistent with subsection 8.37.080.C;

> d. Any policy that would result in a deactivation based on an app-based worker contacting the network company;

> e. Any policy that would result in a deactivation based solely on a quantitative metric derived from aggregate customer ratings of an app-based worker's performance;

> f. Any policy that would result in a deactivation based on statements by an app-based worker regarding compensation and/or working conditions

32                    UBER TECHNOLOGIES, INC. V. CITY OF SEATTLE

made to customers, other app-based workers, network companies, the media, public officials, and/or the public;

g. Any policy that would result in a deactivation based on an app-based worker asserting their legal rights, whether in court or via procedures provided by any local, state, or federal agency; and

h. Any policy that would deactivate a worker based on the results of a background check, consumer report, driver record, or record of traffic infractions, except in cases of egregious misconduct or where required by other applicable law.

3. Investigation. A network company must conduct a fair and objective investigation prior to deactivating an app-based worker. The investigation must be sufficiently thorough to justify the deactivation and demonstrate an unbiased and neutral view of facts collected. If the app-based worker does not participate in the investigation or provide relevant information, the network company may complete the investigation based on available sources of information.

4. Confirmation of violation. The network company must demonstrate by a preponderance of the evidence that the alleged violation of the network company's policy or rule occurred.

5. Consistent application. The network company must apply the rule or policy, and penalty for violations, in a consistent manner.

6. Proportionate penalty. The penalty of deactivation must be reasonably related to the offense, and account for mitigating circumstances, such as the app-based worker's past work history with the network company.

B. Deactivation of an app-based worker will be considered unwarranted if the action is intended to or results in discrimination or a discriminatory act.

C. Subject to the provisions of this Section 8.40.050 and rules issued by the Director, a network company may immediately deactivate an app-based worker if such action is required to comply with any applicable court order or local, state, or federal laws or regulations, or where an app-based worker has engaged in egregious misconduct.

D. In the case of allegations of egregious misconduct, the network company may deactivate the app-based worker before completing an investigation. Except in extraordinary circumstances, the investigation shall not take longer than 14 days. If the investigation is delayed due to extraordinary circumstances, the network company must provide the app-based worker with written notice that the investigation is delayed, the reason(s) for the delay, and the date on which the completion of the investigation is anticipated.

34    UBER TECHNOLOGIES, INC. V. CITY OF SEATTLE

BENNETT, Circuit Judge, dissenting in part:

I agree with the Majority that the Ordinance is not unconstitutionally vague. Unlike the majority, however, I believe the Ordinance compels speech and is thus subject to the First Amendment. While I agree with the majority's alternative reasoning that the speech at issue is commercial speech and subject to intermediate scrutiny, I believe Plaintiffs have raised serious questions going to the merits. Here, the district court found that the Ordinance had no First Amendment implications,[1] and I believe that to be error. I would therefore vacate and remand to have the district court redo its analysis on the merits and reexamine the *Winter* factors[2] in light of a determination that the Ordinance *is* subject to intermediate scrutiny, and in light of the current facts. Thus, I respectfully dissent, in part.

### i.    *The Ordinance compels speech.*

The majority concludes that the Ordinance "regulates conduct, not speech," and that "the conduct that draws the remedy is the unwarranted deactivation of worker accounts," Maj. Op. at 12. The Ordinance does regulate conduct by prohibiting unwarranted deactivations. Ordinance § 8.40.060.A.1. But it also compels speech, and that regulation of speech also draws a remedy. The Ordinance requires plaintiffs to draft and provide workers a written

---

[1] "The starting point of the Court's analysis is whether the Ordinance presents a restriction on speech. The Court finds that the Ordinance does not, and that the First Amendment claim is unlikely to succeed on the merits."

[2] Because the district court found that the Ordinance had no First Amendment implications, its analysis of the other *Winter* factors was cursory.

"deactivation policy, defining what constitutes a violation that may result in deactivation," *id.* § 8.40.050.A.1, and which "must be reasonably related to the network company's safe and efficient operations," *id.* § 8.40.050.A.2.

The drafting and publication of such a policy is speech.[3] In a recent case, we specifically noted that the publication of "existing [terms of service] and content moderation policies may be commercial speech," if not pure compelled speech subject to even more rigorous scrutiny. *See X Corp. v. Bonta*, 116 F.4th 888, 901 (9th Cir. 2024). And the Supreme Court has held that "the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 570 (2011). Indeed, "[i]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2011) (quoting *Bartnicki v. Vopper*, 200 F.3d 109, 120 (3d Cir. 1999)). Because it is "well-established that the forced disclosure of information, even purely commercial information, triggers First Amendment scrutiny," *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1117 (9th Cir. 2024), the Ordinance's deactivation policy

---

[3] Contrary to the majority, I believe the present case is unlike *O'Brien* and *City of Everett*—it concerns speech itself, not expressive conduct. The drafting of a policy text, making trade-offs between competing and controversial values, and proclaiming that certain internal regulations are or are not "reasonably related to safety and efficiency," are orders of magnitude more expressive than simply "wearing bikinis while working." *Edge v. City of Everett*, 929 F.3d 657, 662 (9th Cir. 2019). And the *O'Brien* Court declined to hold that expressive conduct, such as the burning of a draft card, is outside the scope of the First Amendment. *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

requirement compels speech subject to the First Amendment.

To some extent, the majority acknowledges that sections 8.40.050.A.1–2 of the Ordinance not only regulate conduct but also compel speech. The majority appears to concede "[t]he fact that the Ordinance, in Plaintiffs' words, necessarily 'compel[s] and dictate[s] the content of a written communication." *See* Maj. Op. at 16. However, the majority finds that "this reading ignores the placement of these provisions 'in the context of the Ordinance as a whole,'" and that "[t]o read these provisions independently from the Ordinance would be to orphan them from their purpose: preventing unwarranted deactivations." *Id.* at 15 (quoting *Yim v. City of Seattle*, 63 F.4th 783, 792 (9th Cir. 2023)). The majority therefore concludes that these "[c]ompelled changes in conduct—which might incidentally compel changes in speech—are not reviewed as content-based speech restrictions." *Id.* at 18 (quoting *Olympus Spa v. Armstrong*, 138 F.4th 1204, 1216 (9th Cir. 2025)). I disagree with this conclusion for three reasons.

First, the Ordinance's compulsion of speech is *not* incidental to its prohibition on unwarranted deactivations. The prohibition on unwarranted deactivations and the requirement to promulgate a deactivation policy of a certain kind are distinct and separately enforceable. *See* Ordinance § 8.40.140 ("The failure of any respondent to comply with any requirement imposed on the respondent under this Chapter 8.40 is a violation."); *id.* § 8.40.170.E (empowering the Director of the Office of Labor Standards to "assess fines for a violation of this Chapter" including under § 8.40.050). In fact, while the Office of Labor Standards has been empowered since January 1, 2025, to "administer and enforce" the deactivation policy requirement, the Office is

*prohibited* from enforcing the prohibition on unwarranted deactivations until June 1, 2027.  *Id.* §§ 8.40.130.A, B. Thus, for the twenty-nine months following enactment, including now, the Ordinance empowers the Office to assess fines only for violations of the speech regulation, and not for violations of the conduct regulation.[4]  And we have held that we cannot "ignore that the [challenged] requirement compels speech simply because other parts of the [challenged law] may primarily or exclusively regulate non-expressive conduct." *NetChoice*, 113 F.4th at 1117.[5]  That is because the government "cannot insulate a specific provision of law from a facial challenge under the First Amendment by bundling it with other, separate provisions that do not implicate the First Amendment." *Id.*

Second, by concluding based on the Ordinance's "purpose" that the speech regulation is incidental to the conduct regulation, the majority, I believe, applies the wrong test.   We consider a law's "stated purpose" when determining whether the *conduct* that the law regulates is

---

[4] I am unconvinced by the majority's argument that "this delay suggests only that the City cares more about encouraging compliance with the substance of the new Ordinance than about punishing violators."  Maj. Op. 16 n.5.  First, it does not matter whether Seattle cares more about encouraging compliance or punishing violators.  Nor does it matter whether Seattle cares more about preventing unwarranted deactivations or promoting transparency.  The Ordinance aims at both, and does not compel speech *only* incidentally to its regulation of conduct.

[5] Seattle argues that *NetChoice* is distinguishable on this point because, in that case, we found the regulation was subject to the First Amendment because the regulated speech was "disconnected from any economic transaction."  *NetChoice*, 113 F.4th at 1119.  But Seattle misreads *NetChoice*.  The absence of a connection to an economic transaction is the reason we applied *strict scrutiny* in *NetChoice*—it is not the reason we found the statute to regulate speech.  *Id.* at 1119–21.

sufficiently expressive to fall within the purview of the First Amendment. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019) (quoting *Sorrell*, 564 U.S. at 565). That test is inapplicable here because the Ordinance's speech regulation is *separate* from its conduct regulation, and we can consider the statutory purpose only if the law regulates conduct rather than speech.

Third, the Ordinance's "stated purpose" is more ambiguous than the majority says. Quoting from the Ordinance's findings and declarations, the majority identifies the Ordinance's purpose as to "protect[] and promote[] public health, safety, and welfare by establishing protections against unwarranted deactivations for app-based workers." Maj. Op. at 10, 14 (quoting Ordinance § 1.C**)**. The majority concludes that the purpose of the Ordinance is to prevent unwarranted deactivations and not to compel speech. But the same section of the Ordinance also reflects a purpose to compel plaintiffs' publication of deactivation policies, separate from the prevention of any deactivation decisions. *See id.* § 1.H ("App-based workers often do not have the information they need to know about how they will be evaluated."). At least one purpose of the Ordinance is, therefore, to compel plaintiffs to share information about how app-based workers will be evaluated. Because disclosure of such information is speech subject to First Amendment scrutiny, *Sorrell*, 564 U.S. at 570; *NetChoice*, 113 F.4th at 117; *X Corp.*, 116 F.4th at 901, the Ordinance's stated purpose was, in part, to compel speech.[6]

---

[6] The majority wrongly contends that my reading "isolates a small part of the law, and, in doing so, misses the central purpose animating the Ordinance." Maj. Op. 14 n.4. The Ordinance aims not only at decreasing unwarranted deactivations, but also at increasing transparency. I do not

I therefore disagree with the majority's conclusion that the Ordinance does not regulate speech.

*ii. Plaintiffs raise serious questions on the merits.*

I agree with the majority 1) that the speech at issue is commercial speech, and 2) that the so-called *Zauderer* standard applies to the commercial speech compelled by the Ordinance. *See Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626 (1985); *see also* Maj. Op. at 22–23. But I disagree with the majority's decision to conduct the *Zauderer* analysis in the first instance. Because the district court concluded that the Ordinance does not compel speech, it "had no occasion to conduct a further inquiry into whether [the Ordinance], as a speech regulation, survived First Amendment scrutiny." *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 48 (2017). We should therefore remand for the district court to consider "whether the law can be upheld as a valid disclosure requirement under *Zauderer*." *Id.*

Moreover, unlike the majority, I believe that plaintiffs at least raise a serious question on the merits as to whether the Ordinance satisfies the *Zauderer* standard. "Under *Zauderer* as we interpret it today, the government may compel truthful disclosure in commercial speech as long as the compelled disclosure is 'reasonably related' to a substantial governmental interest and involves 'purely factual and uncontroversial information' that relates to the service or

---

distort the Ordinance by noting that it compels speech, §§ 8.40.050.A.1–2, based on separate policy findings, § 1.H, and that it establishes an enforcement regime separate from the regime regulating unwarranted terminations, §§ 8.40.140, 170.E. Rather, it is the majority that improperly cabins the Ordinance by focusing exclusively on its separate regulation of conduct.

product provided." *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 842 (9th Cir. 2019) (first quoting *Zauderer*, 471 U.S. at 651, then quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 768 (2018)).

The speech compelled here is not purely factual and uncontroversial information. The speech regulation requires more than a mere notice of rights—that is separately required by a distinct section of the Ordinance. *See* § 8.40.100. The speech regulation instead requires plaintiffs to formulate and publish their opinions on what behaviors or standards are reasonably related to safety or to efficiency. These are not purely factual determinations but are instead plaintiffs' opinions. And they are likely to be controversial opinions. This is especially so because safety and efficiency are often in tension, and plaintiffs' policies will have to balance these two values. Plaintiffs will likely also balance these two values against others, such as customer satisfaction, profitability, and administrability, because the Ordinance does not require that the policy be related *solely* to safety and efficiency. Any balance of these oft-competing values is likely to be controversial. Different stakeholders—including users, workers, employees, shareholders, and traffic authorities—are bound to have different perspectives on where the best balance lies.[7] Because the Ordinance

---

[7] I do not agree with the majority that this material is purely factual and uncontroversial simply because "once a deactivation policy is issued, it will be 'literally true.'" Maj. Op. 23 n.9. Yes, once the policy is published, there will be a "fact" as to what the policy says. But that is true of all speech. And there will remain, after publication, no "fact" as to the best balance of safety, efficiency, and other values, and no "fact" as to which internal regulations are "reasonably related" to these values. Nor, contrary to the majority's suggestion, could the injury to the companies' First Amendment rights be fully ameliorated by the

compels commercial speech that is not or at least may not be "purely factual and uncontroversial information," it potentially violates the First Amendment. *See CTIA*, 928 F.3d at 842.

The majority states that the speech regulation is nonetheless permissible because any challenge to it "must first satisfy a threshold inquiry that the communication be 'neither misleading nor related to unlawful activity.'" Maj. Op. at 24 (quoting *World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 684 (9th Cir. 2010)). The majority finds that the speech regulation "regulates at most speech related to . . . unlawful activity: the unwarranted deactivations of worker accounts." *Id.* The majority concludes that plaintiffs' challenge thus fails this "threshold inquiry." *See id.* But the majority's threshold inquiry does not apply to challenges to compelled speech—it governs only challenges to restrictions on speech. *See World Wide Rush*, 606 F.3d at 684–85. And, in any case, the speech here is unrelated to (or not solely related to) unlawful activity.

The majority's "threshold inquiry" is taken from *World Wide Rush*, a case involving a challenge to a restriction on speech, not to a compulsion of speech. *See World Wide Rush*, 606 F.3d at 680, 685. *World Wide Rush*, in turn, derived this test from *Metro Lights, L.L.C. v. City of Los Angeles*, which was also a speech restriction case. 551 F.3d 898 900, 903 (9th Cir. 2009). And *Metro Lights* identifies this "threshold matter" as an element of the *Central Hudson* test, not the *Zauderer* test. *See Metro Lights*, 551 F.3d at

---

company's ability "to express its disagreement, even alongside the policy itself." *Id.* The Ordinance requires the companies to make and publish *their* judgment about what is "reasonably related." §§ 8.40.050.A.1–2.

903–04 (describing the requirement that "the communication [be] neither misleading nor related to unlawful activity" as an "element[] of the *Central Hudson* test" (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980))). Because, as even the majority acknowledges, Maj. Op. at 25 n.10, the *Central Hudson* test is not applicable to this case, plaintiffs need not show that their speech is unrelated to unlawful activity.

This distinction matters because, even though *Zauderer*'s rational basis standard is "more permissive" than *Central Hudson*'s intermediate scrutiny standard, *see Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, *petition for cert. filed*, No. 25-1018 (U.S. Feb. 24, 2026), 153 F.4th 795, 808 (9th Cir. 2025), "one size does not fit all in commercial speech cases," *CTIA*, 928 F.3d at 842. The two tests have different triggering conditions, *see id.*, and a regulation that survives *Central Hudson* review is therefore not guaranteed to survive *Zauderer* review.

In any event, the majority is wrong to conclude that the speech *is* related to unlawful activity. The majority concludes that by requiring that deactivation policies be reasonably related to safe and efficient operations, the Ordinance simply regulates speech related to unlawful activity—namely, speech related to unwarranted deactivations. I believe that this conclusion is both circular and incorrect. The Ordinance defines "unwarranted deactivation" as "a deactivation that does not comply with Section 8.40.050." Ordinance § 8.40.020. But § 8.40.050 does not contain any freestanding limits on when deactivation is prohibited. In other words, it does not proscribe the firing of an app-worker for a reason unrelated to safe and efficient operations. Instead, it prohibits only certain forms of deactivation *policy* and describes when a

*policy* would fail to be reasonably related to safe and efficient operations. *Id.* §§ 8.40.050.A.1–2. It *then* prohibits companies from deactivating a worker without the results of an investigation finding that the worker violated the company's deactivation policy. *Id.* §§ 8.40.050.A.3.1–5. In other words, *it is not unlawful* to deactivate workers for reasons unrelated to safe and efficient operations. It is unlawful to speak a policy that is unrelated to safe and efficient operations; and it is unlawful for a company to violate its own deactivation policy. Thus, this is not a regulation of speech related to unlawful activity, but a direct regulation of speech itself.

I think it is far from clear that Seattle is likely to prevail on the merits. At the very least, I believe that plaintiffs have raised serious questions going to the merits.

> ### iii. *We should remand for the district court to reanalyze the Ordinance under intermediate scrutiny and to reexamine the other* Winter *factors.*

In addition to likelihood of success on the merits, a district court considering a motion for a preliminary injunction must consider whether the movant will likely suffer irreparable harm without the injunction, whether the balance of the equities favors the movant, and whether a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "It is well-established that the first factor is especially important when a plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023). A determination a plaintiff alleging such an injury is likely to prevail on the merits "usually demonstrates he is suffering irreparable harm" and "tips the public interest sharply in his favor." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023).

44        UBER TECHNOLOGIES, INC. V. CITY OF SEATTLE

"As a general matter, district courts '*must* consider' all four *Winter* factors." *Id.* at 1040 (quoting *Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 577 (9th Cir. 2014)). But because the first factor is most important, if a movant fails to show likelihood of success on the merits, "the court need not consider the other factors in the absence of 'serious questions going to the merits.'" *Disney Enterps, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011)).

Plaintiffs have at least raised a serious question going to the merits. In my view, therefore, the district court must consider all four *Winter* factors. *Baird*, 81 F.4th at 1041. And I believe that the district court must decide in the first instance whether the Ordinance survives *Zauderer* review. *Expressions Hair Design*, 581 U.S. at 48. Here, its review of the other three factors was cursory, dividing only four sentences between them. Further, the district court's analysis of these three factors was based on what I believe was its erroneous analysis of questions going to the merits. Moreover, since the district court's decision, plaintiffs have issued deactivation policies in light of the Ordinance. The district court has had no opportunity to consider how the issuance of these policies, and Seattle's response or lack thereof, has affected the equities or the existence of irreparable harm.

Accordingly, I would remand for reconsideration of all four *Winter* factors. I therefore respectfully dissent, in part.