**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UBER TECHNOLOGIES, INC.; PORTIER, LLC,

*Plaintiffs - Appellants*,

and

MAPLEBEAR INC., doing business as Instacart,

*Intervenor-Plaintiff*,

v.

CITY OF SEATTLE,

*Defendant - Appellee*.

No. 25-228

D.C. No. 2:24-cv-02103-MJP

ORDER AND OPINION

UBER TECHNOLOGIES, INC., PORTIER, LLC,

*Plaintiffs*,

and

MAPLEBEAR INC., doing business

No. 25-231

D.C. No. 2:24-cv-02103-MJP

as Instacart,

*Intervenor-Plaintiff - Appellant*,

v.

CITY OF SEATTLE,

*Defendant - Appellee*.

Appeals from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted July 10, 2025
Seattle, Washington

Filed October 29, 2026

Before: Susan P. Graber, Richard R. Clifton, and Mark J. Bennett, Circuit Judges.

Order;
Opinion by Judge Clifton;
Partial Dissent by Judge Bennett

## SUMMARY*


### First Amendment / Preliminary Injunction

The panel filed (1) an order withdrawing its opinion and dissent filed on March 4, 2026, and denying as moot a petition for rehearing en banc; and (2) a superseding amended opinion and dissent, affirming the district court's denial of a motion by Uber Technologies, Inc. and Maplebear Inc. for a preliminary injunction to enjoin the City of Seattle from enforcing Seattle's App-Based Worker Deactivation Rights Ordinance (the "Ordinance"), which applies to network companies that provide a platform for customers to hire temporary workers and prohibits unwarranted deactivations of these app-based workers' accounts.

Section 8.40.050.A of the Ordinance requires (1) that a network company "inform" any app-based worker "in writing" of the company's deactivation policy and (2) that the deactivation policy be "reasonably related" to the company's "safe and efficient operations." Plaintiffs, two network companies that rely on app-based workers for their businesses, alleged that the Ordinance compels speech in violation of the First Amendment, and that it is unconstitutionally vague.

Assuming, without deciding, that the Ordinance regulates speech, the panel concluded that speech is commercial speech, and the Ordinance's regulation of it overcomes the applicable lower level of First Amendment


* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

scrutiny. Because the Ordinance regulates deactivation standards and requires companies to communicate those standards to their workers, the panel applied the test articulated in *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651 (1985).

As to the Ordinance's first requirement that network companies inform app-based workers of their deactivation policies, the panel held that it meets the test drawn from *Zauderer*, because the provision is reasonably related to Seattle's goal to keep app-based workers informed and employed while keeping the public safe, does not purport to compel speech on controversial issues, and is not unduly burdensome.

Concerning the Ordinance's second requirement that the deactivation policies be "reasonably related" to the companies' "safe and efficient operations", the panel concluded that provision is not an impermissible regulation of speech because it regulates speech related to what Seattle has designated as unlawful activity: the unwarranted deactivations of worker accounts.

The panel further held that the Ordinance is not unconstitutionally vague because it provides fair notice to a person of ordinary intelligence as to what grounds for deactivation are reasonably related to safety and efficiency.

Accordingly, the panel held that because Plaintiffs are unlikely to succeed on the merits of their claim, the district court did not abuse its discretion when it denied the preliminary injunction.

Dissenting in part, Judge Bennett agreed with the majority that the Ordinance is not unconstitutionally vague. However, he disagreed with the majority's decision

to "[a]ssum[e] without deciding[] that the Ordinance regulates speech," because the Ordinance *does* compel speech and is thus subject to the First Amendment. As for the majority's alternative reasoning that the speech at issue is commercial speech and "overcomes the appropriate level of scrutiny," Judge Bennett is unpersuaded and believe Plaintiffs have at least raised serious questions going to the merits. He would therefore vacate and remand to have the district court redo its analysis on the merits and reexamine the *Winter* preliminary injunction factors in light of a determination that the Ordinance is subject to intermediate scrutiny, and in light of the current facts.

---

## COUNSEL

David M. Zionts (argued), Alexander J. Cave, Neha Jaganathan, and Stacey K. Grigsby, Covington & Burling LLP, Washington, D.C.; Neema Sahni, Covington & Burling LLP, Los Angeles, California; Robert J. Maguire and Theo A. Lesczynski, Davis Wright Tremaine LLP, Seattle, Washington; for Plaintiffs-Appellants.

Alexander T. MacDonald (argued), Littler Mendelson PC, Washington, D.C.; Douglas E. Smith, Littler Mendelson PC, Seattle, Washington; for Intervenor-Plaintiff-Appellant.

Jessica L. Goldman (argued), Lawrence C. Locker, Eva S. Oliver, Molly J. Gibbons, and Jesse L. Taylor, Summit Law Group PLLC, Seattle, Washington; Ghazal Sharifi, Assistant City Attorney; Ann Davison and Erika J. Evans, City Attorneys; Seattle City Attorney's Office, Seattle, Washington; for Defendant-Appellee.

Jason W. Anderson, Mark C. Lamb, and Nicholas A. Carlson, Carney Badley Spellman PS, Seattle, Washington, for Amicus Curiae Washington Food Industry Association.

Adam G. Unikowsky and Jonathan J. Marshall, Jenner & Block LLP, Washington, D.C.; Jonathan D. Urick and Audrey Beck, United States Chamber Litigation Center, Washington, D.C.; for Amicus Curiae The Chamber of Commerce of the United States.

Naomi Tsu, Sophie House, Elaine Poon, and Jonathan B. Miller, Public Rights Project, Oakland, California; Robert Taylor, City Attorney, Office of the Portland City Attorney, Portland, Oregon; Heather Ferbert, San Diego City Attorney, Office of the San Diego City Attorney, San Diego, California; for Amici Curiae Local Governments.

Jessica A. Skelton and W. Scott Ferron, Pacifica Law Group LLP, Seattle, Washington, for Amicus Curiae International Municipal Lawyers Association.

---

## ORDER

Pursuant to General Order 5.3(c)(1), the panel withdraws the opinion and dissent filed on March 4, 2026, and concurrently files a superseding amended opinion and dissent. Appellant's petition for rehearing en banc (Docket Entry No. 51) is denied as moot. G.O. 5.3(c)(1). Further petitions for panel rehearing and rehearing en banc may be filed from the superseding amended opinion. See id.

## OPINION

CLIFTON, Circuit Judge:

The City of Seattle enacted Ordinance 126878 (the "Ordinance") in 2023.[1] It added a new chapter 8.40 to the Seattle Municipal Code, titled the "App-Based Worker Deactivation Rights Ordinance." Applying to "network companies" that provide a platform for customers to hire temporary workers, like delivery drivers, the Ordinance prohibits "unwarranted deactivations" of these app-based workers' accounts. Seattle, Wash., Ordinance 126878, § 8.40 (Aug. 14, 2023). The law is Seattle's attempt to address what it perceives to be the instability of the gig economy and the consequent vulnerability of delivery workers.

Uber Technologies, Inc., including its wholly owned subsidiary Portier, LLC ("Uber"), and Maplebear Inc. ("Instacart") (collectively, "Plaintiffs") are two network companies that rely on app-based workers for their businesses. They claim that the Ordinance violates their constitutional rights in two ways: it impermissibly infringes on their protected speech, and it is void for vagueness. They appeal the district court's denial of their motion for a preliminary injunction to enjoin enforcement of the Ordinance against them.

Assuming, without deciding, that the Ordinance regulates speech, that speech is commercial speech, and the Ordinance's regulation of it overcomes the applicable lower level of First Amendment scrutiny. As for the vagueness

[1] Relevant portions of the Ordinance are attached as an appendix to this opinion.

challenge, we conclude that the Ordinance is not unconstitutionally vague, because a person of ordinary intelligence would understand its meaning. Accordingly, the district court did not abuse its discretion when it denied Plaintiffs' request for a preliminary injunction, and we affirm.

## I. Background

Uber and Instacart are large companies in the growing gig economy. Plaintiffs and other companies like them connect workers with customers, then take a cut of payments made by the customers. Relevant to the Ordinance, Uber and Instacart act largely as delivery services. (The Ordinance does not apply to certain categories of app-based workers, like rideshare drivers, which is what many people may immediately think of as "Uber." Ordinance § 8.40.020.) Their workers pick up orders from restaurants, or retailers, or even other customers on the app. The workers also can operate as personal shoppers by going to businesses like grocery stores, browsing for items, and delivering those items to customers.

Both workers and customers access those services through accounts on apps built by the network companies. While Uber and Instacart are the parties to bring this challenge, any app-based worker regulation affects more than just the users of those two platforms. As of 2021, sixteen percent of adults in the United States have earned money via an online gig platform. Monica Anderson et al., *The State of Gig Work in 2021*, PEW RSCH. CTR. (Dec. 8, 2021), https://www.pewresearch.org/internet/2021/12/08/the-state-of-gig-work-in-2021/ (last visited Oct. 29, 2025) [https://perma.cc/JH6W-VSDM].

Seattle's Ordinance prohibits deactivations of app-based workers for reasons that its drafters deemed unwarranted. Ordinance § 8.40.060.A. Plaintiffs do not challenge that prohibition but instead challenge the constitutionality of certain provisions of the Ordinance, in particular section 8.40.050, titled "Deactivation requirements." That section requires (1) that a network company "inform" any app-based worker "in writing" of the company's deactivation policy and (2) that the deactivation policy be "reasonably related" to the company's "safe and efficient operations." *Id.* § 8.40.050.A.1–2.

The Ordinance includes a list of eight example policies that are not reasonably related to safety and efficiency. *Id.* § 8.40.050.A.2.a–h. The list includes policies that would result in a deactivation "based solely on a quantitative metric derived from aggregate customer ratings" or "based on the results of a background check, consumer report, driver record, or record of traffic infractions, except in cases of egregious misconduct or where required by other applicable law." *Id.* § 8.40.050.A.2.e, h.[2]

[2] "Egregious misconduct" is defined as:

> [A]n action or behavior by an individual app-based worker that: (1) endangers the physical safety of the customer, or a third person, the network company, or an animal; or (2) intentionally causes economic harm to the customer, a third person, or the network company; or (3) is threatening, harassing, or abusive to the customer, a third party, or the network company.
>
> . . . [It] includes but is not limited to . . . failing to maintain a valid state driver's license . . . .
>
> . . . [It] shall not include conduct related to non-criminal moving violations . . . or traffic collisions unless the app-based worker has accumulated more

The Ordinance applies only to internal communications with app-based workers. It does not require that the companies communicate any deactivation policies to the general public. Nor does it require that the companies communicate their agreement with such policies. The companies may describe the policies as being required by the Ordinance.

Seattle's stated purpose for enacting the Ordinance is to "protect[] and promote[] public health, safety, and welfare." *Id.* § 1.C. Minimum labor standards are recognized as helping both employers, by improving worker performance and quality, and workers, by increasing job stability. *Id.* § 1.E, W. But network companies' growing reliance on algorithms leads, Seattle says, to "arbitrary evaluations and unwarranted deactivations." *Id.* § 1.H. Establishing "clear performance expectations," limitations on deactivations predicated on quantitative metrics and possibly inaccurate background checks, and a legal right to challenge unwarranted deactivations are all attempts to regulate reliance on automatic, algorithmic determinations of worker-eligibility. *See id.* § 1.I–L, P, U.

Uber filed this action seeking a temporary restraining order and preliminary injunction against the Ordinance shortly before it was set to take effect. It alleged three claims, two of which are pursued in this appeal: that the Ordinance compels speech in violation of the First Amendment, and that it is unconstitutionally vague.[3] Instacart moved to

---

> than three non-criminal moving violations or at-fault collisions in the previous three years.

*Id.* § 8.40.020.

[3] The third claim cited in the complaint, that the Ordinance restricts

intervene and, in doing so, agreed to forego independent briefing on the temporary restraining order before the district court.

The district court held that the Ordinance regulates the deactivation of worker accounts, with any effects on speech or expression being "incidental to its worker-related conduct goals." The court concluded that the Ordinance was not void because the term "reasonable" was not vague, and any discrepancies in interpretation were rooted in a "fundamental disagreement" between Uber and Seattle over what policies are reasonably related to safe and efficient operations. After determining that Uber did not show a likelihood of establishing any constitutional violation, the district court found neither irreparable harm nor a balance of equities or public interest tipping in Uber's favor. It denied the motion for a temporary restraining order and preliminary injunction.

Uber and Instacart appealed. A stay pending final resolution of the appeals, entered by the district court based on a stipulation of the parties, is currently in place.

We have jurisdiction under 28 U.S.C. § 1292(a)(1). A district court's denial of a preliminary injunction is reviewed for abuse of discretion, a "limited and deferential" standard. *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004); *see also X Corp. v. Bonta*, 116 F.4th 888, 897 (9th Cir. 2024). The underlying issues of law that led to that decision, such as whether the Ordinance compels speech or merely regulates conduct, are reviewed de novo. *See Harris*, 366 F.3d at 760.

---

Uber's expressive associational rights in violation of the First Amendment, has not been argued in this appeal.

## II. First Amendment claims

Uber and Instacart argue that Seattle's Ordinance compels pure, content-based speech in violation of the First Amendment in two ways. First, the notice requirement compels speech by forcing the companies to communicate their deactivation policies and decisions in writing and make them accessible to workers. Second, the deactivation standards regulate that speech's content by requiring that the companies' policies be, in the words of the Ordinance, "reasonably related" to "safe and efficient operations." Seattle argues that the Ordinance is not a regulation of speech and that the First Amendment does not apply. In the alternative, Seattle argues that, if the Ordinance regulates speech, then it is commercial speech subject to lower scrutiny under the First Amendment. Plaintiffs insist that the regulated speech is pure speech about controversial issues and not commercial speech.

We agree with Seattle. Assuming, without deciding, that the Ordinance regulates speech, it is speech that "simply propose[s] a commercial transaction." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 760 (1976) (quoting *Bigelow v. Virginia*, 421 U.S. 809, 822 (1975)). We have already held that speech related to hiring people who "perform temporary work" is commercial speech. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 817–18 (9th Cir. 2013); *see also Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 387–88 (1973) (holding that employment advertisements are commercial speech); *Greater Phila. Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 137 (3d Cir. 2020) (holding that speech involving a "proposal of possible employment" is commercial speech).

Our precedents establishing that hiring communications can be commercial speech cover the purported speech at issue here. That speech is communication by Uber or Instacart to temporary app-based workers about the proposed terms of engagement, including the standards for deactivation or termination of those workers' accounts. The Ordinance's challenged provisions regulate how and when a platform may prevent a worker from accessing its service to seek employment. Whatever speech might be regulated by the Ordinance is directly related to employment, however temporary.

Plaintiffs invoke two recent decisions by this court to argue that the Ordinance should be subject to greater scrutiny than that applied to commercial speech. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1111, 1121 (9th Cir. 2024); *X Corp.*, 116 F.4th at 894, 898. Both cases involved state laws that regulated the speech of social media companies by requiring that they submit reports to the government that identified harmful speech and described what the companies were doing to address the problem. That requirement distinguishes these cases from the one before us. In both *NetChoice* and *X Corp.*, we held that the reports were not commercial speech subject to intermediate scrutiny, but instead were compelled speech subject to strict scrutiny, because they required businesses to provide their *own* conclusions about "highly controversial issues of public concern." *NetChoice*, 113 F.4th at 1120; *see X Corp.*, 116 F.4th at 901–03. We noted that these reports required businesses to go beyond "opining about their products or services," *NetChoice*, 113 F.4th at 1120, and instead communicate their "opinions *about* and reasons *for* those policies," *X Corp.*, 116 F.4th at 901 (emphasis added).

Here, the Ordinance regulates Plaintiffs' deactivation policies and requires communication of the policies to the workers subject to them. Unlike the social media companies—which were required to speak on topics "disconnected from any economic transaction" like hate speech, online harassment, and content harmful to children, *NetChoice*, 113 F.4th at 1119—Plaintiffs are not subject to a directive to produce a report. Instead, they must modify their deactivation policies, if necessary to comply with the Ordinance, and communicate those policies to their app-based workers.

The reporting requirement differs in another key area. Under both laws at issue in *NetChoice* and *X Corp*, social media companies were required to produce communications for an outside party: the government. Here, the Ordinance applies only to internal communications between a company and its app-based workers. It is a modern version of established workplace disclosure laws—it makes no difference whether such a disclosure occurs on bulletin boards, via distribution of employee handbooks, or in an online portal that only app-based workers may access. *See CompassCare v. Hochul*, 125 F.4th 49, 65 (2d Cir. 2025) ("[S]uch notice requirements are part of 'a longstanding tradition in this country' supported by a 'historical warrant.'" (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795, 792 (2011))).

Assuming the Ordinance does regulate commercial speech, we conclude that the Ordinance satisfies the appropriate, lower level of scrutiny. Commercial speech is still subject to constitutional protections. We determine what protection that speech receives depending on whether the

government is restricting or compelling speech.[4] *Am. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 755 (9th Cir. 2019) (en banc).

Under our precedent, we apply one of two separate Supreme Court tests to laws regulating commercial speech. *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 842 (9th Cir. 2019). When the government restricts or prohibits commercial speech, we apply the test established in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980). When the government compels disclosure of commercial speech, we apply the standard from *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651 (1985). Here, because the Ordinance regulates deactivation standards and requires companies to communicate those standards to their workers, the appropriate test is the one articulated in *Zauderer*. Our conclusion comports with that of the Second Circuit, which applied *Zauderer* to the requirement that an employer include in its handbook a notice about employees' rights and remedies under a state statute prohibiting discrimination with respect to personal choices related to reproductive health. *CompassCare*, 125 F.4th at 64–67; *see also DoorDash, Inc. v. City of New York*, 185 F.4th 1, 7 (2d Cir. 2026) (citing with approval, but distinguishing, the application of *Zauderer* in our original opinion, which remains substantively the same in this amended opinion).

[4] During oral argument, both Plaintiffs requested that we resolve the case before us on the merits rather than remand to the district court. The record is sufficiently developed for us to decide how the law applies, so we do. *See X Corp.*, 116 F.4th at 898 (rejecting the district court's application of *Zauderer* and instead applying strict scrutiny).

Subsection 8.40.050.A.1—which requires network companies to inform app-based workers of their deactivation policies—meets the test drawn from *Zauderer*. "[T]he government may compel truthful disclosure in commercial speech as long as the compelled disclosure is reasonably related to a substantial governmental interest and involves purely factual and uncontroversial information that relates to the service or product provided." *CTIA*, 928 F.3d at 842 (citation modified). Additionally, if such compelled disclosure is "unjustified or unduly burdensome," it might not pass constitutional muster. *Zauderer*, 471 U.S. at 651.

"There is no question that protecting the health and safety of [workers] is a substantial governmental interest." *CTIA*, 928 F.3d at 845. The provision requires network companies to inform workers of what situations may lead to account deactivation and resulting lost income, which is reasonably related to Seattle's goals. The notice is purely factual and concerns only the service provided, because it contains details of a company's deactivation policies. Because the disclosure does not "force [Plaintiffs] to take sides in a heated political controversy," *id.* at 848, or purport to compel speech on—or analogous to—matters we have previously identified to be controversial, *see, e.g.*, *id.* at 845 (noting abortion as a matter of controversy), it is noncontroversial.

The partial dissent asserts that the content of network companies' deactivation policies is not purely factual and uncontroversial because the Ordinance "requires more than a mere notice of rights"; the partial dissent claims that it also requires Plaintiffs to "publish their opinions on what behaviors or standards are reasonably related to safety or to efficiency." Partial Dissent at 32. We are unpersuaded by this characterization. For one thing, once a deactivation

policy is issued, it will be "literally true." Whether or not the network company issuing the deactivation policy would have devised its policy differently had the City enacted different labor regulations, or no regulations at all, the policy will truthfully and accurately identify the conduct of app-based workers that could lead to deactivation. The policy will reflect facts. *CTIA*, 928 F.3d at 847.

More broadly, as we recently observed, "a purely factual statement does not become controversial simply because it 'can be tied in some way to a controversial issue.'" *Foothills Christian Ministries v. Johnson*, 148 F.4th 1040, 1054 (9th Cir. 2025) (quoting *CTIA*, 928 F.3d at 845), *cert. denied*, 2026 WL 1377110 (May 18, 2026). That observation applies here. The recognition that the concepts of safety and efficiency could generate differing views among various stakeholders in the context of devising deactivation policies, *see* Partial Dissent at 32, is insufficient to render the required disclosure of the deactivation policies controversial. *See Foothills Christian Ministries*, 148 F.4th at 1054 ("[A] compelled statement is controversial when it takes 'sides in a heated political controversy,' and forces the speaker 'to convey a message fundamentally at odds with its mission.'" (quoting *CTIA*, 928 F.3d at 845)).

It also bears emphasis that, if a network company disagrees with the Ordinance's examples of policies that are not reasonably related to safe and efficient operations, the company may elect to express its disagreement, even alongside the policy itself. This matters because the ability to register one's disagreement, even while complying with the Ordinance, dispels any "forced association" between the discloser (the network company) and the disclosure (the Ordinance-compliant deactivation policy), thereby undermining any suggestion of compulsion. *See Pharm.*

*Rsch. & Mfrs. of Am. v. Stolfi*, 153 F.4th 795, 812 (9th Cir. 2025), *petition for cert. filed*, No. 25-1018 (U.S. Feb. 24, 2026) (quoting *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005)).

Further, the notice requirement can be satisfied by a single webpage and is therefore not unduly burdensome.

Subsection 8.40.050.A.2—which requires that the deactivation policies be "reasonably related" to the companies' "safe and efficient operations"—regulates at most speech related to what Seattle has designated as unlawful activity: the unwarranted deactivations of worker accounts. Any challenge involving the restriction of commercial speech must first satisfy a threshold inquiry that the communication be "neither misleading nor related to unlawful activity." *World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 684 (9th Cir. 2010) (quoting *Cent. Hudson*, 447 U.S. at 564). Even if we accept Plaintiffs' contention that the Ordinance regulates commercial speech, it is not an impermissible regulation of that speech.

The partial dissent faults us for conflating the two tests for commercial speech. Partial Dissent at 33–34. Specifically, it observes that the threshold inquiry of whether the purported speech relates to unlawful activity is an element of the *Central Hudson* test for regulation of commercial speech, not the *Zauderer* test for compulsion of commercial speech. Partial Dissent at 33–34. The threshold inquiry is indeed an element of *Central Hudson*, and we do not purport to import it into *Zauderer*. Rather, in considering Plaintiffs' assertion that *Central Hudson* applies, we conclude that their argument falters at *Central Hudson*'s doorstep. This matters because we have already observed that *Zauderer* sets forth a "more permissive standard" than

that articulated in *Central Hudson*. *See Pharm. Rsch. & Mfrs. of Am.*, 153 F.4th at 808; *see also id.* at 810–11 (explaining that, if a "law[] that compel[s] certain information to be communicated directly from one private entity to another" regulates commercial speech, "courts apply either intermediate scrutiny," pursuant to *Central Hudson*, "or a lower level of scrutiny akin to rational basis review," pursuant to *Zauderer*). Plaintiffs fail to show that the Ordinance violates the First Amendment even under the more rigorous test in *Central Hudson*; *a fortiori*, the Ordinance passes the more permissive standard in *Zauderer*.

Plaintiffs have not demonstrated that the Ordinance violates the First Amendment.

## III. Vagueness claim

A municipal ordinance violates the Fourteenth Amendment if it either fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited" or is so standardless that it may be applied in an arbitrary or discriminatory manner. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)).

Plaintiffs argue that the Ordinance's deactivation standard provision in subsection 8.40.050.A.2 is void for two reasons. First, the word "reasonable" does not supply adequate guidance to follow the law. Second, the examples of what is *not* reasonably related to safety and efficiency are so contradictory as to be more confusing than clarifying. We are unpersuaded by both arguments.

The term "reasonable" is a well-established standard that is widely employed in both statutory and common law. As

the district court pointed out, Plaintiffs must satisfy a reasonableness inquiry to succeed on their vagueness claim. Additionally, the Ordinance's text supplements the term by delineating between what is and is not a permissible reason to deactivate an account. *See First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1274 (9th Cir. 2017) ("[I]mprecise terms may avoid vagueness problems when used in combination with terms that provide sufficient clarity." (quoting *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1021 (9th Cir. 2010))). For example, the bar on deactivations based on customer ratings is limited by the word "solely." Ordinance § 8.40.050.A.2.e. ("Any policy that would result in a deactivation based *solely* on a quantitative metric derived from aggregate customer ratings of an app-based worker's performance[.]" (emphasis added)).

Seattle passed the Ordinance out of its concern that companies like Uber and Instacart relied on algorithms to deactivate accounts automatically. Its concern was magnified by the City's belief that customer ratings are "highly likely" to be influenced by bias against workers of certain races and ethnicities. *Id.* § 1.L. For those reasons, the Ordinance dictates that an account deactivation may not be based "solely" on customer ratings. *Id.* § 8.40.050.A.2.e. Deactivation based on more than that—for instance, including review of comments that accompany customer ratings—is not prohibited.

Plaintiffs may be right that a person of ordinary intelligence could "*reasonably* think [that quantitative metrics] relate to safety and efficiency," but that same person could also understand, once the concern for discrimination was identified, that deactivation based *solely* on customer ratings is unreasonable. We also note that the services covered by the Ordinance and at issue here are delivery

services, not ridesharing. An Uber rideshare passenger has an obvious basis to evaluate the safety of a ride; the recipient of a delivery by Uber Eats does not. Because of this distinction, Seattle may have thought it wise to designate customer ratings as a less reliable indicator to assess safety and efficiency in the context of delivery services. Regardless of the policy considerations the City took into account when enacting the Ordinance, in the context of a vagueness challenge, what matters is not whether a person of ordinary intelligence would *agree* with the content of or motivations for a law, but rather whether they would *understand* its dictates. Here, given the clarity afforded to the word "reasonable" when that word is read within the context of neighboring text and provisions in the Ordinance, we conclude that they would.

Plaintiffs' argument that the other examples are more confusing than clarifying fare no better. There are multiple throughlines of policies in the list of examples. One of them is safety. The bar on deactivations based on background checks creates a carveout for reports that raise evidence of "egregious misconduct," *id.* § 8.40.050.A.2.h, or any "action or behavior" that involves physical, economic, or emotional harm, *id.* § 8.40.020. So, too, with the bar on deactivations related to driving records: the Ordinance contains a carveout for unsafe behavior, *id.* § 8.40.050.A.2.h, as defined by more than three "moving violations or at-fault collisions" in less than three years, *id.* § 8.40.020. These limitations help to make clear what is and is not permitted under the law.

The Ordinance provides fair notice to a person of ordinary intelligence as to what grounds for deactivation are reasonably related to safety and efficiency. Plaintiffs may disagree with standards imposed by the Ordinance or may wish for more unfettered discretion in terminating a worker

or deactivating an account, but that does not make the regulation vague.

## IV. Conclusion

The Supreme Court has said, "[P]laintiff[s] seeking a preliminary injunction must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The first factor is "the most important." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quoting *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020)). If a movant cannot show a likelihood of success on the merits, then a court "need not consider the other factors." *Id*. (quoting *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017)).

Assuming, without deciding, that the Ordinance regulates speech, it is commercial speech, and the Ordinance overcomes the appropriate level of scrutiny under the First Amendment. Plaintiffs also fail to show that the law is unconstitutionally vague. Because Plaintiffs are unlikely to succeed on the merits of their claim, the district court did not abuse its discretion when it denied the preliminary injunction.

By affirming the authority of Seattle to enact and enforce the Ordinance, we do not express a view on the merits of the policy. Seattle has decided to enact the Ordinance, and the policy judgments reflected in the Ordinance are the City's. Plaintiffs are not required to agree with this or any other regulation but remain subject to them.

**AFFIRMED.**

## APPENDIX

### Seattle, Wash., Ordinance 126878, § 8.40.050 (Aug. 14, 2023)[5]

8.40.050 Deactivation requirements

A. A network company shall adopt the following measures prior to deactivating an app-based worker, except as provided in subsections 8.40.050.C and 8.40.050.D:

1. Fair notice of deactivation policy. A network company must inform the app-based worker in writing of the network company's deactivation policy, defining what constitutes a violation that may result in deactivation. The network company's written deactivation policy must be specific enough for an app-based worker to understand what constitutes a violation and how to avoid violating the policy. The deactivation policy must be available to the app-based worker in English and any language that the network company knows or has reason to know is the primary language of the app-based worker. The deactivation policy must be accessible to the app-based worker at least three years after deactivation. The Director may issue rules governing the form and description of the deactivation policy, the manner of its distribution, and required languages for its translation.

2. Reasonable policy. The policy that may lead to a deactivation must be reasonably related to the network

[5] *Ordinance 126878*, Off. of the City Clerk, https://clerk.seattle.gov/search/ordinances/126878 (last visited Oct. 29, 2025) [https://perma.cc/E24S-UCNQ].

company's safe and efficient operations. Examples of policies that are not reasonably related to the network company's safe and efficient operations include, but are not limited to:

a. Any rule or policy that would result in a deactivation based on an app-based worker's availability to work or number of hours worked, consistent with subsection 8.37.080.A.1;

b. Any policy that would result in a deactivation based on an app-based worker's acceptance or rejection of any individual offer, any types of offers, or any number or proportion of offers, consistent with subsection 8.37.080.A.2;

c. Any policy that would result in a deactivation based on an app-based worker's cancellation of an offer with cause, consistent with subsection 8.37.080.C;

d. Any policy that would result in a deactivation based on an app-based worker contacting the network company;

e. Any policy that would result in a deactivation based solely on a quantitative metric derived from aggregate customer ratings of an app-based worker's performance;

f. Any policy that would result in a deactivation based on statements by an app-based worker regarding compensation and/or working conditions

made to customers, other app-based workers, network companies, the media, public officials, and/or the public;

g. Any policy that would result in a deactivation based on an app-based worker asserting their legal rights, whether in court or via procedures provided by any local, state, or federal agency; and

h. Any policy that would deactivate a worker based on the results of a background check, consumer report, driver record, or record of traffic infractions, except in cases of egregious misconduct or where required by other applicable law.

3. Investigation. A network company must conduct a fair and objective investigation prior to deactivating an app-based worker. The investigation must be sufficiently thorough to justify the deactivation and demonstrate an unbiased and neutral view of facts collected. If the app-based worker does not participate in the investigation or provide relevant information, the network company may complete the investigation based on available sources of information.

4. Confirmation of violation. The network company must demonstrate by a preponderance of the evidence that the alleged violation of the network company's policy or rule occurred.

5. Consistent application. The network company must apply the rule or policy, and penalty for violations, in a consistent manner.

6. Proportionate penalty. The penalty of deactivation must be reasonably related to the offense, and account for mitigating circumstances, such as the app-based worker's past work history with the network company.

B. Deactivation of an app-based worker will be considered unwarranted if the action is intended to or results in discrimination or a discriminatory act.

C. Subject to the provisions of this Section 8.40.050 and rules issued by the Director, a network company may immediately deactivate an app-based worker if such action is required to comply with any applicable court order or local, state, or federal laws or regulations, or where an app-based worker has engaged in egregious misconduct.

D. In the case of allegations of egregious misconduct, the network company may deactivate the app-based worker before completing an investigation. Except in extraordinary circumstances, the investigation shall not take longer than 14 days. If the investigation is delayed due to extraordinary circumstances, the network company must provide the app-based worker with written notice that the investigation is delayed, the reason(s) for the delay, and the date on which the completion of the investigation is anticipated.

BENNETT, Circuit Judge, dissenting in part:

I agree with the Majority that the Ordinance is not unconstitutionally vague. I disagree, however, with the majority's decision to "[a]ssum[e] without deciding[] that the Ordinance regulates speech," Maj. Op. at 12, because the Ordinance *does* compel speech and is thus subject to the First Amendment. As for the majority's alternative reasoning that the speech at issue is commercial speech and "overcomes the appropriate level of scrutiny," *id.* at 22, I am unpersuaded and believe Plaintiffs have at least raised serious questions going to the merits. Here, the district court found that the Ordinance had no First Amendment implications,[1] and I believe that to be error. I would therefore vacate and remand to have the district court redo its analysis on the merits and reexamine the *Winter* factors in light of a determination that the Ordinance *is* subject to intermediate scrutiny, and in light of the current facts.[2] Thus, I respectfully dissent, in part.

*i. The Ordinance compels speech.*

While the Ordinance does regulate conduct by prohibiting unwarranted deactivations, Ordinance § 8.40.060.A.1, it also compels speech, triggering First Amendment scrutiny. The Ordinance requires Plaintiffs to draft and provide workers a written "deactivation policy, defining what constitutes a violation that may result in

---

[1] "The starting point of the Court's analysis is whether the Ordinance presents a restriction on speech. The Court finds that the Ordinance does not, and that the First Amendment claim is unlikely to succeed on the merits."

[2] Because the district court found that the Ordinance had no First Amendment implications, its analysis of the other *Winter* factors was cursory.

deactivation," *id.* § 8.40.050.A.1, and which "must be reasonably related to the network company's safe and efficient operations," *id.* § 8.40.050.A.2. Based on these requirements, I would find that Sections 8.40.050.A.1–2 of the Ordinance compel speech for four reasons.

First, and most importantly, the drafting and publication of such a policy is speech. In a recent case, we specifically noted that the publication of "existing [terms of service] and content moderation policies may be commercial speech," *X Corp. v. Bonta*, 116 F.4th 888, 901 (9th Cir. 2024), if not pure compelled speech subject to even more rigorous scrutiny. *See id.* at 901–03. And the Supreme Court has held that "the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 570 (2011). Indeed, "[i]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category . . . ." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (alteration in original) (quoting *Bartnicki v. Vopper*, 200 F.3d 109, 120 (3d Cir. 1999)). Because it is "well-established that the forced disclosure of information, even purely commercial information, triggers First Amendment scrutiny," *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1117 (9th Cir. 2024), the Ordinance's deactivation policy requirement compels speech subject to the First Amendment.

Second, the Ordinance's compulsion of speech is *not* incidental to its prohibition on unwarranted deactivations. The prohibition on unwarranted deactivations and the requirement to promulgate a deactivation policy of a certain kind are distinct and separately enforceable. *See* Ordinance § 8.40.140 ("The failure of any respondent to comply with any requirement imposed on the respondent under this

Chapter 8.40 is a violation."); *id.* § 8.40.170.E (empowering the Director of the Office of Labor Standards to "assess fines for a violation of this Chapter" including under Section 8.40.050). In fact, while the Office of Labor Standards has been empowered since January 1, 2025, to "administer and enforce" the deactivation policy requirement, the Office is *prohibited* from enforcing the prohibition on unwarranted deactivations until June 1, 2027. *Id.* §§ 8.40.130.A, B. Thus, for the thirty-eight months following enactment, including now, the Ordinance empowers the Office to assess fines only for violations of the speech regulation, and not for violations of the conduct regulation. And we have held that we cannot "ignore that the [challenged] requirement compels speech simply because other parts of the [challenged law] may primarily or exclusively regulate non-expressive conduct." *NetChoice*, 113 F.4th at 1117.[3] That is because the government "cannot insulate a specific provision of law from a facial challenge under the First Amendment by bundling it with other, separate provisions that do not implicate the First Amendment." *Id.*

Third, any argument that the speech regulation is incidental to the conduct regulation based on the Ordinance's "purpose" of preventing unwarranted deactivations applies the wrong test. We consider a law's "stated purpose" when determining whether the *conduct* that the law regulates is sufficiently expressive to fall within the

---

[3] Seattle argues that *NetChoice* is distinguishable on this point because, in that case, we found the regulation was subject to the First Amendment because the regulated speech was "disconnected from any economic transaction." 113 F.4th at 1119. But Seattle misreads *NetChoice*. The absence of a connection to an economic transaction is the reason we applied *strict scrutiny* in *NetChoice*—it is not the reason we found the statute to regulate speech. *Id.* at 1119–21.

purview of the First Amendment. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019) (quoting *Sorrell*, 564 U.S. at 565). That test is inapplicable here because the Ordinance's speech regulation is *separate* from its conduct regulation, and we can consider the statutory purpose only if the law regulates conduct rather than speech.

Fourth, even if we considered the Ordinance's "stated purpose," it is ambiguous. According to the Ordinance's findings and declarations, the Ordinance "protects and promotes public health, safety, and welfare by establishing protections against unwarranted deactivations for app-based workers." Ordinance § 1.C. A casual reader might naturally assume from that language that the purpose of the Ordinance is to prevent unwarranted deactivations and not to compel speech. But the same section of the Ordinance also reflects a purpose to compel Plaintiffs' publication of deactivation policies, separate from the prevention of any deactivation decisions. *See id.* § 1.H ("App-based workers often do not have the information they need to know about how they will be evaluated."). At least one purpose of the Ordinance is, therefore, to compel Plaintiffs to share information about how app-based workers will be evaluated. Because disclosure of such information is speech subject to First Amendment scrutiny, *see Sorrell*, 564 U.S. at 570; *NetChoice*, 113 F.4th at 117; *X Corp.*, 116 F.4th at 901, the Ordinance's stated purpose was, in part, to compel speech.[4]

[4] To be clear, the Ordinance aims not only at decreasing unwarranted deactivations, but also at increasing transparency. I do not misconstrue the Ordinance by noting that it compels speech, Ordinance §§ 8.40.050.A.1–2, based on separate policy findings, *id.* § 1.H, and that

Because the Ordinance compels speech, I therefore disagree with the majority's conclusion to only "[a]ssum[e] without deciding[] that the Ordinance regulates speech." Maj. Op. at 12.

*ii. Plaintiffs raise at least serious questions on the merits.*

I agree with the majority that 1) the speech at issue is commercial speech, and 2) the so-called *Zauderer* standard applies to the commercial speech compelled by the Ordinance. *See Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626 (1985); *see also* Maj. Op. at 12, 15. But I disagree with the majority's decision to conduct the *Zauderer* analysis in the first instance. Because the district court concluded that the Ordinance does not compel speech, it "had no occasion to conduct a further inquiry into whether [the Ordinance], as a speech regulation, survived First Amendment scrutiny." *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 48 (2017). We should therefore remand for the district court to consider, in the first instance, "whether the law can be upheld as a valid disclosure requirement under *Zauderer*." *Id.*

Moreover, unlike the majority, I believe that Plaintiffs *at least* raise a serious question on the merits as to whether the Ordinance satisfies the *Zauderer* standard. "Under *Zauderer* as we interpret it today, the government may compel truthful disclosure in commercial speech as long as the compelled disclosure is 'reasonably related' to a substantial governmental interest and involves 'purely factual and uncontroversial information' that relates to the service or

it establishes an enforcement regime separate from the regime regulating unwarranted terminations, *id.* §§ 8.40.140, 170.E.

product provided." *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 842 (9th Cir. 2019) (first quoting *Zauderer*, 471 U.S. at 651; then quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 768 (2018)).

The speech compelled here is not purely factual and uncontroversial information. The speech regulation requires more than a mere notice of rights—that is separately required by a distinct section of the Ordinance. *See* Ordinance § 8.40.100. The speech regulation instead requires Plaintiffs to formulate and publish their opinions on what behaviors or standards are reasonably related to safety or to efficiency. These are not purely factual determinations but are instead Plaintiffs' opinions. And they are likely to be controversial opinions. This is especially so because safety and efficiency are often in tension, and Plaintiffs' policies will have to balance these two values. Plaintiffs will likely also balance these two values against others, such as customer satisfaction, profitability, and administrability, because the Ordinance does not require that the policy be related *solely* to safety and efficiency. Any balance of these oft-competing values is likely to be controversial. Different stakeholders—including users, workers, employees, shareholders, and traffic authorities—are bound to have different perspectives on where the best balance lies. [5]

[5] I disagree with the majority that this material is purely factual and uncontroversial simply because "once a deactivation policy is issued, it will be 'literally true.'" Maj. Op. at 16–17. Yes, once the policy is published, there will be a "fact" as to what the policy says. But that is true of all speech. And there will remain, after publication, no "fact" as to the best balance of safety, efficiency, and other values, and no "fact" as to which internal regulations are "reasonably related" to these values. Nor, contrary to the majority's suggestion, could the injury to the companies' First Amendment rights be fully ameliorated by the

Because the Ordinance compels commercial speech that is not or at least may not be "purely factual and uncontroversial information," it potentially violates the First Amendment. *See CTIA*, 928 F.3d at 842.

The majority states that the speech regulation is nonetheless permissible because any challenge to it "must first satisfy a threshold inquiry that the communication be 'neither misleading nor related to unlawful activity.'" Maj. Op. at 18 (quoting *World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 684 (9th Cir. 2010)). The majority finds that the speech regulation "regulates at most speech related to . . . unlawful activity: the unwarranted deactivations of worker accounts," and thus fails this "threshold inquiry." *Id.* But the majority's threshold inquiry does not apply to challenges to compelled speech—it governs only challenges to restrictions on speech. *See World Wide Rush*, 606 F.3d at 684–85. And, in any case, the speech here is unrelated to (or not solely related to) unlawful activity.

The majority's "threshold inquiry" is taken from *World Wide Rush*, a case involving a challenge to a restriction on speech, not to a compulsion of speech. *Id.* at 680, 685. *World Wide Rush*, in turn, derived this test from *Metro Lights, L.L.C. v. City of Los Angeles*, which was also a speech restriction case. 551 F.3d 898 900, 903 (9th Cir. 2009). And *Metro Lights* identifies this "threshold matter" as an element of the *Central Hudson* test, not the *Zauderer* test. *See Metro Lights*, 551 F.3d at 903–04 (describing the

---

company's ability "to express its disagreement, even alongside the policy itself." *Id.* at 17. The Ordinance requires the companies to make and publish *their* judgment about what is "reasonably related." Ordinance §§ 8.40.050.A.1–2.

requirement that "the communication [be] neither misleading nor related to unlawful activity" as an "element[] of the *Central Hudson* test" (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 564–66 (1980))). Because, as even the majority acknowledges, Maj. Op. at 18, the *Central Hudson* test is not applicable to this case, Plaintiffs need not show that their speech is unrelated to unlawful activity.

This distinction matters because, even though *Zauderer*'s rational basis standard is "more permissive" than *Central Hudson*'s intermediate scrutiny standard, *see Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 153 F.4th 795, 808 (9th Cir. 2025), *petition for cert. filed*, No. 25-1018 (U.S. Feb. 24, 2026), "one size does not fit all in commercial speech cases," *CTIA*, 928 F.3d at 842. The two tests have different triggering conditions, *see id.*, and a regulation that survives *Central Hudson* review is therefore not guaranteed to survive *Zauderer* review.

In any event, the majority is wrong to conclude that the speech in this case *is* related to unlawful activity. The majority concludes that by requiring that deactivation policies be reasonably related to safe and efficient operations, the Ordinance simply regulates speech related to unlawful activity—namely, speech related to unwarranted deactivations. Maj. Op. at 18. I believe that this conclusion is both circular and incorrect. The Ordinance defines "unwarranted deactivation" as "a deactivation that does not comply with Section 8.40.050." Ordinance § 8.40.020. But Section 8.40.050 does not contain any freestanding limits on when deactivation is prohibited. In other words, it does not proscribe the firing of an app-worker for a reason unrelated to safe and efficient operations. Instead, it prohibits only certain forms of deactivation *policy* and describes when a

*policy* would fail to be reasonably related to safe and efficient operations. *Id.* §§ 8.40.050.A.1–2. It *then* prohibits companies from deactivating a worker without the results of an investigation finding that the worker violated the company's deactivation policy. *Id.* §§ 8.40.050.A.3.1–5. In other words, *it is not unlawful* to deactivate workers for reasons unrelated to safe and efficient operations. But it *is unlawful* to speak a policy that is unrelated to safe and efficient operations; and *it is unlawful* for a company to violate its own deactivation policy. Taken together, this is not a regulation of speech related to unlawful activity, but a direct regulation of speech itself.

I think it is far from clear that "the Ordinance overcomes the appropriate level of scrutiny under the First Amendment." Maj. Op. at 22. At the very least, I believe that Plaintiffs have raised serious questions going to the merits.

*iii. We should remand for the district court to reanalyze the Ordinance under intermediate scrutiny and to reexamine the other* Winter *factors.*

In addition to likelihood of success on the merits, a district court considering a motion for a preliminary injunction must consider whether the movant will likely suffer irreparable harm without the injunction, whether the balance of the equities favors the movant, and whether a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "It is well-established that the first factor is especially important when a plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). A determination a plaintiff alleging such an injury is likely to prevail on the merits "usually demonstrates he is suffering

irreparable harm" and "tips the public interest sharply in his favor." *Id.* "As a general matter, district courts '*must* consider' all four *Winter* factors." *Id.* (quoting *Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 577 (9th Cir. 2014)). But because the first factor is most important, if a movant fails to show likelihood of success on the merits, "the court need not consider the other factors in the absence of 'serious questions going to the merits.'" *Disney Enterps, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011)).

Plaintiffs have at least raised a serious question going to the merits. In my view, the district court must consider all four *Winter* factors, *see Baird*, 81 F.4th at 1040, and must also decide in the first instance whether the Ordinance survives *Zauderer* review. *Expressions Hair Design*, 581 U.S. at 48. Here, its review of the other three factors was cursory, dividing only four sentences between them. Further, the district court's analysis of these three factors was based on what I believe was its erroneous analysis of questions going to the merits. And after the district court's decision, Plaintiffs have issued deactivation policies in light of the Ordinance. The district court has had no opportunity to consider how the issuance of these policies, and Seattle's response or lack thereof, has affected the equities or the existence of irreparable harm.

Accordingly, I would remand for reconsideration of all four *Winter* factors. I therefore respectfully dissent, in part.